FILED

**The United States Bankruptcy Court**
**Eastern District of North Carolina**
**Raleigh Division**

JAN 3 1 2019

STEPHANIE J. BUTLER, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NC

Case number 18-03044-5 DMW

IN Ref:Timothy Omar Hankins Sr / Debtor
Pro Se

## AFFIRMATIVE DEFENCE / Response to Mr Brewer's Motion to Dismiss

NOW COMES DEBTOR  responding to Mr Brewers motion to dismiss, affirmative defence and offer applicable law seeking relief  and state the following:

1. Debtor file the petition in good faith  seeking Fed protection against the allegations and unlawful activity of Mrs Hankins and others previously named

2. Debtor has been a license General Contractor since 1995 living in a 5200 sq ft home

3. Debor  seeking to save my career, my company &  inherited property that the State Court via Michael J Denning is seeking to take. As testified in open Court Jan 24, 2018, my 83 yr old uncle who inherited that property still use it purchased by his father in 1962

4. All opposing  parties seem to imply that Debtor does not have the right afforded in title 42 USC 1981  and 1982  to live my life as a matter of right to all citizens of the U. S.

5. It's not enough that Debtor buy & inherited property, others still feel that it should be sold to benefit their families and move to do so with help from the State of NC lawyers.

6. On or about October 2018 the Court appointed a Trustee, Nicholas Brown  to investigate the allegations of fraud  concerning the Judgements from State Court and Creditor Hankins doing the marriage and Debtor argued the report was inaccurate & incomplete

7. Allegation of  fraud was clearly easily available in previous filings by Debtor

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

8.  Evidence intentionally excluded from the report can be examined in Debtor"s previously
    filed motions  including but not entirely limited to filing on Nov 8th,  Dec 18th, 2018

9.  Additional in the filing on Dec 18th include the certified Deed showing that Debtor's
    Grandfather purchased the property located at 60 Randolphville Rd in 1962 ( the most
    valuable piece of property in the ED Order) & is encumbered w/ a Lifetime Right

10. The Trustee's finding state he did not see anything fraudulent  concerning the
    unauthorized signatures by Jennifer Smith, one of the 4 signatures was copied from one
    Order to another was excluded from the report as Debtor argued that 01/ 24/ 2019.

11. Much of Mrs Hankins unlawful activity included but not entirely limited to a violation of
    title 18 USC 7206(1) ( filing a false report to the IRS ) was filed Dec 18, 2018

12. That filing alone show the unlawful activity of her attorney John M Oliver of title 18 USC
    7206(2) of subordinate / aiding and assisting   Mrs Hankins in her unlawful activity in
    flinig the false report to the IRS an din the local District Court proceedings  and perjury

## JUDICIAL ESTOPPEL  AFFIRMATIVE DEFENCE

1.  The State of North Carolina  via District Court Judge Michael Denning ("JD")  issued an
    many orders that are , included but not entirely limited to :

    (a) bias motivate  ( he called me the Devil in the Aug 2015 Hearing & repeatedly implied
    / stated that  Debtor was not telling the truth when evidence was presented later that
    supported Debtor's testimony )

    (b) corruptly motivated in that JD  knew from the attorney ( John M Oliver )  representing
    the opposing party/  movenant  Sardia Marie Hankins , ex wife, Creditor Hankins  ( "SH")
    that the LLC.s were never served prior to the Preliminary Injunction Order ( "PIJ" ) which

is the bases of the ORDER ENJOINING DISBURSEMENT ( "OED') issued 12/14/2017

(c) JD went on in violation of title 18 USC 1956-1957 move to award SH the $346k cash,

money obtained unlawful from criminally derived property ( title 18 USC 1956(a)(1)(a)(b)

(d) the 610 Martin St Deed clearly show  fraudulent activity that had taken place

( e) lawyers working in concert in violation of title 18 USC Chapter 96 (RACKETEERING)

in an effort to further their objective , JD knowing that Debtor was in his courtroom on

Dec 14th, 2017 as the OED stated, JD entered  the EDO about May 25th, 2018 and

removed the 14th from the record stating that we concluded Court on the 13th of Dec ,

(f) JD  gave no notice or reference to Debtors prior financial stability prior to the marriage

only to the extent that the homes were paid for as well did  as Mr Brown in his report.

(f-1) JD /  family Court staff , after paying lawyers $140k & fail to present a case to justify

taking of Debtor's $, depriving Debtor of Rights protected by the 4th, 5th , & 14th

Constitutional Amendment did  summonsed Debtor to court moved the hearing based on

how debtor conducted business & conducted the hearing himself did the hearing

representing Mrs Hankins against the LLC's and Debtor. JD ignored all the accounts and

money discovered by Debtor himself by subpoena in 2017, 2 1/2 yrs after this began

(g ) JD made no notice or reference to Omar Construction Inc which was established

about 1997 ( prior to the marriage)

(h) JD seemly blamed Debtor for Mrs Hankins unlawful activity and at the same time

make reference to Debtor's actions taken to prevent the unlaw sale , lost or

embezzlement of the equity out of the remaining  properties and property henceforth the

signing of the agreement as if I did something wrong trying to stop Mrs Hankins from

taking other properties that belong to (1) Debtor (2) Debtor;s community

(1) the reason for that ( my firm belief ) is to cover for the notary that wrote the false

statement stating that he witness me signing the Deed on the 14th when we were clearly in court on the 14th of Dec, 2017.

(2) tho there would have still been time to go to a closing ( had it really happened ) Debtor ask the court to recognize the steps taken to further their unlawful behavior

2.  JD & all other parties has made one thing perfectly clear  and Debtor agree with it, 1009 Fieldgrass Place , Debtor's house was purchased and paid for  prior to the marriage

3.  That means according to local State  Rule of law **NCGS 50-20 (b)(2)** that is separate money / property belonging solely to Debtor

4.  Attorney David R Shearon appraided the house at $550,,000 X 80% of that,  with signatures obtained under false pretense did get a 80% to value loan that paid out $466,500 on Debtor's  home about May 2005. My Hankins was complicit in that unlawful activity.  Mr Shearon wrote Mrs Hankins a check for $1750 in connection with that loan to imply that Debtor was aware of said loan, I WAS NOT AWARE OF THAT LOAN

5.  That $466,500 refinance loan was the third $400,000+ loan on my house by those two using the same said unlawful method

6.  If any Honorable Court was to consider the fact that Mrs Hankins already sold Debtor's second home ( 2624 Newberry Ln in Bolivia NC  ) ( inherited property) on Dec 29th, 2005 and received $70,000  doing the time in which she swore under the penalty of perjury ( violating  **NCGS 14-209 , title 18 USC 1621**) ( November 16, 2016 transcript about page 55 ) that she had no money while Debtor was in New Orleans ("NO") , the Court should consider Mrs Hankins behavior and unlawful activity.

7.  That home was replaced by Debtor's family and they held a lifetime right to 60 Randolphville RD  in Bolivia NC valued about $500,000, that to is separate property by definition of NCGS 50-20(b)(2) and title 42 USC 1982 ( right to inherit )

8. The Court should consider said local rule of law ( applicable law ) Consider Mrs Hankins behavior doing the marriage, Debtor's home and value purchased prior to , Omar Construction Inc established  1997  that was injured by Mrs Hankins and consider  the agreement signed between the parties signed about Sept 2007 ( title 42 USC 1981 (a) (b) and (c)  and title 42 USC 1982 , Mr Hankins  is not entitled to anything by way of law.

9. But everyone want to imply that Debtor is not entitled to his  money , my work , my career and the rights afforded  to all citizens in  both State and Federal Law

10. On or  June 2015 a summons  was issued and complaint was filed against Debtor not against the Omar Construction and Trucking LLC and Sardia Enterprises LLC ("LLC'S )

11.  JD was presented with a ex-parte motion file against Debtor ( not Debtor's companies )

12. A hearing was set and was heard before the Honorable Judge A Worley and heard on June 15th, 2015 , ( transcript provided )

13. The Order was entered 7 months after the hearing about 01/ 25 /16 from that hearing

14. That tactic alone allowed  Mrs Oliver and Mr Chad Axford , the lawyers doing the hearing, that time allowed them to change the Court works, the meaning of the hearing and caused an unlawful seizure of Debtor's company and money.

15. As Rev Dr Martin Luther King Jr  said " a threat to justice anywhere is a threat to justice everywhere " That unlawful act has worked from the time  to this 01/ 27/ 2019

16. This said act alone goes to show the America is still hindering  black men and families by one means or another under the Color of Law and the Color of Office offering no protection pursuant to the 14th Constitutional  Amendment. ( applicable Law)

17. At that time the LLC's still had not been served ( Ref: Nov 16, 2016 Hearing as the Court asked JO had he served the LLC's in which time he replied " No"  about page 5 and 6

18. Knowing that LLC's had not been properly served , JD went on to write the OED & the EDO based on the PIO that was heard 30 months earlier that included the LLC's

19. Doing the hearings Dec 2017, Debtor tried to explain to the court of the issue with the PIJ with evidence (the AOC Certified Transcript), JD made it clear , he did not care or wanted to hear it and let Debtor know he was taking the money from 610 sale. That is why Debtor did not complete the sale of 610 Martin St.

20. On or about April 2017, JD issued and GATEKEEPER ORDER ( "GKO")  preventing Debtor from filing any motions without an attorney knowing that the other attorney had been paid over $140,000 and had not done so much as a discovery or interrogatory on behalf of Debtor. JD take actions against Debtor but not against the attorneys knowing they were not doing their work as a paid lawyer ( reference the June 14th, 2016 hearing)

21. Knowing that other lawyers has taken so much and refuse to provide any legal assistance , unlawfully seizing over $300,000 in cash that was obtained under false pretense, JD own words of calling Debtor a Devil in Open Court  and the GATEKEEPER ORDER, JD intentionally Obstructed Debtor;s ability to Appeal his decision within the State of North Carolina . in doing so , Debtor feel that that is depriving Debtor Rights protected in the 5th Amendment ( DUE PROCESS OF LAW ) 42 USC 1981, 1982 & 1985 and 1986 ( Debtor's Civil Rights)  to meet his personal objective,

22. The seizure of the money on Dec 14th, 2017 & JD writing an Order giving the money to SH after she (a) stole so much money doing the marriage (b) signed a written agreement waive her rights to future division (c) taking the money from a LLC knowing that the LLC's was never properly served (d) and JD's Order are based on the Preliminary Injunction Order that included the LLC's only in the Order Debtor feel that JD is moving in violation of title 18 USC Chapter 95 sec 1956-1957 and Chapter 96 sec 1961-1962

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

23. Judge Denning intentionally ignored Mrs Hankins illegal activity doing the marriage, doing the court proceedings is an intentional act of depriving Debtor Rights Protected in the 14th Amendment and title 18 USC 241-242 ( the Color of Law / the Color of Office )

## ESTOPPEL , UNCLEAN HANDS , AFFIRMATIVE DEFENCE, CREDITOR HANKINS

1. Mrs Hankins claim should be discharged pursuant to Estopped pursuant to the agreement signed about September , 2007

2. Mrs Hankins claim should should be discharged because the agreement  comports with NCGS 50-20(d) and 52-10

3. The agreement , SH " **expressly waived her rights and release any and all rights, whether now in existance or hereafter acquired, to State Courts and any Jurisdiction for distribution or division of all real property that wife may have an interest therein "**

4. SH claim should be discharged pursuant to Chapter 7 USC 727(a)

5. Debtor pray that the Court take in consideration the behavior and previous testimony by SH  that lead to the EDO entered by JD on or about May 25th, 2018.

6. Debtor re-alleged that SH is in violation of the title 18 chapter 152 & 157 for coming into Bankruptcy Court with a Lawyer knowing the US Criminal Codes that she has violated for an extended period of time

7. That 5200 sq ft house was purchased to raise me children in giving them lots of space , they arrive in 2002, 2004 and 2006. The children are in high school preparing for college losing the chance to enjoy all the work Debtor did in the 80's & 90's as SH & DS  stole the equity out of the house causing the foreclosure on both homes, that hurt bad

8. It was Mrs Hankins own hands that (a) caused the foreclosure of both homes that were without mortgages when Debtor took possession of said homes  ( b) caused the close of many of debtor companies , Omar Construction INC an dHankins Construction Inc (c)

caused the financial instability that cause my license to become invalid and now she was to be paid because the house she abandoned was not livable ( her sworn testimony ) and when she left the house, I was sleeping in the crawl space of the house she was living in or sleeping on couches with friends because of her threats. NOW SHE WANT THE FEDERAL COURT TO PAY HER FOR HER CONTRIBUTION TO THE EXISTING FINANCING.,

9. The current finances are in largely in part because of the sweat equity from my family who worked to replace what she, David Shearon and my brother Wade Hankins stole

10. Mrs Hankins should be in prison or making restitution to Debtor but instead she is awaiting more money because she has the full force of NC behind her in violation of US and Local Law behind her due to the fact that I am a black man with money. ( the Color of Law/ the Color of Office title 18 USC 241-241)

11. Considering what Mrs Hankins did/ have been doing , her testimony and most recently threatening injury to the children and the false affidavit to the IRS , Mrs Hankins is now in violation of title 18 USC  **title 21 USC 848 Continuing Criminal Enterprise**

12. Four months prior to the marriage  Debtor had 4 house properties minimum:

| | | |
|---|---|---|
| 1009 fieldgrass Place, the main home | valued at | $550,000 |
| 2624 NewBerry Ln ( inherit traded ) | | $100,000, |
| 109 Gumdrop Path ( Company owned business) | | $175,000 |
| 3108 sweetgum Cr ( company, Omar Construction Inc ) | | $125,000 |

<u>Today current status</u>

| | |
|---|---|
| 4729 G St | $225,000 |
| 60 Randolphville Rd ( inherited / encumbered | $500,000 |
| 610 Martin ( remolded by co after divorce ) | $222,000 current value $346k |

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

2608 under construction            80% completed          $100,000

10. The point is , doing the marriage , there was no increase to value due to SH illegal activity , The increase in value comes by way of inheritance and sweat equity from Debtors family.


## ESTOPPEL , UNCLEAN HANDS ,AFFIRMATIVE DEFENCE ,

1. Debtor is asking for a minimum of 2 hours at the Court convenience

2. Debtor intend on showing that most if not all claims came are from the poison tree and should be denied

3. Debtor knows the Court has it's own discretion

4. Debtor has never had a house payment or personal monthly payment , Debtor should not have to start at the age of 52 due to unlawful activity by SH

5. Allowing Mrs Hankins and Mr Brewer to continue is Cruel and unusual punishment, she stole both my homes and working to get 1 more home ( inherited ) and $346,000

6. The document in Mr Brown's report # 21 , Mrs Hankins Bank statement clearly show she was embezzling  large amounts of money  ( title 18 USC 1341 )  and the proceed from the very last house sold , 4600 G St, she deposit the $138,000 and immediately withdrew the money in cash

   (a) Mrs Hankins testified in the August 2015 hearing and lead the court to believe that when Debtor was in New Orleans , she had no money in violation  State Law NCGS 14-209 Perjury title 18 usc 1621 and 1962 by John M Oliver for procuring her to perjury.

   (b) Mrs Hankins was questioned by Debtor in the 11/16 2016 hearing and falsely testified that she only had gas money and enough money to by little food in violation of title 18 USC 1341( fraud & swindles )  title 18 USC 7201 ( attempt to evade and defeat taxes ) title 21 USC 848 (continuing criminal  enterprises)  title 18 USC 1961 ( treats & extortion)

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

title 18 USC 1956-1957 ( money laundering) title 18 USC 1343 (fraud by wire ) State law NCGS 14-100 ( obtaining property by false pretense)

(1) as the banking Statement filed in Mr Browns report, she deposited $156,000 in that account and withdrew it out in cash

,(c) upon examination JD asked SH about removing $90,000 in cash in one week

(D) SH  wired off large amounts of money, one being $20,000 and has not had to answer as to where she wired that much money.

(e) SH submitted a sworn affidavit to the State District Court stating that she changed my company name and caused my company to profit 7 straight

(d) doing the same time of the document Mr Brown included in his report # 21, Mrs Hankins sold my coastal home receiving another $70,000

7.  Doing the same time, 2 other house sold for about $400,000 and that money went missing as she was depositing money into an account that  (a) I did not have signature authority on (b) an account that I did not know she had (c) she later moved to blocked me from using that account  doing the very time I was trying to rebuild 610 Martin St

8.  Mrs Hankins got most of what she did by embezzling and threats of harm to the children

9.   Lawyer engaging in unlawful activity  get upset when Debtor tell anyone/ the courts what they are doing when i'm just trying to save myself from financial ruin a 2nd time.

10. JD wrote his Order Dec 2017 awarding Mrs Hankins inherited property and money obtained by false pretense from 610 Martin St and ignored the fact that Mrs Hankins was injuring the children depriving the children Rights pursuant to the 14th Amendment. JD made reference to the pattern of behavior of the kids being sick in her custody. ,

11. Mrs Hankins and Attorney David R Shearon "(DS") has already received the equity out 610 once as the elected not to pay the seller's loan in 2003.( Ref the letter from James R

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

R Levinson) I would guess now, Mr Levinson has a different opinion now that the equity

was stolen for the second time with him facilitating the unlawful activity Ref the Deed

work date about Dac 15th, 2017)

12. On average , in construction Debtor only clear about 10 to 15 % of the net proceeds of a
construction project. That mean that if I build a $200k house , I only make about $20k to
$30K considering that I am only doing the paperwork, that is good money.

13. With JD calling Debtor the Devil, the lawyers aiding SH , they all want to imply that all
funds generated in my company is net profit and divisible ( the Color of Law ) it's wrong
for them to intentionally mislead SH and aid her in her unlawful activity

14. If I am doing 2 house that take 6 months to complete, I make about $60k working about
20 hours a week twice a year , Mrs Hankins stole the building capital money with is
outlined in Mr Brown's #21 document . That closed the new construction portion of my
company and the trucking firm ( I was hiring many trucks ) in 2006, just 42 months after
arriving in the US.

15. Lawyers are alway redefining how my company operate, for example most
sub-contractors work on a honor system , meaning they will work on my promise to pay
them when the job is done, we don't do contracts, in many cases we never see each
other at all, we make an oral agreement as to the work to be done and when they will get
paid. My Hankins and these lawyers are always taking the subcontractors money
claiming it as profits leaving me with the liability to pay the subcontractors

16. A greater example of that is JD awarding SH $346,000 form 610 Martin st not
considering the subcontractors that had work to increase the value and prepare the
house for sale as late as the 1st week of Dec 2017.

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

17. SH did the very same thing March 27th, 2006 in the taking of the proceeds from 4600 G St  outlined in that very statement Mr Brown entered into his report 01/24/2018

18. With that, I can no longer work in my field so the court should understand why I am seeking some kind of Fed protection/ Fed resolution in hope that I may go back to work, put other back to work and not live in fear of others

19. Debtor has all but abandoned the idea that my children will attend college with a son in the 11 grade, a daughter in the 9th grade and a child in the 6th grade.They have now abandoned much of their extracurricular activity, educational enrichment due to SH

20. Debtor was license by the State since 1995 and my license is now invalid because I can not should financial stability which is a requirement to renew contractor's license .

21. My license has been invalid since Dec 2016.

22. James R levinson does not have clean hands in this matter, He accepted that deed work knowing that the signature was obtained under false pretense  in violation of title 42 USC 1986, (fail to prevent) ignoring his sworn professional responsibility ,

23. Mr Levinson had been involved in 610 Martin Street for years , even before the separation of Debtor & SH. trying to clear up the activity where they ( DS & SH ) decided not to pay off the seller's loan

24. According the US Law , that is a punishable offence by James R Levinson partner of Chad E Axford , they attorney that did the PIJ and the hearings with allied properties.

25. Debtor swore in open Court that Mr Axford ,  Mr Levinson's law partner had the hearing with Allied Property without Debtor's knowledge or permission doing the time of  the injunction Hearing / divorce proceeding was taken place

26. Mr Axford did them both and unlawfully help the other lawyers receive Judgements against Debtor while getting paid from Debtor. ( the Color of Law and the Color of Office)

27. Debtor's only crime ( Doctrine ) in all this is being a black with money and Debtor has paid his debt to the system for that crime in 2007 with the lost of my homes

28. Debtor firmly believe that having to pay again for that crime would be like Double Jeopardy, Rights afforded in the 5th ( Double Jeopardy and equal rights under the law ) and the 8th ( Cruel and unusual punishment) United States Constitutional Amendment

29. Debor is seeking some kind of official Judicial actions to prevent this & future unlawful activity by lawyers and Mrs Hankins , without it, they will do this again.

30. Mr Brewer handed the court Deed work for the martin St Closing, false documents

31. **Ref: the attachment** for other unlawful activity by SH ( later years of the marriage) & what everyone is trying to cover up to get more $$. She ruled by way of threats and moved on those threats against the children & now they want me to pay her more $$

**Wherefore Debtor respectfully pray upon the Court for the following:**

1. Relief pursuant to the current pleading and previous filed pleading , relief for the violation to title 18 Chapter 9 USC 152(8)by Mr Brewer , there should be some fines and for the violation of title 18 USC 152(4) against Mr Hankins for doing the same thru an attorney

2. Enter an Order pursuant to Rule 9014-1(G) for discharge or Schedule a hearing granting Debtor time to offer a defence to each claim.

3. Discharge of Debt where appropriate pursuant to Chapter 7 title 11 USC 727(a) , estoppel pursuant to State law concerning the agreement between the parties

4. To consider Debtors rights afforded in the 4th, 5th 14th Constitutional Amendment

5. Whatever the Court deem fit and proper.

_Timothy Omar Hankins Sr_ _____ this the _____ day of January, 2019
Timothy Omar Hankins SR

AFFIRMATIVE DEFENCE / respond to MR Brewer to Dismissed , plea for Discharge

FILED

JAN 3 1 2019

STEPHANIE J. BUTLER, CLERK
US. BANKRUPTCY COURT
EASTERN DISTRICT OF NC

The United States Bankruptcy Court
Eastern District of North Carolina
Raleigh Division

Case number 18-03044-5 DMW

IN Ref:Timothy Omar Hankins Sr / Debtor
Pro Se

#### NOTICE OF MOTION AND CERTIFICATE OF SERVICE

Please take notice that Debtor hereby give notice that  the Motion , AFFIRMATIVE DEFENCE, RESPONSE TO MR BREWER MOTION AND MOTION TO DISCHARGE has been filed with the clerk's office

Debtor is asking the all interested parties to file with the court a response to the attached motion on or before the schedule court date and give Debtor time to respond to your response.

You must file a response pursuant to Local Rule 9013-1 and 9014-1 . Debtor is requesting a court ruling pursuant to local Rule 9014-1(G) for Relief requested in Debtor's Motion. You are required to file a response within 21 days from the date of this notice
**Mail a copy of your response to the trustee and Debtor**

Nicholas C Brown , Trustee    and          Timothy Omar Hankins Sr./ Debtor
PO Box 12347                                          4729 G St
Raleigh NC 27605                                     Garner NC 27529

If you request a hearing concerning my motion for relief , please issues a written request in  your response . If you do not respond , the court may rule at his discretion and grant the relief sought. Debtor's desire is to pay all credible claims , those without contentious and pray that the court discharge all non credible claims or claims that are based on unlawful activity . As the court dismissed a portion of Debtor's motion 01/24/2019 , that does not dismissed the attached evidence exhibits in all motions filed. Please respond to all but particular the last statement on the attached evidence

*Timothy O Hankins Sr.*
Timothy Omar Hankins Sr / Debtor          This the 28th day of January, 2019

---

The United States Bankruptcy Court
Eastern District of North Carolina
Raleigh Division

Case number 18-03044-5 DMW

IN Ref:Timothy Omar Hankins Sr / Debtor
Pro Se

#### CERTIFICATE OF SERVICE

I , Timothy Omar Hankins Sr, Debtor in the forging matter hereby certify that I have filed this motion and served it to the Trustee Nicholas C Brown and the Bankruptcy Administrator Brian Behr . I have as well mailed it to Mr William Brewer , attorney for creditor Sardia  Hankins  by depositing it in the care of the United States Post Office address to

Nicholas C Brown Hand                       delivered to his Office

Brain Behr , Bankruptcy Administrator       delivered to his Office

And mailed to Mr William Brewer, Jr
311, E Edenton St
Raleigh NC 27601

I declare under the penalty of perjury to the statement herein to be true and correct to the best of my knowledge .

*Timothy O Hankins Sr.*    this the 28th Day of January, 2018
Timothy Omar Hankins Sr.

---

The United States Bankruptcy Court
Eastern District of North Carolina
Raleigh Division

Case number 18-03044-5 DMW

IN Ref:Timothy Omar Hankins Sr / Debtor
Pro Se

#### Affirmative Affidavit

addition unlawful activity by Mrs Hankins aided by lawyers  in violation of including but not entirely limited to title 18 USC 1961( Racketeering) , 1343, 1708 (stolen mail)  title 21 USC 848 (continuing Criminal Enterprise)

Mrs Hankins comes to the US and started working with lawyer embezzling money out of my company and family. Just as Judge Michael J Denning did by calling me the Devil, so did they teach her the social injustice and Judicial injustice  plaguing African American Men in this country. Lawyer helped Mrs Hankins ( 1) steal $466,500 out of my main house, $70,000 out my coastal inherited property, close out my accounts , create new shell companies ( Sardia Hankins DBA Behavior Intervention Healthcare) (Sardia Hankins DBA  Hankins Construction and Associates) and  ( Sardia Enterprize LLC which the NCSOS rejected ) to divert money. After closing my business accounts, closing my companies  and barring me from her account, she had complete control over all the money . All that Mrs Hankins done , the work outside the house never changed , just the Banking accounts  and paperwork within the State of NC aided by attorneys. By the time that I learned what she and the lawyers had done, there was not much I could do but adjust to the situation until I could figure out what to do. As I explain in emotion, I only clear on average about 10 to 20% of the total payout for a job, the rest goes to the subcontractors that did the work. When Mrs Hankins and the lawyers took over, I had to

---

discontinue the work that I had been doing because she refuse to pay the works / subcontractors . The lawyers were helping her and she was helping the lawyers , a lethal combination for a black man and a Black company. Mrs Hankins first 4 years was embezzling . After 2006 , the threats started and continued until the business was not generating the money she was use to stealing. The lawyer just as Judge Denning did , made it clear that IN NC , she would never be charged with a crime for what she was doing to her children and Debtor. That continue to this 29th day of January, 2018, the filing of this motion and affirmative affidavit. Lawyers taught Mrs Hankins that I was the Devil and move to take everything that I have made doing my professional career. Considering that Judge Denning intended on leaving me with less that the value of the inherited property, they intend on taking it all.  To this day as explained in the motion, I have far less today than I did the day I got married and she got lawyer wanting that which I have even tho she expressly waived her right to any future division.

Debtor intend on showing the court addition unlawful activity and give reason why Mrs Hankins can get a Lawyer and Debtor can not. They have at this present time the $140,000 outlined in the ED Order as legal fees and the $346,000 from the proceeds from Martin St, That is $486,000. If and when a Judge and lawyers  is engaging in unlawful activity against a black owned company in NC, the aggrieved party can not get any representation to recover that which they have obtained control over. If I was to settle with them, I will be excusing all that Mrs Hankins has done , that I can not do. Debtor feel like I am being penalized for doing what is right by my children and for being a Black Man. If lawyers do not want me to talk about what they are doing, than they should  do the right thing and stop breaking the law, that will be a great start.

3

By 2010 Mrs Hankins and her friends had totally destroyed me name . While taking the money, my brother Wade Hankins taught her to spread rumors and lies about me, in that way when her issues came up , no one would believe me. It worked because no one knew I had the kind of money Mrs Hankins had stolen.  An example, at the age of 33, I had 100% equity in both my homes, both homes was about 6200 sq ft total so when the equity go missing, that meant nothing to no one. The only persons that knew that was me, than Mrs Hankins and that the lawyers. They got the equity and Mrs Hankins in the injunction Hearing heard June 15, 2015 made the argument that I did not pay back the money she stole. Debtor realize that trying to enter all Mrs Hankins Banking information would just muddy the water. I don't want to enter so much that my point get missed, so I chose to enter just the relevant documents or to better explain, I don't need to bring a cow to court to prove that I had beef for dinner. Mrs Hankins did a lot that 140 months she was in my life causing irreparable injury and harm. The 140 moths is from the day she got off the airplane to the day she abandoned the home. I use abandoned because I wasn't living with her when she left in June 2014. It is my firm belief that her leaving was just another stunt orchestrated by my brother Wade V Hankins to get more money out on Debtor. Wade paid Mrs Hankins money to hire lawyers and Judge Denning moved to take the inherited property and Wade down there in Bolivia thinking that he is about to own a $500,000 piece of property. Wade listed the property on the internet for rent just after Judge Denning wrote that Order. Debtor file a police Report for unauthorized rental posting. These Lawyers has made a lot of money engaging in unlawful activity helping Wade and Sandia Hankins steal. Judge Denning learned what they have been doing , how long it's been going on and decided to get in on the racket for his own personal financial gain and hey all get mad when I take steps to stop them. Things got so bad with everyone stealing money and the State deciding not to investigate, I had a gun pulled out in my face at my own house. I just had to adjust and survive

4

until. With that being said, if they get it , they get it but I assure you they can not get me to make any agreement with Mrs Hankins , the state made it clear, they offer no protection for me and my children , so I came to Federal Court seeking protection. After realizing in 2006 2007 that the State wa snot going to investigate , knowing that I could not do anything to her, I could not harm my children's mother no matter what she did, I just had to adjust. Mrs Hankins embezzled money from my company as late as 2014, the year she left the house. Money she embezzled in 2014 was presented in State Court as Debtors income and Mr John M Oliver was trying to get child support , alimony and PPS  based on money she stole, that is why she is not getting any. As they presented the income, they presented copies of checks that I knew that I did not receive. When I subpoenaed Mrs Hankins banking information in 2017, that is when I had discovered much of what she had done including 2014  income. Mrs Hankins got a $8300 insurance check out the mailbox , deposited in one of her many accounts and withdrew that money in cash. That was February 2014. I had to consider the children and what was best for them which is try to grant them the benefit of a two parent home.  Mrs Hankins movement and unlawful activity  has now prevented that with all lawyers supporting her with the same motive of getting more money or helping other lawyers keep the $498,000  they already have that is outlined in the Equitable Distribution Order. Black men are not free as defined in US Law, the Supreme Law of the land. The law says it's is unlawful to restrict a man's freedom and subject him to harsh labor without pay but it seem the same law will allow Black men to work and allow them to take / steal that which he has worked for including his homes and inherited property while engaging in unlaw activity

5

### ESTOPPEL pursuant to the Agreement between Mr and Mrs Hankins and lawyers unlawful activity and prior argument.

. An example of that: two lawyers working in concert take a black man to court requesting an injunction against his company, the court says no. The two lawyers wait seven months to present the Judge the Order for signature seizing the opportunity to change what the hearing was about, add defendants that was not part of the hearing and changing  the Judges words and findings ( ref the Transcript for June 15th 2015). The lawyer representing the aggrieved party ( Chad Everett Aixford )  at the same time was working with other lawyers to obtain another Order without his clients knowledge or permission. The two cases were held on June 15 and June 16 of 2015 causing irreparable harm to Debtor, Debtor's family and career. The  unlawful actions by Chad Everett Axford and John M Oliver caused an unlawful seizure of Debtor's companies ,  money, career and family. From the perspective a black man, these lawyers has taken hostage a Black community.  The Preliminary injunction Order was a malicious act done in violation of  Including but not entirely limited title 18 USC 241-242( the color of law and the Color of Office),  title 18 USC 1505-1509 , 1512( obstruction of Justice ),  title 18 USC 1961-1962 ( Racketeering) causing irreparable harm to Debtor community and now I am present  with offers for my freedom. Laws are written ( the 5th 14th Constitutional Amendment ) but they seem not to apply to Black  Men /  peopls. The wolf guarding the hen house. I , Timothy Omar Hankins Sr do hereby swear under the penalty of perjury to the statements to be true except those statement meant to be my firm belief and in those, I do believe them to be true .

_Timothy Omar Hankins Sr._ _____ this the 29th day of January , 2019
Timothy Omar Hankins Sr Debtor/ Pro Se

1

Summary to the Court & AFFIRMATIVE AFFIDAVIT / direct response to Mr William
Brewer's Motion on behalf of Mrs Sardia M Hankins, Creditor

TO THE HONORABLE COURT: If I allow them ( Mrs Hankins and Lawyers ) to do this for a
second time, what is going to stop them from doing this again. In 2008 I was talked into letting it
go ( the Lost of my homes, 1009 Fieldgrass Pl & 2624 Newberry Lane in Brunswick Co ) & my
2 companies ( Omar Construction Inc & Hankins Construction Inc ). At the time when Mrs
Hankins arrived here in 2002, I was preparing to semi- retire and raise my family while the
companies was running very well at the age of 33. I started back over at the age of 41 and now I
am presented with the idea of starting over at the age of 52 after being cut of work for two plus
years because I am deprived of the very laws that protect white citizens ( 42-USC 1981 & the
14th Amendment ). I just can not do that with fighting all that I have the right to pursuant to US
Law.  At the age of 52, I am presented with the idea of making payments on inherited property
purchased in 1962 by my grandfather and ignoring that fact that lawyers has and continue to
forge documents in and around the courts taking property from me and my family. Much of what
they are after is the sweat equity of my family where they move to replace what was previously
stolen and All State Court want to do is recognize the year the new property was obtained  while
ignoring was Mrs Hankins already stole, her unlawful activity and the law as they may apply.
Because of this , I have almost abandoned the fact that I do have Rights . I have almost
abandoned the future of my children but instead , I will continue to try to have the Federal
Government /  Laws grant me what which Congress wrote into law and granted to all  citizen of
the United States of America , equal rights under the law and full and equal benefit of the law
and  without denial , delay or favor (Article 1 section 18 of the NC Constitution).

Most is not all of the claims levied against the estate of the Debtor are directly based on
unlawful activity or indirectly because of unlawful activity. There is not one claim without
controversy. The claims against Debtor should be immediately DISCHARGED without delay so
Debtor can live his life like all citizens.

All or most of the people involved in this case matter has a college degree and many a
professional degree. I mention that because everyone knows exactly what is going on
concerning this particular case matter. We all know the history of this country and how Black
men have been treated, the perversion of the law and the taken of property using unlawful tactic

Direct response to Mr William Brewer's Motion to dismiss, response as requested

2

and expression( title 18 USC 241-242) and depriving me of my Rights protected by the
Constitution. This case has been converted to a chapter 7 because I refuse to enter into
agreements making payments to what I know was illegal activity in and around State Court
(estoppel ) without having the chance to go on record and defend my decision. I pray that the
court grant me the chance to defend myself  in this chapter 7 before any decision is made on
what claims are valid and what need to be paid.

Years ago , white citizens  can ride down the road and see a black man hanging from a tree and
just keep on going. Years ago white citizens could see black man chained and shackled and felt
no moral, legal  obligation to act. Today for some of us Black men, we get somewhat the same
treatment and just as history has shown , no one has an moral , legal , professional or
Constitutional obligation to act. We all have heard that Debtor once owned free and clear a 5200
sq ft home accompanied by a second inherited property that was also with any encumbrance
and both was stolen by unlawful activity and like history has shown, no one is bothered by the
fact that both homes were foreclosed on at the hands of Mrs Hankins and Attorney David R
Shearon. The crime of being a black man with money has not changed at all in this country over
the years for the Black Community . Black Families and more importantly the leader of the
communities . Black men. We have been labeled with the stigma that we black men are not
suppose to have what we have or as the State referred me as ( the Devil ) , when we are
subjected oppression as defined in title 18 USC 241-241, oppress, robbed, extorted, embezzled
and deprived of out property and money, no one is bothered.

From the perspective of a black man in response to MR Brewer's  request for my position on the
matter, I am a black man who married a woman from Jamaica who came here and lawyer aided
her in stealing, embezzle lots  of money from this black community and the next lawyer come
alone hiding what she did and work to take more violating both State and Federal Law.

I personally do not believe it all about the money. I firmly believe this is about like the Bill Cosby
drugging and raping females, THE THRILL OF THE HUNT, the thrill of taking out big game. Bill
Cosby did not have to rape anyone, he has the money, power and status to do what he wanted ,
get what he wanted without breaking the law but he chose to drug females like these lawyers go
after me, it's the thrill of the hunt that motivate them and these lawyers , the thrill of controlling a
million dollar black  man, taking him down ,  oppressing and robbing of community of people.

Direct response to Mr William Brewer's Motion to dismiss, response as requested

3

Lawyers find someone like my brother Wade Hankins and Sardia Hankins , the low level
persons in a community with not so much as an high school diploma and you lawyers empower
them by perversion of the law, breaking the law both State and Federal, you take great
measurement to keep them from prosecution of the law in their unlawful activity than oppress
the community out of more money. The community I speak of include but not entirely limited to
(a) the licensee, the debtor , the defendant Timothy Omar Hankins, the three children, my 83
year old Uncle ( holding the lifetime Right to 60 Randolphville Rd purchased in 1962 by my
grandfather his father ) my friends and workers and employees . Siad unlawful activity for has
had a adverse effect on this community for an extended period of time and has cause
irreparable harm and I take nothing away form the fact that much of the injury can never be
replace or fixed.

The estoppel defence, I pray that this court, District Court or the Circuit Court consider what I
have alleged as a violation of the automatic stay that occured in 2018. I hope they consider the
fact that other lawyers were paid in State Court offering no proper representation, I pray the
court consider the fact that th eState moved against the LLC's knowing after being told that the
LLC's had never been served. I Pray that the Courts consider that fact that Mrs Hankins waived
her Rights to any and all distribution in State and all jurisdiction. I pray that the Courts consider
title 11 USC 502(b) 1) . I pray  the Courts consider the State law concerning the contract
between she and I .  I also pray that the Court consider NSGS 52-2 and NCGS 52-5 concerning
applicable law concerning this case matter

As this country has a history of taken over other persons property, money and land, so are you
lawyers doing the same thing without proper cause and sound reason of the law while violating
both State and Federal Law under the color of Law Act.

The best way to continue to control the black community is to take out the head of the
community, destroy the pillows of the community, empower the wicked / the offenders of the
law, protect those within that community that has broken the law and is willing to work with you
lawyers and turn the community against itself. That is what you lawyers are doing. Mrs Hankins
has no legal grounds for any relief in any court pursuant to the (estoppel ) the Agreement .
Federal Law ( title 42 USC 1981 a, b, c & 1982 the right to inherit ) affords Debtor the right to a
contractual relationship.  the State of NC and lawyer operating in their capacity as officers of the

Direct response to Mr William Brewer's Motion to dismiss, response as requested

4

Courts  did deprived me of that Right as well as other Rights.They want to bypass, overlook or
otherwise obscure her behavior from the courts for your own personal financial gain.

Mr William Brewer the United States Federal Law says that I have the right to the same
privileges as White Citizens ( title 42 USC 1981) , I personally feel that you are violation the
State and Federal Law  in that you presented the Federal  Court that Deed about September ,
2018 when you know that is a false representation of the title work for the  closing for 610 E
Martin St Raleigh that purportedly happened on or about Dec 14, 16th 2017.  This is the type of
issues that cause the black community problems over the years, one lawyer engaging in
unlawful activity and other lawyers try to pass it off with the intent to defraud.  You and other
moving in Federal Court , intentionally delay things, I personally feel that much of your actions
mimic the actions of lawyers in and around State Court, subjecting Debtor to Oppression in
violation of title 18 USC 241-241 with the intent to defraud. You guys are lawyers, you know that
when I file Bankruptcy , you were not suppose to continue to hold that money even when it was
obtained under false pretense causing irreparable harm to  this  black community. I was thinking
you were going to bring the guy who notarized the Deed into court, based on what you said in
the deposition.

If your idea is to oppress me into a deal, hold out until I fold and pay Mrs Hankins with you all
knowing who she is and what she has done. Other lawyers and your client Mrs Hankins also
closed down my companies Omar Construction Inc and Hankins Construction Inc, both
established before the marriage .  She wrote and filed a sworn affidavit to that trying to taking
credit for my success and that lie worked then supported by other lawyers. Now the State
comes alone and want to say she was a homemaker knowing that she cause the foreclosure of
both my homes and the failure of both of my companies engaging in unlawful activity. All this
has  cause my license to become invalid now over two years , shut down construction company
again and on current projects  because of you guys ability to take my life hostage by way of
corruption within the law.

My position on this, being that your client has broken so many State and Federal Laws that has
been filed in filing as late as Dec 18, 2018, I  will just sit patiently until you are done, but I will not
offer her one dime, it do not matter how long I have to sit or the appeal process take. Even if
you get the stay removed, I will appeal that and move the Federal District Court for an injunction

Direct response to Mr William Brewer's Motion to dismiss, response as requested

5

pursuant to title 18 USC 1509 ( Injunction ) , for the violation title 18 USC 1505, 1956, 1957, 1961,1962. Its funny how America get upset if you starve or mistreat a dog but mistreating a black community, a black man and children is acceptable. All you know you are facilitating Mrs Hankins in her continuing criminal enterprise hoping that I pay you for my freedom  and the freedom of my children and family , I will not pay again as I did in up to 2014 when she left the house. I done gave up two homes and another million in an effort to provide these children with the benefit of a two parent home, you guys including Mrs Hankins has even destroyed that even as you want your love ones to have the same thing that I wanted for my children , I am not agreeing to paying any more ransom for what the United States Federal Government say is free to all US Citizens in said laws and pursuant to the United States Constitution. Robbery is robbery not matter what weapon you use , even corruption in the law. I am finished with being shaken down by white lawyers engaging in unlaw activity. In said Court they made great effort to have me falsely incarcerated, I expect you to do the same.

My Homes

1009 Fieldgrass place, my 5200 sq ft home. That property was purchased before I even met you client Mrs Hankins. The house was not encumbered with a mortgage until I decided to borrow money on it to fund a commercial project located at 411 Loop Rd . The intent was to use the money to build a commercial Garage. When it was done ( expected time of 18 months) I was going to finance the garage and pay the house back off. Your client and attorney David R Shearon had other plans taking the money that I had worked for in the late 80's and 90's to by that home. I purchased that home to raise my children in thinking about his time when they would be in high school. As a somewhat smart person in high school and anticipating my kids being smart , I had plans on setting up educational labs in that house and they would have room and space to set up other things they would need in their high school years  Including and a 800 sq ft  home gym that was on the 3rd floor of those home. Mrs Hankins having done no work in the purchase of that home , was not bothered to the fact that the house was foreclosed on because she with attorney David R Shearon was able to secure and take possession of $468,500 of the equity out of that home, That was money she did not work for nor earned . Mr Hankins in violation of including but not limited to title 18 USC Chapter 95 ( sec 1956-1957) Chapter 96 (sec 1961-1962) chapter 63 ( sec 1341( 1343) Chapter 47 ( sec 1028) title 26 Chapter 75( sec 7201) Chapter 13 title 21 ( sec 848) and NCGS 14-100 ( Obtaining property by false pretense over $100,000) and now you come alone and violate including but not limited to title 18 Chapter

Direct response to Mr William Brewer's Motion to dismiss, response as requested

7

be charged with a crime and move to cover up her unlawful activity, you are putting the lives of me and my children in serious danger.  Mrs Hankins has been assured that she will never be charged for her illegal activity, she has relayed that to her co conspirators / friends outside the Courts ,  even my brother Wade V Hankins. They to know that any crime against me, the one holding the communities money under my contractors license and business, no one will be held accountable for any offence the commit, they have no reason to stop their unlawful behavior.
You are not going to shovel the prior lawyers unlawful activity and lie down my throat in hope that I will give in and stop trying  Mr Brewer,  I hope the satisfy you on  my position on your motion as you requested.

I, Timothy Omar Hankins Sr hereby swear under the penalty of perjury to the statements herein to be true to the best of my knowledge except for those statement meant to be my firm belief and in those, I do believe them to be true to the best of my knowledge.

_Timothy Omar Hankins Sr._ _____ this the _____ day of January, 2018
Timothy Omar Hankins Sr

---

6

95 USC 1956 (3) (c) (facilitation), title 42 USC 1985 ( conspire against Rights ) title 18 USC 242-242 ( the Color of law ) title 18 Chapter 9 USC sec 152(1) & (6) title 11 USC 362(2) (3) & (6) , by holding money obtained under false promises before Mr Brown was appointed and  title 18 Chapter 9 USC 157(2) (3). Mrs Hankins enters here in the US in October 2002 to that house being paid for and within 5 years, we had to move out, because of her direct unlawful actions depriving me of my home and now your client and other lawyers want property that my grandfather purchased in 1962, purchased 5 years before I was born. You guys now want the property I was born on in 1967 some 10 years before your client was born. My honest opinion is that the Circuit Court will eventually review this very document.

Second home 2624 Newberry Ln , (inherited by trade )

Debtor own property located at 769 Galloway rd. That property was traded to get 2624 Newberry lane in Bolivia. Your client sold that house while I was sin New Orleans on Dec 29th , 2005 pocketing another $70,000  doing the time that she swore that she had no money ( Nov 16, 2016 Transcript about page 55 on). This took place when 3 other homes was sold and that money was missing. Banking records accented with Mrs Hankins sworn testimony show that Mrs Hankins deposited the proceeds into an account that I did not have signature authority on ( her testimony)  and admittedly in cash storing the money in her safe deposit box and wired the money off. To this 29th day of January, 2019 after seven lawyers has been paid more that $140,000 ( as outlined in the ED Order), your client has not had to answer to where she wired the money to. One of the wires was $20,000. Your client testified in open Court that she had a sister in Jamaica that worked at a bank. Debtor subpoena Mr Hankins records that show there was money moving back and forth between her and her sister in Jamaica. Mr Brewer , you and other lawyer has a legal responsibility, Constitutional Obligation, a professional responsibility according to us law and Rule 8.3 and 8.4 of the Rule set by the NC State Bar to report unlawful activity. You elected to ignore said Rules and Laws for your own personal financial gain and engage in illegal activity in doing so. I say again, America has attached a bad stigma to black men , you guys taught that to Mrs Hankins and you guys want to cash in on it. Evan Judge Denning as he referred to me as the Devil in open Court. There is no way to take that out of context ( August 4th Transcript , page 8 about the 1st quarter of that page) that Judge Denning move to ban me from courthouse ground to further his objective. ( JUDICIAL ESTOPPEL) Judge Denning act in such an egregious manor  in an effort to get money, cause other lawyer to Inger their professional responsibility, and you lawyers assure Mrs Hankins that she will never

Direct response to Mr William Brewer's Motion to dismiss, response as requested

---

**Additional attachment / Affidavit      case number 18-03044-5-DMW**
REF: creditor Sardia Marie Hankins

If no one is going to take in accounts the unlawful activity of Mrs Hankins, Attorney David R Shearon, Wade Hankins ( Debtor's brother) her friends and all partied are going to protect , defend support her , than all the other violations of both State and Federal Law is not going to matter. Mrs Hankins even tho she has broken the Law is as comfortable in Court as she is at home on her couch knowing that she has broken the law year after year . Debtor speak of issues concerning , including but not entirely limited to the following

1. Racketeering as defined in title 18 USC 1961-1962
2. Extortion
3. Embezzlement
4. Child abuse and neglect ( Threats and  intentional injury)
5. Felony conspiring
6. Taxes avaision
7. The false affidavit
8. Perjury
9. That fact that she testified ( Nov 16, 2016 ) that the house( 1009 Fieldgrass Ln )  was in both of our names when it was not
10. Coming into Federal Court on what she know was based on fraud via a lawyer
11. Moving to collect on a judgement outside of Bankruptcy Court in violation to title
12. The fact that evidence has been introduced with prior filed motion concerning Mrs Hankins prior unlawful behavior doing he marriage
13. Mrs Hankins unlawful behavior doing the proceedings in State Court
14. Mrs Hankins unlawful behavior here in Federal Court (Chapter 9 , sec 152(4) & 157(3)
15. The agreement between the parties which State Law NCGS 52-2 & 52-4, and Chapter 11 sec 502 (a) (1)

If we are not going to address and deal with Mrs Hankins unlawful activity, applicable law in both State and Federal Statute,  than there is nothing I can offer in my defence myself and receive relief other than that an an appeal.

_Timothy O Hankins Sr._ _____ this the 29 day of January, 2019

Direct response to Mr William Brewer's Motion to dismiss, response as requested

1

Exhibit list per Mrs Hankins motion via Mr William Brewer. Debtor see no need to file the same evidence and supporting documents twice. If Mr Brewer object to movement by Debtor so state his objection in writing and Debtor will print out said evidence and refile it. This notice will include any and all evidence previously filed rather mentioned herein.

### Exhibit List

1. Exhibit filed into record on June 15th, 2018
2. Exhibit filed into record on Jule 2, 2018
3. Exhibits file into record on October 04, 2018
4. Exhibits filed into record on November 02, 2018
   a- false affidavit to the IRS by Mrs Hankins
5. Exhibit filed into record on December 18,2108
   **Filed with this response on January 29th, 2019**
6. The agreement and appropriate law
7. The Preliminary Injunction Order
8. The Motion for Contempt by Mrs Hankins via Attorney John M Oliver
   after obstructing the Order in violation of title 18 USC 1505, 1509
9. The Summons to the LLC's issued 02/16/2017, 19 mos after injunction hearing
10. Renewal of the GATEKEEPER ORDER
11. ORDER TO ENJOINED OF PROCEEDS based on the Injunction Order
12. Civil Summons & Complaint issued to Debtor June 5th, 2015
    naming only Debtor, not the LLC's as the Defendant
13. ORDER, EQUITABLE DISTRIBUTION ORDER
14. ORDER, THE GATEKEEPER
15. Transcript for June 15th, 2015, the Preliminary Injunction
    NOTE: PAGE 35 on, the Judges oral Order
16. Affidavit on the August 04, 2015 Hearing
17. The AOC Certified transcript 1-287 pages

EXHIBIT LIST per Hankins Motion to Dismiss pursuant to Local Rule 9013-1 & 9014-1

18. The AOC Certified transcript closing remark,    note Judges
    words " you are going to be the DEVIL in detail" page 8 , top 1/4 of the page
19. The J 14th 2016 Transcript   Mrs Hankins Motion for contempt via John M Oliver
20. Transcript for the September 13th, 2016, Summary Judgement 1-45 pages
21. The AOC Certified Transcript Declaratory Judgement Hearing
22. Jennifer Smith , notice of unauthorized use of a signature
    in violation of title 18 USC 1028(a) -(1 ) (2) ( identification documents )
    **notation** : all the Documents Jennifer Smith filed Dec 2015 was fraudulently
    obtained coping and pasting signatures ( reasons for her firing ). It was not until
    Debtor review the files that I realized that one of the signatures was not included
    in the filing. The reason for that particular filing was because I, Debtor knew I had
    not signed any of the documents. Judge Denning in his effort to meet their
    objective , issued the GATEKEEPER ORDER , page 2 about #8 " Banned Debtor
    from Courthouse grounds with malice intent and the intent to defraud. Debtor is
    going to resubmit all the forged signature document and include my notice to the
    State Court. If these lawyers do not want Debtor to tell anyone of their unlawful
    behavior , they should consider not engaging in unlawful behavior.
    Please see attachment to EXHIBLE for Mrs Jennifer Smith Echols
    **This is the same tactics that took both my homes causing the foreclosure**
    **on 2624 Newberry Lane to foreclose about January 2007 and 1009**
    **Fieldgrass Place to foreclose about March 2008, LAWYERS**

I, Timothy Omar Hankins Sr do swear under the penalty that the statements
herein are true to the best of my knowledge except for those things that are
meant to be my firm belief and in those , I do believe they are true

_Timothy Omar Hankins_    this the 29th Day of January 2019
Timothy Omar Hankins Sr

EXHIBIT LIST per Hankins Motion to Dismiss pursuant to Local Rule 9013-1 & 9014-1



EX =

1. Motion
2. Affidavits
3. Exhibits

EXHIBIT #1



**EXHIBIT 6**

BK012738PG01372

§ 50-20 _____ or otherwise, of the statutes of ...
rights of equitable distribution.

In accordance with N.C.G.S. 50-20(d), the parties hereby acknowledge that the provisions herein for the partial and unequal distribution of marital property are equitable and are fair, reasonable and satisfactory to Husband and Wife. Wife for herself and her heirs, assigns, executors, and administrators, hereby expressly waives and releases any and all rights, whether now in existence or hereafter acquired, to apply to the courts of the State of North Carolina, or any other jurisdiction for distribution or division of all real property that the Wife may have an interest therein;

**STATE OF NORTH CAROLINA**

**COUNTY OF WAKE**

POSTNUPTIAL AGREEMENT

THIS POSTNUPTIAL AGREEMENT made and entered into this 23th day of August, 2007 by and between Timothy Omar Hankins, Sr., the party of the first part, a resident of Wake County, (hereinafter called "Husband") and Sardia Hankins, the party of the second part, a resident of Wake County, (hereinafter called "Wife").

**WITNESSETH**

THAT WHEREAS, the parties hereto were lawfully married to each other on or about 01-27-01 / ___

WHEREAS, there were three children born of the marriage, namely, Timothy Omar Hankins, III, Hillary Hankins, and Nyla Hankins;

WHEREAS, the parties wish to agree in this writing to the distribution of certain property matters and further agree that these provisions will bind them regardless of the success or failure of their marriage or the separation or reconciliation of the parties;

WHEREAS, Husband parties has independently consulted with his attorney and Wife has been advised of the right to do so and has waived this right concerning this Agreement, and both parties fully understand the terms, conditions and provisions of this agreement, believe and agree that same are just, fair, adequate and reasonable in all respects;

NOW, THEREFORE, for the good and valuable considerations hereinbefore recited, the benefits to be expected hereunder, the exchange of the property herein, and other good and valuable considerations, the parties do hereby stipulate and agree one with the other to the following property settlement pursuant to N.C.G.S. § 52-10 and § 50-20 (d).

**WITNESSETH**

1. Husband at the present time owns real properties located in the State of North Carolina and is doing extensively business in the State of North Carolina in his individual capacity and as a corporation; Husband also owns real property in his individual capacity and as the owner and operator of his businesses;

mailing

Timothy Omar Hankins
1317. W Garner Rd.
Garner NC 27529

---

*(handwritten notes):*

Page 2   Paragraph 3   of postnuptial
title 11 USC 502 (A)(1)
"Agreement" (NCGS 52-2)
Applicable Law
State & Federal "Estoppel"

---

BK012738PG01373

2. The parties own real properties jointly as husband and wife located in the State of North _____ Carolina; Husband agrees to allow Wife to continue to use the real property titled jointly in the parties name and to pay all indebtedness owed on the real property;

3. The parties agree that Husband shall be entitled to sole ownership and rights to all real properties titled in his name, individually or jointly, except property titled jointly in the name of the parties. Wife expressly waives and relinquishes any and all rights established by any law of North Carolina relating to rights of equitable distribution concerning said real property, whether codified as N.C.G.S. § 50-20 et seq. or otherwise, or the statutes or laws of any other states establishing rights of equitable distribution.

   In accordance with N.C.G.S. 50-20(d), the parties hereby acknowledge that the provisions herein for the partial and unequal distribution of marital property are equitable and are fair, reasonable and satisfactory to Husband and Wife. Wife for herself and her heirs, assigns, executors, and administrators, hereby expressly waives and releases any and all rights, whether now in existence or hereafter acquired, to apply to the courts of the State of North Carolina, or any other jurisdiction for distribution or division of all real property that the Wife may have an interest therein;

4. That parties acknowledge that it is in the best interest the parties' minor children that the
   Minor children shall be placed in the primary care, custody and control of Husband and
   Wife shall be given liberal visitation with the minor children. Husband agrees not to bring an action for support from the Wife for the minor children.

**GENERAL PROVISIONS**

1. ENFORCEMENT - The parties agree that the remedy at law for any breach of this agreement will be inadequate unless the provisions hereof shall be enforceable by specific performance and accordingly, either party shall be entitled to specifically enforce each and every provision of this agreement. The right to specific enforcement of this agreement shall be in addition to all other rights and remedies either party may have at law or in equity arising by reason of any breach of the agreement by the other party.

2. VOLUNTARY EXECUTION - Each party acknowledges that this agreement is entered into of his or her own free will and volition and that no coercion, force, pressure or undue influence has been used in the execution of this agreement, either by the other party hereto or by any other person or persons. Neither party has relied upon any representation nor promise in making this agreement except those expressly set forth herein.

3. WAIVER OF GRIEVANCES - Any conduct on the part of either party concerning prior to the execution of this agreement which may have constituted a basis for

---

BK012738PG01374

any legal claim by either party against the other, is hereby waived and released and will not be used by either party against the other in any future proceeding between them.

4. JURISDICTION - Each party submits themselves to the jurisdiction of the courts of the State of North Carolina in any future action brought by either of them to enforce the provisions of this agreement.

5. MODIFICATION - A modification or waiver of any of the provisions of this agreement shall be effective only if made in writing and executed with the same formality as this agreement.

6. PARTIAL INVALIDITY - If any provision of this agreement is held to be invalid or unenforceable, all other provisions shall nevertheless continue in full force and effect.

7. BINDING EFFECT - Every provision of this agreement shall be binding upon each of the parties and their respective heirs, executors, administrators and assigns.

8. SUIT COSTS - In the event either party shall institute an action to enforce the provisions of this agreement, the party prevailing in said action, whether by adjudication or settlement, shall be entitled to recover suit costs, including reasonable attorney's fees, from the other party.

9. OTHER INSTRUMENTS - Each party shall, upon the request of the other or the other's personal representative, execute, acknowledge and deliver any instruments appropriate or necessary to effectuate the intent and provisions of this Agreement.

10. CHANGE IN CIRCUMSTANCES - The parties recognize that these provisions differ from the rights provided by law absent this Agreement. Both parties acknowledge and agree that despite any disparity that may exist between them at the time of the execution of this Agreement or with regard to their respective incomes or assets at the time of a separation or marital dissolution, of the inequality or disability of either party; that this Agreement should not be voided or rescinded on the grounds of unconscionability at the time this Agreement becomes enforceable, and that any rescission or voiding of the Agreement would be expressly contrary to their intentions in executing this Agreement.

BK012738PG01375

### ENTIRE AGREEMENT

This Postnuptial Agreement contains the entire understanding of the parties, and there are no representations, warranties, covenants, or undertakings other than those expressly set forth herein.

_____ (SEAL)

Timothy Omar Hankins, Sr.

_Sardia Hankins_ (SEAL)
Sardia Hankins

STATE OF NORTH CAROLINA
COUNTY OF WAKE

I, the undersigned, a Notary Public in and for said County and State, do hereby certify that Timothy Omar Hankins, Sr., personally appeared before me this day and acknowledged the due execution of the foregoing Postnuptial Agreement.

WITNESS my hand and notarial seal or stamp this _1_ day of _____, 2007.

_____
NOTARY PUBLIC

My Commission Expires: 10/24/2010

STATE OF NORTH CAROLINA
COUNTY OF WAKE

I, the undersigned, a Notary Public in and for said County and State, do hereby

BK012738PG01376

certify that Sardia Hankins personally appeared before me this day and acknowledged the due execution of the foregoing Postnuptial Agreement.

WITNESS my hand and notarial seal or stamp this _1st_ day of _____, 2007.

_____
NOTARY PUBLIC

My Commission Expires: 10/24/2010



**EXHIBIT 7**

_Ex 7._

NORTH CAROLINA    FILED    THE GENERAL COURT OF JUSTICE
                                        DISTRICT COURT DIVISION
WAKE COUNTY   2016 JAN 25  P 3:03   15 CVD 7476

WAKE COUNTY, C.S.C.



SARDIA HANKINS,
        Plaintiff,

v.                                          PRELIMINARY INJUNCTION

TIMOTHY HANKINS,
O'MAR CONSTRUCTION AND
TRUCKING LLC, and
SARDIA ENTERPRISE, L.L.C.,

        Defendants.

THIS CAUSE COMING on to be heard and being heard by the Honorable Anna E. Worley, District Court Judge Presiding on June 15, 2015 on the Plaintiff's request for a Preliminary Injunction and Plaintiff being present and represented by John M. Oliver and Defendant Timothy Hankins being present and represented by Chad Axford. Defendants O'mar Construction and Trucking LLC, and Sardia Enterprise, L.L.C. having been added as parties to this action by Plaintiff's Amended Complaint. The Court, having reviewed the verified Motion presented by Plaintiff and hearing arguments from both Plaintiff and Defendant, makes the following:

### FINDINGS OF FACT

1.   Plaintiff is a citizen and resident of Wake County, North Carolina, and has been a citizen and resident for more than six (6) months immediately preceding institution of this action.

2.   Defendant is a citizen and resident of Wake County, North Carolina.

3.   Plaintiff and Defendant were married to each other on January 27, 2001, and separated on June 14, 2014.

BOOK:012738 PAGE:01375 - 01377

Yellow probate sheet is a vital part of your recorded document.
Please retain with original document and submit for rerecording.



**Wake County Register of Deeds**
Laura M. Riddick
Register of Deeds

This Computer Group    This Document
_____ # of Time Stamps Needed    __6__ New Time Stamp # of Pages

4.    There were three children born of the marriage, namely: TIMOTHY O. HANKINS, III, born January 13, 2002, NYLA N. HANKINS, born May 17, 2004, and HILLARY S. HANKINS, born December 30, 2006.

5.    Plaintiff and Defendant are both over eighteen (18) years of age and do not suffer any legal disability that would render either incompetent to proceed in this action.

6.    During the marriage, Plaintiff and Defendant acquired real and personal property that Plaintiff contends is marital property within the meaning of N.C. Gen. Stat. § 50-20(b)(1), et seq., and that is divisible property within the meaning of N.C. Gen. Stat. § 59-20(b)(4), et. seq., which property is subject to equitable distribution.

7.    On or about August 25, 2007 the parties entered into a postnuptial agreement (hereinafter "purported agreement").

8.    Plaintiff has alleged that the agreement is not enforceable, she is entitled to an equitable distribution of the parties' assets and debts. 

9.    Defendant Timothy Hankins has sold a certain vacant lots located in Onmer, North Carolina titled in the name of Defendant Omar Construction & Trucking LLC. Plaintiff contends that are marital property and divisible by the Court in equitable distribution.

10.    It appears that Defendant Timothy Hankins's business (not Defendant individually) acquired the lots via quit claim deed from Plaintiff on June 27, 2007, approximately two (2) months prior to the execution of the purported agreement.

11.    The lots that were sold by Defendant are not in Defendant's individual name, but rather the name of Defendant's business, "Omar Construction & Trucking, LLC."

12.    "Omar Construction and Trucking, LLC" was created on May 23, 2007, during the marriage prior to the parties' separation and Plaintiff claims it is marital.

13.    Plaintiff has amended her Complaint to add Omar Construction and Trucking, LLC as a party to this action. The sole member and registered agent of this company is Defendant Timothy Hankins

14.    Plaintiff has amended her Complaint to add Defendant Sardis Enterprise, L.L.C. as a party to this action. The only members of the L.L.C. are Plaintiff and Defendant Timothy Hankins. The registered agent of this company is Defendant Timothy Hankins.

2

and copies of any checks used to pay the sales contract price. He shall also provide an accounting regarding the disposition of the sales proceeds.

4.    Other than in the regular course of business, Plaintiff and Defendants shall not transfer, waste, convert, encumber or otherwise dispose of any real or personal property pending further order of the Court or agreement of the parties.

This the __ day of November 2015.

Anna E. Worley, Judge Presiding

CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served this Preliminary Injunction in the above-captioned case upon all other parties to this cause by delivery to the United States Postal Service in a prepaid envelope addressed to Defendant's attorney:

Chad Axford
P.O. Box 23
Raleigh, NC 27602

Also Via Facsimile:    (919)714-9935

This the ____ day of November 2015.

John M. Oliver
State Bar #14259
OLIVER & OLIVER, PLLC
Attorneys for Plaintiff
P.O. Box 10349
Raleigh, North Carolina 27605

4

WHEREFORE, based on the foregoing Findings of Fact, the Court makes the following:

## CONCLUSIONS OF LAW

1.    Plaintiff will be irreparable harmed and has shown good cause and needs a Preliminary Injunction prohibiting Defendants from disposing of any sales proceeds, other than that necessary for the normal business purposes of Omar Construction and Trucking, LLC.

2.    Pursuant to Rule 65 of the North Carolina Rules of Civil Procedure and N.C.G.S. Section 50-20(i), Plaintiff has shown good cause for the imposition of a preliminary injunction prohibiting the waste, disposal, sale, transfer of any property owned by the parties, either individually or via a business entity.

3.    No persons or other entities other than Plaintiff and Defendant Timothy Hankins are members of either Sardis Enterprise, L.L.C. or O'mar Construction and Trucking LLC; hence the rights of any third party will not be adversely affected by this Preliminary Injunction.

WHEREFORE, based on the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    Defendant Timothy Hankins, individually or on behalf of either O'mar Construction and Trucking LLC, or Sardis Enterprises, L.L.C., shall not transfer, waste, convert, encumber or otherwise dispose of any sales proceeds he obtains from the sale of any real property, except that the businesses can use the proceeds for normal business expenses.

2.    Defendant Timothy Hankins shall notify Plaintiff of any transaction (purchase or sale of any property or transfer of funds) involving more than $25,000.00. This notification shall occur prior to the transaction and shall be as much notice as is possible. Defendant Timothy Hankins shall also provide an accounting for any such transaction within one week of the transaction, including, but not limited to HUD statements, offers to purchase, contracts to purchase, and copies of any checks used to pay the sales contract price.    He shall also provide an accounting regarding the disposition of the transaction funds.

3.    Defendant Timothy Hankins shall provide Plaintiff's attorney with all documents related to the closing referred to herein regarding the Garner lots already sold, including, but not limited to HUD statements, offers to purchase, contracts to purchase,

3

(919) 719-3340

5

369   Ex 8

| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE DISTRICT COURT DIVISION |
| WAKE COUNTY | 15-CVD-7476 ASSIGNED JUDGE: DENNING |

SARDIA HANKINS,
Plaintiff,

v.

TIMOTHY OMAR HANKINS SR.,
OMAR CONSTRUCTION AND
TRUCKING, LLC, and SARDIA
ENTERPRISES, LLC,
Defendants.

MOTION FOR CONTEMPT
ORDER

*****************************

NOW COMES Plaintiff, pursuant to N.C.G.S. Section 5A-23(a1) and respectfully moves the Court for an Order holding Defendant in Contempt of Court and in support thereof shows the Court:

1. On January 25, 2016 this Court entered a Preliminary Injunction.

2. Defendant has violated the Order in that:

   a. Defendant has failed and refused to give Plaintiff a full and proper accounting regarding the sale of certain lots located in Garner, North Carolina as required by the January 25, 2016 Order.

   b. Defendant has failed or refused to give any accounting for any transactions valued at greater than $25,000.00 as required by the January 25, 2016 Order.

WHEREFORE, based on the foregoing, Plaintiff respectfully prays the Court:

1. Enter an Order holding Defendant in contempt of Court.

2. Enter an order requiring Defendant to pay Plaintiff's reasonable attorney fees.

3. Enter an Order requiring Defendant to provide the accounting as required by the prior Order.

4. For such other and further relief as the Court deems just and equitable.

1

---

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE DISTRICT COURT DIVISION |
| Name Of Plaintiff SARDIA PORTER HANKINS | 15 CVD 7476 |
| WAKE County | In The General Court of Justice ☒ District ☐ Superior Court Division |

Address C/O John M. Oliver   P.O. Box 10349
City, State, Zip
Raleigh                  NC   27605

VERSUS

Name Of Defendant(s)
TIMOTHY OMAR HANKINS, SR., OMAR CONSTRUCTION
AND TRUCKING, LLC and SARDIA ENTERPRISES, LLC.

CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

Date Of Original Summons Issued

Date(s) Subsequent Summons(es) Issued

Ex.9

To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 OMAR CONSTRUCTION AND TRUCKING, LLC c/o Timothy O. Hankins, Sr., Registered Agent 4729 G Street Garner          NC    27529 | Name And Address Of Defendant 2 SARDIA ENTERPRISES, LLC  Created Dec c/o Timothy O. Hankins, Sr., Registered Agent  2615 4729 G Street Garner          NC    27529 |

A Civil Action Has Been Commenced Against You!

You are required to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff) John M. Oliver Oliver & Oliver, PLLC P.O. Box 10349 Raleigh,          NC    27605 | Date Issued 2-3-1677 | Time ☐ AM ☐ PM |
| | Signature | |
| | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

| Date Of Endorsement | Time ☐ AM ☐ PM |
| Signature | |
| ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

NOTE TO PARTIES: Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

By: M. Vicks
Date: 3-15-17

AOC-CV-100, Rev. 6/16
© 2016 Administrative Office of the Courts          (Over)

---

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION

FILE NO. 14 CVD 8806
&
15 CVD 7476

SARDIA MARIE PORTER
HANKINS,

PLAINTIFF,

v.

TIMOTHY OMAR HANKINS SR.,

DEFENDANT.

Ex 10.

ORDER

RENEWAL OF GATEKEEPER ORDER

THIS CAUSE coming on to be heard on the Court's motion for extension of the period of operation on the instant order;

AND IT APPEARING TO THIS COURT that on April 10, 2017, and for good cause the Court entered a Gatekeeper Order (the Order) for period of twelve (12) months for the reasons and purposes set forth in same. And

AND IT FURTHER APPEARING TO THE COURT That the order expired as of April 10, 2018 and the reasons for entering the order remain and that the interests of justice require the Order remain in effect until such time as the litigation between the parties is complete.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that:

1. The Gatekeeper order entered in this matter is hereby renewed and shall stay in effect until such time as the litigation between the parties is complete or there is further order of the Court.

This the 25th day of May, 2018.

The Honorable Michael J. Denning
District Court Judge Presiding

Sardia Marie Porter-Hankins v. Timothy Omar Hankins 14 CVD 8806 • Page 1 of 1

---

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
15 CVD 7476
Assigned Judge: Denning

SARDIA HANKINS,

Plaintiff,

v.

TIMOTHY HANKINS,
OMAR CONSTUCTION AND
TRUCKING LLC, AND
SARDIA ENTERPRISE, LLC,

Defendant.

ORDER: ENJOINING DISBURSEMENT
OF PROCEEDS FROM CLOSING OF
810 EAST MARTIN STREET

Ex 11

THIS CAUSE was present in Court and being heard before the Honorable Judge Michael Denning, Judge presiding over the Domestic Session of the General Court of Justice, District Court Division, Wake County, North Carolina, Tenth Judicial District, beginning Monday, December 11th, 2017, and concluding Thursday, December 14th, 2017 upon Plaintiff's claims for Equitable Distribution, among other things.

Plaintiff was present in Court and represented herself, and Defendant was present in Court and represented himself.

Based upon review of the Court file, evidence presented at trial and consideration of the testimony of the parties, and after considering the arguments of both parties, the Court makes and enters the following:

FINDINGS OF FACT

1. The Plaintiff's Equitable Distribution action was filed June 15, 2015, and Defendant has been properly served with a copy of the action pursuant to North Carolina Rules of Civil Procedure.

2. Plaintiff and Defendant are citizens and residents of Wake county, North Carolina, and have been citizens and residents of Wake county, North Carolina for more than six (6) months immediately preceding the institution of this action.

3.    Plaintiff and Defendant were lawfully married to each other on January 27, 2001 and separated on June 24, 2014.

4.    Plaintiff and Defendant are the parents of three (3) minor children, namely: Timothy Omar Hankins Jr., born January 13, 2002; Kyla Nicole Hankins, born May 17, 2004; and Hillary Sardia Hankins, born December 30, 2006.

5.    Plaintiff and Defendant are both over eighteen (18) years of age and do not suffer any legal disability that would render either incompetent to proceed in this action.

6.    During the marriage Plaintiff and Defendant Timothy Hankins acquired real property that was transferred into the name of one their corporations, "Omar Construction and Trucking LLC." This property is marital property within the meaning of N.C. Gen. Stat. § 50-20(b)(1), et. seq., and that is divisible property within the meaning of N.C. Gen. Stat. § 50-20(b)(4), et. seq., which property is subject to equitable distribution.

7.    On January 16, 2017, a Preliminary Injunction was ordered by the Honorable Anna E. Worley, which prohibited the disbursement of funds from any sale proceeds obtained from the sale of any real property.

8.    On June 27, 2007, 610 East Martin Street was titled to Omar Construction and Trucking LLC and the Corporation is currently the owner.

9.    The value of the 610 East Martin Street property ("the Property") is included in the total valuation of Omar Construction and Trucking LLC which is subject to distribution pursuant to the Plaintiff's Equitable Distribution claim.

10.   From testimony heard during the Plaintiff's Equitable Distribution claim that Omar Construction and Trucking LLC has received and accepted an offer to sell the Property for $348,000, the closing to take place December 15, 2017.

11.   The net proceeds from such sale is subject to valuation and distribution of Omar Construction and Trucking LLC in the parties' Equitable Distribution Litigation. Said net proceeds if disposed, spent, and/or wasted, would cause one or both parties to suffer irreparable harm.

WHEREFORE, based on the foregoing Findings of Fact, it is HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    On the closing of the 610 East Martin Street property the closing attorney for said transaction shall retain all net funds received from the sale of the Property in trust until further order of the Court detailing the disposition of same. Retained funds shall not include necessary costs and fees associated with closing and shall only enjoin disbursement of any net proceeds.

This the 14th day of December 2017.

Michael J. Denning, Judge Presiding

*Exhibit -1*

BK01 J998PG00870

WAKE COUNTY, NC
CHARLES P. GILLIAM
REGISTER OF DEEDS
PRESENTED & RECORDED ON
12-15-2017 AT 15:11:42
STATE OF NC REAL ESTATE
EXCISE TAX: $692.00
BOOK: 016998 PAGE: 00870 - 00872

**WAKE COUNTY**
Wake County Register of Deeds
Post Office Box 1897
Raleigh, North Carolina 27602-1897

Charles P. Gilliam
Register Of Deeds

STATE OF NORTH CAROLINA
COUNTY OF WAKE

I, CHARLES P. GILLIAM, REGISTER OF DEEDS IN AND FOR THE ABOVE NAMED STATE AND COUNTY, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND EXACT COPY OF AN INSTRUMENT RECORDED IN THE WAKE COUNTY REGISTRY ON June 13, 2018. IN BOOK 016998 PAGE 00870.

IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY HAND AND CAUSED THE OFFICIAL SEAL OF MY SAID OFFICE TO BE AFFIXED HERETO THIS, THE 13TH DAY OF JUNE, 2018.

REGISTER OF DEEDS

DEPUTY / ASSISTANT

Patricia S. Blackwell
DEPUTY / ASSISTANT (Printed Name)

(SEAL)

**NORTH CAROLINA GENERAL WARRANTY DEED**

Excise Tax $692.00

Tax Lot No. 22586    Parcel Identifier No. 1713072679
Verified by                 County on the ____ day of _____
by _____

Mail after recording to Levinson Law Firm, P. A.    NO TITLE SEARCH/NO TAX EXAMINATION
PO Box 117, Benson, NC 27504
This instrument was prepared by James R. Levinson, Attorney at Law
Brief description for the Index    Part Lot 6, Womble Prop

THIS DEED made this   14   day of   December  , 2017 , by and between

GRANTOR    GRANTEE

Omar Construction & Trucking, LLC    Cathleen Coroghen
4729 G. Street    7877 Allscott Way
Garner, NC 27529    Raleigh, NC 27612

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g. corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in the City of Garner _____ Township, Wake _____ County, North Carolina and more particularly described as follows:

See Schedule "A" - Legal Description Attached hereto

Submitted electronically by Mann, McGibney & Jordan, PLLC in compliance with North Carolina statutes governing recordable documents and the terms of the submitter agreement with the Wake County Register of Deeds.

BK01j998PG00671

The property hereinabove described was acquired by Grantor by instrument recorded in _____
In Deed Book 012624 at Page 01263 _____.

A map showing the above described property is recorded in Plat Book _____ page _____.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against the lawful claims of all persons whomsoever except for the exceptions hereinafter stated. Title to the property hereinabove described is subject to the following exceptions:

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal, or if corporate, has caused this instrument to be signed in its corporate name by its duly authorized officers and its seal to be hereunto affixed by authority of its Board of Directors, the day and year first above written.

**USE BLACK INK ONLY**

O'Mar Construction & Trucking, LLC                                   _____ (SEAL)
(Corporate Name)
By: Timothy O. Hankins

_Timothy O Hankins_ President                                        _____ (SEAL)

ATTEST:                                                               _____ (SEAL)

_____ Secretary (Corporate Seal)                      _____ (SEAL)

SEAL-STAMP          NORTH CAROLINA, _____ County.
                    I, a Notary Public of the County and State aforesaid, certify that _____
                                                                                    Grantor,
Use Black Ink       personally appeared before me this day and acknowledged the execution of the foregoing
                    instrument. Witness my hand and official stamp or seal, this _____ day of _____
                    _____.

                    My commission expires: _____   _____ Notary Public

SEAL-STAMP          NORTH CAROLINA, _____ Wake _____ County, Timothy O mcd. Hankins Sr.
PUBLIC              I, a Notary Public of the County and State aforesaid, certify that _Timothy O mcd. Hankins Sr._
WAKE COUNTY NC      personally came before me this day and acknowledged that _he is_ _Member Secretary of_
Use Black Ink       O'Mar Construction Hawkins, LLC , a North Carolina corporation, and that by authority
                    duly given and as the act of the corporation, the foregoing instrument was signed in its name by
                    _Member/Manager_/ President, sealed with its corporate seal and attested by
                    as its _____ Secretary.
                    Witness my hand and official stamp or seal, this _14_ day of _December, 2017_ .

                    My commission expires: _4/30/18_                         _____ Notary Public

The foregoing Certificate(s) of _____

BK016996PG000672

State of North Carolina
County of Wake

I, Wesley Black, a Notary Public, certify that Timothy O. Hankins personally came before me this day and acknowledged that he is Member/Manager of O'Mar Construction & Trucking, LLC a North Carolina LLC, and that he, being authorized to do so, executed the foregoing on behalf of the limited liability company.

Witness my hand and official seal this 14th day of December 2017.

_____
Notary Public

My Commission expire April 30, 2018.



---

STATE OF NORTH CAROLINA

WAKE          County

In The General Court Of Justice
☒ District ☐ Superior Court Division

Name Of Plaintiff
SARDIA PORTER HANKINS
Address
C/O John M. Oliver   P.O. Box 10349
City, State, Zip
Raleigh, NC 27605

CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

VERSUS

Name Of Defendant(s)
TIMOTHY OMAR HANKINS, SR.

G.S. 1A-1, Rules 3, 4

*Ex 12*

To Each Of The Defendant(s) Named Below:

Name And Address Of Defendant 1
Timothy Omar Hankins, Sr.
c/o Chad B. Axford, Attorney for Defendant
Levinson & Axford Law, P.A.
P.O. Box 23, Raleigh, NC 27602

A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)
John M. Oliver
OLIVER & OLIVER, PLLC
P.O. Box 10349
Raleigh, NC 27605

Date Issued    JUN 05 2015    Time  9  ☐ AM ☐ PM

Signature
☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement    Time   ☐ AM ☐ PM
Signature
☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

NOTE TO PARTIES: Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

AOC-CV-100, Rev. 4/11
© 2011 Administrative Office of the Courts

15CV007476

---

STATE OF NORTH CAROLINA

WAKE          County
FILED

In The General Court Of Justice
District Court Division

Name And Address Of Plaintiff 1
SARDIA PORTER HANKINS
C/O John M. Oliver
P.O. Box 10349
Raleigh, NC 27605

2015 JUN -5  A  9:19

WAKE COUNTY, C.S.C.

BY_____

*Ex 12*

DOMESTIC
CIVIL ACTION COVER SHEET
☒ INITIAL FILING   ☐ SUBSEQUENT FILING

Rule 5(b), Rules of Practice For Superior and District Courts

VERSUS

Name Of Defendant 1
TIMOTHY OMAR HANKINS, SR.

Jury Demanded In Pleading?   ☐ Yes   ☒ No

Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)
John M. Oliver
OLIVER & OLIVER, PLLC
P.O. Box 10349
Raleigh, NC 27605

Telephone No.
(919) 719-2817

Attorney Bar No.
14259

Attorney E-mail Address
oliverjlaw@aol.com

☒ Initial Appearance In Case   ☐ Change Of Address

Name Of Firm
OLIVER & OLIVER, PLLC

FAX No.
(919) 719-2817

☒ All Plaintiffs   ☐ All Defendants   ☐ Only (List parties) represented

TYPE OF PLEADING
(check all that apply)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Answer/Reply (ANSW-Response)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Counterclaim (CTCL) Assess Countercalim Costs
☐ Extend Time For An Answer (MEDT-Response)
☐ Modification Of Alimony (MALI)
☐ Modification Of Custody (MCUS)
☐ Modification Of Support in non-IV-D cases (MSUP)
☐ Modification Of Visitation (MVIS)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Vacate/Modify Judgment or Order (VCMO)
☐ Other (OTRPD)

CLAIMS FOR RELIEF
(check all that apply)
☐ Alimony (ALM)
☐ Annulment (ANUL)
☐ Child Support (CSUP)
☐ Custody (CUST)
☐ Divorce (DIVR)
☐ Divorce From Bed And Board (DIVB)
☐ Domestic Violence (DOMV)
☐ Equitable Distribution (EQUD)
☐ Medical Coverage (MEDC)
☐ Paternity (PATR)
☐ Possession Of Personal Property (PDPP)
☐ Post Separation Support (PESU)
☐ Reimbursement For Public Assistance (RPPA)
☐ Visitation (VIST)
☐ Other: (specify and list separately)

Date
6-5-15

Signature Of Attorney/Party

NOTE: All firms in this address shall include on the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. The subsequent filings in civil actions, the filing party must include a Domestic (AOC-CV-752), Motions (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.

AOC-CV-750, Rev. 1/14
© 2014 Administrative Office of the Courts

15CV007476

---

NORTH CAROLINA   FILED

WAKE COUNTY

2015 JUN -5  A  9:20

WAKE COUNTY, C.S.C.
BY_____

THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
15 CVD

15CV007476

*Ex 12*

SARDIA HANKINS,
            Plaintiff,

v.

TIMOTHY HANKINS, SR.,
            Defendant.

)   COMPLAINT, RE:
)   EQUITABLE DISTRIBUTION,
)   SETTING ASIDE THE POSTNUPTIAL
)   AGREEMENT, OR
)   ALTERNATELY BREACH OF POST-
)   NUPTIAL AGREEMENT AND,
)   MOTION FOR TEMPORARY
)   RESTRAINING ORDER AND
)   PRELIMINARY INJUNCTION

The plaintiff, complaining of the defendant, alleges as follows:

1. Plaintiff is a citizen and resident of Wake County, North Carolina, and has been a citizen and resident for more than six (6) months immediately preceding institution of this action.

2. Defendant is a citizen and resident of Wake County, North Carolina.

3. Plaintiff and Defendant were married to each other on January 27, 2001, and separated on June 14, 2014.

4. There were three children born of the marriage, namely: TIMOTHY O. HANKINS, III, born January 13, 2002, NYLA N. HANKINS, born May 17, 2004, and HILLARY S. HANKINS, born December 30, 2006.

5. Plaintiff and Defendant are both over eighteen (18) years of age and do not suffer any legal disability that would render either incompetent to proceed in this action.

6. During the marriage, Plaintiff and Defendant acquired real and personal property that is marital property within the meaning of N.C. Gen. Stat. § 50-20(b)(1), et seq., and that is divisible property within the meaning of N.C. Gen. Stat. § 50-20(b)(4), et seq., which property is subject to equitable distribution.

7. On or about August 25, 2007 the parties entered into a purported postnuptial agreement (hereinafter "purported agreement"). That purported agreement is attached hereto as Exhibit #1.

1

8.      The agreement actually given to Plaintiff to sign was a different agreement than Exhibit #1. The agreement Plaintiff actually signed had several pages different than what appear as Exhibit #1.

9.      Defendant presented the other agreement to Plaintiff, and after it had been signed by Plaintiff, Defendant removed and substituted pages creating the purported agreement. Defendant then presented the purported agreement for filing as the agreement signed by the parties.

10.     Without any consideration, this purported agreement attempts to give much of the parties' real property to Defendant. Plaintiff received nothing in return for the agreement to transfer property to Defendant under the purported agreement.

11.     The purported agreement is unconscionable in both its execution and its terms, and is therefore unenforceable.

12.     If the purported agreement is found to be valid and enforceable, Defendant is in breach of the purported agreement. Defendant breached paragraph #2 of the purported agreement.

13.     Paragraph #2 of the purported agreement required Defendant to allow Plaintiff to continue to use the jointly held real property (the then existing marital home) and Defendant would pay the expenses related to the home. Defendant failed to pay the expenses related to this home, and the home was lost via foreclosure.

14.     Paragraph #3 of the purported agreement grants to Defendant all property in his name, jointly or individually, except that titled jointly with Plaintiff.

15.     The vast majority of the property controlled by Plaintiff and Defendant was not in Defendant's name, but rather the name of either "Sardia Enterprise, LLC" or "Omar Construction & Trucking, LLC."

16.     On information and belief Defendant is attempting to sell certain vacant lots located on Loop Road in Garner, North Carolina titled in the name of Omar Construction & Trucking LLC. Plaintiff contends that these lots are marital property and divisible by the Court in equitable distribution.

17.     Plaintiff will be irreparably harmed if Defendant is able to sell the property and dispose of the proceeds of the sale; therefore, Plaintiff is in need of a temporary restraining order and preliminary injunction prohibiting Defendant from disposing of my sales proceeds.

FIRST CLAIM FOR RELIEF – EQUITABLE DISTRIBUTION

2

18.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-17 above as if fully set out herein.

19.     Plaintiff is entitled to an equitable distribution of the marital property and divisible property of the parties pursuant to N.C. Gen. Stat. § 50-20, et seq.

20.     Plaintiff is entitled to an equitable but unequal distribution of marital and divisible property in her favor, pursuant, but not limited to the following factors set forth in N.C. Gen. Stat. § 50-20(c)(1)-(12):

(a)     The income, property and liabilities of each party at the time the division of property is to become effective;

(b)     Plaintiff's direct and indirect contributions to help develop the career potential of Defendant;

(c)     . The non-liquid character of the majority of the marital property owned by the plaintiff and the defendant;

(d)     Any other factor that the court finds to be just and proper.

SECOND CLAIM FOR RELIEF – SET ASIDE POST MARITAL AGREEMENT

21.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-20 above as if fully set out herein.

22.     The purported post marital agreement is unconscionable in both its execution and its terms and should therefore be set aside.

THIRD CLAIM FOR RELIEF: BREACH OF CONTRACT

23.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-22 above as if fully set out herein.

24.     Defendant has breached the material terms of the purported agreement; therefore, the entire agreement must be declared null and void.

FOURTH CLAIM FOR RELIEF: TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

25.     Plaintiff hereby realleges and incorporates by reference the allegations in paragraphs 1-24 above as if fully set out herein.

26.     On information and belief, Defendant is prepared to sell certain vacant lots more particularly described by the attached Exhibits #2-6, hereinafter, "the lots." On information and belief, the closing is scheduled for June 5, 2015.

3

27.     As shown on the attached Exhibit #8, Defendant's business (not Defendant individually) acquired the lots via quit claim deed from Plaintiff on June 27, 2007, approximately two (2) months prior to the execution of the purported agreement.

28.     The purported agreement attempts to vest in Defendant any real property in his individual name.

29.     The lots that are being sold by Defendant are not in Defendant's individual name, but rather the name of Defendant's business, "Omar Construction & Trucking, LLC."

30.     As shown on the attached Exhibit #7, Articles of Organization, the business "Omar Construction and Trucking, LLC" was created on May 23, 2007, during the marriage prior to the parties' separation.

31.     Having been created during the marriage, Omar Construction '& Trucking LLC is a marital asset, and as such, the lots titled in the name of Omar Construction & Trucking marital as well.

32.     On information and belief, the net proceeds from the sale of the lots will total more than $200,000.00.

33.     $200,000.00 is a substantial portion of the over-all value of the marital estate.

34.     Plaintiff will be irreparable harmed if the sale of the lots is completed and Defendant obtains unfettered control of the proceeds.

35.     Plaintiff needs a Temporary Restraining Order prohibiting Defendant from disposing of the sales proceeds prior to a hearing on Plaintiff's request for a preliminary injunction.

36.     Pursuant to Rule 65 of the North Carolina Rules of Civil Procedure and N.C.G.S. Section 50-20(i), Plaintiff will be irreparably harmed if Defendant is permitted to sell the lots that are subject to equitable distribution and dispose of the sales proceeds.

37.     To the extent Defendant has sold any real property, or other property of the parties' claimed to be marital, then Defendant should be ordered to hold and account for any such sales proceeds.

WHEREFORE, Plaintiff prays the Court grant the following relief:

4

1.      Accept this verified Complaint as an affidavit of Plaintiff in any hearing related to this action.

2.      Order an equitable distribution of the parties' marital and divisible property pursuant to N.C. Gen. Stat. § 50-20, with an unequal distribution of the parties' marital and divisible property in Plaintiff's favor.

3.      Set aside the purported agreement, or alternatively, declare it to be null and void based on Defendant's material breach of the same.

4.      Issue a Temporary Restraining Order prohibiting Defendant from disposing of the sales proceeds from the sale of the lots.

5.      Enter a preliminary injunction prohibiting the further sale of any assets, pending Order of the Court.

6.      ' Such other and further relief as the Court deems just and equitable.

This the 4th day of June 2015.

John M. Oliver
State Bar #14259
OLIVER & OLIVER, PLLC
Attorneys for Plaintiff
P.O. Box 10349
Raleigh, North Carolina 27605
(919) 719-3340

5

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
15 CVD 7476
Assigned Judge: Denning

SARDIA HANKINS,

Plaintiff,

v.

TIMOTHY HANKINS,
O'MAR CONSTUCTION AND
TRUCKING LLC, AND
SARDIA ENTERPRISE, LLC,

Defendant.

*Ex 13.*

ORDER: EQUITABLE DISTRIBUTION

THIS CAUSE coming on to be heard and being heard before the Honorable Judge Michael Denning, judge presiding over the Domestic Session of the General Court of Justice, District Court Division, Wake County, North Carolina, Tenth Judicial District, beginning Monday, December 11th, 2017, and concluding Wednesday, December 13th, 2017 upon Plaintiff's claims for Equitable Distribution.

Plaintiff was present in Court and represented by herself, and Defendant was present in Court and represented by himself. Both parties testified and this Court received into evidence documentary exhibits offered by Plaintiff and Defendant.

Based upon review of the Court file, evidence presented at trial and consideration of the testimony of the parties, and after considering the arguments of both parties; the Court makes and enters the following:

## FINDINGS OF FACT

1. Plaintiff and Defendant are citizens and residents of Wake county, North Carolina, and have been citizens and residents of Wake county, North Carolina for more than six (6) months immediately preceding the institution of this action;

2. This action was filed June 15, 2015, and Defendant has been properly served with a copy of the action pursuant to North Carolina Rules of Civil Procedure.

3. On August 13, 2015, Defendant filed a Motion to Dismiss, Affirmative Defenses, Answers and Counterclaim.

4. On August 21, 2015, Defendant filed an Amended Motion to Dismiss, Affirmative Defenses, Answers and Counterclaims.

5. Plaintiff and Defendant were lawfully married to each other on January 27, 2001 and separated on June 24, 2014.[1]

6. Plaintiff and Defendant are the parents of three (3) minor children, namely: Timothy Omar Hankins Jr., born January 13, 2002; Nyla Nicole Hankins, born May 17, 2004; and Hillary Sardia Hankins, born December 30, 2006.

7. Plaintiff and Defendant are both over eighteen (18) years of age and do not suffer any legal disability that would render either incompetent to proceed in this action.

8. During the marriage, Plaintiff and Defendant acquired real and personal property that is marital property within the meaning of N.C. Gen. Stat. § 50-20(b)(1), et seq., and that is divisible property within the meaning of N.C. Gen. Stat. § 50-20(b)(4), et seq., which property is subject to equitable distribution.

9. On or about August 25, 2007 the parties entered into a postnuptial agreement (hereinafter "purported agreement") which was drafted by the Defendant.

10. Plaintiff has alleged that the purported agreement is not enforceable and that she is entitled to an equitable distribution of the parties' assets and debts.

[1] Parties stipulated to this fact in the Scheduling and Discovery Order (Equitable Distribution) on December 5, 2015.

11. Defendant has alleged that the purported agreement is enforceable, and that Plaintiff has waived her rights to equitable distribution.

12. The specific language in question from the purported agreement states:

"The parties agree that Husband shall be entitled to sole ownership and rights to all real properties titled in his name, individually or jointly, *except property titled jointly in the name of the parties.* Wife expressly waives and relinquishes any and all rights established by any law of North Carolina relating to rights of equitable distribution concerning said real property, whether codified as N.C.G.S. §50-20 et seq. or otherwise, or the statute or laws of any other states establishing rights of equitable distribution."[2]

13. There are no properties as described in the parties' postnuptial agreement that would be subject to the agreement and require consideration in the instant equitable distribution process. All of the properties valued and detailed herein are titled to one of the two remaining corporations that were formed during the marriage and go directly to the valuation and distribution of each of these corporations.

14. Each of the parties have asserted a claim for equitable distribution in the above-entitled action. Defendant asserts specifically a claim for partial equitable distribution for marital and divisible property and debt outside the scope of the parties' purported agreement. Both parties allege factors exist pursuant to N.C. Gen. Stat. § 50-20(c)(1)-(12) to justify an unequal distribution of marital and divisible property.

15. The parties stipulated to the value and classification of certain property as of the date of separation as detailed in and attached hereto as

[2] Pl's Compl., Ex. 3, ¶ 3 (emphasis added).

Enclosure A and incorporated herein by reference as if fully set forth. The court finds that the stipulations as to value are fair and reasonable.

16. The parties identified and stipulated to the classification of various other property, held by O'mar Construction & Trucking LLC, and Sardia Enterprise L.L.C., excepting some property which the Defendant contended to be separate as of the date of separation. This property and its' respective classification is detailed in, and attached hereto, as Enclosure B and incorporated herein by reference as if fully set forth. The values reflected in Enclosure B are values of the property found by the Court after considering the sufficient and competent evidence presented regarding each

17. As detailed in Enclosure A the value of the marital property not held by either of the marital corporations is $10,500.00.

18. As detailed in Enclosures B the total value of O'mar Construction & Trucking LLC and Sardia Enterprise L.L.C. as of the date of distribution is $1,084,348. Of this O'mar Construction & Trucking LLC is valued at $753,878.00 and Sardia Enterprise L.L.C. is valued at $330,470.00.

19. Complicating things regarding the marital corporations, was the Defendant's behavior during the marriage whereby he would take property, both real and personal, acquired by the marriage and transfer it into the name of Defendant "O'mar Construction & Trucking, LLC" and "Sardia Enterprise L.L.C." This property is marital property within the meaning of N.C. Gen. Stat. § 50-20(b)(1), et. seq., and is divisible property within the meaning of N.C. Gen. Stat. § 50-20(b)(4), et. seq., which property is subject to equitable distribution.

20. The Court takes judicial notice of the North Carolina Secretary of State web site regarding Corporations and corporate filings. Further complicating matters is that on December 22, 2015, after the date of separation, in a blatant attempt to secret and/or shield assets from equitable distribution, Defendant dissolved Sardia Enterprise L.L.C. and formed Sardia Enterprises LLC identifying himself as the sole member/manager.

21.    Disposition of thee two assets herein identified as being held by Sardia Enterprise L.L.C. as of the date of distribution is unclear, to the extent they have been re-titles sold and/or transferred to the new corporation Sardia Enterprises LLC that portion of Sardia Enterprises LLC is marital property/value and subject to distribution by the Court. There are two assets that comprise(d) the entire value of Sardia Enterprise L.L.C.:

    a.    A 2004 Sterling dump truck valued at $33,000.00, and

    b.    The property located at 60 Randolphville Rd., Bolivia , NC , valued at $297,470.00 

    c.    Together these assets have a total value of $330,470.00 representing the total value of Sardia Enterprise L.L.C.

22.    After the date of marriage, January 27, 2001, until around 2004, Defendant's contention a significant amount of money went missing from marital assets and his business Hankins Construction, Co., Inc.[3]

23.    On April 8, 2005, Sardia Enterprise, L.L.C. was formed.[4]

24.    Pursuant to the North Carolina Secretary of State, the Articles of Organization for Sardia Enterprise, L.L.C. both parties are listed as Member/Manager(s) for the company, and the AOI further states that "all members by virtue of their status as members shall be managers of this limited liability company.[5]

25.    North Carolina General Statute, Chapter 57D, controls Limited Liability Companies and provides for remedies with respect to wrongful distributions, and liability of wrongful acts by a manager. Defendant alleges fraud and misconduct from Plaintiff in her member and manager position but did not exercise remedies or attempt to prevent further loss of company funds/assets.

---
[3] Def.'s Ex. 2.
[4] Pl.'s Ex. 3.
[5] Pl.'s Ex. 5.

26.    Defendant went to New Orleans, LA from 2005 until 2006 and contends significant underhanded dealings by the Plaintiff but continued to operate the businesses together with her for seven years prior to separating. Nothing evidences Defendant taking any steps or measures to take away any control or power of the Plaintiff in the company.

27.    Defendant's contention that a property he owned prior to the marriage, 1009 Fieldgrass Place, had three separate mortgages taken out on it by the Plaintiff, without his knowledge, with the help of David R. Shearon. Defendant contends that he initially took out the original deed of trust, on March 27, 2003, signed by both parties individually, to use the money in running Hankins Construction, Co., Inc.  Defendant contends the other deed of trusts that were taken out were fraudulent.

28.    That on March 27, 2003, a deed of trust was taken out for a principal balance of $326,250, on 1009 Fieldgrass Place, with both parties listed as the grantors with accompanying signatures.[6]

29.    That on November 6, 2003, a deed of trust was taken out for a principal balance of $400,000, on 1009 Fieldgrass Place, with both parties listed as the grantors with accompanying initials and signatures.[7]

30.    On May 13, 2005, a deed of trust was taken out for a principal balance of $466,500, on 1009 Fieldgrass Place, with both parties listed as the grantors with accompanying initials and signatures.[8]

31.    Defendant alleges he did not find out about the mortgages until 2015 despite the property going into foreclosure in 2008.  When the court inquired as to whether a judgment was entered after the foreclosure or whether he did anything to stop the foreclosure because of alleged fraudulent activity Defendant's only response was that there was too much going on at the time and it was just too

---
[6] Def.'s Ex. 20.
[7] Def.'s Ex. 21.
[8] Def.'s Ex. 22.

much for him. The Court finds this less than credible, and, given the Defendant's diligence and acuity in virtually all other matters regarding his business, unbelievable.

32.    On May 23, 2007, Defendant formed O'mar Construction & Trucking LLC[9] using capital from Sardia Enterprise, L.L.C.

33.    Defendant was the sole member and organizer of O'mar Construction & Trucking LLC.[10]

34.    In 2007 with the exception of property located at 60 Randolphville Rd., Bolivia , NC,[11] the Defendant proceeded to transfer all of the properties held by Sardia Enterprise, L.L.C. and those held by the parties individually, to O'mar Construction & Trucking LLC to obtain complete control of the properties. This in case of properties held by Sardia Enterprise, L.L.C. despite the properties having been purchased with funds from Sardia Enterprise, L.L.C. resulting in a devaluation of the company.

35.    On July 17, 2007, Defendant attempted to deposit a check into one of the company's (Sardia Enterprise, L.L.C.) bank accounts and received the check returned with notice that he was frozen/blocked from the account. Defendant did not inquire with the bank or follow up to find out the reason but assumed it was the due to the IRS without any letter or notice to lead him to this conclusion.

36.    Defendant further alleges he was unaware of a Suntrust bank account the Plaintiff opened, contending he did not have access to the account despite writing checks on the account. Further, when Defendant "became aware" of the account in 2006 he failed to contact the bank or prevent Plaintiff from using this account for the company and again stated the reason for doing nothing was that there was too much going on.[12]

---
[9] Pl.'s Ex. 9.
[10] Pl.'s Ex. 10.
[11] The Randolphville Road property is indicated on the deed as being Owned by Sardia Enterprises in 2008 when the property was bought; Sardia Enterprises and Sardia Enterprise L.L.C. are one and the same.
[12] See generally Pl.'s Ex. 15; Def.'s Exhibit 23.

37.    The Postnuptial agreement which was drafted and entered into on the effort and insistence of the Defendant was a blatant attempt to re-classify assets and shield them from future valuation and distribution as marital in the event of the dissolution of the marriage.

## CLASSIFICATION AND VALUATION OF ASSETS AND LIABILITIES

38.    The following assets are marital/divisible assets and liabilities. The Court makes findings concerning classification and valuation based either upon the stipulation of the parties as contained with the Pretrial Order, or based upon the evidence presented:

    a.    2004 Honda Odyssey. Regarding the property the Court finds the parties' stipulation is reasonable and the property value is $3,000. This vehicle is distributed to the Plaintiff.

    b.    2001 Jeep Grand Cherokee. Regarding the property the Court finds the parties' stipulation is reasonable and the property value is $2,000.00. This vehicle is distributed to the Defendant.

    c.    Baptism Wall Picture. This picture was rendered by an artist from a picture that was taken in Jamaica when the Plaintiff was being baptized. Defendant has a suitable reproduction of the picture, unframed. Regarding the Property the Court finds the parties' stipulation is reasonable and the property value is $2,500.00. This picture is distributed to the Plaintiff.

    d.    Boat and trailer. Regarding the Property the Court finds the following: Regarding the Property the Court finds the parties' stipulation is reasonable and the property value is $3,000.00. These items are distributed to the Defendant.

39.    There are multiple property lots and trucks in dispute which are owned not by the parties individually, but by the marital companies: O'mar Construction & Trucking LLC and Sardia Enterprise, L.L.C. There was no expert

testimony as to the value of the companies throughout the course of the trial. There was however sufficient testimony as to certain assets held by each company to value the companies for equitable distribution.

40.     Pursuant to the Secretary of State of North Carolina, the Court takes judicial notice that "Sardia Enterprise, L.L.C." was formed April 8, 2005, during the marriage prior to the parties' separation.[13] The company had only two members/managers, those being the Plaintiff and the Defendant.[14] The registered agent of this company was Defendant Timothy Hankins. The LLC was dissolved December 17, 2015 by Defendant. Sardia Enterprises, L.L.C. is/was marital property.

41.     Pursuant to the Secretary of State of North Carolina, the Court takes judicial notice that "O'mar Construction & Trucking, LLC" was formed on May 23, 2007, during the marriage prior to the parties' separation.[15] The sole member and registered agent of this company is Defendant Timothy Hankins.[16] O'mar Construction & Trucking, LLC is marital property.

42.     Pursuant to the Secretary of State of North Carolina, the Court takes judicial notice that "Sardia Enterprises LLC" was formed December 22, 2015, after the date of separation.[17] This company's sole member and organizer is Timothy Hankins.[18] The timing and nature of this companies formation and subsequent transferring of company assets from Sardia Enterprise, L.L.C. to Sardia Enterprises LLC, its sole purposes was to transfer value from the one to the other in a blatant effort to prevent distribution of the value of the later. 

43.     Defendant O'mar Construction & Trucking LLC and Sardia Enterprise L.L.C. is itself a marital asset, with its valuation to be divided by the Court and as such is also a necessary party to this litigation.

[13] Pl.'s Ex. 3
[14] Pl.'s Ex. 5
[15] Pl.'s Ex. 9
[16] Pl.'s Ex. 10
[17] Pl.'s Ex. 4
[18] Pl.'s Ex. 6

Hankins v. Hankins 15 CVD 7476; Page 9 of 29

44.     Plaintiff amended her Complaint June 15, 2015, to add O'mar Construction & Trucking, LLC and Sardia Enterprise, L.L.C. as necessary parties to this action.

45.     During the marriage, Defendant made efforts to conceal, transfer, and convert property of Sardia Enterprise L.L.C. to O'mar Construction & Trucking LLC to ensure he obtained control of all the properties.

46.     Neither party presented expert testimony as to the value of the corporations, therefore the Court is left valuing the corporations by the value of the assets held by each at the date of separation and date of trial.

47.     As of the date of separation the following properties were held by O'mar Construction & Trucking LLC:

    a.     411 Loop Road. Regarding the property the Court finds the following:

        i.     The property was bought by Sardia Hankins on August 2, 2004 and was then transferred to O'mar Construction & Trucking LLC on June 27, 2007. The property was then sold, after the date of separation on June 8, 2015.[19]

        ii.     The proceeds from the sale go to the value of O'mar Construction & Trucking LLC.

        iii.     On June 5, 2015, the Honorable Judge Denning entered a Temporary Restraining Order to prohibit Defendant from disposing of any sales proceeds from lots being sold under the name of the corporations prior to a hearing on Plaintiff's request for a preliminary injunction.

        iv.     On June 8, 2015, O'mar Construction & Trucking LLC sold 411 Loop Road and realized a net gain of $250,000. After the

[19] The Court took Judicial Notice of the Wake County Deed History of this property as detailed on the Wake County Registrar of Deeds web site.

Hankins v. Hankins 15 CVD 7476; Page 10 of 29

sale Plaintiff moved for a Preliminary Injunction. The motion was heard on June 15, 2015, by the Honorable Anna E. Worley, and the order was entered January 26, 2016, which in relevant parts the Preliminary Injunction decrees as follows:

        1.     "Defendant Timothy Hankins, individually or on behalf of either O'mar Construction and Trucking LLC, or Sardia Enterprises, L.L.C., shall not transfer, waste, covert, encumber or otherwise dispose of any sales proceeds he obtains from the sale of any real property, except that the businesses can use the proceeds for normal business expenses."

        2.     "Defendant Timothy Hankins shall notify Plaintiff of any transaction (purchase or sale of any property or transfer of funds) involving more than $25,000.00. This notification shall occur prior to the transaction and shall be as much notice as is possible. Defendant Timothy Hankins shall also provide an accounting for any such transaction within one week of the transaction, including, but not limited to HUD statements, offers to purchase, contracts to purchase, and copies of any checks used to pay the sales contract price. He shall also provide an accounting regarding the disposition of the transaction funds."

        3.     "Defendant Timothy Hankins shall provide Plaintiff's attorney with all documents related to the closing referred to herein regarding the Garner lots already sold, including but not limited to HUD statements, offers to purchase, contracts to purchase, and copies of any checks used to pay the sales contract price. He shall also provide an accounting regarding the disposition of the sales proceeds."

        4.     "Other than in regular course of business, Plaintiff and Defendants shall not transfer, waste, convert, encumber or otherwise dispose of any real or personal property pending further order of the Court or agreement of the parties."

        v.     From the time the motion was heard on June 15, 2015, to the time after the Preliminary Injunction was entered on January 26, 2016, Defendant expended funds from the sale of 411 Loop Road. From those funds, approximately $140,000 were used for attorney fees and greater than $100,000 on obtaining the lots and, or the building on 2608 Garner Road and 428 Corno Drive.

        vi.     It is clear some of these funds were expended after entry of, and expressly contrary to the Preliminary Injunction. Concerning the funds expended prior to the order, the Court is without any jurisdiction to hold Defendant accountable via contempt powers of the Court but takes note of a consistent pattern and practice of the defendant to obtain, secret and other wise use monies and property to his direct benefit and to the exclusion of the Plaintiff.

        vii.     Defendant has improperly expended significant funds in defense of his case that otherwise would properly belong to the corporations and the Defendant can provide no sufficient or accurate accounting for said expenditures. Thereby, devaluing the corporation by at least $140,000.

        viii.     The Court shall consider this as a distributional factor.

        ix.     The Defendant alleged that the closing attorney for this property, David R. Shearon, was responsible for multiple fraudulent encumbrances, falsely represented the 411 Loop Road property would be deeded to the company but then colluded with Plaintiff to defraud Defendant, and almost caused the property to go into

foreclosure by not releasing money to pay a promissory note held by the seller.

x.    Defendant filed a complaint with the North Carolina State Bar and disciplinary action was taken to suspend David R. Shearon's license for three years for findings based on false representations regarding closing information, failing to disburse the funds held for the Hankins' in trust, and failing to act with reasonable diligence and promptness in representing a client.[20]

b.    As referenced above in paragraph (a), after the date of separation on June 8, 2015, Defendant sold the property located at 411 Loop Road, which was owned by O'mar Construction & Trucking LLC. With the proceeds from the sale, Defendant then bought the following two properties and deeded them to O'mar Construction & Trucking LLC:

i.    2608 Garner Rd., Raleigh, NC: Regarding this property the Court finds the following:

1.    The property was bought by O'mar Construction & Trucking LLC on June 26, 20015, for $25,500, using funds from O'mar Construction & Trucking LLC. Omar Construction & Trucking LLC is the current owner.

2.    The parties stipulate and the Court finds the value of the property is $107,000.[21]

3.    This property was purchased with proceeds from the sale of a marital property, 411 Loop Road.

4.    The value of this property is properly considered in the valuation of O'mar Construction & Trucking LLC.

[20] Pl.'s Ex. 17.
[21] Def.'s Ex. 4.

---

ii.    428 Como Dr., Raleigh, NC: Regarding the property the Court finds the following:

1.    The property was bought by O'mar Construction & Trucking LLC on June 26, 20015, for $25,500, using funds from O'mar Construction and Trucking LLC. Omar Construction and Trucking LLC is the current owner.

2.    The parties stipulate and the Court finds the value of the property is $24,000.[22]

3.    This property was purchased with proceeds from the sale of a marital property, 411 Loop Road.

4.    The value of this property is properly considered in the valuation of O'mar Construction & Trucking LLC.

c.    4728 G St., Garner, NC 27529.  Regarding this property the Court finds the following:

i.    The property was bought by Serdia Enterprise L.L.C. on November 22, 2005 for $18,600 and was then transferred to O'mar Construction & Trucking LLC on June 27, 2007.[23] Subsequent to the purchase of the land a house was built using corporate funds of O'mar Construction & Trucking LLC who is the current owner.

ii.    This property is currently the residence of Defendant Timothy Hankins.

iii.    The parties stipulate and the Court finds the value of the property is $204,897.[24]

[22] Def.'s Ex. 5.
[23] Pl.'s Ex. 2.
[24] Pl.'s Ex. 1.

---

iv.    The value of this property is properly considered in the valuation of O'mar Construction & Trucking LLC.

d.    1317 W Garner Rd, Garner, NC. Regarding this property the Court finds the following:

i.    The property was bought by Defendant February 23, 2007 and was then transferred to O'mar Construction & Trucking LLC January 24, 2008. O'mar Construction & Trucking LLC is the current owner.[25]

ii.    The property is encumbered by an owner financed mortgage, by James Levinson, for which the terms of such were freely negotiated between the parties. The payment amounts on the mortgage fluctuated based on Defendant's ability to pay.

iii.    The parties stipulate and the Court finds the value of the property is $92,491.[26]

iv.    The Defendant believes $76,000 is left on the note and that from the date of separation to the date of trial Defendant alleges he has made ten (10) payments of $800 on the current mortgage. The Court is without sufficient evidence to find this as a fact.

v.    The Court finds that this property has $16,491.00 of equity and is adding the same value to O'mar Construction & Trucking LLC.

e.    610 E Martin St, Raleigh, NC. Regarding this property the Court finds the following:

i.    The property was bought by Defendant December 30, 2003, the property was then transferred to Defendant's brother, Latimore L. Hankins, January 9, 2007, who then sold the property to

[25] Pl.'s Ex. 8.
[26] Pl.'s Ex. 7.

---

O'mar Construction & Trucking LLC, six months later on June 27, 2007, for $10,000. Omar Construction & Trucking LLC is the current owner.[27]

ii.    O'mar Construction & Trucking LLC has received and accepted an offer to sell the property for $346,000, the closing to take place December 15, 2017.

iii.    Therefore, based on the selling price, the Court values the property at $346,000.

iv.    The value of this property is properly considered in the valuation of O'mar Construction & Trucking LLC.

v.    On December 14, 2017, the Court entered an Order Enjoining Disbursement of Proceeds from the Closing of 610 East Martin Street.

vi.    Pursuant to the order, "On the closing of the 610 East Martin Street property the closing attorney for said transaction shall retain all net funds received from the sale of the Property in trust until further order of the Court detailing the disposition of same. Retained funds shall not include necessary costs and fees associated with closing and shall only enjoin disbursement of any net proceeds."

f.    The following two properties were bought on May 3, 2012, by O'mar Construction & Trucking LLC and Defendant contends that the lots are not worth what Wake County values them at because the lots are unable to be built on due to septic tank issues.

i.    4512 G St, Garner, NC. Regarding the property the Court finds the following:

[27] Pl.'s Ex. 11.

1.    O'mar Construction & Trucking LLC is the current owner.[23]

2.    The Plaintiff contends the value of the property is $9,000, based on the current Wake County assessment.[29]

3.    The Court finds that the value of this property is the purchase price of $3,500, given the land cannot be developed.[30]

ii.    4508 G St, Garner, NC. Regarding this property this Court finds the following:

1.    O'mar Construction & Trucking LLC is the current owner.

2.    The Plaintiff contends the value of the property is $9,000, based on the current Wake County assessment.

3.    The Court finds that the value of this property is the purchase price of $3,500, given the land cannot be developed.

g.    The following three properties were also bought on May 2, 2014, by O'mar Construction & Trucking LLC and Defendant contends that the lots are not worth what Wake County values them at because the lots are unable to be built on due to septic tank issues.

i.    4401 H Ct, Garner, NC. Regarding this property the Court finds the following:

1.    O'mar Construction & Trucking LLC is the current owner.[31]

[28] Pl.'s Ex. 15.
[29] Pl.'s Ex. 14.
[30] Id.
[31] Pl.'s Ex. 15.

2.    The Plaintiff contends the value of the property is $8,000, based on the current Wake County assessment.[32]

3.    The Court finds that the value of this property is the purchase price of $3,900, given the land cannot be developed.[33]

ii.    4409 H Ct, Garner, NC. Regarding this property the Court finds the following:

1.    O'mar Construction & Trucking LLC is the current owner.[34]

2.    The Plaintiff contends the value of the property is $2,000, based on the current Wake County assessment.[35]

3.    The Court finds that the value of this property is the purchase price of $1,000, given the land cannot be developed.

iii.    4405 H Ct, Garner, NC. Regarding this property the Court finds the following:

1.    O'mar Construction & Trucking LLC is the current owner.[36]

2.    The Plaintiff contends the value of the property is $8,000, based on the current Wake County assessment.[37]

3.    The Court finds that the value of this property is the purchase price of $3,600, given the land cannot be developed.

[32] Id.
[33] Id.
[34] The Court takes Judicial Notice of Wake County Online real-estate data.
[35] Id.
[36] The Court takes Judicial Notice of Wake County Online real-estate data.
[37] Id.

48.    As of the date of separation the following property were held by Sardia Enterprise L.L.C:

49.    60 Randolphville Rd, Bolivia, NC. Regarding this property the Court finds the following:

a.    The parties stipulate the property was inherited by Defendant and then transferred to and deeded to Sardia Enterprise L.L.C., on November 12, 2005.[38] A residence was built subsequently on the property using funds from Sardia Enterprise L.L.C.

b.    The transferring of 60 Randolphville Rd, Bolivia, NC. to a marital corporation and then using the funds of that corporation for construction make this an asset of a marital corporation and shall be considered in the valuation of Sardia Enterprise L.L.C. (and its successors and assigns) as marital for distributional purposes.

c.    The parties stipulate and the Court finds the value of the property as $297,470[39] and as of the date of trial is unencumbered by mortgage or debt and held by Sardia Enterprise L.L.C. The property is encumbered by a life estate.

50.    Prior to the marriage the Defendant had two 1999 Sterling Dump Trucks. During the marriage he sold them and with additional funds from the corporations bought two new Sterling Dump Trucks to be used for the operation of the businesses. These dump trucks are the property of the respective businesses and should be included in their respective values.

a.    2004 Sterling Dump Truck: Regarding the property the Court finds the following:

[38] Def.'s Ex. 1.
[39] Pl.'s Ex. 13.

i.    On December 16, 2005, Sardia Enterprise L.L.C. bought the 2004 Sterling Dump Truck for $66,000. Sardia Enterprise L.L.C. is named on the title.[40]

ii.    The Plaintiff contends the current value of the property is $47,000. While the Defendant contends the value of the property as of the date of separation is $33,000.

iii.    Defendant contends that since he had the two 1999 Sterling Dump Trucks prior to the marriage and that he bought this truck after selling the two 1999 Sterling Dump Trucks, it is his separate.

iv.    The truck was used in the operation of Sardia Enterprise L.L.C. which is marital and subject to this equitable distribution. The Truck's value is property included in the valuation of Sardia Enterprise L.L.C.

v.    The Court finds that the current value of the truck is the same as the date of separation, which is $33,000.

b.    2005 Sterling Dump Truck: Regarding the property the Court finds the following:

i.    December 2, 2005, O'mar Construction & Trucking LLC bought this truck for $82,152.50 from Crescent Ford Trucks.[41]

ii.    The Plaintiff contends the current value of the property is $76,500. While the Defendant contends the value of the property as of the date of separation is $40,000.

iii.    Defendant contends that since he had the two 1999 Sterling Dump Trucks prior to the marriage and that he bought this

[40] Def.'s Ex. 4.
[41] Def.'s Ex. 3, 3(a) (The title names O'mar Construction LLP, not LLC as the owner, which was in error.)

truck after selling the two 1999 Sterling Dump Trucks, it is his separate property.

iv.   The truck was used in the operation of O'mar Construction & Trucking LLC and the valuation of which is marital and subject to this equitable distribution.

v.   The Court finds that the current value of the truck is the same as the date of separation, which is $40,000.

51.   Defendant contended that all of the assets held by the corporations are separate, his reasoning stemming from alleged fraud that the Defendant believes was carried out by the Plaintiff. Plaintiff contended that these assets are marital property, given they were acquired during the time of the marriage and used for the marital businesses.

52.   All of the property detailed herein in paragraphs 47-49 owned, titled, and/or held by either O'mar Construction & Trucking LLC or Sardia Enterprise L.L.C. Both corporations are marital, and the property held, owned and/or titled to each should be considered in the valuation of each corporation for the purposes of distribution of the corporations as marital property.

53.   Based on the values of the property found herein and held by the respective corporations, the distributable value of Sardia Enterprise L.L.C. is $330,470.00 and the distributable value of Omar Construction & Trucking LLC is $763,876.00.

54.   Plaintiff shall be distributed 100% of the value of Sardia Enterprise L.L.C. Plaintiff shall be distributed 45.9% of the value of Omar Construction & Trucking LLC and Defendant shall be distributed the remaining 54.1%. Both of the marital corporations shall be distributed as detailed herein below.

55.   In considering whether an equal distribution would be equitable, the Court has considered all of the evidence presented by the parties relating to the statutory factors set out in Chapter 50-20(c) of the North Carolina General Statutes

(as more particularly set out in findings of facts contained in this Judgment), and specifically including the following:

a.   That on August 2, 2004, the property at 411 Loop Road was bought and deeded in the name of Plaintiff, Sardia M. Hankins. Defendant's contention that this property was fraudulently deeded in Plaintiff's name individually while admitting he participated in the closing but alleges he was falsely led to believe the property would be deeded to Hankins Construction, Co., Inc. Defendant's allegation he did not find out the property was in Plaintiff's individual name until January 2005. However, the property remained in Plaintiff's name until 2007 when it was transferred to O'mar Construction & Trucking LLC. Defendant did nothing to retitle the property prior to the transfer and alleged the reason he did nothing when the alleged fraudulent activity was occurring, and he was aware of it was because 'there was too much going on at the time.'

b.   That Defendant proceeded to sell 411 Loop Road after the date of separation on June 8, 2015 and realized a net gain of $250,000.

c.   The monies from the sale of 411 Loop Road were distributed by the Defendant both contrary to and in direct violation of the Court's Order.

56.   The Court finds that an unequal distribution is equitable and that there is evidence that Plaintiff should receive more than 50% of the net marital estate based on the above-mentioned findings.

BASED UPON THE FOREGOING FINDINGS OF FACT, the Court hereby makes the following:

## CONCLUSIONS OF LAW

1.   This Court has personal jurisdiction over the parties and subject matter jurisdiction to enter orders related to the parties' claims.

2.   Any Findings of Fact as set forth herein above more appropriately construed as Conclusions are incorporated herein as if fully set forth.

3.   During the marriage, Plaintiff and Defendant acquired certain property, both real and personal, which constitute marital property within the meaning of North Carolina General Statutes § 50-20(b)(1).

4.   The real and personal property described in the above paragraphs are the marital, separate, and divisible property of the parties as defined in North Carolina General Statutes 50-20 (b) (1).

5.   An unequal division of the property as provided below is equitable and fair, considering all of the evidence and the statutory factors.

6.   The presumption that an in-kind division is equitable has been rebutted by the greater weight of the evidence. A complex distribution in-kind is accounting for an unequal distribution is consistent with the present assets and property.

NOW THEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.   The Plaintiff shall receive the following marital/divisible assets and liability with the net values as shown below as her sole and separate property

| 2004 Honda Odyssey | $3,000 |
|---|---|
| Baptism Wall Picture | $2,500 |
| Sardia Enterprises LLC | $330,470.00 |
| Omar Construction & Trucking LLC | $346,000.00** |
| Total | $681,970.00 |

1.   Plaintiff is hereby awarded all right, title and interest to the Sardia Enterprise L.L.C. and all assets comprising the value of same as detailed herein to include all right title and interest in same should they have been, conveyed to

** Said sum of $346,000.00 represents the 45.9% value of the corporation to be distributed to the Plaintiff

any new corporation during and/or after the instant litigation free from any claim or demand of the Defendant.

2.   Plaintiff is hereby awarded all right, title and interest to the Omar Construction & Trucking LLC free from any claim or demand of the Defendant. On entry of this Order, the Court's order of December 14, 2017 restraining distribution of net proceeds for the sale of 610 East Martin Street is hereby vacated and any such proceeds held in trust pursuant to said order shall be distributed to the Plaintiff as soon as is practicable.

3.   Within 30 days of Plaintiff's receipt of the net proceeds, from the sale of 610 East Martin Street and the other property distributed to Plaintiff herein, Plaintiff shall execute appropriate documentation relinquishing any remaining right, title and/or ownership interest she might have remaining in Omar Construction & Trucking LLC to Defendant, said remaining right, title and/or ownership interest representing the 49.1% value of the corporation the Defendant is entitled to Defendant shall be responsible for the preparation and presentation of such documentation.

4.   Prior to Plaintiff's execution of her relinquishment of rights to the remaining interest in O'mar Construction & Trucking LLC, and until such time as she has received the net proceeds as ordered herein, Defendant shall be solely responsible for care and custody of any and all assets and debt associated with and/or held by Omar Construction & Trucking LLC. Including but not limited to mortgages, taxes, insurance, liens, utilities, etc. and shall fully indemnify and hold harmless the Plaintiff from same.

5.   Defendant shall receive the following marital/divisible assets and debts with net values as shown below as his sole and separate property;

| 2001 Grand Jeep Cherokee | $2,000 |
|---|---|
| 2006 Ford F350 Ram Pickup | $4,700 |
| Boat | $1,500 |

| | |
|---|---|
| Trailer | $1,500 |
| Omar Construction & Trucking LLC | $407,887.00 |
| **Total** | **$417,578.00***[a] |

6.    Within 30 days of entry of this order Defendant shall execute any necessary documentation relinquishing any remaining right, title and/or ownership interest he might have in Sardia Enterprise L.L.C. and/or its successors (eg Sardia Enterprises LLC) to Plaintiff, said remaining right, title and/or ownership interest representing the entire value of the corporation the Plaintiff is entitled to.  Plaintiff shall be responsible for the preparation and presentation of such documentation.  Contemporaneously with execution of said documentation, Defendant shall provide any and all corporate documentation to include, but not limited to all deeds, titles, ledgers, and any other such vital documentation that is necessary to manage Corporate affairs and/or assets held by the corporation.

7.    Contemporaneously with the execution of his relinquishment of right/title and/or ownership of Sardia Enterprise L.L.C and/or its successors as detailed above, Defendant shall place into Plaintiff's possession any other assets of the corporation and/or its successors that are within his possession, custody and control as of entry of this order.

8.    Regarding the real property located at 60 Randolphville Rd, Bolivia, NC, and owned by Sardia Enterprises LLC, this property remains subject to the possession of the life estate tenant pursuant to the terms of said tenancy.

9.    Each party is entitled to immediate exclusive use and possession of all assets awarded to a party pursuant to this Order/Judgment and each party is solely responsible and shall indemnify the other party from all liability or loss associated with liabilities awarded to a party pursuant to this Order/Judgment. Within 30 days of this order, unless otherwise indicated herein each party shall

---

*[a] Set sum of $417,578.00 representing the 49.1% value of the corporation to be distributed to the Defendant.

Hankins v. Hankins 15 CVD 7476; Page 25 of 29

take the necessary steps to transfer all property within their possession, custody or control as ordered herein.

10.    The Defendant is ordered to execute any and all documents necessary to transfer title of all of the property distributed to Plaintiff herein within his possession, custody and/or control into the Plaintiff's sole name.  Should Defendant fail to transfer title within the time as set forth herein title to said property shall be transferred and conveyed by Plaintiff to Defendant pursuant to Rule 70 of the North Carolina Rules of Civil Procedure.  The Clerk of Court shall issue a writ of attachment or sequestration against the property of Defendant to compel obedience to the judgment or adjudge Defendant in contempt

11.    The court retains jurisdiction of this matter for entry of further orders.

SO ORDERED, this the 25th day of May, 2018.

HONORABLE MICHAEL DENNING
District Court Judge Presiding

Hankins v. Hankins 15 CVD 7476; Page 26 of 29

---

Hankins v. Hankins 15 CVD 7476

**Enclosure A** – Marital Property/Assets Stipulated Value
(Distribution as Ordered by the Court)

| Item | Classification | Stipulated Date of Separation Value | Distribution Plaintiff | Distribution Defendant |
|---|---|---|---|---|
| 2004 Honda Odyssey | Marital | $3,000 | $ | $ |
| 2001 Jeep Grand Cherokee | Marital | $2,000 | | Defendant has a suitable reproduction of the picture, which he can keep and the court will consider $200 for having it framed. |
| Baptism Wall Picture | Marital | $2,500 | $2,500 | |
| Boat | Marital | $1,500 | $ | |
| Trailer | Marital | $1,500 | | $ |
| **TOTALS** | | **$10,500** | **$** | **$** |

Hankins v. Hankins 15 CVD 7476; Page 27 of 29

---

Hankins v. Hankins 15 CVD 7476

**Enclosure B** – Marital Property/Assets Stipulated Classification
(Values and Distribution as Determined by the Court)

| Item | Classification | Value (as found by the Court) | Distribution Plaintiff | Distribution Defendant |
|---|---|---|---|---|
| 2606 Garner Rd. | Marital (O'mar Construction & Trucking LLC) | $107,000 | $ | $ |
| 428 Como Dr. | Marital (O'mar Construction & Trucking LLC) | $24,000 | $ | $ |
| 4720 G St. | Marital (O'mar Construction & Trucking LLC) | $204,887 | $ | |
| 1317 W Garner Rd. | Marital (O'mar Construction & Trucking LLC) | $16,491.00 | | $92,491 |
| 610 E Martin St. | Marital (O'mar Construction & Trucking LLC) | $348,000 | | |
| 60 Randolphville Rd. | Marital (Sardia Enterprise L.L.C) | $297,470 | | |
| 4512 G St. | Marital (O'mar Construction & Trucking LLC) | $3,500 | $ | $ |
| 4508 G St. | Marital (O'mar Construction & Trucking LLC) | $3,500 | | $ |
| 4401 H Ct. | Marital (O'mar Construction & Trucking LLC) | $3,900 | | |
| 1409 H Ct. | Marital (O'mar Construction & Trucking LLC) | $1,000 | | |
| 4405 H Ct. | Marital (O'mar Construction & Trucking LLC) | $3,600 | | |
| 2004 Sterling Dump Truck | Marital (Sardia Enterprise L.L.C) | $33,000 | | |

Hankins v. Hankins 15 CVD 7476; Page 28 of 29

Hankins v. Hankins 15 CVD 4745

**Enclosure B – Marital Property/Assets Stipulated Classification**
(Values and Distribution as Determined by the Court)

| | Marital (O'mar Construction & Trucking LLC) | | | |
|---|---|---|---|---|
| 2005 Sterling Dump Truck | $40,000 | | | |
| **TOTALS** | **$1,684,348** | | $ | $ |

Hankins v. Hankins 15 CVD 747½; Page 29 of 29

---

STATE OF NORTH CAROLINA    **FILED**    IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
COUNTY OF WAKE    2011 APR 11  P 2:43    **FILE NO. 14 CVD 8806**
&
WAKE COUNTY C.S.C.    **15 CVD 7476**

SARDIA MARIE PORTER HANKINS,

     PLAINTIFF,

v.

TIMOTHY OMAR HANKINS SR.,

     DEFENDANT.

*Ex - 14*

**GATEKEEPER ORDER**

THIS CAUSE coming on to be heard, and being heard on April 3rd, 2017 on the Courts setting for entry of the instant order;

AND IT APPEARING TO THIS COURT that the Plaintiff was present and proceeded Pro Se, and the Defendant was present and proceeding Pro Se,

AND IT FURTHER APPEARING TO THE COURT having heard the evidence presented by the Parties, having review of the file, and having made inquiries of the Parties, the Court makes the following:

**FINDINGS OF FACT**

1. The Plaintiff is a citizen and resident of Wake County, North Carolina and has been for six months preceding this action.

2. The Defendant is a citizen and resident of Wake County, North Carolina and has been for six months preceding this action.

3. The parties are currently in ongoing litigation regarding the custody of their children and regarding equitable distribution, **14 CVD 8806 and 15 CVD 7476** respectively. The litigation has been particularly contentious at various points, both parties having been represented by counsel.

4. Currently both parties are unrepresented, the Plaintiff just recently.

Sardia Marie Porter-Hankins v. Timothy Omar Hankins 14 CVD 8806 - Page 1 of 4

---

5. Defendant has had multiple attorneys throughout the course of the litigation, the most recent attorney withdrawing from representation in or about April of 2016.

6. During the periods in which he has not been represented Defendant has filed numerous motions the substance of which are more often than not difficult to discern and not relevant to the current Equitable distribution action. Defendant's filings include but are not entirely limited to

| | | |
|---|---|---|
| a. | 8/30/16 | Motion for Sanctions |
| b. | 9/22/16 | Motion for Summary Judgment |
| c. | 1/10/17 | Motion for Sanctions |
| d. | 1/31/2017 | Def's Motion to Dismiss |
| e. | 1/31/2017 | Def's Motion for Sanctions |
| f. | 4/10/15 | Motion for Sanctions |
| g. | 5/19/15 | Motion for Show Cause |
| h. | 5/21/15 | Emergency Custody |
| i. | 7/1/15 | Emergency Custody |
| j. | 6/8/16 | Motion to Modify Custody |
| k. | 6/25/16 | Motion to Modify Custody |
| l. | 9/16/16 | Motion to Show Cause |
| m. | 11/1/16 | Motion for Sanctions |
| n. | 11/30/16 | Motion to Waive |

7. In addition to the motions detailed above, Defendant has filed numerous motions regarding fraud he alleges to have taken place regarding his litigation, implicating the Family Court Case Coordinator, opposing counsel, and several of his former counsel.

8. Defendant is currently required to be escorted at all times while on the premises of the Wake County Court House.

9. Defendant has consistently failed to comply with the rules of civil procedure and the Wake County local rules of Court, engaging in conduct that needlessly delays litigation and increases the costs for the Plaintiff.

10. Defendant has multiple clocked motions and papers with the Clerk, failed to file them and then left said motions and papers in the Case Coordinators box, later making accusations of items being removed from the Court file related to this matter.

11. In addition to filing numerous motions, Defendant has:

     a. failed to follow the North Carolina Rules of Civil Procedure and the local rules regarding service and has repeatedly, despite being informed

Sardia Marie Porter-Hankins v Timothy Omar Hankins 14 CVD 8806 - Page 2 of 4

---

of the necessity to do so, failed to calendar, notice and serve his motions; and

     b. has continued to make unsubstantiated allegations regarding Family Court Personnel and prior and current counsel;

**CONCLUSIONS OF LAW**

1. This Court has jurisdiction over the parties and subject matter in this action.

2. The Court has inherent power to impose special limitations as are reasonably necessary for the proper administration of justice and to provide solutions which enable the process of litigation to proceed smoothly. This includes the authority to regulate and discipline those persons who appear before the court and to fashion a remedy to meet the circumstances of each case.

3. Entry of an order requiring Defendant to obtain certification by a licensed attorney prior to filing any further motions to modify or vacate the current orders for a twelve-month period, is reasonable and necessary.

4. Entry of an order determining the manner and scope in which the Defendant may interact with Family Court Personnel and access the Court House as it specifically relates to his litigation is Appropriate.

5. Such Findings of Fact above that are more properly denominated Conclusions of Law are hereby incorporated by reference as if set forth in full.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that:**

1. For a period of 12 months from the date of the entry of this Order, and for so long as Defendant does not qualify as an indigent person pursuant to N.C.G.S. 1-110, Defendant shall not file, or attempt to file, any further motions and/or other papers related to his litigation in both files (14 CVD 8806 and 15 CVD 7476) with the Family Court Office unless such motion and/or paper contains a certification by an attorney licensed under the laws of the State of North Carolina to practice law in North Carolina that in the opinion of that attorney the motion sought to be filed complies with Rule 11 of the Rules of Civil Procedure. The attorney's certification shall contain a recitation that the attorney has read and is aware of the requirements of the instant order. Failure to comply with this requirement may result in the dismissal of the motion or motions.

Sardia Marie Porter-Hankins v Timothy Omar Hankins 14 CVD 8806 - Page 3 of 4

2.      Defendant shall not at any time, absent further order of the Court, go to the 11th floor of the Wake County Court House.

3.      On entry of this order, all matters pertaining to Defendant's litigation that would necessarily require the assistance/participation of Family Court personnel will be directly addressed with the Family Court Manager, Leigh Stallings.

4.      Any and all communication that is not incidental to Defendant's need to review his file and/or be physically present in the Court house to file any appropriate motions or attend noticed hearings in the matter is to be conducted via email to Leigh.L.Stallings@nccourts.org only and preserved until further order of the Court.

5.      Prior to filing any such document, Defendant shall ensure he is in compliance with paragraph 1 herein above and shall via email, make an appointment to do so with Ms. Stallings in the Clerk's office on the first floor of the Wake County Court House.

6.      Defendant shall only have access to his Court file for review by appointment to be made as detailed as herein and under the supervision of Ms. Stallings or other appropriate personnel within the Clerk's office. Any Such review shall be conducted in Court Room 1A of the Wake County Court House or any other suitable location as determined by the Clerk's office.

7.      Within 15 days of entry of this order, Defendant shall provide to Ms. Stallings via email and/or flash drive, whichever is more practicable and in PDF format, a complete compilation of all filings he contends/believes he has made in relation to his litigation.

8.      A copy of this order is to be placed in each file.

This the 10th day of April, 2017.

_____
The Honorable Michael J. Denning
District Court Judge Presiding

Sardia Marie Porter-Hankins v. Timothy Omar Hankins 14 CVD 8805 - Page 4 of 4

CERTIFICATE OF SERVICE   15CVD7476

This is to certify that the undersigned has, this date, served a copy of Gatekeeper Order
By hand depositing a copy in the US mail to:

Sardia Marie Porter Hankins
3626 Brittlebark Drive
Raleigh NC 27610

Timothy Omar Hankins Sr.
4729 G Street
Garner NC 27529

April 11, 2017

_____
Pamela Reese
Family Court Case Coordinator
PO Box 351
Raleigh, NC 27602
(919) 792-4885

---

**1 of 42**

| | |
|---|---|
| 1 | STATE OF NORTH CAROLINA |
| 2 | COUNTY OF WAKE |
| 3 | |
| 4 | SARDIA PORTER HANKINS |
| 5 | PLAINTIFF |
| 6 | VERSUS |
| 7 | TIMOTHY OMAR HANKINS, SR. |
| 8 | DEFENDANT |
| 9 | |

IN THE GENERAL COURT OF JUSTICE
DOMESTIC SPECIAL SESSION
15-CVD-7476

EXHIBIT 15

10  Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
11  June 15, 2015 Domestic Special Session, before the Honorable Anna Worley, Judge Presiding.

12                                    A P P E A R A N C E S

13  ON BEHALF OF THE PLAINTIFF
14        JOHN OLIVER, Attorney at Law
15  ON BEHALF OF THE DEFENDANT
16        CHARLES AXFORD, Attorney at Law

Heather H. Bath
AOC Approved Transcriptionist

---

**2 of 42**

1                                    I N D E X

2   Opening Argument by Mr. Oliver    -    -    -    -    -    -    3

3   Opening Argument by Mr. Axford    -    -    -    -    -    -    7

4   Direct examination of Plaintiff by Mr. Oliver -    -    -    8

5   Cross examination of Plaintiff by Mr. Axford    -    -    -    17

6   Re-direct examination of Plaintiff by Mr. Oliver    -    -    25

7   Direct examination of Defendant by Mr. Axford    -    -    27

8   Cross examination of Defendant by Mr. Oliver    -    -    -    31

9   Closing Argument by Mr. Oliver    -    -    -    -    -    -    33

10  Closing Argument by Mr. Axford    -    -    -    -    -    -    34

11  Judge's Order -    -    -    -    -    -    -    -    -    35

12  Certification of Transcript    -    -    -    -    -    -    42

Heather H. Bath
AOC Approved Transcriptionist

---

**3 of 42**

1                                    P R O C E E D I N G S

2   The case of Hankins versus Hankins, Wake County 15-CVD-7476, was called for hearing at 2:36 pm on

3   Monday, June 15, 2015. Plaintiff, Defendant and all counsel were present.

4        THE COURT:   Okay. Porter and Hankins. I've got a return on a TRO.

5        MR. AXFORD:   My client just texted me and said he went to 5B instead where we originally

6   unintelligible. Strike that.

7        MR. HANKINS:   I was sitting up in the other courtroom unintelligible this morning.

8        THE COURT:   Mr. Oliver, how many copies?

9        MR. OLIVER:   Just one. I believe the Judge's copy and those are mine.

10       THE COURT:   Okay.

11       MR. OLIVER:   My copies.

12       THE COURT:   Usually I know you appear before Judge Denning. I understand he's not

13  available today so I'll hear the ten (10) day return and we'll see how things end up. Uhh, you all

14  have an hour on the calendar. As you know that means each of you has half an hour to present

15  your case. That would include your opening or closing arguments, any direct or cross

16  examination you wanted to perform. Umm it looks like it's the Plaintiff's motion so the Plaintiff

17  will explain why she feels a Restraining Order is necessary and then sir you'll have the

18  opportunity to respond. Any questions about any of this? And I understand that we're getting

19  some copies made

20       MR. OLIVER:   Uhh-hmm.

21       THE COURT:   but, but I think we can start unintelligible.

22       [Opening statement by counsel for Plaintiff]

23       MR. OLIVER:   We, I think we can probably start Judge and umm I do wanna give a little bit of

24  an opening just because I think it will help you once we start to work through a couple of these

Heather H. Bath
AOC Approved Transcriptionist

---

**4 of 42**

1   documents and all but two (2) my exhibits are unintelligible Affidavit that was the Complaint.

2   So I will only have a couple of exhibits to what I already have as the Affidavit. I'm gonna ask the

3   Court to look at the Affidavits that are in the Complaint. They will be unintelligible, but just as a

4   bit of background. Uhh these are the Hankins. The first date that you need to keep in mind

5   Judge is that they were married in 2001, okay and they didn't separate until June 14, 24 of last

6   year, 2014. 2001 to 2014. The next date that's important in this case there are a couple of

7   corporations that, based on a conversation we had with Judge Denning and talking about LLC's

8   we join them in amended Complaint that i filed this morning that they are joined and having

9   been officially served, but let me tell the Court about these two (2) LLC's. The first LLC was

10  formed on April 8 of 2005, obviously during the marriage, during the unintelligible. That LLC is

11  Sardia Enterprise, LLC. The next date to remember is May 23, 2007, obviously also during the

12  unintelligible. Another LLC was formed and that LLC is Omar Construction and Trucking, LLC.

13  With regarding to Sardia Enterprise, LLC there are two (2) members, husband and wife. With

14  regard to Omar Construction and Trucking, LLC there is one member, husband, Defendant. On,

15  the, the next date you need to remember is June 27 of '07. There are gonna be five (5) lots

16  we're gonna talk about that became part of the TRO that at all, part of a single deed. You'll see the

17  deed and that deed interestingly enough Judge transfers five (5) lots from Sardia, not, not

18  to Timothy Hankins, but to Omar Construction and Trucking, LLC. The title owner to these five

19  (5) lots is Omar Construction and Trucking, LLC. Alright. The next umm date that you need to be

20  aware of and keep in mind Judge, is August 27, 2007. On August 27, 2007 the parties

21  purported to sign and the reason I say purported was if you read the Complaint, Sardia states

22  that the filed document with the Register of Deeds called a Post-Nuptial Agreement is not the

23  Agreement that she signed, but that it was altered before it got filed. Alright. The important

24  part about that document, the Post-Nuptial Agreement, which we're gonna look at in just a

25  minute after we, after, after I get done with just showing the background, is that that document

26  purports and I'm gonna quote it and we're gonna look at it. It purports that husband shall be

27  entitled to the sole ownership and rights to all real properties titled in his name individually or

28  jointly except property titled jointly and in the name of the parties and the reason I emphasize

29  that is nothing in this supposedly Post-Nuptial Agreement deals with the fact that their

30  properties are owned by LLC's and not by them individually. Now at the time this was signed

Heather H. Bath
AOC Approved Transcriptionist

5 of 42

1    Mr. Hankins did own individually two (2) separate pieces of property and they did own one

2    piece of property jointly, which they were gonna continue to hold, hold jointly and that was the

3    *unintelligible* is, is the unintelligible and subsequently lost to foreclosure. The reason that it's

4    important Judge is for the purposes of today's hearing it is, it, irrespective of whether or not you

5    believe that this Post-Nuptial Agreement is enforceable we contend in the Complaint that it

6    absolutely is not enforceable, but even if you were to say well maybe it is on its face it does not

7    address these LLC's and further when you read this document it goes on to say umm, hold on

8    one second. What, this language is really important, Judge. "Wife expressly waives and

9    relinquishes any and all rights established by the law of North Carolina as, related to the rights

10    of equitable dis, distribution concerning said real property, whether codified in NCGS 50-20 or

11    otherwise where statute or laws may *unintelligible* establishing equitable distribution." The

12    Agreement itself, again even if you say where, we, this may be enforceable Mr. Oliver, you can't

13    just tell me it's not enforceable. We say it's not, but even if you said it's enforceable,

14    by its own terms she would have waived her rights only to properties in his individual name and

15    the property we're gonna talk about is not in his individual names and she waived her rights to

16    equitable distribution only as it results to those properties that are in his individual names. So it

17    has nothing to do with the LLC's. She's got an LLC that she's a member of. She'll unintelligible

18    any waives to that. This Agreement doesn't even talk about that and that, the oth, and, and,

19    and by the way Judge this is a little bit more information Sardia Enterprise, LLC owns a beach

20    house in Bolivia, North Carolina. Okay. These, these five (5) lots are owned by the LLC and

21    there are other pieces of real property that are owned by Omar Construction and Trucking, LLC.

22    In fact, to my knowledge, there's only one property left that's in any, any, any, either one of

23    their individual names. So what's happened and what brought up the TRO? We, we got

24    information on Thursday before, Thursday June 4th the individual names and the closing on Friday June 5th of

25    the five (5) lots that we're talking about that are titled in the name of Omar Construction and

26    Trucking, LLC and that the closing proceeds we understood were gonna be in excess of

27    $200,000. Umm my client will testify that she recalls they paid $275, 000, I believe, for all five

28    (5) lots. So knowing that Mr. Hankins controlled Omar Construction and Trucking, LLC and the

29    properties were titled in the name of Omar Construction, LLC he could carry through with this

30    closing without Sardia being able to exercise her equitable rights through her rights to the LLC,

---

6 of 42

1    which owned the property. So we got the TRO saying that if you've got the sale proceeds and

2    you, you got a copy of it. Basically it says don't sell any other pieces of property and if you sold

3    these properties don't do anything with the proceeds that you've gotten from the sale of the

4    property until we come up, back on a preliminary injunction. We're here today for a preliminary

5    injunction and the reason is very simple. Properties are owned, not in their individual names,

6    which are gonna require them to be joined at the closing table if they're gonna close, but are

7    owned in the names of LLC's, particularly Omar Construction and Trucking, which is controlled

8    by the Defendant, Timothy Hankins and he can go sell; he can do anything he wants with those

9    because he controls the LLC. He owns the LLC. He's the sole member of the LLC. So without my

10    client's knowledge or consent he can go out and sell what we would contend would be virtually

11    all of the assets of the marital estate except for one he might have trouble selling to the beach

12    property in Bolivia, because my client is a member of that LLC, although Mr. Hankins actually

13    controls it. So at the end of the day because the manner in which everything is titled and

14    because this purported Post-Nup that we'll look at does not address what do you do with the

15    LLC's that clearly were created during the marriage and clearly have hundreds of thousands of

16    dollars of assets in them. What are you gonna do with them? Well you gotta control them in

17    some way. I mean the Court has to take control of those assets to make sure they don't just

18    disappear or that someone takes it, sells it and uses the money how they deem appropriate. I

19    know that's a longwinded opening, but there's, there's, it's easier I think when you look at the

20    Complaint and you see these, these Exhibits that are part of it and we'll go through to kind of

21    give the Judge a clear understanding of why it is important, unlike other cases, to get a

22    preliminary injunction in place to control these properties because the properties are controlled

23    by LLC's that at least one of which is controlled solely by Mr. Hankins and what I would like

24    to go into umm evidence from or call witnesses and the only question I have before the Court

25    and I think will be answered is I don't think the closing went through, but I'm not sure.

26    *Laughing.* I couldn't tell from the deeds.

27    THE COURT:   Okay.

28    MR. OLIVER:   Okay.

29    THE COURT:   Mr. Axford, any opening statements?

---

7 of 42

1    [Opening statement by counsel for Defendant]

2    MR. AXFORD:   Uhh, briefly Judge, umm if you can imagine we'll contend that their Post-Nuptial

3    Agreement is in full force and effect and the two (2) paragraphs that uh Mr. Oliver is referring to is I

4    think they uhh, they specifically say the opposite of he would have the Court believe umm even if the

5    Court were to find that this piece of property is not under the first part of the paragraph that he

6    referred to, then the Plaintiff is still gonna be, have the Court find that the property and the LLC are

7    marital assets, but in this Post-Nuptial Agreement does specifically include marital assets and all nuptial

8    agreements specifically include marital property, otherwise we wouldn't need one. So Judge there's,

9    I've, I've got several different cases I can hand up. I, I don't even know if you've even had a chance to

10    look at the Post-Nuptial Agreement umm but the language specifically in this Post-Nuptial Agreement

11    fits squarely under the relevant case law as it's related to post-nuptial agreements umm and I know

12    Your Honor doesn't have a history with these, these two (2) particular parties, but I think it will become

13    evidently clear to you that what Mrs. Porter Hankins does is she enters agreements and then when she

14    decides she doesn't like 'em she comes in here and says 'No, I didn't know what I was signing. No, this

15    isn't valid on its face. Umm, Mr. Hankins tricked me. Umm, I didn't know what I was doing. Umm, I'm

16    doing a lot of different things', but Judge we will actually have evidence that it was Mrs. Hankins who is

17    very, very close to committing a fraud on the Court in transferring the property to begin with. Umm so

18    Judge other, other than that I would just say the evidence will show that it shows and, and if you gonna

19    ask you to dissolve the injunction and not grant the TRO. As you well know Judge, the standard is that

20    the moving party has to prove to you that there is a substantial likely bit of success on the merits of the

21    case. Uhh we're not here to discuss the merits. We're here to discuss whether there is a substantial

22    likelihood of success on the underlying case. Umm I don't think and in fact I know that the Plaintiff will

23    not be able to show that to the Court and I'm gonna ask that you do not grant the TRO and if a later

24    Court decides something differently about this, then so be it. However, that's not where we are today.

25    Thank you.

26    THE COURT:   Okay. Mr. Oliver.

27

28

---

8 of 42

1    [Direct examination of Plaintiff by counsel]

2    MR. OLIVER:   Call Sardia Hankins. Judge, this is for your ease of looking at Exhibits. I'm gonna

3    have them there and, and uhh after I'll hand 'em to you as I *unintelligible.*

4    THE COURT:   Do you have an Exhibit list, Mr. Oliver? Mr. Oliver? Do you have an Exhibit list?

5    MR. OLIVER:   I don't. Umm I'll just have to read 'em off to you as I go through 'em.

6    THE COURT:   If you will have a seat, if you will. Please raise your right hand. If you wish you

7    may place your left hand on the Bible, otherwise you'll be affirmed. Do you solemnly swear testimony

8    you shall give to the Court to be the truth, the whole truth and nothing but the truth so help you God?

9    MRS. HANKINS: Yes, ma'am.

10    THE COURT:   Thank you. You may proceed.

11    MR. OLIVER:   Judge, if you'll turn to Exhibit 1 in that notebook I gave you. If I may approach

12    the witness?

13    THE COURT:   You may.

14    MR. OLIVER:   Okay. I'm, I'm showing you a notebook and the first one to come up Exhibit 1

15    and it consists of a few pages and it appears to have a notary, notarized signatures of you and Mr.

16    Hankins on it. Do you recognize this document?

17    MRS. HANKINS: Unintelligible.

18    MR. OLIVER:   Okay. Is that the purported Post, let me see that unintelligible. Yes, she did I

19    think was the answer. And is that the purported Post-Nuptial Agreement that you and your husband are

20    supposed to have sign in the form it exists here?

21    MRS. HANKINS: No.

22    MR. OLIVER:   Well wait, wait a minute. Do you contest in your Complaint that's, that Exhibit 1

23    is not the one you actually signed? Is that correct?

24    MRS. HANKINS: Umm everything is not what was in the Agreement that we signed.

## 9 of 42

1  MR. OLIVER:   And that part of you're contesting whether this is the one that was actually
2  signed as you set out in your Complaint. Correct?

3  MRS. HANKINS: That's correct.

4  MR. OLIVER:   Alright now. This is the one that was actually filed by the, I think your husband
5  filed it with the Registry. Do you recall that?

6  MRS. HANKINS: Unintelligible.

7  MR. OLIVER:   You recall finding out after this was filed.

8  MRS. HANKINS: Yes. Yeah, I found out after that was filed.

9  MR. OLIVER:   Alright. Now I'm gonna look at this document that's been filed and I'm turning
10  to Page 2 of that document and looking at Paragraph 3 okay and I'm gonna ask you to read the part
11  where it starts "In accordance with NCGS 50-20(g). Can you read that? Sardia, start at this. "In
12  accordance with NCGS 50-20.

13  MRS. HANKINS: In accordance with NCGS 50-20 the parties hereby acknowledge that the
14  provision herein for the partial and unequal distribution of marital properties are equitable and are fair,
15  reasoned out and satisfied to the husband.

16  MR. OLIVER:   Okay and you read that it said "partial and unequal division of the marital
17  assets" correct?

18  MR. AXFORD:   I'm gonna object at this point. He asked her to read the whole thing and she
19  stopped. She didn't read the whole sentence or the whole part of that paragraph.

20  MR. OLIVER:   I think she did end with reasonable and satisfactory to husband and wife
21  though.

22  MR. AXFORD:   She didn't say, she did not say "and wife."

23  MRS. HANKINS: Unintelligible didn't say.

24  MR. OLIVER:   Oh, okay. I'm sorry.

## 10 of 42

1  MRS. HANKINS: I'm sorry. I didn't unintelligible.

2  MR. OLIVER:   Okay so that, that sentence says that this is a partial settlement of your marital
3  estate. Doesn't it?

4  MRS. HANKINS: Yes, it does.

5  MR. OLIVER:   Alright. Do you recall whether any part of that document says anything about
6  Sardia Enterprise?

7  MRS. HANKINS: No.

8  MR. OLIVER:   It doesn't, does it?

9  MRS. HANKINS: No, it doesn't.

10  MR. OLIVER:   And it doesn't mention Omar Construction and Trucking either, does it?

11  MRS. HANKINS: No, it doesn't.

12  MR. OLIVER:   You've never signed any document to your knowledge that waives your interest
13  in either of those LLC's have you?

14  MRS. HANKINS: No, I haven't.

15  MR. OLIVER:   Okay.  These five (5) lots that we're talking about; can you tell the Judge where
16  they're located?

17  MRS. HANKINS: One's at

18  MR. OLIVER:   Just generally, are they in Garner?

19  MRS. HANKINS: They're in Garner.

20  MR. OLIVER:   Alright. And those, did you normally, did you first own those five (5) lots?

21  MRS. HANKINS: Yes, I did.

22  MR. OLIVER:   When did you acquire those five (5) lots?

## 11 of 42

1  MRS. HANKINS: Umm I think they were in 2000 and umm, I'm trying to remember the year, but I
2  think it was in 2004.

3  MR. OLIVER:   Okay.  So you owned those lots, but at some point you did transfer them to
4  Omar Construction, did you not?

5  MRS. HANKINS: Yes, I did.

6  MR. OLIVER:   If I may approach again, Judge?

7  THE COURT:   You may.

8  MR. OLIVER:   Judge, if you'll turn – this is Exhibit 8 in your booklet and I'm handing you what
9  is Exhibit 8 and it appears to be a deed from you Behavior Intervention Healthcare to Omar Construction
10  regarding the Exhibit 8, which is these tracts. Do you recognize that?

11  MRS. HANKINS: Yes, sir.

12  MR. OLIVER:   Or do you recall transferring the property to Omar Construction and Trucking,
13  LLC?

14  MRS. HANKINS: Yes, I did.

15  MR. OLIVER:   And do you remember when you did that?

16  MRS. HANKINS: That was back in 2007.

17  MR. OLIVER:   Can you tell me the date the deed that you transferred that property to you, to
18  the company?

19  MRS. HANKINS: I know it's

20  MR. OLIVER:   Do you know what the date is on the top of it, when it was filed in the Register
21  of Deeds?

22  MRS. HANKINS: There's June 27, 2007.

## 12 of 42

1  MR. OLIVER:   So from this record as public record it appears that on that date you personally
2  transferred those five (5) lots from your ownership to Omar Construction and Trucking, LLC.  Correct?

3  MRS. HANKINS: Yes, sir.

4  MR. OLIVER:   Alright.  You are part owner, part owner or member I should say of Sardia
5  Enterprises?

6  MRS. HANKINS: Yes, sir.

7  MR. OLIVER:   And when did you start Sardia Enterprises?  Do you recall?

8  MRS. HANKINS: That was in 2005.

9  MR. OLIVER:   2005?

10  MRS. HANKINS: Yes, sir.

11  MR. OLIVER:   Okay.  And if you'll look at, this is your Exhibit 9, do you recall registering it with
12  the Register of the State of North Carolina Secretary of State?

13  MRS. HANKINS: Yes, sir.

14  MR. OLIVER:   And who else is a member of that LLC?

15  MRS. HANKINS: Mr. Hankins.

16  MR. OLIVER:   Alright.

17  MR. AXFORD:   I don't have that Exhibit, John.

18  MR. OLIVER:   Oh that's the one I just gave you

19  Crosstalk between counsel and the Clerk.

20  MR. AXFORD:   I just told him I didn't have that particular Exhibit. I've got, I've got the other
21  ones so far.

## 13 of 42

1   MR. OLIVER:   I had, that's the one that's not unintelligible. I'll let you look at it while I ask
2   some questions. I know your copy is here somewhere.

3   MR. AXFORD:   That's supposed to be 9.

4   MR. OLIVER:   Okay.

5   MR. AXFORD:   I had the wrong number on that.

6   MR. OLIVER:   Okay. Umm Sardi's Enterprises umm is, does it own any real estate?

7   MRS. HANKINS: Yes, it does.

8   MR. OLIVER:   Do you know where it owns real estate?

9   MRS. HANKINS: There's some property in Bolivia.

10  MR. OLIVER:   Okay. If I may approach, Judge?

11  THE COURT:   You may.

12  MR. OLIVER:   I'm gonna hand you what I've marked as Exhibit 10 and ask if you can identify
13  where you got that unintelligible. You don't have that one either. That's 10. Do you know what that is?

14  MRS. HANKINS: Yes, this is a house we have in Bolivia in Brunswick County.

15  MR. OLIVER:   Do you remember when it was deeded to Sard, Sardia Enterprise?

16  MRS. HANKINS: It was either back in umm unintelligible.

17  MR. OLIVER:   Okay. Is there a lien on that property?

18  MRS. HANKINS: No.

19  MR. OLIVER:   How much, how much do you think the property is worth?

20  MRS. HANKINS: $292,000.

21  MR. OLIVER:   Alright. Let's go back to the five (5) lots. Do you recall the five (5) lots? When
22  you guys bought them, how much did you put down and how much did you borrow?

Heather H. Bath
AOC Approved Transcriptionist

## 14 of 42

1   MRS. HANKINS: We put down $225,000 cash and we borrowed $50,000.

2   MR. OLIVER:   Now do you still owe $50,000 on that?

3   MRS. HANKINS: No.

4   MR. OLIVER:   And you just testified when you, when you and Mr. Hankins during the marriage
5   acquired those five (5) lots, it came in to be in your name?

6   MRS. HANKINS: Yes, sir.

7   MR. OLIVER:   Was it ever in Mr. Hankins name?

8   MRS. HANKINS: No.

9   MR. OLIVER:   Was it ever in your and Mr. Hankins name?

10  MRS. HANKINS: No.

11  MR. OLIVER:   To your knowledge has his name ever been on that deed?

12  MRS. HANKINS: No.

13  MR. OLIVER:   Judge, what's my time?

14  THE COURT:   Eleven (11) and some change.

15  MR. OLIVER:   Eleven (11) and some change? Okay. Did you come to me on June 4 of 2015
16  and tell me that you believed that the properties were gonna be sold?

17  MRS. HANKINS: Yes, sir.

18  MR. OLIVER:   Have those, had those properties been on the market for, or for what period of
19  time had those properties been on the market, to your knowledge?

20  MRS. HANKINS: I'm not sure. I know Mr. Hankins been trying to sell for quite a while behind my
21  back.

22  MR. OLIVER:   He's, okay this is the even before you separated?

Heather H. Bath
AOC Approved Transcriptionist

## 15 of 42

1   MRS. HANKINS: Yes.

2   MR. OLIVER:   Okay and do you know what the list price was for these properties?

3   MRS. HANKINS: Well when I looked on the internet I saw the $250,000.

4   MR. OLIVER:   Okay and that would be comparable to what y'all paid for it. I mean it's not the
5   same amount, but it was in that ballpark. Do you know if there was any liens on that property?

6   MRS. HANKINS: Not to my knowledge.

7   MR. OLIVER:   And in preparation for filing an equitable distribution action did you complete
8   an equitable distribution affidavit?

9   MRS. HANKINS: Yes.

10  MR. OLIVER:   And I'm gonna read some properties to you and, and tell me if you know, to the
11  best knowledge, 4729 Garner – who is the title owner of that property? Do you know?

12  MRS. HANKINS: 2729?

13  MR. OLIVER:   20, I'm sorry 4729.

14  MRS. HANKINS: Okay, that's Omar Construction and Trucking, LLC.

15  MR. OLIVER:   Okay. And 1317 Garner Road in Garner, uhh Garner Road in Garner. Who owns
16  that to your knowledge?

17  MRS. HANKINS: Timothy Hankins.

18  MR. OLIVER:   610 East Market Street in Raleigh North Carolina. To your knowledge who owns
19  that?

20  MRS. HANKINS: Umm it was, it was deeded in Timothy Hankins, but I think it's in Omar
21  Construction and Trucking now.

Heather H. Bath
AOC Approved Transcriptionist

## 16 of 42

1   MR. OLIVER:   Okay and are there, I'm, I'm looking at your affidavit and it appears you have
2   fourteen (14) separate items of property umm strike that. Are there other properties other than the
3   Bolivia property that you believe are owned by Sardia Enterprises?

4   MRS. HANKINS: No.

5   MR. OLIVER:   Okay. Do you know of any other properties other than these five (5) lots that
6   are owned by Omar Construction and Trucking Company?

7   MRS. HANKINS: Yes, there are other properties.

8   MR. OLIVER:   Okay. Where are those properties generally located?

9   MRS. HANKINS: They're in Garner.

10  MR. OLIVER:   Alright and to you knowledge are their liens on a lot of these properties or are
11  most

12  MRS. HANKINS: There is no liens on any of the property. There is one, 1317 West Garner Road
13  we had a mortgage on that one.

14  MR. OLIVER:   Okay. Was that the former marital residence?

15  MRS. HANKINS: No.

16  MR. OLIVER:   Okay.

17  MRS. HANKINS: Umm we had bought it in 2007 for the office.

18  MR. OLIVER:   Okay.

19  MRS. HANKINS: Unintelligible.

20  MR. OLIVER:   So most of these properties are owned free and clear – is that your testimony?

21  MRS. HANKINS: Yes.

22  MR. OLIVER:   One second, Judge. Judge, that's, that's all I have right now.

Heather H. Bath
AOC Approved Transcriptionist

## 17 of 42

1     THE COURT: Okay. Cross examination

2     [Cross examination of Plaintiff by counsel]

3     MR. AXFORD: Thank you, Judge. Mrs. Hankins, Mrs. Porter Hankins, I'm sorry. Umm you said

4 you acquired this property, these five (5) lots that your attorney asked you about. How did you do that?

5     MRS. HANKINS: We had sold two (2) houses in Clayton.

6     MR. AXFORD: And at that point you testified that uhh Sardia Enterprises was created in 2005.

7     MRS. HANKINS: Yes, sir.

8     MR. AXFORD: And that's, the two (2) members of Sardia Enterprises are yourself and Mr.

9 Hankins.

10     MRS. HANKINS: Yes.

11     MR. AXFORD: You acquired this Loop Road property when?

12     MRS. HANKINS: As I stated before, I'm not sure about the exact date of the property, but I

13 believe it probably in umm, I think it was in 2004.

14     MR. AXFORD: And when you acquired those properties, you acquired when you, earlier you

15 said that he's trying to sell this, these lots or this lot behind your back. You actually acquired that in your

16 own name as a DBA of Behavior Intervention Healthcare didn't you?

17     MRS. HANKINS: Yes, it was, it was in Sardia Enterprise first and umm after we were trying to

18 form a business unintelligible Jennifer, Jennifer. So we were gonna run a business on that property so

19 we had it listed Intervention Behavior unintelligible and which I was the owner of that business.

20     MR. AXFORD: How could you, how could it be your intention to acquire this property in the

21 name of Sardia Enterprises, if Sardia Enterprises wasn't even in creation at the time?

22     MRS. HANKINS: The property was listed in Sardia Hankins.

23     MR. AXFORD: Right. You said it was your intention

Heather H. Bath<br>AOC Approved Transcriptionist

## 18 of 42

1     MRS. HANKINS: In Sardia Hankins.

2     MR. AXFORD: Correct.

3     MRS. HANKINS: Okay.

4     MR. AXFORD: And that's, that's, that's you.

5     MRS. HANKINS: That's right.

6     MR. AXFORD: That has nothing to do with my client.

7     MRS. HANKINS: That's right.

8     MR. AXFORD: Even though you and my client bought it together you titled in your name

9 individually.

10     MRS. HANKINS: No. We had an agreement but to unintelligible at the time when we bought it it

11 was Jackie, the real estator, that this man was supposed to do all the paperwork for that property. He

12 was going behind Jackie's back to do it. That was a problem. That's how it ended up being deeded in

13 my name instead of the business name or in his name because he was going behind Jackie's back and he

14 didn't want Jackie to know that's what he done. So he brought home an agreement that he would put it

15 in my name. That's what he said, then that way Jackie would unintelligible had done all the transaction

16 and at that time I was the one who was running the business.

17     MR. AXFORD: But you, now you just testified that it was your intention, both of y'all's

18 intention, to put this in the name of Sardia Enterprises.

19     MRS. HANKINS: We didn't put it in Sardia Enterprises.

20     MR. AXFORD: That's not, you, you're misunderstanding my question. My question is, is you

21 just testified three (3) minutes ago that it was your intention to put the name of this property on Loop

22 Road in the name of Sardia Enterprises.

23     MR. OLIVER: Judge, I'm gonna object to the extent that I'm, I'm not sure if that's what she

24 said, but even if that's what she said back when she, they acquired it and they intended to do something

25 with it. That's not, clearly that's not what they did it. They put it in the name of his LLC.

Heather H. Bath<br>AOC Approved Transcriptionist

## 19 of 42

1     THE COURT: I'll let him, I'll let him ask.

2     MR. AXFORD: My question is simply this. How could it have been your intention to put it in

3 the name of Sardia Enterprises if Sardia Enterprises didn't even exist?

4     MRS. HANKINS: I didn't, I didn't say, I didn't say we put it in Sardia 'cause we didn't intend it to

5 go there. We had bought the business. It was for me and Jennifer to run a business on, which is

6 Behavior Intervention Healthcare. That was the purpose of that land.

7     MR. AXFORD: Did you, did you ever set up a business on this land?

8     MRS. HANKINS: We didn't set up a business on the land because we were having some problem

9 with the land and on the other hand Jennifer did unintelligible at the time because Jennifer did and

10 Jennifer realized Tim was going to be in the business and she didn't want to do any business with him.

11     MR. AXFORD: So in fact

12     MRS. HANKINS: Then she backed out

13     MR. AXFORD: So in fact it was, you ended up putting a, this land in your name behind Tim's

14 back.

15     MRS. HANKINS: No, no. We were at the closing together with David Sharon, both of us. They,

16 we all agreed right at the closing. He was there in the closing. This wasn't me alone. I just 'cause I was

17 from Jamaica. I didn't honestly know how these things goes. He spoke to David Sharon and tell David

18 Sharon what to do and David Sharon did as just what as Mr. Hankins said.

19     MR. AXFORD: Isn't it true that you conspired with David Sharon to put this property in your

20 name?

21     MRS. HANKINS: No, no, no 'cause I didn't know David Sharon.

22     MR. AXFORD: You didn't know him, but he was doing a closing for you?

23     MRS. HANKINS: I didn't know Sharon. David Sharon was Tim's lawyer. He took me to David

24 Sharon. We were in the office. David Sharon met, I, the only time I go to David Sharon on this. He sent

25 me to give David Sharon something. We wasn't that close to do anything like that.

Heather H. Bath<br>AOC Approved Transcriptionist

## 20 of 42

1     MR. AXFORD: You filed the DBA for Behavior Intervention Healthcare in July of 2004?

2     MRS. HANKINS: I don't quite remember what year it was.

3     MR. AXFORD: Does that sound right?

4     MRS. HANKINS: Probably.

5     MR. AXFORD: That, that business never has actually done anything has it?

6     MRS. HANKINS: No, we didn't because at the time we were going to do it unintelligible as I told

7 before I came from Jamaica. I didn't understand the unintelligible or anything. Jennifer Jones was the

8 one that was, I was gonna be the one over Jennifer 'cause Tim really like it but unintelligible his money.

9 She is the one that had the license and everything to handle the business. We were gonna do a group

10 home there for teenagers and she was the one that was gonna be. So we had formed the business.

11     MR. AXFORD: So did you get any bu

12     MRS. HANKINS: We

13     MR. AXFORD: Did you get any business licenses?

14     MRS. HANKINS: No, we didn't get any. We didn't go in for it because Jennifer was the one who

15 was supposed to do the paperwork since she understand how to do it. I'm not, I didn't, I unintelligible.

16     MR. AXFORD: But you put

17     MRS. HANKINS: It was a business

18     MR. AXFORD: a $250,000 property into it.

19     MRS. HANKINS: It was a business that Mr. Hankins and Jennifer had been talking before I got

20 here and when I got here they started talking about it again and he told Jennifer that we could go do the

21 business together and we would operate the business. That's what he told Jennifer. So at that time

22 that's what we were going after, but during the course of the business Mr. Hankins and her husband

23 start doing, getting all this stuff together and then Jennifer realized Tim was in it. He and Jennifer speak

24 about it and Jennifer didn't wanna get into it with Tim because she say Tim is somebody that will do a

Heather H. Bath<br>AOC Approved Transcriptionist

1   shady business. If it was me and her alone she would do it, but with him being involved she ain't gonna
2   do it.

3   MR. AXFORD:   But when did that come about?

4   MRS. HANKINS: That was back when we were trying to create the business together.

5   MR. AXFORD:   But you just, again you just testified thirty (30) seconds ago that Jennifer and
6   Tim had been talking about this business

7   MRS. HANKINS: For years

8   MR. AXFORD:   Let me finish my question please. You said before you ever got here, which
9   means before you ever arrived in the US

10   MRS. HANKINS: That's right.

11   MR. AXFORD:   Jennifer and Tim were talking about doing this business.

12   MRS. HANKINS: That's right.

13   MR. AXFORD:   Now all of a sudden you get here and Jennifer says Tim's shady so the business
14   got canceled. Is that what you want this court to believe?

15   MRS. HANKINS: Jennifer

16   MR. OLIVER:   Objection.

17   MRS. HANKINS: I can go only after what

18   THE COURT:   Overruled.

19   MRS. HANKINS: I can only go after what Jennifer told me. They told, Tim told me

20   MR. AXFORD:   Objection to what Jennifer said.

21   THE COURT:   Okay.

22   MRS. HANKINS: Tim told me

Heather H. Bath
AOC Approved Transcriptionist

---

1   THE COURT:   Tim told her.

2   MRS. HANKINS: Tim told me that she and Jennifer was supposed to do the business as a group
3   home for years and that what was, I told Tim at that time okay we will get it then. Jennifer came over at
4   the house at that time; we used to go from because Jennifer used to transport me to and from school.
5   We used to go shopping and stuff 'cause Tim had asked her because I didn't know my way around in
6   Raleigh. So that's how we end up start talking the business and I let her know okay Tim told Jennifer
7   then okay me and her gonna run the business, in which we all did agree at that time and what happened
8   we had started doing the paperwork. Jennifer was supposed to do her side and at least I don't know
9   what it is and so what she was supposed to do. All I know is we were gonna run this group home. I
10   didn't know anything about group home. I don't have no knowledge of group home. Jennifer is the one
11   who does it because she has the license. She has the education for it and everything. I, Tim, we were
12   just gonna open the business. That's what it was.

13   MR. AXFORD:   So it's your testimony here that you have a property interest in this Loop Road
14   property because you guys bought this property after you were married. Isn't that right?

15   MRS. HANKINS: Yes, I do.

16   MR. AXFORD:   You also testified that the, the piece of property down in, is it Brunswick
17   County?

18   MRS. HANKINS: Yes, sir.

19   MR. AXFORD:   That is titled in the name of Sardia Enterprise?

20   MRS. HANKINS: It is.

21   MR. AXFORD:   Has Tim ever tried to do anything shady with that?

22   MRS. HANKINS: Unintelligible.

23   MR. AXFORD:   You have any information that that's trying to be sold or it's on the market?

24   MRS. HANKINS: No, I don't.

25   MR. AXFORD:   He ever try to sell the marital residence behind your back?

Heather H. Bath
AOC Approved Transcriptionist

---

1   MRS. HANKINS: Not that I know of.

2   MR. AXFORD:   Just give me one second, Judge. Do I have a time?

3   THE COURT:   Fifteen fifty-five.

4   MR. AXFORD:   That's remaining or elapsed?

5   THE COURT:   Remaining.

6   MR. AXFORD:   Remaining. Can you tell me who Evroy Brown is?

7   MRS. HANKINS: Yes.

8   MR. AXFORD:   Who is that?

9   MRS. HANKINS: Evroy Brown is a friend of all of us.

10   MR. AXFORD:   You do business with him?

11   MRS. HANKINS: Yes, I used to.

12   MR. AXFORD:   Is that the same business that, was, was that recently?

13   MRS. HANKINS: Yes, we; yes, we did.

14   MR. AXFORD:   And what, what kind of business did you guys do together?

15   MRS. HANKINS: Well he owns a trucking company and uhh I'm not saying do business together.
16   He own a trucking company and he would ask me to do his paperwork.

17   MR. AXFORD:   Like admin, like administrative capacity?

18   MRS. HANKINS: Yes.

19   MR. AXFORD:   Umm, describe a little bit; I'm not real fa, completely familiar with what an,
20   administrative assistant would do like that. Describe some of your duties.

21   MRS. HANKINS: Well it was his, will call the contractor on the job umm checks and the
22   invoices to be paid.

Heather H. Bath
AOC Approved Transcriptionist

---

1   MR. AXFORD:   You provide other contractors information? Like if, if somebody calls and
2   wants to hire his business – do you handle that part of it?

3   MRS. HANKINS: Yeah, I did that some times.

4   MR. AXFORD:   Okay. Does that involve sending out uhh bids?

5   MRS. HANKINS: No.

6   MR. AXFORD:   Does not. You don't do the bidding part.

7   MRS. HANKINS: No.

8   MR. AXFORD:   Do you send out umm well – strike that. Sorry, Judge. What other, what kind of
9   information would you send to somebody who wants to hire his business?

10   MRS. HANKINS: Well if someone wants to hire the only thing I would do is send out the
11   insurance company, probably send out insurance coverage information.

12   MR. AXFORD:   Okay. Make sure you're bonded and all that stuff.

13   MRS. HANKINS: That's right. Just regular insurance.

14   MR. AXFORD:   Okay. This Post-Nuptial Agreement – you were given an opportunity to talk to
15   an attorney and you chose not to do that. Correct?

16   MRS. HANKINS: No, that is incorrect.

17   MR. AXFORD:   Why is that incorrect?

18   MRS. HANKINS: Because at the time when Mr. Hankins bring the papers home I was
19   unintelligible thing I could not have even and he came home and stated that he had umm, he had some
20   papers he wanted me to sign for unintelligible his business and what happened I told I him I was tired
21   that day and umm I put it on the table and I'll get the papers signed. At that time we were having
22   problems and umm by the morning when I got home the papers were missing. So I called unintelligible
23   the paperwork missing so I took my son to school and he had called me asking me was I'm gone sign the
24   papers and I told him that the papers they wasn't there for me to sign so how I can sign the paperwork if

Heather H. Bath
AOC Approved Transcriptionist

---

**25 of 42**

1    it's not there. Anyhow, months passed after he been told me unintelligible calling me, asking me to

2    come out to sign the papers and stuff. I told him what papers 'cause I never seen the papers. I don't

3    know what the paper is and he told me if I don't sign the paper he's not gong pay the mortgage on the

4    house and if I notice that he hadn't paid the previous month mortgage and I told him yes I know this it

5    hasn't been paid.

6            MR. AXFORD:   Where were you living at the time?

7            MRS. HANKINS: 109 Fieldgrass Place.

8            MR. AXFORD:   Your Honor, does, does the time you have remaining include my presenting

9    evidence?

10           THE COURT:    It includes everything. Anything you wanna do.

11           MR. AXFORD:   I have no more questions at this time.

12           THE COURT:    Okay. Mr. Oliver.

13           MR. OLIVER:    Time, Judge? Not a lot, I know.

14           THE JUDGE:     Eight-fifteen.

15           [Re-direct examination of Plaintiff by counsel]

16           MR. OLIVER:    Okay. Just to make sure we're clear – you were married in 2001, correct?

17           MRS. HANKINS: Yes, sir.

18           MR. OLIVER:    Did you thereafter build; you and your husband build a couple of homes in

19    Clayton, North Carolina?

20           MRS. HANKINS: Yeah

21           MR. OLIVER:    When you sold those homes did you make a profit?

22           MRS. HANKINS: Yes, sir.

23           MR. OLIVER:    What did you do with the profits from the homes that you built in Clayton,

24    North Carolina?

Heather H. Bath
AOC Approved Transcriptionist

---

**26 of 42**

1           MRS. HANKINS: That's the property that used to help buy umm house, that two (2) lots.

2           MR. OLIVER:    The lots that we've been talking about?

3           MRS. HANKINS: Yes.

4           MR. OLIVER:    Alright. Was that, you said $225,000. To the best

5           MRS. HANKINS: Yes.

6           MR. OLIVER:    of your knowledge is that where that money came from?

7           MRS. HANKINS: Yeah

8           MR. OLIVER:    The

9           MRS. HANKINS: Yeah part of it came from there.

10           MR. OLIVER:    And you took out $50,000 loan from the person you bought the property from?

11           MRS. HANKINS: No, we took a $50,000 loan on our house that we're living in before, 109

12    Fieldgrass Lane.

13           MR. OLIVER:    Okay. So you took a loan off that to pay the rest of what you owed.

14           MRS. HANKINS: Yes.

15           MR. OLIVER:    Did you initially pay off the equity line that you got the $50,000 from? Did you

16    pay off the $50,000? Do you still owe that money or did you get paid off?

17           MRS. HANKINS: It paid off.

18           MR. OLIVER:    Okay. And if I recall correctly, the initial purpose of these lots was to build and

19    create a business, Behavioral Intervention Healthcare.

20           MRS. HANKINS: Yes, that was my knowledge.

21           MR. OLIVER:    And that business never got off the ground.

22           MRS. HANKINS: No.

23           MR. OLIVER:    And so those properties remained titled in your name until they were

24    transferred to Omar Construction and Trucking Company.

25           MRS. HANKINS: Yes, sir.

26           MR. OLIVER:    That's all I have, Judge.

Heather H. Bath
AOC Approved Transcriptionist

---

**27 of 42**

1           THE COURT:    Anything based on that?

2           MR. OLIVER:    No.

3           THE COURT:    Thank you, ma'am. You can step down. Any other witnesses for the Moved?

4           MR. OLIVER:    No, Your Honor.

5           THE COURT:    For the Respondent?

6           [Direct examination of Defendant by counsel]

7           MR. AXFORD:   Yes, Judge. I called Mr. Timothy Omar Hankins, Sr.

8           THE COURT:    Sir, come on up. Before you have a seat please raise your right hand if you wish

9    or you may place your left hand on the Bible otherwise you'll be affirmed. Okay. Do you affirm the

10    testimony you shall give the Court should be the truth, the whole truth and nothing but the truth? Is

11    that your solemn affirmation?

12           MR. HANKINS: It is.

13           THE COURT:    Thank you. You may be seated.

14           MR. AXFORD:   Will you state your name for the Court?

15           MR. HANKINS: Timothy Omar Hankins, Sr.

16           MR. AXFORD:   Okay. Mr. Hankins we've got a little bit of a time crunch so we

17           MR. HANKINS: Alright.

18           MR. AXFORD:   gonna try to focus on some of the stuff that you heard Mrs. Porter Hankins

19    testify about. Umm when acquiring these lots at, on the, the Loop Road property that we're talking

20    about here today were you aware at the time that it was recorded that Mrs. Porter Hankins put that, the

21    title to those properties in her own name?

22           MR. HANKINS: I did not.

23           MR. AXFORD:   When did you learn about that?

24           MR. HANKINS: I actually learned when I went to pay some fees over at the City of Garner for

25    the water, the city hook-up and it, has to be the owner of the property. That's, it was at that time when I

26    went to find out unintelligible.

27           MR. AXFORD:   Okay. Umm did you believe at that point she was trying to tide that property in

28    her name behind your back?

Heather H. Bath
AOC Approved Transcriptionist

---

**30 of 42**

1           MR. AXFORD:   Okay. And eventually she signed it. As far as the document that you have its

2    signed and notarized.

3           MR. HANKINS: That's, that's correct. We both were there, had it signed and notarized and we

4    both went down and had it recorded. We were together that day.

5           MR. AXFORD:   And this at the Wake County Register of Deeds?

6           MR. HANKINS: It, yes, sir. That's where it was recorded at. We, we went down there. We

7    signed it and at the time she was my wife. I was extremely upset. I felt like we were in a bind 'cause

8    when she took that $175,000 and put that property in her name keep in mind I got other people's

9    money and that was a, that was a showstopper. That was just, that was just a showstopper for me. It

10    was just

11           MR. AXFORD:   Okay.

12           MR. HANKINS: devastating.

13           MR. AXFORD:   When she put it in her own name under the DBA did she ever make any attempt

14    to transfer it back even to Sergia Enterprise, which was a business owned by both of you?

15           MR. HANKINS: Uhh, no she did not. It was, it was, it, that $175,000 it missing out of my, you

16    know out of the money plus I had to pay an additional $50,000. Okay from the $175,000 down to this

17    day I have spent another $110,000 to save that property. Just to hold on to it, which was the $50,000

18    that I had to pay David Sharon to finish paying it off. That's why he lost his license. Umm then it was

19    $5,800 a year in taxes. Umm then they charged uhh $12,000 for foreclosure, which it shouldn't have

20    been in foreclosure because he got the money up front. So the whole thing with uhh him and her and

21           MR. AXFORD:   By you say him – you mean David Sharon.

22           MR. HANKINS: David Sharon and my wife. Eventually, the State Bar got hold to him. I know

23    once I got it paid off and got the foreclosure stopped it took me about a year to get my head together

24    before I filed that complaint with the State Bar and that's when they come in and took his license.

25           MR. AXFORD:   And it's so, so you say took his license – you mean be got disbarred for this?

26           MR. HANKINS: He got disbarred for that.

27           MR. AXFORD:   Have you gotten any other information about Mrs. Porter Hankins uhh, umm

28    subverting your business in, in any other way? Any other complaints from any other

29

Heather H. Bath
AOC Approved Transcriptionist

1    MR. HANKINS:  Well I recently got a complaint uhh last week I got a complaint about her using

2    MR. OLIVER:  Objection to hearsay. He's getting complaints from outside sources.

3    THE COURT:  Sustained.

4    MR. AXFORD:  Alright. That's all the questions I have at this point then.

5    THE COURT:  Okay.

6    [Cross examination of Defendant by counsel]

7    MR. OLIVER:  I just have a couple. Umm, can you tell me it, it is true is it not that this Post-
8    Nuptial Agreement does not mention Omar Construction and Trucking, LLC by name anywhere in it,
9    does it?

10    MR. HANKINS:  Not to my knowledge.

11    MR. OLIVER:  Okay and this Post-Nuptial Agreement does not mention, in any place umm
12    Sardia Enterprise, LLC specifically, does it?

13    MR. HANKINS:  Not to my knowledge. I don't think so, no.

14    MR. OLIVER:  And you heard what your wife read and it said that and I'm gonna cut the
15    sentence down just for the part "the provisions herein for the partial and unequal distribution of marital
16    property are equitable and fair, reasonable and satisfactory to husband and wife." The intent then of
17    this Agreement, is it not, that this is a partial agreement?

18    MR. AXFORD:  Objection. That's the evidence rule.

19    MR. HANKINS:  It is not. That is not the intention.

20    THE COURT:  He can answer.

21    MR. OLIVER:  It does say it's a partial and unequal – does it not?

22    MR. HANKINS:  I, Sardia, but that's not unintelligible is not the intent.

23    MR. OLIVER:  And then

24    MR. HANKINS:  Would you like to know the intent of the document?

25    MR. OLIVER:  The Omar Construction and Trucking, LLC it was filed with the Secretary of State
26    on 5-24-2007.  Does that sound right?

27    MR. HANKINS:  Correct.  Yeah, it sounds correct.

1    any of that. The bootstrapping part of the argument Judge, is the Post-Nuptial Agreement does not
2    address land in the name of any business, but the businesses are marital property. So at this stage of
3    the game we're gonna argue that it doesn't address that land. Down the road to waste more of the
4    Court's time we're gonna say well the LLC's are marital property so therefore everything that the LLC's
5    own is marital property. In the second half of paragraph three (3) of this Post-Nuptial Agreement says
6    that she relinquishes all of her rights. If I can read to you – "whether now in existence or hereafter
7    acquired to apply to the Courts of State of North Carolina for distribution or
8    division of all real property that the wife may have an interest therein." All real property that the wife
9    may have an interest therein. Judge, preliminary injunctions are disfavored.  Mr. Oliver in his closing
10    said there's hundreds of thousands of dollars in, that may or may not be marital property, but marital
11    property in and of its face is allowed to be disposed of before marriage, through separation agreement
12    or after marriage in a Post-Nuptial Agreement. It is standard case law. If I can approach?

13    THE COURT:  You may.

14    MR. AXFORD:  It's turn Your Honor probably very close to the end where it's, I don't know if
15    it's setoff on your copy. It says "the wife hereby releases and relinquishes any and all property interest
16    in property, real, personal and mixed, now owned or hereafter acquired." That's the same thing for all
17    intents and purposes from a legal standpoint that paragraph three (3) in this Post-Nuptial Agreement
18    says. "Now in existence or hereafter acquired for distribution or division of all real property that the
19    wife may have an interest therein." Again that's going towards the merits. That completely cuts against
20    the grain of Mrs. Porter Hankins having a substantial likelihood of success on the merits. She transferred
21    the property into her name with a lawyer that was later disbarred because of the transaction and now
22    she's claiming some type of an interest in this property, which she freely, knowingly and voluntarily
23    waived her rights to in the Post-Nuptial Agreement. She was there when it was signed.  It was
24    notarized. Those documents, again to quote the law, is plain and unambiguous on its face. The first part
25    of the paragraph addresses certain pieces of property. The second part of that paragraph addresses all
26    the other property that the wife may have an interest therein. These types of actions, again Judge, are
27    disfavored. Mrs. Porter Hankins has not met her burden and I ask that you dissolve the TRO and if
28    another Judge, again if another Judge says I think this Post-Nuptial has problems and here's what we're
29    gonna do about it, then so be it, but this is not the time or the place to restrict any type of movement
30    from property that we believe is gonna be clearly covered as marital property, which she has
31    relinquished her rights to in the Post-Nuptial. Judge, this is, this is not, this is not a poster child for a TRO
32    case.  This is a poster child for a valid Post-Nuptial Agreement, which North Carolina has had in place for
33    a hundred (100) years.  Thank you.

34    [Judge's order]

35    THE COURT:  Certainly you've may or may not; I have a Post-Nuptial Agreement that arguing
36    for the sake of today's hearing, if we presume it valid, talks about real property. I currently have,
37    according to what I've been told today, LLC's that are named as Defendant's and prior to that looking at

1    property out there that are in the name of these LLC's; not in individual names, that can be gone
2    tomorrow and to talk specifically about this, if the property was sold and when it's sold the $200,000
3    plus dollars that comes out of these two (5) lots, which was the, the impetus behind moving to this
4    hearing. Somehow they want to say that now because it's suddenly in the name of marital LLC that he
5    gets control of it and gets to sell it and do whatever he, whatever he wants with it? Umm, and, and
6    what will happen now is you're just gonna have a Wild West of whoever wants to do whatever they can
7    with the properties. What's even more concerning now is the one part that I felt a little bit comfortable
8    In was with, that my document said that Sardia was still a member of Sardia Enterprise.  I may be
9    incorrect on that, which is even more worrisome because then complete control of those LLC's would be
10    placed with Mr. Hankins.  At the end of the day, Judge, one I don't, we're gonna content that Post-
11    Nuptial Agreement's not enforceable the way it's written, but even if you do enforce it as it's written it
12    doesn't mention the two (2) LLC's, which are the biggest assets of this business, of this marriage. Those
13    LLC's own all of these pieces of real estate and all of the evidence before the Court today is that all the
14    pieces of real estate we're talking about and both of these LLC's were created during the marriage,
15    which presumes that they are then marital property to be divided by this Court and that Post-Nuptial
16    Agreement is partial on its face, even if it not unenforceable, it's partial on its face and it leaves open
17    what to do with the largest assets of this marriage. This is the poster child case for a, for a preliminary
18    injunction preventing either one of these two (2) people from on their own wasting, selling, conveying,
19    encumbering or doing anything with these pieces of real estate that, that are owned by these
20    companies until we can get further into what the evidence is gonna be. This will be a long equitable
21    distribution trial, even based on what we see today and we just can't allow for the dissipation,
22    waste, encumbrance, sale, transfer of any of these pieces of real estate and finally Judge entering an
23    order like that there's been no evidence of how it could be possibly be prejudicial to anybody.  All it
24    does is maintain the status quo. We, we would ask that you do enter a preliminary injunction
25    prohibiting both of these people and the, the other defendants that were added today from again
26    wasting, disposing of, encumbering until further order of the Court until an agreement by the clients.
27    Thank you.

28    THE COURT:  Okay.

29    [Closing argument by counsel for the Defendant]

30    MR. AXFORD:  Well Judge, unfortunately Mr. Oliver, everything that has been argued to you so
31    far is on the merits. To issue the preliminary injunction, Judge, the Plaintiff has not shown to you a
32    substantial likelihood of success on the merits. She's got a bootstrapping argument. The argument is
33    #3] this isn't the document that I signed. Why not? 'Cause it's different. That's not evidence. That's
34    opinion. #2] Oh and then when Mr. Hankins' lawyer questions me – why did you sign the document; oh
35    it's not 'cause it was different its cause he said I'm gonna stop paying the mortgage, which you have
36    evidence of, in direct contradiction to that from my client. Where's there, where's the missing
37    payment? Where's evidence of that? Where's the Note from Wells Fargo or Wachovia, or whoever it
38    was back then, saying you're fifteen (15) days late on your mortgage? That's evidence. You didn't see

1    the file businesses that were alleged to be marital. I think, from what I was gathering, from what I was
2    looking at, prior to it being clear that they were LLC's.

3    MR. ?:  They are allegedly marital. Yes.

4    THE COURT:  Umm those businesses in this case appear to be subject to restraint due to the
5    possibility or the probability that were they to be wasted, if the assets of the business were to go away
6    In whatever, that the rest of the equitable distribution could not take place. That does not prevent the
7    sale of the real property as long as those proceeds and as long as those resulting assets are then kept
8    within the business and not wasted. This Pre-Nup or Post-Nuptial rather says nothing about marital
9    property generally. It only talks about real property. So I'm gonna grant the T, the injunction umm as to
10    the assets of the business. That does not prevent the business from doing business and if that business
11    includes selling the real property so be it, but you cannot waste in any way the proceeds once they are
12    held in the business.  Unintelligible.

13    MR. AXFORD:  I, I do incidentally, question I have is that this, some of the property we're
14    talking about is not within the confines of what the business does as a business entity. There are, it's a
15    construction and trucking company.

16    THE COURT:  Yeah, I heard

17    MR. AXFORD:  It's not of, own a beach property, a business. That's not really, so the use of the
18    sale proceeds

19    THE COURT:  And certainly there will be a, this does not preclude some future argument that
20    business sold for something not at arm's length nor does it preclude umm business was doing some
21    operation outside their normal practice arguments, but it does maintain that anything that happens to
22    any of these proceeds must be traceable; must be an arm's length operation; must be at fair market
23    value. Cannot simply decide to pay member holder a huge salary in one year because of this, because
24    the property sold for example.

25    MR. AXFORD:  So I understand correctly tho, the business can continue to operate. I mean like,
26    like my client testified.

27    THE COURT:  Sure.

28    MR. AXFORD:  Some, hypothetically

29    THE COURT:  Hypothetically.

30    MR. AXFORD:  If there are investors to be paid back, which can be documented, legitimately
31    documented

32    THE COURT:  Documented.

1   MR. AXFORD:   to pay 'em back.

2   THE COURT:   Yep.

3   MR. AXFORD:   If the closing costs are involved, whatever the, whatever else may, may or may

4   not go on.  Legitimate expenses that can be documented.

5   THE COURT:   Legitimate documented expenses and as I said this would not preclude an

6   argument by wife at a future date that he trumped those up somehow.

7   MR. AXFORD:   Well I can certainly anticipate that.

8   THE COURT:   I mean, but, but it would not prohibit it from happening.

9   MR. OLIVER:   Umm, Judge, I, I would also ask since and again I'll have to go back and look at

10   Sardia Enterprise, because the document I had has her as member and if she's no longer a member

11   THE COURT:   It should go both ways if it's

12   MR. OLIVER:   So if it does, but my only question would be if she, if either Plaintiff or

13   Defendant Hankins and I have to refer to him that way because there's two (2) either Defendants in the

14   case; if either one of them intend to sell, disburse and do something with it they are, they are required

15   to give notification to the other of what their intent is so that they, the person not doing something

16   would have at least some amount of time to react to it and know what's going on 'cause my fear is now

17   with, with regard to these transactions is with the way it's worded would allow some construct of a debt

18   on these properties.  For example, the '04 property that was about for $175,000 umm in '04, '05 and

19   here we are in '15, suddenly someone is getting paid back a debt that was owed all the way back there

20   and that's kinda what I'm thinking that we need to give notice of the transactions.  If he's gonna do a

21   transaction or she's gonna do a transaction both of 'em the way it sits right now are alleged to have an

22   equitable dis, equitable interest in any LLC that they're, they're not a member of.

23   THE COURT:   Any problem with giving notice as long as it's going both ways?

24   MR. AXFORD:   Well what Mrs. Porter Hankins, what Mrs. Porter Hankins, what they want is if

25   my client has to pay a bill I'll have to give him a phone call and say 'we have a bill for this' and then, I'll

26   have to do three (3) hours' worth of paperwork to legitimize it and then we're gonna be back here for

27   another TRO.

28   THE COURT:   Over $50,000.

29   MR. OLIVER:   Yeah, it's gotta be a transaction of some substance.  What I'm thinking about is

30   the, the, I'm more interested in are they selling and what, where are the proceeds so I can track that and

31   again I would like to ask the question if this were applied immediately if they did just sell something for

1   $300,000, then Omar Construction and Trucking is sitting on the sales proceeds and that's where, that's

2   where the accounting would have to start.  Right?  What are you doing with that money?

3   THE COURT:   Yeah.  But I, I think that you know, if they're going to fill the gas tank of the

4   construction vehicle, you know at $80, they don't have to account for that in anyway, other than their

5   normal profit and loss statements.

6   MR. OLIVER:   Well the problem is we don't know.  What my fear is if you allow that door to

7   open as far as what happens to those proceeds and the Court doesn't have an ability to clamp on them I

8   can tell you right now what is probably gonna happen they're gonna get lost within the washing and get

9   sailed regular business expenses.  That's what's gonna end up happening.

10   MR. OLIVER:   But I would hope that they are documenting those regular business expenses

11   for their taxes.  Umm, I would hope.  Certainly most businesses would run a normal cost of business

12   ledger of some sort.  Umm to the degree it is a normal operating, daily operating expense, I don't think

13   I'm gonna require notice, but as far as a notice requirement sure.  If it's over, let's call it over $25,000

14   they'll give notice to the other party.

15   MR. OLIVER:   Again, because it, what that makes me fear is you have these properties that

16   have been sitting out there for eleven (11) years and they suddenly get sold and you get, you, you,

17   you've got a lot of money you and now you can start using that money for ongoing business expenses

18   when that property had nothing to do with the ongoing business expenses

19   THE COURT:   I, I

20   MR. OLIVER:   that for years that have operated without those

21   MR. OLIVER:   I know, but

22   MR. OLIVER:   without those monies.

23   MR. OLIVER:   It, it is, they get to, you, you've got LLC's that get to do business.  I'm, I'm not

24   shutting down the business.  I'm not saying everything freezes right now 'cause we haven't gotten an

25   equitable distribution yet and as I said I'm not precluding any future argument that payment X to friend

26   Y was not a legitimate business expense.

27   MR. OLIVER:   So $15,000 and up.

28   THE COURT:   $25,000 and up.

29   MR. AXFORD:   Thank you, Judge.

30   THE COURT:   Not to say that $25,000 and down isn't gonna be questioned at some point.

1   MR. OLIVER:   Understood.  With that being said, then right now I'm entitled to know how

2   much they got from the sale on the lots that they did that to

3   THE COURT:   When they sold

4   MR. OLIVER:   when they're sold.

5   THE COURT:   Were they sold?

6   MR. OLIVER:   Not yet sold.

7   MR. HANKINS:   May I speak, Your Honor?

8   THE COURT:   Yes, sir.

9   MR. HANKINS:   May I?

10   THE COURT:   You, you may want to ask your attorney first, but yes.

11   MR. AXFORD:   You wanna speak?

12   MR. OLIVER:   Yeah.  Yeah, I got $233,000 for the property and only thing I wanna do is just

13   buy more property umm and buy more property and build so if it come a day where I owe the money

14   the real estate is always there.  It's what I was doing ten (10) years prior to her getting here.

15   THE COURT:   And as long as they are arm's-length operations

16   MR. HANKINS:   Yeah.

17   THE COURT:   that you are selling to

18   MR. HANKINS:   Yeah.

19   THE COURT:   not family members, not you know, not a friendly

20   MR. HANKINS:   No, no.

21   THE COURT:   deal.  Umm we're all good.

22   MR. HANKINS:   Yeah.

23   MR. OLIVER:   The, the other thing I would want in there and I had this in my original

24   preliminary injunction that I drafted unintelligible within a certain period of time I think I have five (5)

25   business days of any closing on real estate owned that we get documentation regarding those closings.

26   MR. HANKINS:   Your Honor, I'll give them; I will give them any documents.  Let me go 'head on

27   and continue business.  The money will always be there.  It will always be available.  You know that he

1   made an argument just a while ago, like the money from 2004 has been sitting all this time as needed.

2   My argument on that stand was that she took it fraudulently.  You know I

3   THE COURT:   But that's different

4   MR. HANKINS:   Yeah.

5   THE COURT:   that's kind of a different.  You're both starting to

6   MR. HANKINS:   Yeah.

7   THE COURT:   veer off the

8   MR. HANKINS:   Yeah, but that's what I thought he was

9   THE COURT:   to the edge.

10   MR. HANKINS:   doing.  But uhh, but like I said it took me another $100,000 just to hold onto the

11   property and now when I finally get it untangled he wants to restrict me from continuing the business.

12   THE COURT:   Okay.

13   MR. HANKINS:   Yeah, I've, I've been shut down for a while.  So I will give him every

14   THE COURT:   Okay.

15   MR. HANKINS:   every account of everything I do business

16   THE COURT:   Okay.

17   MR. HANKINS:   and that's all gone go back in real estate.

18   THE COURT:   Okay.  I, I would, especially now that they are now doing this I would expect that

19   there's gonna be discovery and that there's gonna have to be

20   MR. HANKINS:   Yeah, I mean it's gonna

21   THE COURT:   some accounting and

22   MR. HANKINS:   always be there.  Too much property.

23   THE COURT:   and regular documentation.

24   MR. HANKINS:   Yeah, it's too much property around.  It'll always be there.

25   THE COURT:   And it's all gonna have to be documented.  Okay.  Okay.

1    MR. OLIVER:    Thank you, Judge.

2    THE COURT:    Have a good day folks.

Heather H. Bath<br>
AOC Approved Transcriptionist

---

1

2    CERTIFICATION OF TRANSCRIPT

3    This is to certify that the foregoing transcript of proceedings of the Domestic Special Session

4    held on June 15, 2015 in Wake County is a true and accurate transcript of the proceedings transcribed

5    by me.  I further certify that I am not related to any party or attorney, nor do I have any interest

6    whatsoever in the outcome of this action.

7    This the 3rd day of April, 2016.

8

9

10    HEATHER H. BATH

11    AOC Approved Transcriptionist

12    804 Kimberly Ann Lane

13    Shallotte, NC 28470

14    910-470-8972

Heather H. Bath<br>
AOC Approved Transcriptionist

**The United State Bankruptcy Court**
**Eastern District of North Carolina**
**Raleigh Division**

IN REF: Timothy Omar Hankins Sr        Case Number: 18-03044-5-DMW

**Affidavit concerning the August 2015 Hearing**

Doing the August Hearing ( 14-CVD-8806 & 15-CVD-7476 Wake Co NC ) and prior hearing, I heard the District Court Judge refer to Deotor than Defendant as the DEVIL in detail (page 8 of the 1-10 transcript , about the 5th line dated August 4th, 2015) . I requested that the transcription be produce of  the closing remarks to confront the Court about his remarks.

The  person transcribing the hearing granted my request and later transcribe the entire hearing that produced about 287 pages. The day before I was to appear before the Honorable David Warren in Bankruptcy Court is  when I realized that I was working on the 1 of 10 pages  ( the devil in detail remark by  District Court Judge Michael J Denning "and had the entire transcript of 287 pages. At that time I did not have the time to highlight and copy the entire 287 pages. Instead, I am going to enter the 1-10 transcript which is the closing Remarks from the August 2015 Hearing and the beginning portion of the 287 of the same hearing.

*Timothy O. Hankins Sr.*            this the 23rd Day of January, 2019
Timothy Omar Hankins Sr


EXHIBIT
Ex-16

---

| 1 | STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| 2 | COUNTY OF WAKE | DOMESTIC SPECIAL SESSION |
| 3 | ------------------------------ | 14-CVD-8806 |
| 4 | SARDIA MARIE PORTER HANKINS | |
| 5 | PLAINTIFF | |
| 6 | VERSUS | |
| 7 | TIMOTHY OMAR HANKINS, SR. | |
| 8 | DEFENDANT | |
| 9 | ------------------------------ | |

10    Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
11    August 4, 2015, Domestic Special Session, before the Honorable Michael Denning, Judge Presiding.

12                    A P P E A R A N C E S

13    ON BEHALF OF THE PLAINTIFF

14       JOHN OLIVER, Attorney at Law

15       HAPRIA PORTER-BEST, Sister of Plaintiff

16       LAVERN DOWDY, Sister-in-law of Plaintiff

17       MELINDA FUSHEE, Friend of Plaintiff

18       EVROY BROWN, Friend of Plaintiff

19    ON BEHALF OF THE DEFENDANT

20       JENNIFER SMITH, Attorney at Law

21       JAMES DAVIS, Friend of the Defendant

22       EDWARD COKLEY, Friend of the Defendant

EXHIBIT
17

Heather H. Bath
AOC Approved Transcriptionist

---

1
2                 I N D E X – August 4, 2015

3    Direct examination of Melinda Fushee by Mr. Oliver  -  .  .  .    7
4    Cross examination of Melinda Fushee by Ms. Smith  .  .  .  .    24
5    Re-direct examination of Melinda Fushee by Mr. Oliver  .  .    25
6    Direct examination of Harpria Porter by Mr. Oliver  -  .  .    27
7    Cross examination of Harpria Porter by Ms. Smith  .  .  .    43
8    Direct examination of Lavern Dowdy by Mr. Oliver  -  .  .    44
9    Cross examination of Lavern Dowdy by Ms. Smith  .  .  .    58
10   Re-direct examination of Lavern Dowdy by Mr. Oliver  .  .    59
11
12                 I N D E X – August 5, 2015
13
14   Cross examination of the Defendant by Mr. Smith  -  .  .    62
15   Direct examination of the Defendant by Mr. Oliver  .  .    115
16   Re-cross examination of the Defendant by Mr. Oliver  .  .    124
17   Re-direct examination of the Defendant by Ms. Smith  .  .    128
18   Direct examination of the Plaintiff by Mr. Oliver  -  .  .    129
19   Cross examination of the Plaintiff by Ms. Smith  .  .  .    163
20
21                 I N D E X – August 7, 2015
22
23   Re-direct examination of the Plaintiff by Mr. Oliver -  .    180
24   Re-cross examination of the Plaintiff by Ms. Smith  -  .    182
25   Re-direct examination of the Plaintiff by Mr. Oliver  .  .    186
26   Direct examination of James Davis by Ms. Smith  -  .  .    187
27   Cross examination of Edward Cokley by Ms. Smith  -  .    188
28   Direct examination of Edward Cokley by Mr. Oliver  -  .    192
29   Direct examination of the Defendant by Ms. Smith  -  .    195
30   Cross examination of the Defendant by Mr. Oliver  -  .    272
31   Re-direct examination of the Defendant by Ms. Smith  .    276
32   Judge's Remarks  .  .  .  .  .  .  .  .  .    277
33   Direct examination of Evroy Brown by Ms. Smith  .  .    278
34   Cross examination of Evroy Brown by Ms. Smith  .  .    281
35   Closing Argument by Mr. Oliver  .  .  .  .  .    282
36   Certification of Transcript  .  .  .  .  .  .    287

Heather H. Bath
AOC Approved Transcriptionist

---

1                    P R O C E E D I N G S

2    The case of Hankins versus Hankins, Wake County 14-CVD-8806, was called for hearing at 2:30 pm on
3    Tuesday, August 4, 2015.  Plaintiff, Defendant, witnesses and all counsel were present.

4        THE COURT:    Okay.  We are on record on for 14-CVD-8806.  Sardia Marie Porter Hankins
5    versus Timothy Omar Hankins.  The Plaintiff is present and represented by Mr. Oliver and the Defendant
6    is present and represented by Ms. Smith.  Umm we are here on permanent custody, child support, PSS
7    and cross-motions for Orders to Show Cause.  Alimony is made the calendar also, but we're only here on
8    PSS.  Is that correct?

9        MR. OLIVER:    Yes, Your Honor.

10       THE COURT:    Okay and I'll just note for the record that we had a brief administrative
11   discussion uhh back in chambers about how we're going to move forward uhh procedurally and it's my
12   understanding that uhh you wish the Court to talk to at least uhh the two (2) older children *unintelligible*

13       MR. OLIVER:    Correct, Your Honor.

14       THE COURT:    and of unintelligible to do that simultaneously and will be allowed to consider
15   those discussions in fashioning any Order that may result for the present hearing.

16       MR. OLIVER:    Yes, Your Honor.

17       THE COURT:    Is that correct?

18       MS. SMITH:    Uhh-hmm.

19       THE COURT:    Okay.  Umm prior to getting started do we have any other uhh housekeeping
20   matters that we need to take care of.

21       MS. SMITH:    No, Your Honor.

22       MR. OLIVER:    I don't think so, Your Honor.

23       THE COURT:    Okay.  Uhh then, Mr. Oliver since uhh you're the Plaintiff and it's your case in
24   chief I'll turn it over to you.

Heather H. Bath
AOC Approved Transcriptionist

4 of 287

1  MR. OLIVER:    Thank you, Judge. Umm Judge I know that you've seen these people frequently
2  over the last six (6) months or so and it has been a contentious case. Umm I, I think there's a
3  variety; there's always a variety of reasons for that, umm but in this case when you look at the, the
4  custody issue first umm look at where these parties started last summer, what they tried to do with the
5  agreement. Remember this started with a Custody Order for week to week by consent. I know the
6  Court will also know that many of the problems started because the handwritten Memorandums of
7  Order were not written very well. Let's just say that and that caused problems as to which one of them
8  applied. The evidence is gonna show that while those problems were existing, our evidence will show
9  that Mr. Hankins has taken advantage of those, those confusions within those Orders and has failed to
10 cooperate in trying to come to a resolution and has used those Orders when he felt, felt fit to do to try
11 to thwart Sardia's custodial time with the kids and I'd remind the Court of the problem we had regarding
12 the transportation on the last Motion & Order to Show Cause that we did about the changing of the
13 transportation and change, trying to change the custodial schedule even after you in January had put
14 down what the custodial schedule should be. So you have to look at how the parties are acting since
15 they entered into these consents. Sardia is gonna testify that she was willing to give the week to week a
16 chance, but the week to week has not worked and it is her strong belief that these children will need a
17 base house and a house to go see their father and that is what we are going to ask the Court at the end
18 of the day. When you look at the custodial parts I think you, the two (2) things that you need to focus in
19 on is one umm Mr. Hankins' job and what he does and how he conducts the business. He works hard.
20 He drives a truck. He drives down in Brunswick County sometimes, but the hours of his work are not
21 conducive to a week to week schedule. I think you also have to look very closely umm Judge at the
22 decision making process vis-à-vis the children that every parent makes while the children are with them.
23 I think that you will be able to very starkly contrast the parenting styles of the two (2) individuals and I
24 believe the evidence will show that you can starkly contrast the decisions that are made and I want you
25 to look very closely at these decisions that are made on a day to day basis on the custodial portion of
26 this. With regard, with regard to the post-separation support and child support, we were supposed to
27 be here on an alimony. Judge I had a Motion to Compel, Motion for Sanctions that was heard about a
28 month ago. Umm, Mr. Axford and I did work out that Order. You haven't signed it yet and he was, Mr,
29 Mr. Hankins was required to produce some documents and he did produce documents. The evidence is
30 clearly going to show though the, the documents that have been produced by the Defendant to date are
31 wholly inadequate for us to be able to move very, only enough just to get to the post-separation support
32 and temporary support and even with that you're gonna have to look very closely to determine what his
33 income is and we'll get into that in some detail. We are, while the Court Order that I drafted for the
34 Motion to Show, the Motion to Compel and Motion for Sanctions hasn't been signed yet, the Court will
35 recall that you were going to leave open the issue of sanctions. I did not notice the new attorney, Mrs.
36 Smith, of that so I'm not pressing that issue today. So I don't want there to be confusion about that, but
37 the fact goes deeper than that and this, this is why I think; you know there's a lot of cases and I found a
38 lot of cases boil down to a lot of objective points that you can't argue with. Right?  No one can argue
39 with the objective point that it's fact and gives you an idea of, of the underlying issues that might be
40 going on in the case, but don't necessarily jump to rise to the surface and in this case there's one very

Heather H. Bath
AOC Approved Transcriptionist

5 of 287

1  simple thing that's gone on and that is that since these parties separated this father has paid this
2  mother four hundred dollars ($400) in child support and any which way you cut the financial information
3  that you're gonna see today, Sardia has struggled to get a job. She has had a part-time job. She's been
4  looking for a job, but under any circumstances she's dependent. She makes less money than he does.
5  They had a fifty-fifty schedule, but the evidence, I believe was not, has not been one dollar of post-
6  separation support. Nothing. There's not even been an attempt to work through maybe housing for
7  Sardia, because the evidence is gonna show, and I want the Court to look at this, Mr. Hankins through
8  two (2) different corporations owns about a million dollars' worth of property and most of it is free and
9  clear. They're rented. There's never been any kind of movement, no offer, nothing to say well maybe
10 since I've got this rental property that at some point I can say to the tenant your lease is up and you can
11 move into it instead Sardia has struggled, borrowed money, a lot of money and been living with
12 deferred rent. She signed a lease for $1350 a month, but she's not paying it right now because it's her
13 sister-in-law that owns the house and I think when you look at those kinds of facts; those are objective
14 facts. You can't argue with them. It gives you some sense of what's going, what, what the undercurrent
15 is in the case. At the end of the day, Judge, or tomorrow or Friday the evidence is going to be in our
16 mind very clear. One that these children need a relationship with both their parents. They need
17 substantial time with their father; that they love their father, but they need a primary residence and
18 that's Sardia's job. That's what she's always done because she was the stay-at-home mom for the
19 thirteen (13) years that they were in the minority. The oldest is thirteen (13) or fourteen (14). Secondly,
20 we've got to get some money flowing, Judge. It's been thirteen (13) months and we are going to ask for
21 the amount to be retroactive back to the date of separation; for both post-separation support and for
22 child support. We're gonna ask for attorney's fees, although I don't think that was noticed, but we'll
23 have to have a hearing on that. Umm and, and Judge, there's some other, the one other thing about
24 how this money's gonna flow is, is it, is it going to be an interesting argument, but I will, I will project the
25 evidence. It is my understanding from, you signed a TRO about a month ago about a sale of a piece of
26 property, Mr. Hankins sold a piece of property through one of his companies and I believe he, he
27 obtained $250,000 in that. I know he subsequently bought two (2) pieces of property for $64,000, two
28 (2) different lots. So there's some money there and while umm Judge Worley limited the use of that
29 money to business related expenses, since this is now before you we're gonna ask that you look at that
30 money as a means by which to kick start getting money into Sardia's hands for the satisfaction of
31 thirteen (13) months of support that's not been paid. So umm Judge, umm this is, this is a case as best
32 you can because of its history needs to be to bed and moved to the next step. Thank you, Judge.

33 THE COURT:    Ms. Smith.

34 MS. SMITH:    Thank you, Your Honor. Yes, I have just gotten in this case about a month ago
35 and understand that these folks have been in front of you in many times and I will agree with Mr. Oliver
36 that these folks have had some unfortunately drafted Orders that I think has caused a great deal of
37 confusion for everyone involved. Umm as far as the week on-week off I just wanna reiterate that my
38 client had never intended to agree to week on-week off for a long period of time. The intention was just

Heather H. Bath
AOC Approved Transcriptionist

6 of 287

1  for the summertime frame. I think that is what has led to, I think, our mutual Show Causes actually are
2  the issue of withholding visitation between the two (2) of 'em. Umm the other issue is as far as these
3  kids I think one other thing that we can all agree on are that these folks have phenomenal children.
4  They are exceptionally smart. They're very talented. I think both of these folks, you know, love their
5  children and want the best for 'em umm but unfortunately these two (2) have a difficult time co-
6  parenting. There's a significant breakdown in communication. There's a significant breakdown as far as
7  parenting style, as far as viewpoints on health concerns and those health concerns have been in front of
8  you umm on the basis of emergency custody with one of the children being taken to the Emergency
9  Room. I mean to the point that these kids can't even agree on what's appropriate as far as health care
10 for the kids. Umm another issue is safety. Umm the first Emergency Order that umm was addressed by
11 the Court involved umm a young lady that the, Mr. Hankins believed could, has umm sexually molested
12 one of the children. Umm that she was then being umm brought about the umm residence of the
13 Plaintiff, of being present in front of the children, the daughter and the mother. I understand the
14 mother has actually been subpoenaed to testify today so we can explore that issue as well when she
15 testifies umm but Mr. Hankins had barred them from the home a number of years ago only to then
16 discover that the children are being exposed to this person again. It's frightening. They can't talk and
17 come to a conclusion to make sure these kids are safe. Umm as far as schooling umm you know they
18 can't really agree on how to even handle umm homework issues. My client is a big proponent of letting,
19 ensuring the kids do their own homework and check their own schedules. He is trying to teach them to
20 be, ya know, Independent individuals and umm the Plaintiff has a different viewpoint. She's more
21 wanting, you know wanting to do it for them. She doesn't want them to have responsibility for their
22 schedules and this causes the conflict of my parent, my party is probably viewed more so by the kids as
23 parent, if not friend, and I think Ms. Hankins has more of a style of being portrayed as the friend and
24 then the friend. On some discipline issues, completely diverse. My client is the one that has always
25 wanted to ensure the kids are participating in extracurricular activities and camps that are gonna enrich
26 their educational backgrounds and promote their, you know, interest in going to college and careers and
27 that's something he's done. He's been the planner. He's the person seeking out information, but what
28 has happened, or these communication problems come about and when he's trying to work with Ms.
29 Hankins she's non-responsive or she's sharing wrong information. Umm they, they can't work together.
30 One of the results being that the umm party's son missed going to NCCU camp this summer over this
31 horrible conflict in communication and you know as far as the support goes, my client offered Ms.
32 Hankins a debit card back in the spring to use and she refused to take it. She refused to use it. Umm he
33 has made that debit card available to the oldest son to use and he's offered to have Ms. Hankins charge
34 umm swimsuit, swimming items on this debit card. You know it's, it's, she's, I, I think she problem is
35 these two (2) have this conflict. I think Ms. Hankins doesn't want anything that's associated with him,
36 like using that debit card. She doesn't want to be, you know, viewed as she, you know just refusing from
37 him him umm on his terms. The other problem is umm he suggested they use, you know the family
38 yahoo, everybody use the same email. All the emails for the different activities come to this one. She
39 refuses to use it and it's, I, I think it's because my client came up with the idea. Umm you know it's, it's,
40 this animosity towards my client has created these co-parenting problems, which is why these folks

Heather H. Bath
AOC Approved Transcriptionist

7 of 287

1  have joint legal custody is just simple not gonna work. We would ask that my client have sole legal
2  custody. Umm we would ask that my client have umm primary physical custody. My client now is in a
3  position his schedule is more flexible umm than it once was years ago because unfortunately his
4  business has fell off so much and umm you'll hear testimony that a lot of that is due by the involvement
5  of Ms. Hankins as far as having a negative impact on his business and that's why he doesn't have the
6  business he once had and I would just want to point out as well umm that what's gonna work for these
7  kids is to be in a home that's stable, that has their best interest at heart, with the parent, the one who
8  isn't interested in being friends with the kids, but wants to ensure that their, ensure their wellbeing,
9  ensure that they're, they continue to grow and thrive as they have been in the past and umm I think this
10 time around you're gonna really be able to get more testimony and hear more about my client's role in
11 the parent, in the parenting of the children than you probably haven't, have not heard in the past and I
12 believe that will be all I have for you, Your Honor.

13 THE COURT:    Thank you.

14 (Direct examination of Ms. Fushee by counsel)

15 MR. OLIVER:    Call Melinda Fushee please.

16 THE COURT:    Please place, place your right hand. Do you solemnly swear that the testimony
17 you shall provide to this Court be the truth, the whole truth and nothing but the truth so help you God?

18 MS. FUSHEE:    Yes, sir.

19 THE COURT:    Thank you. And before we start, Mr. Oliver just so you'll know I'm not shopping
20 or doing anything. I'm taking notes unintelligible.

21 Laughing.

22 THE COURT:    Unintelligible, okay.

23 MR. OLIVER:    Thank you. Please tell the Court your name.

24 MS. FUSHEE:    Melinda Fushee.

25 MR. OLIVER:    Where do you live Melinda?

26 MS. FUSHEE:    Raleigh, North Carolina.

27 MR. OLIVER:    And how do you know umm Tim Hankins?

28 MS. FUSHEE:    Umm I met him; we all used to go to church together.

29 MR. OLIVER:    How long ago did you meet Tim Hankins?

Heather H. Bath
AOC Approved Transcriptionist

1    MR. HANKINS:  5.

2    MR. OLIVER:  Okay and if I went in here, you, you now have Sardia Enterprises in 2014 Sardia
3    Enterprises, LLC appears on your individual return on Schedule C.  Right?  I'm, I'm looking at your

4    MR. HANKINS:  Hold on.  I'm at Exhibit 5.  You said turn to what page?

5    MR. OLIVER:  The third page in Schedule C.

6    MR. HANKINS:  Alright.  I'm at third page in.  Go 'head.

7    MR. OLIVER:  And here is the Schedule C – Profit and Loss from Business and you're listing
8    Sardia Enterprises.

9    MR. HANKINS:  Okay.

10    MR. OLIVER:  Mr., Mr. Hankins can you explain to me how you take an LLC that has two (2)
11    members, you and Sardia, and put the tax ramifications of that business on your individual return or how I
12    individual return?  How, I, how do you do that?  I didn't think you could.

13    MR. HANKINS:  Mr. Oliver, I would be more than happy to clear that up for you.

14    MR. OLIVER:  Okay.  Clear it, because you got two (2) members.  It seems to me you're
15    supposed to get K-1, each of you because you both own it.

16    MR. HANKINS:  Listen in 2006 my social security card and my birth certificate and my passport
17    that was locked up in my room, my master bedroom got missing.  2009 was the first time the IRS froze
18    my accounts up.  It threw me in a whirlwind.  Current today that same information that was taken out of
19    my bedroom is around this country and there's three (3) or four (4) people that's using it.  You
20    understand?

21    MR. OLIVER:  No, sir.  I don't understand.

22    MR. HANKINS:  So as far as me

23    MR. OLIVER:  How do you explain

24    MR. HANKINS:  unintelligible changes and do things different than I typically will do.  I've done
25    be to Washington, DC.  I done been to Color.  I didn't go to Colorado.  So, but anyway that's what
26    happened.  I mean my ID was stolen and I,

27    MR. OLIVER:  And, and therefore you take the, the information or the profits, the losses,
28    everything that has to do with a multi-member corporation and you put it on your individual returns?
29    That's the explanation for why you do that?

Heather H. Bath
AOC Approved Transcriptionist

1    MR. OLIVER:  But your tax return say you only make $24,000 a year.  Where's, is there, is
2    there another source of, of income somewhere?

3    MR. HANKINS:  Yes.

4    MR. OLIVER:  Where is, what is that other source?

5    MR. HANKINS:  The checks come in Sardia Enterprises and as you can see I just opened an
6    account up in something like 2012 because of the whole IRS issue and what you're adding up, Mr. Oliver,
7    is these trucks working in Wilmington; I was working in Greensboro and what you're adding up is where
8    I have to take money out of the Sardia Enterprise account.

9    MR. OLIVER:  Uhh-hmm.

10    MR. HANKINS:  I have to put it on my personal account so the guys can get fuel.  That's where,
11    what you're adding up is the, is the, is the money transfers.

12    MR. OLIVER:  Well I thought that was gonna be your answer so I'd turn to Tab 31A please.

13    MR. HANKINS:  31A.

14    MR. OLIVER:  Alright.  You get.

15    MR. HANKINS:  31A, 31A.  I got it.  31A.

16    MR. OLIVER:  Alright.  Now you'll see that this is the umm, again your personal account

17    MR. HANKINS:  Alright.

18    MR. OLIVER:  and if you'll see on the far left of the first page I tallied up the deposits from
19    January to May in your personal, your personal account

20    MR. HANKINS:  Okay.

21    MR. OLIVER:  and that came up to $50,178.  Do you see that?

22    MR. HANKINS:  Yeah, I see it.

23    MR. OLIVER:  Okay and I didn't wanna double count.

24    MR. HANKINS:  Alright.

25    MR. OLIVER:  So what I did on the next Tab, it says Transfers from Sardia LLC.

26    MR. HANKINS:  Okay.

Heather H. Bath
AOC Approved Transcriptionist

1    the citizenship.  When it almost finished I told him about it.  He asked me where I got the money.  I told
2    him from my sister.  He was upset because he told me that whenever he can't get me something I run to
3    my family for it and that's what he can certainly do 'cause whenever we had a, one time that's what,
4    one time he did it again.  When I found out that he was cheating again he wouldn't supply us with
5    anything in the house to eat.  My aunt from Florida sent me four hundred dollars ($400) to buy food for
6    the kids in the house to eat.  At one time he sent his son, Timothy, to give me, to take me, his wife, to
7    the store for bank, with his bank card to buy the school supplies for the kids and there are times when
8    he locked up in jail one time for child support.  He said I, I had access to the money.  He locked up in jail
9    one time for child support for $5,000 and he has his brother to give $2,500.  Brother couldn't do it.  He
10    sent me to the office to get a check to sign off his account to take it in the bank.  I have to borrow the
11    money from Mrs. G, who we call our mother, so that I could get him out of jail because I couldn't get the
12    money in the bank that he said I have access to.

13    MS. SMITH:  So you don't have signing authority on Sardia's account to sign a check?  I mean
14    'cause isn't it true you wrote yourself several checks back in 2011 from the Sardia account.

15    MS. HANKINS:  Several checks?

16    MS. SMITH:  Checks.  Like did you have the authority to sign checks on the Sardia accounts?

17    MS. HANKINS:  Uhh

18    MS. SMITH:  Ever?

19    MS. HANKINS:  There was one check account we had at Sun Trust, not Sun Trust umm Four
20    Oaks Bank, and Tim authorized me to go open that account 'cause when Sun Trust closed the account,
21    our account at the bank 'cause of what he had done, the only, he sent me to Four Oaks Bank 'cause I
22    didn't of Four Oaks Bank until when he sent me there to open that account and that's when I went to
23    open that account.  He had access to it and he was.  I found out at one time I was the only signer on the
24    check, on that account at, that time and I found out when we had problems that he wrote a check to
25    one of his worker and signed my name at the bottom of the check and they called me and asked me
26    about it.

27    MS. SMITH:  Okay.  Earlier you testified that Mr. Hankins had not attended any of the teacher
28    conferences in the past and then you also testified to his work schedule is pretty full.  So isn't it true that
29    because he was all working for the family he therefore didn't have the ability to get off for teacher
30    conferences that he missed because of work?

31    MS. HANKINS:  During the winter Mr. Hankins schedule is not that busy 'cause you can't do
32    much work during the winter and Mr.

33    MS. SMITH:  So

Heather H. Bath
AOC Approved Transcriptionist

1    MS. SMITH:  Umm, so did you ever contact the IRS directly to get a copy of your tax returns
2    that were filed in just your sole name?

3    MS. HANKINS:  If I did who?

4    MS. SMITH:  Did you contact the Internal Revenue Service for a transcript or copy of your
5    return?

6    MS. HANKINS:  No, I did not contact the Revenue at the time.

7    MS. SMITH:  So you just contacted the accountant and approximately what time did you
8    contact the accountant?  What timeframe?

9    MS. HANKINS:  That was approximately around in March.  I think it was in March, sometime in
10    March.

11    MS. SMITH:  March of 2015?

12    MS. HANKINS:  No, March of 2014

13    MS. SMITH:  Okay, 2014.

14    MS. HANKINS:  Yes.

15    MS. SMITH:  And you're saying the accountant refused to give you a copy of your return in
16    your name.  Is that your testimony?

17    MS. HANKINS:  No, I asked her for a copy of the tax return and she had state to me that she
18    gave them to Mr. Hankins, but when I replied to her that Mr. Hankins said that she got it umm we met
19    one Saturday at the Post Office in Garner to give me a copy of it.

20    MS. SMITH:  So you received a copy of your turn March 2014.

21    MS. HANKINS:  That's correct.

22    MS. SMITH:  And when did you take steps to umm file for a fraudulent tax return, take that
23    action?

24    MS. HANKINS:  Well I was waiting on Mr. Hankins 'cause he told me he was, we had an
25    argument over it because he stated that I shouldn't call the accountant.  That's what he said and unh I
26    told him that I have all right because my name is on it and I need to find out what happened.  So I told
27    the accountant that the tax return need to be amended and I told Mr., Mr. Hankins unh asked me about
28    it and I told him yes, I need to get it amended.  I was waiting on them to get it amended and after when I
29    went to Morgan Accounting and asked her to check on my, my umm the 2013 tax return and with what

Heather H. Bath
AOC Approved Transcriptionist

---

287 of 287

1

2

3

4
CERTIFICATION OF TRANSCRIPT

5       This is to certify that the foregoing transcript of proceedings of the Domestic Special Session

6   held on August 4th, 5th & 7th, 2015 in Wake County is a true and accurate transcript of the proceedings

7   transcribed by me. I further certify that I am not related to any party or attorney, nor do I have any

8   interest whatsoever in the outcome of this action.

9       This the 12th day of April, 2016.

10

11   *Heather H Bath*

12   HEATHER H. BATH

13   AOC Approved Transcriptionist

14   804 Kimberly Ann Lane

15   Shallotte, NC 28470

16   910-470-8972

**EXHIBIT**
**18**

Heather H. Bath
AOC Approved Transcriptionist

---

1 of 10

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE

COUNTY OF WAKE                             DOMESTIC SPECIAL SESSION

-----------------------------------        14-CVD-8806

SARDIA MARIE PORTER HANKINS

        PLAINTIFF

    VERSUS

TIMOTHY OMAR HANKINS, SR.

        DEFENDANT

-----------------------------------

    Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
August 4, 2015, Domestic Special Session, before the Honorable Michael Denning, Judge Presiding.

                    A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

        JOHN OLIVER, Attorney at Law

        HAPRIA PORTER-BEST, Sister of Plaintiff

        LAVERN DOWDY, Sister-in-law of Plaintiff

        MELINDA FUSHEE, Friend of Plaintiff

        EVROY BROWN, Friend of Plaintiff

ON BEHALF OF THE DEFENDANT

        JENNIFER SMITH, Attorney at Law

        JAMES DAVIS, Friend of the Defendant

        EDWARD COKLEY, Friend of the Defendant

Heather H. Bath
AOC Approved Transcriptionist

---

2 of 10

I N D E X – August 7, 2015

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Closing Argument by Ms. Smith | - | - | - | - | - | - | - | 3 |
| Judge's Remarks | - | - | - | - | - | - | - | 6 |
| Certification of Transcript | - | - | - | - | - | - | - | 10 |

Heather H. Bath
AOC Approved Transcriptionist

---

3 of 10

ADDENDUM TO PROCEEDINGS TRANSCRIPT

[Closing argument by counsel for the Defendant]

    MS. SMITH:    Your Honor, what I would start by just saying is Ms. Hankins too has made some
statements that are a bit far beyond the bounds of truth. You know she had her family very, you know
tearful testifying about the fact that my client kept the kids from going to the aunt's funeral. That he
kept the kids from seeing her for three (3) weeks and that wasn't the case and she admitted that Mr.
Hankins made those offers in text messages. It just wasn't on her timetable. It was not a blanket
refusal. I think part of this is Ms. Hankins is keeping her family so upset with Mr. Hankins that it's
motivating them to help more and more and give her more money and give her more money and this,
and it's got her us here today. Now Mr. Hankins filed that Emergency you know back, the first
Emergency because he just discovered

    THE COURT:    The money issue I think he would reply yes she's asking her family for more and
more money, because she's not getting any from Mr. Hankins.

    MS. SMITH:    Uhh-hmm. As far as the Emergency goes, the first Emergency was filed because
he had just learned that, that, that individual was being, was around his children again and he knew
what happened back in 2010. So he took that action it, it wasn't anything to do to get a power play or to
get control or work the system as, as Mr. Oliver mentioned a few times. Umm, you know Ms., Ms.
Hankins has also retaliated and filed things against him. You know with all these Show Causes and
domestic violence actions. Umm, CPS has been involved so many times. You know they've had to tell
'em, you know had to have a meeting with 'em and basically shut down constantly making these
accusations. Umm the records are a disaster. I'm not even going to try to sugar coat that. I've been in
this case for a month and it, it's been difficult to wrap my brain around it. I have done the best I can and
all I can say to the Court is you know moving forward I hope that Mr. Hankins and I can work together
and get the case in better shape so that when we're here for alimony this is all gonna make a lot more
sense. What I can tell you is that my client does not have large sums of money other than that pool of
money that is currently in Four Oaks Bank, but we all have to remember that's under the Temporary
Restraining Order. You know is he gonna be violating that Temporary Restraining Order, once it's ever
entered, because that, it's not a business purpose to pay I, we might have a problem with that and it's
something we have to consider. Umm the other factor is, is Mr. Oliver sorta touched on, is Mr. Hankins
is, he may have assets. You know he has assets. The income is, is poor. If anything he's, maybe
unintelligible real estate. You know he has lots of assets, but not of a lot of income. So we're bringing
into this equitable distribution piece, then we have this post-nuptial agreement that's gonna affect that
and that's something we're all gonna have to fight each another day, but we have to be careful not to
double-dip here as far as if we make him pay something, you know on a continual basis, based on
money that's a finite amount of money, it's just not gonna work. You know so there's a concern about
that. I would ask

Heather H. Bath
AOC Approved Transcriptionist

1    THE COURT:    I, I assume you're going to plead the Post-Nuptial is an affirmative defense in
2    your answer to the equitable distribution.

3    MS. SMITH:    Yes.

4    THE COURT:    Okay.

5    MS. SMITH:    That's a fight for another day. I suppose. Umm so the communication issues,
6    you know they communicate poorly. My client has, has tried to improve the communication, has tried
7    to encourage having that universal family email. Ms. Hankins refused basically it sounds like it's just too
8    much for her to add the email onto her phone and she's just refused to cooperate with it. You know
9    because these folks have communication problems it ended up that their son Trey lost out on going to
10   camp when he was supposed to go. Umm you know Ms. Hankins testified that she helped run the
11   business. You know he was up at 5:00 in the morning. She was making the kids a hot breakfast. She
12   was taking 'em to school. She was working and running the business and she was volunteering at school
13   and she was doing EOGs all week and then she was running 'em all over to Apex and it's, it's got to the
14   point where I don't think any human being could do that. I think that was a bit overreaching and then
15   everyone ignored the fact that my client is not simply just working and not in the picture. He was
16   preparing meals. He had a hand in these kids' lives. He wasn't just working all the time. Yes, he did
17   work a lot and unfortunately someone oftentimes has to work and that may mean he doesn't to to
18   every school conference there is. It's just life. You know he shouldn't get penalized for being a bad
19   parent because you're having to work. It's just, you just have to do what you can do and that's what Mr.
20   Hankins has done. Umm Ms. Hankins had the Court, told the Court she had no access to funds. That
21   Mr. Hankins went to New Orleans and cut her off, when in fact she was the one sending him money.
22   She closed on a house while he was in, in New Orleans. She had signatory authority on the checking
23   account. She had access to money. He didn't cut her off. Ms. Hankins would like for you to believe that
24   Mr. Hankins is just a Disney dad, just about fun, just let's do something fun on the weekend, but that's
25   just simply not the case. He's the one that made sure that these kids went to these camps. That their
26   education was enriched. He has worked with them just umm, my favorite is Hillary is being the doctor
27   and receipts is probably my favorite thing of all the pictures because I just think it's such, so imaginative
28   and creative. He wants his kids to do well. He cares about their education. You know Mr. Hankins
29   ensures the kids have adequate nutrition. I mean we've heard quite a bit about you know when Nyla
30   passed out and I'm still really bothered, you know by and the reasoning is behind it is the fact that Nyla
31   is so worried about leaving a lunch box she just doesn't eat lunch the day she's going to Mr. Hankins and
32   I never got a clear understanding from Ms. Hankins why that was the case. I, I don't understand why,
33   you know she didn't ensure, even if she put something in a paper bag, that the child had something to
34   eat for a snack 'cause that, that and didn't have anything to drink since breakfast is just very concerning
35   to me. You know Mr. Hankins on the other hand realizes they have that sensitivity to the water 'cause
36   they're used to well water and he ensures that they have water with them. He sends with them an
37   Ensure. He makes sure that they have something to eat. Mr. Hankins offered her the debit card. She
38   refused it. You know he was, he was trying to do, do something in the way of giving her some type of

1  support. He just needed to put some parameters around it, but again it wasn't on her terms. So she
2  denied use of that. You know Ms. Hankins has worked over twenty (20) years in the construction umm
3  slash trucking business as far as administrative work by her testimony. She has proven ability to earn
4  $550 a week. This amount should be imputed to her for any calculation of support. As far as the Show
5  Causes go, I mean honestly I, I think those Orders have been such a disaster from the get go. Umm you
6  know it's just hard to even understand the intent. Umm you know the Saturn, the Jeep. You know the
7  intent was for the Jeep to be a substitute for the Saturn since it was a better quality vehicle and I think
8  semantics may have confused that with the Order. Umm the Show Cause that Ms. Hankins filed against
9  Mr. Hankins when is he said she said. He's not smoking around the kids. He doesn't smoke in the
10 house. Yes, there was like a week delay in mediation. I mean it didn't cause any harm. It wasn't
11 necessarily a willful thing and it's just more of a scheduling issue. The, you know the therapy. You know
12 he tried to get the information but the therapist wouldn't cooperate with him. None of these things are
13 willful and so he should not be held in contempt for any of those items mentioned in the November
14 Motion to Show Cause that she filed against him. You know the week on-week off is just something that
15 Mr. Hankins had never intended to agree to except for summer months and then from there it just sort
16 of ran like wildfire and then it got incorporated into well that was the status quo and that's what they
17 agreed to, but originally that is not what they agreed to. It just sort of morphed into that based on
18 subsequent orders.

19     THE COURT:     Wouldn't you say that's the theme in this case? Uhh, I signed it and I swore to it
20 but that's not actually what I meant?

21     MS. SMITH:     That's a, that's a

22     THE COURT:     I mean we seem to have that bubbling up *unintelligible*

23     MS. SMITH:     The summer months is the, the problem and it, it is, it's morphed into what we
24 have here today. Which we, honestly, Your Honor, you're right. It's just, these are two (2) folks they
25 cannot communicate with each other, there's a lot of animosity and I think that animosity gets creeped
26 into their ability to co-parent. I think Ms. Hankins has a lot of animosity toward my client and it clouds
27 her ability to communicate.

28     THE COURT:     I think it's consumed their ability to co-parent. To be honest with you. I don't
29 think it's creeped in there and causing a hiccup here and there. I think it's consumed them.

30     MS. SMITH:     Which is a concern. You know, these kids, I mean that's the one thing that we
31 all agree on. These are wonderful children. They're very bright. They're very talented and you know we
32 need to ensure that they can still continue to thrive and have their parents in their life, but our position
33 is that Mr. Hankins should be the primary person to have them. He's got a flexible schedule. He is in
34 more in line with making sure they have their health needs met. He's the one that's taken 'em to the
35 Emergency Room when necessary. He makes sure that they eat. He makes sure that they are doing
36 their homework and he's not doing it for them; helping them to ensure that they get the benefit of

1  doing the homework. He has a reliable child care provider. Mr. Cokley has been in their lives, you know,
2  for twenty (20) plus years. He's a family man himself. He has two (2) girls. They all play together and,
3  and Mr. Hankins stated he's not constantly using, utilizing childcare. He's not leaving them alone three
4  (3) or four (4) hours every single day. Every once in a while he may need to do that. I mean he has to
5  work. He has to maintain, you know, income coming in as best he can. You know, Trey's thirteen (13),
6  he's not five (5). You know he's responsible, but Mr. Oliver is saying that he utilizes him primarily for
7  childcare is just not the case. That is not the case. Umm maybe an hour or two (2) here or there, but
8  beyond that, that is it. Let's see. Make sure I've covered everything. So what I would say, Your Honor,
9  is really until we can flesh out and make sure that we're not getting *unintelligible* we have to extricate
10  the assets, we have to remember that this, this pool of money in the account right now is under this,
11  you know, Restraining Order. I think that the support should be calculated based on Mr. Hankins
12  amended Financial Affidavit, which is income based on the bank records are contained in our
13  Defendant's notebook. It's been entered into evidence. Umm that Ms. Hankins have the $550 a week
14  imputed to her in order to calculate any support and the child support and post separation support, if
15  any post separation is awarded, be considered in conjunction with each other. Mr. Hankins is the parent
16  that will ensure they are parented. He is, he's not a friend. He's a parent and he's strict. He wants the
17  kids to do well and he, he takes that, he holds that in high regard. It's clear that Ms. Hankins' personal
18  feelings have simply compromised her ability to co-parent with Mr. Hankins, you know, in some of the
19  judgments issues are concerning. You know, the therapist. There's, there's the issue about the rats in
20  the house – well we won't talk about it until today. You know they can't even have a conversation
21  about it. It's, we have to talk about it in Court if it was such a, a huge issue. Waiting two (2) weeks until
22  the court date, you know, just causes more concern. Equal sharing of holidays would be appropriate. I
23  think these folks would benefit tremendously by using My Family Wizard and each party pay for their
24  own account, just to make sure everybody is on the same page. There's been so much confusion in this
25  case with records and dates and who's doing what and coordinating. I think My Family Wizard would
26  solve the problem. It would maintain all the records. It would maintain the integrity of the
27  communications and probably solve lots of trouble. In conclusion and again, three (3) wonderful
28  children loving both parents – it is in the best interest of the minor children for my client to have sole
29  legal and primary custody to ensure that the children will continue to thrive as they are today. Thank
30  you.

31  THE COURT:    Well I think I intimated to your attorneys back here before I talked to your uhh
32  children that you know there's a lot for me to chew on. There's umm, I mean that literally and, and
33  figuratively. Dealing with custody, post separation support, child support, motions and order to show
34  cause, different burdens and different standards that apply to all of those the Court has to weigh out.
35  The Court has to sort of sift through umm all the evidence and weigh not only the evidence, but
36  credibility on certain parts of the evidence umm and you know weighing evidence is the key part of
37  anything the Court does. We *unintelligible* and decide what's fact and what's not fact. That's what,
38  that's what my job is umm and y'all in a lot of incidences made that very difficult. Umm you know if it
39  was a fishing story to some extent Mr. Hankins I'd have a hard time buying some of the fishing story.

1  Some of the other stuff bears out. A lot of the stuff doesn't and I have to go through all your evidence
2  and figure out what bears out and what doesn't and that makes my job a lot harder. I'll tell you what's
3  not real difficult is uhh which is typically the most difficult part here is the custody portion. Uhh I get the
4  fact that you both, you love your kids. I get the fact that both of you parent in, in opposite and in your
5  actions too umm and I'll certainly get, at least since you asked me to by coming into Court, what's in
6  your best interest. I'm not gonna tell you what that is right now because I wanna go through the rest of
7  my evidence and weigh it out and make sure that the way that I feel now is gonna be the way that I feel
8  next Tuesday or Wednesday when I talk to your attorneys and talk to 'em about it. Also y'all have been
9  through almost an entire week of a trial and they call it a trial for a reason. It's not pleasant and it's not
10 gonna be a pleasant weekend for you and it's not gonna be pleasant if you get the result that you want
11 because you still have more of this coming 'cause you gotta get through alimony and permanent child
12 support and permanent custody and equitable distribution. Umm

13     MR. OLIVER:     Your Honor, if I may, I think this is set for permanent custody.

14     MS. SMITH:     It is permanent custody.

15     MR. OLIVER:     I mean you

16     THE COURT:     Oh, it is.

17     MR. OLIVER:     It is set for permanent.

18     THE COURT:     Well that's fine. Well and I'll deal, I'll deal with the permanent custody portion.
19 I've got plenty to do that. Umm but I will tell you that with everything else that sits out there umm I, I
20 think Ms. Smith touched on it a bit. I think it comes down to a matter of value. I, I think that's a pretty
21 good adjective to sort of frame this in. How do you do value future wellbeing of your children in respect
22 to everything that you have right now and what are you willing to hold on to right now at the expense of
23 what's gonna happen in the future to your children, umm because your relationship flies apart. One,
24 you value intangible objects to the Court, which the Court is really, really good at dealing with. You put
25 on evidence and I decide what's valued and I decide what's fair and equitable and who gets what. The
26 other is much more difficult because once you divide your stuff up that's gone and you move on and you
27 make some more money, one would hope, or you go out and get the job *unintelligible* I understand.
28 Umm the money portion you can replace. The damage you have to see your children with the
29 opportunities they miss or the things that they're now not able to do because of what happens in here,
30 because of the way you value those property and real things, that's the worst part about this case. Your
31 kids are great. Don't get me wrong. I love 'em, but if y'all could, if, if this keeps up they're gonna have
32 some problems. I know. I sit in this courtroom every day. Your lawyers can tell you exactly what's
33 gonna happen or at least to an eighty percent (80%) certainty of what's gonna happen when they all hit
34 their teens and umm either they're supervised or they're not supervised or they're angry at their
35 parents 'cause their parents aren't getting along. They're gonna make some very bad decisions. All
36 teenagers do. Umm you would hope that they make bad decisions that are commiserate with their age

1    and not with their anger. So umm you probably need to crunch some more numbers because when I
2    talk to you I'm gonna consider your illustrative exhibit and one of the things that I have to do is wade
3    through a bunch of tax returns and whatnot umm and figure out what you've made, what you haven't
4    made and weigh that against to how credible I think you are. Umm the good news is that there's uhh,
5    there's some liquidity there. There's gonna be PSS Order, I can tell you that. I have no doubt that your
6    dependent spouse, I don't doubt that you are a supporting spouse. Umm there's gonna be a Child
7    Support Order. With those figures you're gonna be in with the arrears. You're gonna be the devil is in
8    the details. I will tell you with PSS and your lawyers can explain all this legal speak to you that umm it's
9    typically my practice to grant PSS for twelve (12) months period umm and say you get PSS for this
10   particular period, for twelve (12) months or until, until such time, either twelve (12) months or until
11   such time as an Alimony Order is entered, whichever is first. I'll tell you why, why, I do that because I
12   like the people to take care of their alimony and not go on perpetuity with PSS. That means at a
13   minimum there's gonna be twelve (12) months' worth of PSS. How that's gonna be paid out going
14   forward and whether or not it's gonna be awarded in arrears umm is the issue. Umm I've been known
15   to go longer than twelve (12) months on PSS. As I look over my notes I will go over the facts in this case.
16   That may happen too, but I don't wanna be dishonest with you and tell you one thing and have you be
17   surprised when you get an Order. Okay, I'm just telling you what might happen and that's what
18   happened when you, like I'll bring it to the chef's table. When, you know when you go out to a
19   restaurant you go to a chef's table. If you sit down on the main floor and you order off the menu you
20   can be reasonably sure you're gonna get something you like and you can eat. When you go to the chef's
21   table you get what I'm cooking and that's what you're gonna eat. Umm and so I, I don't say that to
22   scare ya. I just tell you, you know people look at things differently and my perspective should not
23   surprise either of you may be very different from the way you look at it. Uhh it may be very similar or
24   very different to the way you look at it. The outcome umm is really gonna be driven by what's in the
25   best interest of your children, okay. Umm and, and both of you may have issues with that, but I agree
26   with you on Family Wizard. I'm gonna try to craft something uhh to focus communication between the
27   two (2), but to limit it at the same time and I'm gonna try to do that in a manner that is umm not as
28   financial impactful as it otherwise could be. Sometimes that can't be avoided uhh but I think having you
29   guys write everything down that you do and limiting the amount of time that you can come out and talk
30   to each other is not only going to be helpful to you, but it will be helpful to your children. Umm
31   everybody will have full access to all the records and health information. There will be a non-
32   disparagement clause and your attorneys will explain to you what that non-disparagement means. That
33   means that neither of you are to say anything disparaging, ill or untoward about the other parent in the
34   presence of the children and nor are you to allow or keep the children in a situation where disparaging
35   things are being said, which means I understand you can't control your family. I've got a large family
36   and I'd just as soon herd cats as to control what they say. Umm but I can take my kids out of the area
37   and out of the way if my family or my immediate friends aren't ceding to my requests to cease and
38   desist talking about my ex. It doesn't matter whether it's true. Doesn't matter whether you believe it.
39   Doesn't matter whether it's not true. Not appropriate for your kids to hear it and have to try to sort
40   through that and think about, oh is that really true about mom or is that really true about dad. They just

need to worry about who's cooking 'em breakfast in the morning and who's gonna get 'em to school and what they're gonna do when they get home. Umm I think that's all, about all I have for you. I will tell you I know it's been difficult and it's been a long and I appreciate your patience umm and irrespective of what the outcome is going to be and the number of times that we're going to continue to see each other I'm, I do take seriously the opportunity umm to try and help you, okay. It may not be the help you want, but it might be the help be the help you need. Okay. Any questions from either of the attorneys?

MS. SMITH:      No, sir.

MR. OLIVER:     No, Your Honor.

THE COURT:      Thank you very much.

MR. OLIVER:     Thank you, Judge. Appreciate it. Have a good weekend.

THE COURT:      You too. The holiday schedule will be standard alternating holidays as well. So

MS. SMITH:      Okay.

THE COURT:      We'll stand in recess until 9:00 am Monday morning.

THE BAILIFF:    9:00 am, Monday morning. This Court now stands in recess until 9:00 am Monday morning. God save the State and this Honorable Court.

Heather H. Bath
AOC Approved Transcriptionist

---

1

2

3

4                        CERTIFICATION OF TRANSCRIPT

5           This is to certify that the foregoing transcript of proceedings of the Domestic Special Session, is

6   an addendum to the initial transcript prepared for the August 7, 2015 hearing in Wake County. It is a

7   true and accurate transcript of the proceedings transcribed by me. I further certify that I am not related

8   to any party or attorney, nor do I have any interest whatsoever in the outcome of this action.

9           This the 2nd day of May, 2016.

10

11   _Heather H. Bath_

12   HEATHER H. BATH

13   AOC Approved Transcriptionist

14   804 Kimberly Ann Lane

15   Shallotte, NC 28470

16   910-470-8972

Heather H. Bath
AOC Approved Transcriptionist

**1 of 12**

1  STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE

2  COUNTY OF WAKE                             DOMESTIC SPECIAL SESSION

3  ─────────────────────                      15-CVD-7476

4  SARDIA MARIE PORTER HANKINS

5          PLAINTIFF

6  *VERSUS*

7  TIMOTHY OMAR HANKINS, SR.

8          DEFENDANT

9  ─────────────────────

10     Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
11  June 14, 2016, Domestic Special Session, before the Honorable Michael Denning, Judge Presiding.

12                  A P P E A R A N C E S

13  ON BEHALF OF THE PLAINTIFF

14     JOHN OLIVER, Attorney at Law

15  ON BEHALF OF THE DEFENDANT

16     CHAD AXFORD, Attorney at Law

**EXHIBIT**
**19**
tabbies®

Heather H. Bath
AOC Approved Transcriptionist

---

**2 of 12**

1
2                     I N D E X

3  Argument by Mr. Oliver    -    -    -    -    -    -    -    -    4
4  Argument by Mr. Axford    -    -    -    -    -    -    -    -    8
5  Judge's Remarks           -    -    -    -    -    -    -    -    8
6  Certificate of Transcript -    -    -    -    -    -    -    -    12

Heather H. Bath
AOC Approved Transcriptionist

---

**3 of 12**

1
2                  P R O C E E D I N G S

3  The case of Hankins versus Hankins, Wake County 15-CVD-7476, was called for hearing at 9:58 am on
4  Tuesday, June 14, 2016.  Plaintiff, Defendant and all counsel were present.

5     THE COURT:    We've got 14-CVD-8806, Sardia Hankins versus Timothy Hankins.  Uhh the
6  Plaintiff, Ms. Hankins, is present and represented by Mr. Oliver.  Uhh the Defendant, Mr. Hankins, is
7  present and represented by Mr. Axford.  Umm I think we are here on a Motion to Compel.  Is that
8  correct?  Supposed to have initial pre-trial conference today.

9     MR. OLIVER:   Yeah, if I could explain Judge.  I believe the actual case caption number is,
10  should be 15-CVD-7476.  Umm that's the Equitable Distribution file number.  The other file number, Mr.
11  Hankins a unintelligible case and I'd have to go look that up, but all the equitable distribution that I'm
12  aware of is under 15-CVD-7476.  It's not the case caption that is on the Court's calendar.

13     THE COURT:    Okay, so the initial complaint was bifurcated or tried per case.

14     MR. OLIVER:   I think, I don't recall off the top of my head, but I know that all of the, the
15  scheduling and discovery order and all of the preliminary junction order regarding equitable distribution
16  are all under the number 7476.

17     THE COURT:    Okay.

18     MR. OLIVER:   And I have the pertinent documents and motions that are filed with relate, that
19  relate to the motions that are pending before the Court today.  I do not have the court file.

20     THE COURT:    Alright. Umm, what's your understanding of it, Mr. Axford?

21     MR. AXFORD:   Umm, Judge 7476 isn't unintelligible that we've been operating under as far as
22  equitable distribution.  I know that TRO that uhh with Judge Worley or last time I was involved in this
23  matter regarding uhh proceeds of a, of a sale of a piece of property.  I think that was the other, I think
24  that's the other case number, if I'm not mistaken.  That 8806.

25     THE COURT:    Would the TRO then fall under the ED?  What file number do you think?

26     MR. AXFORD:   I thought it was a different case number.  I don't know why there would have
27  been another case number.

Heather H. Bath
AOC Approved Transcriptionist

---

**4 of 12**

1     MR. OLIVER:   The Preliminary Injunction Order I have is a 7476

2     THE COURT:    7476, which is CVD file.

3     MR. OLIVER:   Correct.

4     THE COURT:    Okay and so the, the 8806, which is the 14 file is the custody file.  Umm

5     MR. OLIVER:   Correct.

6     THE COURT:    So uhh it's, it's bifurcated.  Is there anything else that's part and parcel to 7476.

7     MR. OLIVER:   No.

8     THE COURT:    Okay.  Alright, well now that we have that straightened out.  Umm, Mr. Oliver.

9     MR. OLIVER:   Uhh, I'm gonna start Judge with what I think is the easiest part to deal with and
10  that is the Motion to Compel and if you read the Motion to Compel it's, it's pretty straight forward.  Uhh
11  pursuant to the uhh Scheduling and Discovery Order there was a deadline for written discovery to be
12  done and within that deadline uhh the Plaintiff submitted Plaintiff's First Request for Production of
13  Documents, First Set of Interrogatories and a Request for Entry Upon Land.  The Request for Entry Upon
14  Land was for both the real estate.  I believe there are fourteen (14) separate parcels of real estate that
15  existed on the date of separation.  I believe two (2) of those have been sold and we'll get into that in just
16  a second and it was also for entry on land so that Mr. Hankins could deliver to a forensic computer
17  expert all of the, the his phones and his computers that he was then using so that a pure image of those
18  could be made and an analysis done.

19     THE COURT:    Did you issue a spoliation letter?

20     MR. OLIVER:   I, off the top of my head I don't know, Judge.  I, I usually do.  I would be
21  surprised if I didn't in this case, but I can't tell you as I stand here today whether a unintelligible letter
22  was sent or not.

23     THE COURT:    Okay.

24     MR. OLIVER:   Uhh, Kathleen Murphy was retained to represent the Defendant in this matter
25  and she obtained an extension of time to, to respond to the discovery requests and that response time
26  expired on April 25th.  As required by Rule 37 I as counsel contacted uhh Ms. Murphy and I will represent
27  to the Court that she wanted additional time, even though it had expired and I did verbally agree with
28  her.  I said yes, you can have some more time, a couple of weeks, but I really need to get this done.  I
29  also need entry on land and I also need an accounting under the Preliminary Injunction Order.
30  Thereafter she withdrew from the case and Mr. Axford got the case.  On May 9th umm I received an
31  email from Mr. Axford's office, his paralegal, requesting that the discovery responses be submitted to
32  them in work form, which is typical so they could answer them, which I did on May 9th and in my umm

Heather H. Bath
AOC Approved Transcriptionist

---

**5 of 12**

1  response to Mr. Axford's office, to the paralegal, I did state to her that initially I did give Kathleen
2  Murphy some additional time, but something happened in the interim and that's we had an initial pre-
3  trial conference that no one showed up but me and we set the initial on today's date and you said to me
4  that you wanted some more detail in this case 'cause you were familiar with some things that were
5  going on and I relayed to Kathleen, I said Kathleen I need these discovery responses because Judge
6  Denning does want more detail the Initial Pre-Trial Order when we get there on June 14th. I also told her
7  I wanted entry upon land and I also told her that I wanted the, the umm accounting done as per the
8  Preliminary Injunction. She gets out of the case, I then go to uhh Mr. Axford's paralegal and I say the
9  same thing and I give them, I think in my email I said look if I don't get a response by next week I'm
10  gonna have to file a Motion to Compel and that's in my email and I can present those if the Court wants
11  to look at those.

12      THE COURT:    Okay. So you, you did unintelligible.

13      MR. OLIVER:    I did my good faith effort to try to resolve this.

14      THE COURT:    Unintelligible.

15      MR. OLIVER:    I consider that my good faith to try to resolve this without the Court
16  intervention as required by Rule 37. I, I don't have anything, Judge, and we can't conduct an initial pre-
17  trial conference until these discovery responses are presented. Umm I can't do anything else in the case
18  until I get the accounting on at least, I believe, two (2) lots that were sold and I can refer to that. It's on
19  the Motion to Compel. It's quite simple. The discovery responses, the requests are out there and
20  there's no responses. They need to be compelled to respond to these discovery requests. Simple as
21  that.

22      THE COURT:    Did you, did you issue or serve any admissions?

23      MR. OLIVER:    I did not uhh do any requests for admissions. No, so there's no automatic
24  additional notes. There's interrogatories, request for production of documents, request for entry upon
25  land. None of them have they responded to and the time to respond is way, way past due. I've asked
26  for it. I tried to do it out of court with previous counsel and current counsel and I still don't have it. So
27  that's the Motion to Compel. We would ask for attorney's fees also related to the Motion to Compel in
28  as much as we tried to work this outside of the court and were not able to do so.

29      THE COURT:    Okay. Alright.

30      MR. OLIVER:    Umm I don't know, the time frame Judge I will leave open to you the time
31  frame. I'm worried right now that literally there were fourteen (14) separate pieces of real estate.
32  That's a lot and we had a hearing initially was for four (4) or five (5) days and you cut us down to three
33  (3), which that's fine. I'm worried now whether or not we're gonna be able to get this case in shape to
34  try in three (3) months. So I don't know how quickly you want to compel. The, the requests have been

Heather H. Bath
AOC Approved Transcriptionist

---

**6 of 12**

1  out since February 19th. So they've been out there a long time and I'll leave it up to you as to how long
2  you give them to be able to respond to those requests.

3      THE COURT:    Okay.

4      MR. OLIVER:    The Motion for Contempt. I did not do a Motion and Order to Show Cause and
5  umm what, what we want to have and this is also a, more a Motion to Compel and you have the
6  Preliminary Injunction. I, I only have one copy of it, but I'll hand it to you and let me just explain. You
7  didn't do this. You were on vacation last year. I'm not sure unintelligible. So we had a hearing in front
8  of Judge Worley and the reason and now I remember why it was two (2) case captions. I filed for an
9  Emergency Relief and I filed, opened a new file on Equitable Distribution. I think that's why there's a
10  second file number. At any rate, what happened was Mr. Hankins had certain parcels of land, two (2)
11  lots particularly in Garner that he was going to sell and he did in fact sell them. He testified at the
12  Preliminary Injunction Hearing that he had sold them and what came out of the Preliminary Injunction
13  Hearing was that alright, there are at least two (2) businesses that own these pieces of real estate. The
14  businesses are alleged to be marital today and the businesses can conduct their business. None of us
15  gonna prohibit them from conducting business, but Judge Worley ordered two (2) things. One – any
16  future transactions of $25,000 or greater shall be notified, the Plaintiff shall be notified of them before
17  the transaction takes place with as much notice as possible and that's one paragraph and the second
18  paragraph is that with regard to those transactions that were part of the Preliminary Injunction, the
19  specific lots in Garner that were sold, Mr. Hankins was to give us a complete accounting of those. We
20  have not gotten an accounting with regard to the lots that have already been sold and it is our, our
21  understanding that those, after the lots were sold another lot was purchased that are now being
22  developed. They're building on them and we have gotten no indication from Mr. Hankins. Now maybe
23  those, those transactions didn't cost more than, I think it's $25,000, but at least as it relates to the
24  Garner lots that were sold and were sold before that hearing date he's required to give us an accounting
25  and it says what to give us. It's a HUD statement that has to be given. What happened to the funds and
26  all of that. What we're here today is to umm

27      THE COURT:    Since I wasn't here for Judge Worley, I see that you umm joined both the LLC's.

28      MR. OLIVER:    Correct.

29      THE COURT:    They're, they're actually incorporated. They're not appended LLC's. Right?
30  They're not D, DBA's and LLC's.

31      MR. OLIVER:    No, they are registered LLC's

32      THE COURT:    They're registered with the State.

33      MR. OLIVER:    with the North Carolina Secretary of State.

34      THE COURT:    So who represented the LLC's at the Preliminary Injunction?

Heather H. Bath
AOC Approved Transcriptionist

---

**7 of 12**

1      MR. OLIVER:    No one was there on their behalf. The Judge, those had been added by an
2  Amended Complaint and I do not know that they were represented at that hearing. They, if, if they
3  were

4      THE COURT:    Were those, had they been served?

5      MR. OLIVER:    Mr. Hankins. He's the registered agent.

6      THE COURT:    He's the registered agent?

7      MR. OLIVER:    Correct.

8      THE COURT:    Okay. Alright. Alright so, you haven't got an accounting and

9      MR. OLIVER:    No accounting for the transactions that we know already took place. So at least
10  with regard to those he needs to abide by the Order and give us the accounting that he's already been
11  ordered to give and if, if and I don't know, if there are any future transactions that are over, $25,000 or
12  greater we need an accounting for those also.

13      THE COURT:    Alright.

14      MR. OLIVER:    Now I, I did in the form of a Motion to Compel and not a Motion and Order to
15  Show Cause so the, the burden of proof is, is on us to show that he should be held in contempt. I'm not
16  worried about holding him in contempt particularly. I just want the accounting, Judge. I just wanna
17  start getting the documents so I can start preparing this case for a trial that's supposed to take place on
18  September 9, 2016.

19      THE COURT:    Alright. Okay.

20      MR. OLIVER:    Umm so where we are on that, Judge, and where we are on the entire case is
21  that we need to start getting the flow of documentation that is required. Umm the only thing that I
22  have, the only thing that I have is a, an Equitable Distribution Inventory Affidavit that I got last
23  September in, in this case. Umm so to, to, uhh Motion to Compel ordering him to compel and give us
24  the entry on land. Let us look at the computers to get a, a pure image should we choose to and tell us,
25  answer the interrogatories. Answer the Request for Production of Documents and give us the, the
26  accounting on at least Judge the two (2), the two (2) transactions, the transactions that we know, know,
27  know took place and had taken place last summer at the time of the Preliminary Injunction. Umm with,
28  with regard to asking him to be held in contempt if we need to have any testimony on that I can give it,
29  but again our, our, our real crux is not to have him held in contempt. We just want the documentation
30  so we can start moving forward with this case. Umm as far as the attorney's fees I can submit an
31  Attorney Fee Affidavit and you can leave a blank space and I'll give Mr. Axford time to review the
32  Attorney Fee Affidavit. Again I tried both, I tried before coming to Court to try to get this done without
33  having to come Court, but I'm here and under umm the Rule 37 I'm entitled to some, attorney's fees to

Heather H. Bath
AOC Approved Transcriptionist

---

**8 of 12**

1  have, because I had to compel him to come to court by both this prior order and with the Request for
2  Documents, Interrogatories and Entry on Land. Thank you, Judge.

3      THE COURT:    You're welcome. Uhh, Mr. Axford.

4      MR. AXFORD:    Thank you, Judge. Umm, Your Honor, as you know I have not been in this case
5  for probably about eighteen (18) months now. Umm so I can more than willing to facilitate uhh Mr.
6  Oliver's requests umm, but just by way of information I can tell you that when Mr. Hankins came back to
7  me and requested that I get back in this case the, the prior attorneys I don't believe have been giving
8  Mr. Hankins the information that they had to

9      THE COURT:    Uhh, I don't wanna hear the bus backing up or running over anybody right now.

10      MR. AXFORD:    No.

11      THE COURT:    We're at where we're at and we've all been at this particular station a number
12  of times. So umm I, I can certainly take that by way of explanation umm but sometimes there's a hole
13  that we uhh, we get laid down with.

14      MR. AXFORD:    Well I, I understand that Judge and I'm, like I said I was not in it. I can only, I've
15  obviously gotten only one side of the story. I've not talked to any prior counsel about what they've
16  done or haven't done. Umm and like I said if, if Your Honor gives, wants to give me you know fourteen
17  (14) days from today, thirty (30) days from today, whatever I will, as I have done in the past when I was
18  representing Mr. Hankins, make sure that he was in compliance. Umm again whatever happened in the
19  last eighteen (18) months umm however Judge the, the problem and especially in as Equitable
20  Distribution with a focus on the word Equitable I don't have any documentation from Ms. Hankins.
21  Umm this is a copy of Defendant's Request for Discovery. However, it was never filed. It's got, it's got a
22  signature line, the date in February when the deadline was is blank. So as of this point I don't believe
23  that any discovery requests have flowed from Mr. Hankins to Ms. Hankins, which leaves me in the dark.

24      MR. OLIVER:    Well umm I understand you're out and you're coming back in. If, you know, the
25  rule is pretty clear. Send a Need to Confer letter if there's been discovery served by both parties that
26  hasn't been responded to. I'm happy to hear about it, but y'all are coming up in September and you've
27  got three (3) days. I think you're number one in the line. You've been going on for close to two (2) dcm
28  years now. I ain't continuing anything.

29      MR. OLIVER:    And, and Judge I'm not asking

30      THE COURT:    And I'm gonna get your, I'm gonna get your discovery issue settled for you. I, I
31  don't know what's going on with any discovery. I know Mr. Oliver has just told me and I can fix that
32  umm and I'm gonna give you some direction on that.

33      MR. OLIVER:    Okay.

Heather H. Bath
AOC Approved Transcriptionist

9 of 12

1   THE COURT:   If Mr. Hankins hasn't got any discovery or his other attorneys haven't been
2   diligent or whatever and that's, that's part of coming in on the rear end of the donkey sometimes you
3   unintelligible in the head, but you need to send a Need to Confer Letter and uhh do what the rules tell
4   you and we'll have a hearing on it, but you know I had one initial pre-trial conference that was properly
5   noted and nobody showed up to it, except for Mr. Oliver and he didn't try to make a lot of hay out of it.
6   He just said look I just wanna get the information.  Let's reschedule it and come back.  Umm so I think
7   he's been reasonable.  I don't know what Mr. Hankins doesn't have.  I think the Court has been
8   reasonable.  The window is shutting.  Umm and I'm concerned that there hasn't been any response.
9   Whatever you need to do, do it by the Rules of Civil Procedure and we'll get you on the calendar and
10   we'll come in here.  Mr. Oliver is a perfectly reasonable person.  Umm if Ms. Hankins hasn't responded
11   to any discovery I am pretty sure that he'll get it to you.  As to the discovery that umm Mr. Hankins has
12   not responded to umm whatever issues he's got with his other attorneys – there's other avenues that
13   he can pursue to take care of that.  I'm sure that you can tell him how to do that, but for the purposes of
14   discovery all the objections are weighed.  He is ordered by the Court to respond to all discovery within
15   fifteen (15) days, after entry of the Order today, fully and completely.  He is ordered to give a full
16   accounting umm per the Preliminary Injunction Order.  Umm if he does not respond sufficiently to all of
17   those umm I am uhh the Court will order him to appear and show good cause why he should not be held
18   in contempt for failure to comply with the Order of the Court umm and I can tell you that, Mr. Hankins if
19   you're held in contempt umm

20   MR. HANKINS:   It won't happen.

21   THE COURT:   Mr. Hankins, I'm talking right now.

22   MR. HANKINS:   Okay.

23   THE COURT:   Okay.  I, I appreciate it.  You got fifteen (15) days and when I say full accounting I
24   mean full accounting.  You are entered, you are ordered to allow an entry on land.  Anything that you
25   need to do to forward the reports of the sale and transaction into land or any developmental land needs
26   to be fully explained in detail.  That's down to closing documents and any other documentation that's
27   available.  Okay.  As to any issues that you have with discovery from uhh Ms. Hankins you need to talk to
28   Mr. Oliver about that and if y'all can't reach it when we come back here in fifteen (15) days to address
29   the Order and Show Cause and I will take up any other Motions to Compel, but umm y'all need to get
30   ready to try it in September umm because things aren't gonna get any clearer the further we get out
31   from this.

32   MR. AXFORD:   Judge, just one other issue that I have.  I've issued a subpoena to Mr. Oliver to
33   have Ms. Hankins produce, or at least give me the information to get bank records umm, which I think is
34   probably the biggest part of the picture that I personally don't have.

35   THE COURT:   Well I'm gonna quash the subpoena.  She is a party.  If you want, if you want the
36   information you need to issue discovery, discovery for it 'cause that's, that's the appropriate match.  I

---

10 of 12

1   understand that y'all are on compressed schedule.  Umm if you wanna get your discovery, then talk
2   about your discovery issues and then come back and see me and let me know where you're at we will
3   do the initial pre-trial and final pre-trial and I will give you umm very specific guidance as to what needs
4   to be in those umm orders and what you need to do uhh to get there.  Unintelligible playing long
5   enough.  You should know, you should know what you need to try your case and what you need to get
6   there.

7   MR. OLIVER:   Yes, two (2) questions.  One – was it fifteen (15) days from today or fifteen (15)
8   days from the day you sign the Order?

9   THE COURT:   Umm, fifteen (15) days from the day I sign the Order.  I can't order you to do
10   something unless I sign the Order.  So before you leave the courtroom today fill out a Memorandum of
11   Judgement with particulars that the Court just ordered and the clock will start running today.  I, I don't
12   wanna wait another ten (10) days to get an Order and another fifteen (15) days past that.

13   MR. OLIVER:   Second question.  With regard to the subpoena I did file an Objection to the
14   Subpoena citing the same things that you cited with regard to she being a party not subject to what is in
15   essence is a discovery tool and objected to it.  Do we need to have a formal umm Order saying you've
16   quashed the subpoena?  It wasn't on calendar today, but since you

17   THE COURT:   You need to put it in the Memorandum of Judgement that it was brought up
18   and it was umm, unless you're objecting to it being brought up at a hearing on a Motion to Compel, but

19   MR. OLIVER:   No.

20   THE COURT:   I wanna resolve all your discovery issues today and put you on the right track.
21   We don't need to be coming back here two (2) unintelligible times.

22   MR. OLIVER:   We can just put in the Memorandum that, that an objection was filed for that
23   subpoena and that you quashed that subpoena.

24   THE COURT:   Yes.

25   MR. OLIVER:   Okay.  Thank you, Judge.

26   THE COURT:   Umm it, whatever, whatever you wanted to get to the subpoena just, just issue
27   a Supplemental umm Discovery Request.  I can tell you now that within uhh, when I get the Order if we
28   have to come back in fifteen (15) days I'm gonna cut your discovery off at some point.  I'm not gonna
29   allow you to umm uhh propound supplemental discovery, but well you're gonna have a period where
30   you can propound supplemental discovery, but all your response periods are gonna be truncated.

---

11 of 12

1   MR. OLIVER:   Just to make the Court aware, February 19th was the deadline for written
2   discovery.  That was the, that was the deadline for written deadline.  So I don't know what, how that's
3   gonna play into any supplemental discovery.

4   THE COURT:   Well I think I don't know what's gonna happen with their Discovery Motion
5   umm but I, I do foresee that once you get umm response to your discovery that you may have
6   supplemental discovery

7   MR. OLIVER:   I may.

8   THE COURT:   that necessarily springs from that.  If you're on solid ground with your Discovery
9   Motion and you see your discovery you're necessarily gonna have supplemental discovery umm that
10   you're gonna wanna serve and I'm gonna make that available for both of you because unintelligible and
11   that is how much cap and I wanna make sure the Court's gonna be able to get confidence sufficient
12   evidence to be able to classify and value it and distribute it if, if it comes to that.

13   MR. OLIVER:   Yeah.

14   THE COURT:   Okay.

15   MR. OLIVER:   Thank you, Judge.

16   THE COURT:   You're welcome.

---

12 of 12

1   CERTIFICATION OF TRANSCRIPT

2   This is to certify that the foregoing transcript of proceedings of the Domestic Special Session
3   held on June 14, 2016 in Wake County is a true and accurate transcript of the proceedings transcribed
4   by me.  I further certify that I am not related to any party or attorney, nor do I have any interest
5   whatsoever in the outcome of this action.

6   This the 27th day of June, 2016.

7

8   _Heather H Bath_
9   HEATHER H. BATH

10   AOC Approved Transcriptionist

11   804 Kimberly Ann Lane

12   Shallotte, NC 28470

13   910-470-8972

1   STATE OF NORTH CAROLINA              IN THE GENERAL COURT OF JUSTICE

2   COUNTY OF WAKE                       DOMESTIC SPECIAL SESSION

3   ------------------------------------   15-CVD-7476

4   SARDIA MARIE PORTER HANKINS

5         PLAINTIFF

6         VERSUS

7   TIMOTHY OMAR HANKINS, SR.

8         DEFENDANT

9   ------------------------------------

10        Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
11  September 13, 2016 Domestic Special Session, before the Honorable Michael Denning, Judge Presiding.

12                              A P P E A R A N C E S

13  ON BEHALF OF THE PLAINTIFF

14        SARDIA PORTER HANKINS

15        JOHN OLIVER, Attorney at Law

16  ON BEHALF OF THE DEFENDANT

17        TIMOTHY OMAR HANKINS, SR.

18        CHAD AXFORD, Attorney at Law



EXHIBIT
20
tabbies®

Heather H. Bath
AOC Approved Transcriptionist

---

1
2                                  I N D E X
3   Defendant's Argument by Mr. Axford-    .    .    .    .    .    6
4   Plaintiff's Argument by Mr. Oliver    .    .    .    .    .    27
5   Judge's Final Comments-    .    .    .    .    .    .    38
6   Certification of Transcript    .    .    .    .    .    45

Heather H. Bath
AOC Approved Transcriptionist

---

1                              P R O C E E D I N G S

2   The case of Hankins versus Hankins, Wake County 15-CVD-7476, was called for hearing at 12:26 pm on
3   Tuesday, September 13, 2016.  Plaintiff and Defendant's counsel were present.

4        THE COURT:  Okay.  We are here on the Defendant's Motion for Summary Judgement umm
5   pursuant to the Post-Nuptual Agreement.  Umm present are both the Plaintiff and the Defendant.
6   Plaintiff is uhh represented by Mr. Oliver and the Defendant is represented by Mr. Axford.  Okay umm I
7   appreciate y'all's patient with the Court.  I had to hold you open from yesterday.  There was a lot of
8   emergencies and whatnot in custody cases carried over, but I think we need to get this particular matter
9   resolved so everybody knows where they're going.  Umm prior uhh to starting the hearing do we have
10  any housekeeping to take care of?

11       MR. OLIVER:  Judge, I just have one question and maybe I can briefly talk about uhh I, I called
12  Mr. Axford about this and I talked to his office, not Mr. Axford, in that I'm in a little bit of a quandary in
13  that Mr. Hankins is filing motions in this case and I haven't responded to him and he's emailed me a
14  couple of times and I, I haven't talked with Mr. Axford about it to get permission.  I talked to his office
15  and I would like to get permission from the Court.  If Mr. Hankins wants to file things on his own I, I think
16  he has the right to do that umm, but I have to get permission but I really want permission from the
17  Court to respond to Mr. Hankins directly, to anything that he sends to me directly even though he's
18  represented by Mr. Axford.

19       THE COURT:  Umm that is a sticky wicket and I don't umm object to you being able to talk to him
20  directly and you haven't discussed it with your client is unintelligible and I don't know, I know there's
21  been a flurry of filings.  I don't know.  Have any of them, have they been properly served?

22       MR. OLIVER:  Umm, they were served me, Your Honor, but again because he's represented I've,
23  I've ignored them to this point because I, I, and Mr. Axford and I have talked and he would give, he
24  probably would have given permission.  I don't know, but I want some sort of judicial stamp on it
25  because I'm, I'm very nervous umm about doing that without some sort of official approval given that it
26  could get me in an ethics issue and I don't wanna go there.

Heather H. Bath
AOC Approved Transcriptionist

---

1        THE COURT:  That's fine.  I'll, I'll let y'all talk about that, but when we're done with the hearing
2   today I, I can enter an Order that was brought up pre-hearing and you just chronologically know that the
3   Defendant has made several filings for the last period to include a listing of the filings and has reportedly
4   or has actually served the Plaintiff and that umm the, you're allowed to respond to whoever it is that
5   has filed those and served those

6        MR. OLIVER:  Okay.

7        THE COURT:  to you.  Umm, until such time as uhh Defendant notices that he's, he's either going
8   to exclusively rely on his attorney or bring another counsel in.  Umm you can have a long talk with your
9   client about that because I can see some significant issues umm that can arise out of that uhh especially
10  with uhh anything that, that you or somebody else may want to claim is privileged

11       MR. OLIVER:  Right.

12       THE COURT:  in the future and I, once it's, once it's waived the water is over the dam, the water
13  is over the dam.  I think you're painted into a pretty umm tight corner.

14       MR. OLIVER:  Thank you, Judge.

15       THE COURT:  So does that answer your question.

16       MR. OLIVER:  That answers my question about what to do so that I can respond appropriately.

17       THE COURT:  Okay.  Do you have anything to add to that Mr. Axford?

18       MR. AXFORD:  Uhh, no Judge and I've talked to Mr. Hankins and he umm I think him and I are on
19  an understanding of him filing motions pro-se when I represent him.  So I've, I've had that discussion
20  with him and he's, he feels comfortable continuing to do that even though I've actually gotten them
21  back because the notice that I got was that even though he files the motions he hasn't officially done
22  the calendaring request and notice of hearing and that, that type of stuff.  So even though the motions
23  are out there they're not set for any particular date.

24       THE COURT:  Okay.

25       MR. AXFORD:  Umm

Heather H. Bath
AOC Approved Transcriptionist

---

5 of 45

1    THE COURT: That's fine. I appreciate

2    MR. AXFORD: One question I do have though, Judge, is I was going back through a transcript of

3    the August 2015 hearing when uhh Jennifer Smith was still counsel for Mr. Hankins and in my review of

4    that and you guys were here – I was not, but my reading of the final part of the transcript, which was

5    Your Honor, was that that hearing was determinative of permanent custody and child support and possible post-separation report

6    and possibly even alimony and that an Order just has not been entered yet. I just wanna make sure that

7    if

8    THE COURT: That is

9    MR. AXFORD: that is the case

10   THE COURT: That is correct.

11   MR. AXFORD: Okay. So, so those issues have been handled.

12   THE COURT: Those issues have been handled.

13   MR. AXFORD: So after today's hearing, depending on Your Honor's ruling, in theory the only

14   thing left would be an ED trial.

15   THE COURT: That's correct.

16   MR. AXFORD: Fair enough.

17   THE COURT: Is that your understanding Mr. Oliver?

18   MR. AXFORD: I just wanna make sure

19   MR. OLIVER: Uhh depending on what your ruling – I, I don't know off the top of my head. I do

20   know that the custody was on and child support. I thought it was post-separation support and not the

21   alimony portion, but I'll have to go back and look

22   THE COURT: I'll have to look at

23   MR. OLIVER: look – right

Heather H. Bath
AOC Approved Transcriptionist

---

6 of 45

1    THE COURT: Order which is three-quarters of the way done.

2    MR. OLIVER: Okay and I, I don't know if that included alimony. I don't think it did. I thought it

3    was PSS.

4    THE COURT: Unintelligible post separation support, unintelligible.

5    MR. OLIVER: I think it was unintelligible.

6    MR. OLIVER: Yeah.

7    THE COURT: Yeah, I'll consider that along at that point so the alimony will still be hanging out

8    there.

9    MR. OLIVER: Okay.

10   THE COURT: Okay. Umm well it is your motion Mr. Axford so I'll turn the floor over to you.

11   MR. AXFORD: Yes, Judge. Umm Your Honor there were several uhh attachments to my Motion

12   for Summary Judgement and I think those kinda lead up and are more of a uhh more of attachments

13   that just kinda give a preview of what led to the Post-Nuptual agreement. However, Judge as you know

14   under Chapter 50 and I won't recite the law verbatim; however under Chapter 50 certainly Pre-Nuptual

15   and Post-Nuptual agreements are valid in North Carolina. Umm the only thing that you need for a Post-

16   Nuptual agreement is that it's in writing. It's not against public policy and it's notarized and filed with

17   the proper people. So I think, I mean we definitely have it in writing. It's been notarized and it's, I don't

18   believe, my reading of it shows that there's anything in there that's against public policy. Umm in fact

19   courts in North Carolina have repeatedly uhh encouraged property settlements in marriages based on a

20   contract umm and under 50, 50-20, subsection 22D, it certainly goes that "a written agreement filed in

21   the jurisdiction where executed can provide for the d stribution of marital property or divisible property

22   or both in a manner deemed by the parties to be equitable and the agreement shall be binding on the

23   parties." So what Your Honor, I believe, has to decide is, is, is there any reason why the equitable

24   distribution portion of this whole proceeding should not be upheld. Umm and Judge I have case law

25   specifically, however the, from a procedural standpoint I can tell you that I filed, I believe it was July 29th

26   was the stamp date umm and in a Summary Judgement hearing, the Summary Judgement I filed my

Heather H. Bath
AOC Approved Transcriptionist

---

7 of 45

1    client, I filed an affidavit for my client umm with this. No affidavit in opposition has been filed by Ms.

2    Hankins. There have been no depositions taken in this matter. Umm so I, I don't know exactly how Ms.

3    Hankins, or Mr. Oliver, for that matter, has any grounds to object to

4    THE COURT: Well

5    MR. AXFORD: the Post-Nuptual agreement.

6    THE COURT: Well let me ask you this before Mr. Oliver stands up. This, this matter has been

7    going on for a while and if the, the number of things that have taken place in pursuant to the equitable

8    distribution

9    MR. AXFORD: Correct.

10   THE COURT: cause and action and the, there is an affirmative defense made against equitable

11   distribution and then the parties participated in filing equitable distribution affidavits and significant

12   other litigation regarding the equitable distribution and having gone through several attorneys umm

13   once Mr. Hankins got to you he looked at his complaint, I suppose, of it and the Post-Nuptual agreement

14   said well unintelligible I'd like to plead the Post-Nuptual agreement. How are you gonna respond to the

15   waiver and estoppel issue?

16   MR. AXFORD: Well as you know Judge umm nowhere did I find that umm, I mean under the

17   rules of summary judgement, summary judgement can be filed any time after all the pleadings have

18   been filed umm and also Jennifer Smith, prior counsel, filed a Motion to Dismiss the ED portion of the

19   claim based on this. The fact that she didn't calendar it and it hasn't been heard doesn't make it moot.

20   THE COURT: Well that wouldn't make it moot, but what do you do about the interim where

21   there's been significant portions of litigation that's, that's addressed the equitable distribution and

22   significant amount of activity that seems to support that there's equitable distribution going on? I think

23   the argument there is that you can bring summary judgement anytime you want. You can bring it two

24   (2) years after if nothing's going on, but we're doing litigation over the thing Judge and he hasn't said

25   anything about his affirmative defense and now he comes back after we've done all the discovery and

26   says oh, I'd like summary judgement.

Heather H. Bath
AOC Approved Transcriptionist

---

8 of 45

1    MR. AXFORD: Well Judge

2    THE COURT: So there, is there anything on point you found on that?

3    MR. AXFORD: Well I, I haven't found anything that says that this is an affirmative defense,

4    which I have to plead to begin with. I mean summary judgement is looking at the four (4) corners of the

5    document and once that's, that claim is made is there anything that the, the opposing party can object

6    to.

7    THE COURT: Well obviously he's gotta, if he's gonna plead a bar to a claim by a Post-Nuptual

8    agreement that's an affirmative defense and that's gotta be pled in his first affirmative pleading and he's

9    done that. I don't think there's any question that he's done that. That's in his answer it's his affirmative

10   claim. He's made the affirmative defense, but doesn't he have to stick to the defense rather than go on

11   for a year and a half as if there's gonna be some equitable distribution and then come back at the tail

12   end and say well no, I, I got the Post-Nupt. I'm gonna, I, I don't wanna do anymore litigation.

13   MR. AXFORD: Well again, I, I can't comment as to why that Motion to Dismiss umm on the

14   affirmative defense wasn't calendared or heard. That might be something to take up in a different

15   venue, but all parties were on actual notice that this Post-Nuptual Agreement existed.

16   THE COURT: I don't think anybody's denying that. I, I, if my premonition is correct and it may be

17   partly correct and it may be wrong. Umm someone is gonna get up and say well yeah, he waived it, but

18   he's participated in significant litigation. Just like you have a right to arbitration and you plead the right

19   to arbitration in an affirmative context, but then you take a place in significant litigation regarding it uhh

20   discovery, which will incur – he's gonna stand up and say we've been significantly produced. We spent

21   a lot of money doing discovery and getting ready for ED because they didn't pursue their summary

22   judgement claim and now he comes in after the fact, after all the money has been spent and says that

23   uhh no, I want the Post-Nuptual Agreement.

24   MR. OLIVER: Your Honor, may I interject?

25   THE COURT: Sure.

Heather H. Bath
AOC Approved Transcriptionist

9 of 45

1    MR. OLIVER: The reason it came through this way is in fact and this, this in my pleadings book
2    that I'm gonna hand up to you so you don't have to dig through the file to find it. We filed a complaint
3    and part of the complaint was to set aside, to ask for equitable distribution, to set aside the Post-
4    Nuptual Agreement or that if it is, if it is valid that it, that it, it doesn't do what it purports to do. The
5    answer that was filed Judge, by Ms. Smith requested partial sum, equitable distribution. It said you can
6    do equitable distribution, but you have to determine what's under the agreement and what's not. We
7    then amended that complaint to add the LLC's and you'll hear about the two (2) LLC's that actually hold
8    title to a lot of real estate and in that, and you'll hear that the LLC's are in fact purportedly marital. They
9    were, they were formed during the course of the marriage before separation and in that amended
10   answer and counterclaim she again reaffirmed the Defendant's request for equitable distribution, partial
11   equitable distribution. So it's always been standing there that we do not believe that the Agreement is
12   valid. I'll get into unconscionability 'cause I gotta argue to make the unintelligible or in the alternative
13   that Mr. Hankins breached it and because of the breach that Sardia would no longer be obll, be bound
14   by that contract. So the reason it's gone through the litigation is that Mr. Hankins himself in his
15   pleadings asked for equitable distribution.

16   THE COURT: Okay. Umm, I'm, I'm sorry for the sidetrack there.

17   MR. AXFORD: No, that's fine. I mean

18   THE COURT: You can go on, Mr. Axford.

19   MR. AXFORD: I mean a, I partially agree with what Mr. Oliver saying is. I mean I think in the
20   interest of judicial economy that we need to, Your Honor needs to determine to what extent this is valid,
21   to what and to what property it applies If you believe it's valid. Umm you know again I, I don't have any
22   bearing on what Jennifer Smith did or didn't do.

23   THE COURT: Well yeah, but you're kinda locked in to what she did or didn't do.

24   MR. AXFORD: I, I don't completely disagree with that, but

25   THE COURT: You're gonna step into those shoes. Umm so if I understand both of you correctly
26   the question is, is it going to be equitable distribution in the sense of the statute and compost

---

11 of 45

1    Motion for Summary Judgement with an Affidavit you know if I've done discovery and I tell my client I
2    don't think I have a legal basis to file a Motion for Summary Judgement that keeps me out of hot water
3    with whoever. You know so I think there's, you know you can look at that one both ways. That yes, you
4    don't wanna go through a bunch of litigation and discovery and then file the Motion for Summary
5    Judgement when everybody has spent a lot of money, but you also need to be able to get to the point
6    where you believe that it is a motion based in law and on facts. So I think that's a two-way street.

7    THE COURT: Okay. Alright. Well we'll, we'll get you back on track here. Is that

8    MR. AXFORD: Yes, as far, as far as I'm concerned that's, that, yes. I mean that's where I think, I
9    mean that's where we are on that.

10   THE COURT: Okay. Okay, thank you. Mr. Oliver. Where are you at?

11   MR. OLIVER: Is this my opening?

12   THE COURT: It is.

13   MR. OLIVER: Okay. I was just making sure. Judge, I, I think this is really easy. I'm gone, other
14   than the fact of whether it's a valid Post-Nuptual Agreement or not is really what the question is and
15   you can't answer that today, but let's go back to the Summary Judgement. Umm the Summary
16   Judgement that was filed in terms of that the Post-Nuptual Agreement, which directed the disposal of all
17   property, real or otherwise, related to the marriage between the parties and the Agreement is thereby
18   renders any claim for equitable distribution unnecessary. Two (2) things umm about that. One, when
19   you read the Post-Nuptual Agreement and it's, it's in your book that I'll hand up to you. You will find
20   Your Honor that what it excluded, what it tried to exclude from equitable distribution was real property
21   that was titled in the name of the Defendant individually or jointly. Okay. It purports that Sardia waives
22   her interest to any real estate that is titled in Mr. Hankins name individually or jointly okay and then
23   later it also says the word partial in it. It's partial distribution of property, unequal and that Sardia and
24   this is later on in it, waives any interest she has, may have in any real property. It doesn't talk about
25   LLC's. It doesn't talk about personal property. It doesn't talk about cash in the bank, life insurance,
26   retirement accounts. All it talks about is real estate and the Affidavit that's filed by the Defendant, I
27   have the Equitable Distribution Affidavit as you look at it, I, I haven't confirmed these. The real estate is

---

10 of 45

1    everything or is it going to be a partial equitable distribution. If it's a partial equitable distribution, to
2    what property does that apply?

3    MR. OLIVER: I, I, I think that, you're right Your Honor. What you can come out of this with is a
4    determination based on the Post-Nuptual Agreement, not whether it's valid or invalid, but that if it is
5    valid this is what properties included and this is what property is excluded.

6    THE COURT: Okay.

7    MR. OLIVER: Because, because we're still at, part of the problem here is we've pled that this
8    contract has been breached and if it's been breached then it's, then it's, then she can rescind her side. If
9    he's breached it, you can't hold her to do what she's supposed to do if he's not doing what he's
10   supposed to under the contract, but that's my argument and rescission on that level and also whether
11   it's conscionable or unconscionable, but I think you can determine today

12   THE COURT: Unintelligible breach unintelligible.

13   MR. OLIVER: I think you can determine today looking at it if it is, if I later determine that it is
14   valid this is what it's gonna include and not include.

15   THE COURT: Okay.

16   MR. AXFORD: And, Judge, just one, just for the record what, as far as waiver and estoppel I
17   mean I think Rule 56 contemplates that discovery goes on because it says "if somebody files a Motion
18   for Summary Judgement the party opposing it can use depositions, prior transcripts" so I think there is
19   built in Rule 56 contemplation that some litigation/discovery goes on.

20   THE COURT: Isn't that more of a funneling mechanism, which means you have to have, you
21   have to have a Motion for Summary Judgement first and then you can do discovery and depositions to
22   show that there is an issue of material fact? It doesn't work in opposite, which is to say okay umm I'm
23   gonna say that you're concluding because I have this and I want a Summary Judgement Motion because
24   I have a, a Post-Nuptual Agreement and

25   MR. AXFORD: Well and I'm, whether it's a Post-Nuptual Agreement or any Motion for Summary
26   Judgement based on something completely different, I mean I think that, I mean anybody that files a

---

12 of 45

1    titled either in the name of Omar Construction LLC or Sardia Enterprise LLC; the two (2) LLC's that were
2    created during the marriage. So to the extent that any real estate is titled in the name of these LLC's she
3    hasn't waived a, okay, her right to it. It's not in his name personally, individually or jointly and if she's
4    waiving her right to any piece of real estate she's not gonna, that doesn't say she waives her right to the
5    LLC's that are part of the marriage. The LLC's own the, own real estate. She doesn't own the real
6    estate. She has an interest in the LLC's that own the real estate. There's a huge difference. So for that
7    reason we'll look at whether or not the LLC's, the, the Post-Nuptual Agreement, even if valid, excludes
8    very little from this marital estate. It only excludes real estate, specifically real estate in the Defendant's
9    name, individually or jointly, or real estate that she has an interest in. Okay. Secondly, uhh judge when,
10   when you're looking at the evidence you can't ask for Summary Judgement based on a contract that we
11   contend is not valid. You first have to determine if it's valid and we in our pleadings did state that we,
12   because of the unconscionability of the manner in which it was entered and the unconscionability of the
13   terms of the Agreement, that you should find it to be invalid.

14   THE COURT: Verified pleadings?

15   MR. OLIVER: Verified pleadings, Your Honor.

16   THE COURT: Is there a copy of the Post-Nuptual Agreement?

17   MR. OLIVER: There was a copy of the Post-Nuptual there. So the, then that answers Mr., Mr.
18   Axford's question about how do I defend it if I didn't file an affidavit – I don't have it. He, he has the
19   burden of proof so I don't have to do anything, but I can rely on all of the verified pleadings in the file.
20   The affidavits filed and the equitable distribution action. All those things are sworn statements. I can
21   rely on all of that in Summary Judgement. So the verified pleadings then sets out that remember I said
22   there was another piece of the puzzle. We know what Mr. Hankins received as consideration for the
23   Post-Nuptual Agreement. He got all the real estate that was jointly, was in his name individually or
24   jointly. So the question is what did Ms. Hankins receive? Right. The contract has gotta be supported by
25   consideration. What she received was the right to live in a house that Mr. Hankins would pay the bills
26   on. That is, if I can read, umm I'm gonna read, I was trying to find and read the exact quotes. "Husband
27   agrees to allow wife to continue to use the real estate titled jointly in the party's name and pay all
28   indebtedness, all indebtedness toward that real property." There's a problem though. He didn't do

---

13 of 45

1  that. That house went into foreclosure. They lost that house. So we're contending that if you have a
2  contract that is based on his, the consideration in that way if she waives her right to real, real estate
3  titled in his name individually or jointly and what she got was a place to live that was gonna be debt free
4  'cause he was gonna pay the debt. When he doesn't pay that debt and that house is foreclosed on and
5  she's kicked out of that house, she's not waiving her interest in that real estate anymore 'cause he's
6  breached the contract. That's a material breach to the contract. That's the heart of the contract.

7  THE COURT: Was there a breach clause in the Post-Nuptual Agreement?

8  MR. OLIVER: You know, I was looking. I don't believe, it has enforcement and I think all it says
9  about breach is that you can ask for specific performance. Yeah, it's talking about specific performance.
10  "In addition to all rights and other remedies each party may have in law or equity arising by the breach
11  of this agreement by the other party."

12  THE COURT: Okay and what are the other rights and remedies that you're contending that she
13  has? Unintelligible.

14  MR. OLIVER: Well she uhh

15  THE COURT: Is rescission an appropriate remedy?

16  MR. OLIVER: Absolutely because there's only, there's, there's, it's a very easy contract. She's
17  gotta do one thing, waive her rights. He's gonna do another. He's gonna give her a place to live and pay
18  all the bills. If he stops doing that, then she doesn't have to continue to, to uhh abide by what she
19  promised to do. She's no longer getting what he; he's not doing what he promised to do. You can't
20  force her to do what she promised to do, if he's not doing. Those are the direct exchange. It's like
21  saying I'm gonna quit, I'm gonna give you the uhh, I'm gonna pay for suits for you to produce suits for
22  me – right – and you quit producing the suits but you still want me to pay for them or vice versa. It
23  doesn't make any sense. You rescind the contract. So for those reasons Judge finally the fact is because
24  of the pleadings that were filed already, they've already staked themselves out, I believe, to a, at least a
25  partial equitable distribution. You just have to determine what is in that equitable distribution. I think
26  you can do, actually I think you can probably do, read this contract today, look at it and say what it does
27  or it doesn't not exclude. Okay, I think it's pretty clear on what it does and does not exclude and once

Heather H. Bath
AOC Approved Transcriptionist

---

14 of 45

1  you do that it'll put it in a frame where we'll know how to prepare for the trial after we have the hearing
2  on whether it's a valid or an invalid contract, whether it's enforceable or not.

3  THE COURT: Okay. Mr. Axford.

4  MR. AXFORD: Thank you, Judge. If I can approach, Your Honor.

5  THE COURT: You may.

6  MR. AXFORD: Your Honor, in this particular case, which is Small v Small, Small v a bunch of
7  other people umm if I can direct your attention, Your Honor, to the top right hand corner to page 5 of 7.
8  Uhh, the first offset paragraph about a third of the way down, Judge, specifically says "contracts
9  between husband and wife not inconsistent with public policy are valid and any persons of full age
10  about to be married and married persons may with or without valuable consideration release and quit
11  claim such rights which they might respectively acquire." You do not have to have consideration for a
12  post-nuptual agreement. It's clear.

13  THE COURT: Umm that seems to be referring to post-nuptual agreements prior to the adoption
14  of the Equitable Distribution Act. Now once you take the Equitable Distribution Act into uhh
15  consideration what's the effect on that?

16  MR. AXFORD: I think it was, I think it was

17  THE COURT: Unintelligible equitable distribution?

18  MR. AXFORD: blended into the statute. Again, the statute clearly says that only thing you need
19  for a valid post-nuptual agreement are that it's in writing, that it is notarized and that it's not, it's not
20  void against public policy. Those are the three (3) things you need for a post-nuptual agreement. What
21  I would suggest is Judge is the last sentence of paragraph 3 in this Post-Nuptual Agreement
22  encompasses everything that Mr. Oliver says does not, is not encompassed by this and it clearly says
23  "wife for herself and her heirs, assigns, executors, administrators expressly waive and release any and all
24  rights, whether now in existence or hereafter acquired, applied to the courts of the State of North
25  Carolina or any other jurisdiction for distribution or division of all real property that the wife may have
26  an interest therein." So what I think Judge is, is

Heather H. Bath
AOC Approved Transcriptionist

---

15 of 45

1  THE COURT: So that means, isn't that a bit broad? What if she brought her own real property
2  into the marriage and still has an interest in it and would be considered separate property? Does that
3  mean she waives her right in that too?

4  MR. AXFORD: I would say it does. Umm

5  THE COURT: So

6  MR. AXFORD: Well let, let me explain why

7  THE COURT: Unintelligible. Yeah, go 'head and explain that.

8  MR. AXFORD: what, what, what I'm saying is this is, if she brought real estate into the marriage I
9  would say it would because what Mr. Oliver just said earlier is, is she believes she has an interest in the
10  LLC's. That's the value of the business.

11  THE COURT: It doesn't say that in there. So let me get to my next question. If you roll the LLC's
12  into your answer, if you'd like – how do you, how would that purport with public policy that a term of a
13  post-nuptual agreement says if I leave you any separate real property that I had, that I brought into the
14  marriage for the term of the marriage I'm waiving all my right in and you get it as long as you pay for
15  everything uhh that's in this house and on this particular plot of land for me moving forward?

16  MR. AXFORD: You're talking about hypothetically bringing in separate property acquired prior
17  to the marriage?

18  THE COURT: Well then the statement would seem to cover that. It says any real property that
19  she had an interest in. So if it's real property, regardless of whether it's marital, separate or otherwise,
20  she has an interest in it. She's waiving her right in that and if I hear your argument correct she's waiving
21  her right in favor of Mr. Hankins. How is

22  MR. AXFORD: I would

23  THE COURT: that not unconscionable?

Heather H. Bath
AOC Approved Transcriptionist

---

16 of 45

1  MR. AXFORD: Well Judge, if I can approach again. In a separate case, in this particular case
2  Judge, if you look at and I actually printed a different one kind of a, let's see here, when you get into the
3  paragraph that begins "When we apply these principles"

4  THE COURT: Where's that?

5  MR. AXFORD: The, well I have a different

6  THE COURT: Oh, okay.

7  MR. AXFORD: I printed a different

8  THE COURT: I gotcha.

9  MR. AXFORD: The offset there Judge says the wife "hereby releases and relinquishes unto the
10  husband any and all property or interest in any property, real, personal and mixed, now owned or
11  hereafter acquired by husband just the same as if she'd never been married to him." But if you go
12  further down Judge, which I think is even more important. Umm the "Defendant similarly relinquished
13  his rights in any property owned by the Plaintiff. While the contract did not enumerate in detail the
14  property of the Defendant, we have held that the fact the specific property owned by either party was
15  not described in the agreement cannot serve without more to avoid the unmistakable clear general
16  provisions of the contract." So specific pieces do not have to be enumerated in North Carolina or have
17  to be enumerated in North Carolina. If the face of the document stands by itself

18  THE COURT: Well let me, let me draw your attention to the first sentence in that first paragraph
19  is where – see if we – it said unintelligible still holds. It says "when we apply these principles to the facts
20  of the present case we conclude that the Plaintiff relinquished all her property rights, which arose out of
21  the marriage." Okay. I'm asking you about the property unintelligible prior to the marriage. Doesn't
22  that modify everything that came after that? If she brought in, if she had her parent's house and other
23  real estate, which was her sole and separate property coming into the marriage and it typically remains
24  with her, it seems to me that as a part of the post-nupt that you just read to me says that she's waiving
25  her rights in that. Is, which is to say that all of the separate property that she brought in the marriage
26  that's real is now marital property and when we get divorced you're waiving your rights to it. Is that
27  what; is that what you're saying it says?

Heather H. Bath
AOC Approved Transcriptionist

## 17 of 45

1     MR. AXFORD: Well, I, what I would say Judge, I mean, to argue on this hypothetical, I mean

2     THE COURT: That's, that's what the case says. So I'm just, I'm just trying to ask how, how that

3     particular, how that particular instance fits within the uhh unintelligible of the Post-Nuptual Agreement.

4     MR. AXFORD: Well simply because there, there was, I understand Your Honor's point, if she had

5     brought in separate property, but that's not the case here. The facts of this case are that she did not

6     bring in anything. So there is, there is

7     MR. OLIVER: I'm gonna

8     MR. AXFORD: the overly broad

9     MR. OLIVER: object Judge to what is not in the affidavits and everything that's applied. I don't

10    know. Honestly I don't know what she brought into the marriage frankly

11    THE COURT: Okay. And I, I

12    MR. OLIVER: and I don't think it's in any

13    THE COURT: understand and I just,

14    MR. OLIVER: I didn't read that in his affidavit. I know it's, I know it's not in any of the pleadings

15    that I unintelligible, but if you could point it to me I just, I will, I'll consent to it

16    THE COURT: Well unintelligible

17    MR. OLIVER: if it's in an affidavit

18    THE COURT: still holds water whether it's talking about any separate property that she brought

19    into the marriage

20    MR. OLIVER: Okay.

21    THE COURT: In any affidavits.

22    MR. AXFORD: So all, all I'm saying is any property that, that at least as far as this, I mean this

23    Post-Nuptual Agreement is specifically tailored to this marriage and it would be our contention that

## 18 of 45

1     there will, there will be no umm I don't think there's gonna be a contention by the Plaintiff that there

2     was separate property brought into the marriage from that side. So if you read it that this particular

3     THE COURT: What about the property that remains separate after the marriage? Unintelligible

4     acquired real property by inheritance unintelligible? Unintelligible uhh folks are unintelligible. What

5     about if they're married and she receives separate property during the marriage through an

6     inheritance?

7     MR. AXFORD: Well in theory, I mean what I'm thinking is, is that at that point Post-Nuptual

8     Agreement can be amended.

9     THE COURT: But it hadn't, it hadn't been amended.

10    MR. AXFORD: It hadn't.

11    THE COURT: If she's received separate property with through inheritance through the marriage

12    and now they're divorced, well they're separated and they're dissolving their relationship, by the plain

13    language of their Post-Nuptual Agreement she's waived her right, her rights to that real property.

14    MR. AXFORD: Well and, and I, I understand that part and what, what I'm guessing Judge is, is

15    that at the time that this was, this contract was entered what I would tell Your Honor is, is that uhh the

16    meeting of the minds that happened as it relates to this agreement was only supposed to be property

17    acquired between marriage and separation not with separate property, whether it's inheritance or

18    whatever else the case may be, not to be

19    THE COURT: Doesn't it have to say that though?

20    MR. AXFORD: I don't think it does based on the last case I handed up, Blunt v Blunt.

21    THE COURT: Okay. Based on what paragraph in that case?

22    MR. AXFORD: Uhh right after the offset that I read. It says "the fact that specific property

23    owned by either party was not described in the agreement cannot serve without moor to avoid the

24    unmistakably clear general provisions of the contract."

## 19 of 45

1     THE COURT: Isn't there a difference between description and identification? I mean that just

2     says real property, which means you don't have to give me metes and bounds to describe the real

3     property, but if you sufficiently identify the real property umm Defendant's house located at 123 Apple

4     Way – that identifies it. Isn't there a difference between description and identification of the property?

5     MR. AXFORD: Uhh, yes there's a technical difference in that. I would agree with that.

6     THE COURT: Technical? You think there's a substantive difference? I mean one flows from the

7     other. Uhh

8     MR. AXFORD: I think that

9     THE COURT: unintelligible.

10    MR. AXFORD: I think what this, what the Court was trying to say in Blunt v Blunt is that you do

11    not have to specifically describe, again whether it's by address or by book and page or whatever the

12    case may be. If you say real property, that is sufficient in a post-nuptual to mean the real property that

13    they acquired during the marriage.

14    THE COURT: Okay. Just a minute. Alright, so is it your argument that this case is on the, if

15    you're reading the uhh post-nup is that umm it should be read that she's waived any and all rights to

16    real property they've acquired through the course of the marriage?

17    MR. AXFORD: Yes, that's what I, that's what I think this specifically says. Correct. I mean we,

18    we could put her on the stand and ask if she's inherited anything from the date of marriage to the date

19    of separation.

20    THE COURT: Well we're here, we're here on Summary Judgement right now.

21    MR. AXFORD: I, I, I understand.

22    THE COURT: So I just wanna know if there would be any issue with material fact. Umm

23    MR. AXFORD: And the other, the other uhh, I don't mean to cut you off Judge. Umm but the

24    other, if I could hand up one other case, Your Honor.

25    THE COURT: Sure.

## 20 of 45

1     MR. AXFORD: Your Honor, in this particular case, it's Dohlberg v. Dolberg. Umm if I can direct

2     Your Honor to

3     THE COURT: What happened in Dohlberg?

4     MR. AXFORD: In this particular case Judge, summary judgement was granted and one of the,

5     one of the umm appeal issues was unconscionability or uhh fraud, mistake, duress, anything like that,

6     that umm Mr. Oliver argues should make this contract void at its offset, if I can direct Your Honor in the

7     bottom right hand corner of page 3 of 4.

8     THE COURT: Okay.

9     MR. AXFORD: Umm in this particular case Judge, it con, it continuously holds that the statute of

10    limitations on anything related to a contract is three (3) years. So any argument that the Plaintiff has

11    that this contract was entered under fraud, duress, coercion or umm

12    THE COURT: Well do you have a copy of the Post-Nuptual Agreement that I can mark on? It

13    would be helpful if I

14    MR. AXFORD: Yes.

15    THE COURT: Just might narrow the question.

16    MR. AXFORD: So here Judge umm unconscionability or, or, or procured by duress, coercion or

17    fraud in that

18    THE COURT: Well in looking here it says it's, this was executed under seal so that's an (10) year

19    statute of limitations. Right?

20    MR. AXFORD: The contract itself, but not the formation of the contract.

21    THE COURT: But now fraud though is a bit different, because the nature of fraud is to be

22    concealed. So if you think that there's fraud you have three (3) years from the time that you know or

23    should have reasonably known that something fraudulent took place in the formation or the, inside the

24    entered contract. Right? Are, are you saying that there's a point in time that you can identify in the period

## 21 of 45

1  of three (3) years back when Mrs. Hankins should have known or reasonably known that uhh that she
2  was induced into entering the contract fraudulently?

3  MR. AXFORD: Yes, Judge. Umm, if I can, if you can just give me a second. I believe it was in this
4  case, in the first uhh, excuse me the, on that page that I referenced earlier, Judge, 3 out of 4. The
5  paragraph, I think it's the third paragraph down it says "Under North Carolina law there's a three (3)
6  year statute of limitations for filing actions for duress, undue influence and fraud. Cause of action for
7  duress, undue influence and fraud accrues upon discovery by the agreed party of the facts constituting
8  the fraud", which I don't think uhh Mr. Oliver mentioned unconscionability earlier. I don't think he
9  mentioned fraud umm but it also says "Courts in this jurisdiction have interpreted this language to mean
10  that the cause of action accrues when the wrong is complete, even though the injured party did not
11  then know the wrong had been committed". It goes on to say that umm under Barns v Campbell
12  University "applying the date of having knowledge of an alleged undue influence as the date that the
13  deed was executed and filed." So my argument is the day this was filed in the Register of Deeds started
14  the statute of limitations.

15  THE COURT: Okay. Well so let me ask this question before Mr. Oliver gets up. Filed the
16  complaint, Plaintiff filed the complaint asking for equitable distribution among other things. Your client
17  files an answer and counterclaims and umm pleads, pleads the umm Post-Nuptual Agreement umm in
18  bar of equitable distribution, then there's an amended complaint that's filed that at least his attorney or
19  the time said well if anything it's partial uhh distribution. It's not full equitable distribution and then he
20  files an amended uhh unintelligible

21  MR. OLIVER: Amended Complaint brought all the LLC's.

22  THE COURT: Pardon?

23  MR. OLIVER: The Amended, the Amended Complaint brings in the LLC's.

24  THE COURT: The LLC's, okay and did you deny the validity of the uhh Post-Nuptual Agreement?

25  MR. OLIVER: I re, I incorporated the original Complaint in toto and then added the

26  THE COURT: Okay so the original Complaint that you

Heather H. Bath
AOC Approved Transcriptionist

## 22 of 45

1  MR. OLIVER: We asked, we did. We said it was invalid for the reasons

1  THE COURT: Okay.

3  MR. OLIVER: I've articulated on opening.

4  THE COURT: Okay.

5  MR. OLIVER: I'll, I'll go through those specifically during my

6  THE COURT: Oh, okay. Done in the original, so the original Complaint. So umm pleading the
7  statute of limitations to bar that's, that's an affirmative defense in and of itself also. Correct? You have
8  to put

9  MR. OLIVER: Yes.

10  THE COURT: that in your first response and pleading. Did you uhh, did you answer statute of
11  limitations or

12  MR. AXFORD: Personally?

13  THE COURT: did Mr. Hankins? No, well Mr., did your client, did your client? Did your client
14  answer uhh statute of limitations?

15  MR. AXFORD: I, I did not look at the Amended Answer or Reply. I'm sorry, I don't know if she
16  pled

17  THE COURT: Do you have a copy of the pleadings unintelligible?

18  MR. OLIVER: Why don't I just hand up my book that I'll give you. That's probably the easiest
19  thing 'cause it has all the pleadings we're talking about. There's the copies for you on mine. I've, I've
20  marked them as Plaintiff's Exhibits even though that's part of the Court's file.

21  THE COURT: Okay.

22  MR. OLIVER: And that, the document you're looking for Judge, they, they go in chronological
23  order. First is the Complaint, then there's the original answer, then there's the Amended Complaint.
24  That's number four (4) and then number five (5) is the Amended Answer. Okay. And Judge if you would

Heather H. Bath
AOC Approved Transcriptionist

## 23 of 45

1  like, so I didn't kill too many trees with this one, I have the entire original Complaint with all the
2  attachments. I, I didn't put that one in that book because I didn't know they were missing, but I do have
3  it with me today if you need to look at that.

4  THE COURT: That's okay.

5  MR. AXFORD: Well Judge and I can address a couple more things too after you've finished going
6  through those pleadings.

7  THE COURT: So where in the first answer of the Amended Answer does umm, does Mr. Hankins
8  plead the statute of limitations as an affirmative defense?

9  MR. AXFORD: I'm going through here, Judge.

10  MR. HANKINS: Excuse me, Your Honor. May I go to the bathroom.

11  THE COURT: Unintelligible to speak. You've got an attorney.

12  MR. HANKINS: I need to go to the restroom.

13  THE COURT: The restroom?

14  MR. HANKINS: I'm taking medication.

15  THE COURT: Yeah, you can go to the restroom sir. Yeah.

16  MR. HANKINS: Yeah, I'm taking medication.

17  THE COURT: Umm and while you're looking for that I've read your pleadings again. Does
18  anybody have the original copy of the Post-Nuptual Agreement?

19  MR. OLIVER: No, that's part of my argument, Judge. I, I need to, I'd like to see that
20  unintelligible, but no I have never seen the original. My client does not have one.

21  THE COURT: Umm

22  MR. AXFORD: I think he

23  THE COURT: Go 'head.

Heather H. Bath
AOC Approved Transcriptionist

## 24 of 45

1  MR. AXFORD: The copy that I provided to the Court was the one that was filed in the Register of
2  Deeds. So that's self-authenticating.

3  THE COURT: Is there a, there an affidavit with it?

4  MR. AXFORD: Umm, I just handed you the copy I have, Judge, but I think, I can't remember if
5  there was an affidavit behind it or not.

6  THE COURT: Did you find what you're looking for, Mr. Axford?

7  MR. AXFORD: No, Judge, and I can tell you that uhh no it does not appear through my review of
8  the pleadings that Mrs. Smith filed statute of limitations.

9  THE COURT: Okay.

10  MR. AXFORD: Umm what I will tell Your Honor, however though is, is if the uhh, I'm sorry.

11  MR. OLIVER: May I approach?

12  THE COURT: You may.

13  MR. OLIVER: Just to look at my copy of the Post-Nuptual.

14  THE COURT: I thought this was my copy.

15  MR. OLIVER: Well, it was, it's your copy now. I just want to see what the unintelligible is.

16  THE COURT: We'll get you another copy. I've already started writing on it.

17  MR. OLIVER: That's fine. Thank you.

18  MR. AXFORD: Judge, in response to Mr. Oliver's claim of breach that, the marital residence was
19  not the house that was foreclosed on. It's a different address. So that part of this Post-Nuptual
20  Agreement was that Mr. Hankins was gonna pay the bills in the marital house and the marital house is
21  not the house that got foreclosed on.

22  THE COURT: That's not what the Agreement says. It says the property jointly titled in their
23  names. Which property was jointly titled in their names?

Heather H. Bath
AOC Approved Transcriptionist

1    MR. AXFORD: I mean there were several.

2    THE COURT: What's that?

3    MR. AXFORD: *Speaking to Mr. Hankins.* Just two (2). Which one?

4    MR. AXFORD: Well I, I don't, I don't think any of those addresses actually were titled jointly in
5    their names. It was either titled in the name of the business. There's only been one (1) property ever
6    jointly titled in Mr. Hankins name and Mrs. Hankins name.

7    THE COURT: And which property was that?

8    MR. AXFORD: That's the – what's the address of that?

9    MR. HANKINS: It's 475

10   MR. AXFORD: Is it a lot?

11   MR. HANKINS: No, it's just a little old piece, piece of scrap land.

12   MR. AXFORD: That is just one (1) small piece of unimproved real estate.

13   THE COURT: Well what property was jointly titled in their name that she was using at the time
14   they entered into Post-Nuptual Agreement?

15   MR. AXFORD: That was the

16   THE COURT: Because that says 'husband agrees to allow wife to continue to use the real
17   property titled in parties name and pay all indebtedness owed on the real property.' Continue to use
18   implies continuing and ongoing use.

19   MR. AXFORD: Well that, that was the only piece of property titled in their name as husband and
20   wife. Now there may have been other property titled in their names as under the business names, but
21   again that's the property that I say that, my contention on the Post-Nuptual is, is, is encompassed by
22   the Post-Nuptual Agreement.

23   THE COURT: Okay, so are you saying she wasn't living in a residence or piece of property

1    you have all these, all the property you got during the marriage as long as you keep me in the place I'm
2    living in.

3    MR. AXFORD: And that's what occurred. The property that got foreclosed was not where Mrs.
4    Hankins was living.

5    THE COURT: Okay, but I, I guess my question is according to the Contract it says she gets to
6    continue to use the real property titled jointly in the parties name and paid all the indebtedness owed
7    therein. That implies that she's using that property at the time that they entered into the Pre-Nuptual
8    Agreement, but you're telling me that, that's not the case. She was in a separate; she was in a property
9    that was titled in Mr. Hankins name only. *Unintelligible.*

10   MR. AXFORD: How was the property titled? In the business name?

11   MR. HANKINS: In the business. Only the business.

12   MR. AXFORD: It was titled in the business name.

13   THE COURT: Okay. Alright. Umm, okay. Anything to add, Mr. Oliver?

14   MR. OLIVER: Whenever it's my

15   THE COURT: It's your turn.

16   MR. OLIVER: Okay. Judge, I, I think given umm what we've been talking about and how this
17   should logically proceed forward is for us to first decide and look at if the Post-Nuptual Agreement is
18   enforceable. Let's just assume that for a second. What does that mean? Instead of getting into and I'll
19   get into the contractual issues umm and some legal issues, but just the first read the, the Agreement to
20   see what, what it says on its' face because I think this goes a long way into helping us in how we proceed
21   with the equitable distribution, because there is an equitable distribution. They've already asked for a
22   partial. I think it's just a matter of what the equitable distribution will look like. So if you'll turn to
23   number six (6), Judge, that's the, that's the Post-Nuptual Agreement. Alright.

24   THE COURT: Okay.

1    MR. AXFORD: She was.

2    THE COURT: that was jointly titled?

3    MR. AXFORD: That's correct.

4    THE COURT: At the time they entered in the Post-Nuptual Agreement?

5    MR. AXFORD: Exactly.

6    THE COURT: So that's preparatory language. So giving somebody the sleeves to your vest.
7    Right? How could she continue to live in something that's jointly titled if she's not even living in it? How
8    is that consideration? I guess is a better way to ask that question.

9    MR. AXFORD: Well again, Judge, under the *Small* versus *Small* case, I don't think you need
10   consideration in a Post-Nuptual. That's what that, I mean that's what, that's what the case says.

11   THE COURT: Well you don't, but they can certainly waive that and they certainly seem to do
12   that in their preamble and they say 'now therefore being valuable consideration herein before uhh
13   recited that it's herein unintelligible. They agree to the following.'

14   MR. AXFORD: Uhh-hmm.

15   THE COURT: So there's gotta be some consideration now, right?

16   MR. AXFORD: Well it's a mutual understanding that consideration goes along with the
17   signature. With or without consideration is what the case says.

18   THE COURT: Right. But you can, you can waive a substantial or even a statutory right to some
19   extent, but then the parties are free to contract in the manner in which they see fit.

20   MR. AXFORD: That's correct.

21   THE COURT: So if she enter into a contract they're going to have consideration even though
22   we're not required to. Here is – isn't that saying this is why I'm entering into the contract because I'm
23   getting this and you're giving this and in return for you giving me this, I'm gonna give this. I'm gonna let

1    MR. OLIVER: And if you look at page 2, I've highlighted a couple of places so we can get to it
2    quickly. In paragraph 2 what did the husband promise to do? He agrees to "allow wife to continue to
3    use the real estate titled jointly in the parties name and to pay all indebtedness owed on the real
4    property." Now that failed in, in the and the house that was foreclosed on, she would, we would
5    contend it was, but he's promising to give her a place to live and pay for all, all of it. Okay and whether
6    or not he did that – is that a breach, is it a material breach? All of those things, that's where we're
7    assuming it's a valid contract. So that's what he promised to do. The next paragraph, paragraph 3. The
8    "parties agree that husband shall be entitled to the sole ownership and rights to all real property titled
9    in his name individually or jointly, except jointly with the parties." So he, it has to be in his individual
10   name. He can be an individual name with somebody else. If it's in an individual name jointly with Sardia
11   that doesn't count. She still gets to divide that in equitable distribution. It goes on to say "wife
12   expressly waived and relinquishes any and all rights established by law in North Carolina relating to
13   equitable distributions concerning said real property."

14   THE COURT: Right.

15   MR. OLIVER: Okay.

16   THE COURT: That refers to the previous properties.

17   MR. OLIVER: Correct. Umm and then if you skip down umm they acknowledge that it's an
18   uneven distribution of the marital property and then at the end it says and this what you were arguing
19   about a lot was that the umm, the "distribution and division of all real property that the wife may have
20   any interest therein."

21   THE COURT: Okay and I think that now that I have been able to see the Post-Nuptual Agreement
22   I think that specifically refers to the property identified at the beginning of the paragraph.

23   MR. OLIVER: Correct.

24   THE COURT: Okay.

25   MR. OLIVER: Umm and, and more importantly, Judge, and this is why they plead the case the
26   way they did at the beginning. The "parties hereby acknowledge that the provisions for the partial and

29 of 45

1 unequal distribution of marital property" and the Agreement itself says it's a partial. So you're still left
2 with equitable distribution. The question is what are we gonna gonna divide. Well if this val, if this
3 contract is valid, the only thing that's excluded from equitable distribution is real estate that she has an
4 interest in or real estate that he owns individually or jointly. It doesn't say that she waives her right to
5 an LLC that was created during the marriage. It doesn't say that she waives any business rights that she
6 has so whatsoever. It doesn't say that she waives any right to any cash that may be on hand. It doesn't
7 say that she waives her right to any dump trucks. It just says what it says. It's clear. So that if you look

8 THE COURT: It says that what's the real estate it would fall out of equitable distribution.

9 MR. OLIVER: Only those two (2) pieces and if you will look at Exhibit 1, Judge. I know that this,
10 this Affidavit is not binding necessarily on the Court, but it's the Affidavit we have. These umm, what
11 lots

12 THE COURT: Let me see.

13 MR. OLIVER: owned, owned, by Omar Construction – number 1, number 2 Omar Construction,
14 number 3 Omar Construction, numbers 4, 5, 6, 7 and 8 do not have a designation of who is the titled
15 owner. 9 is Sardia Enterprises, 10 is Omar, 11 is Sardia En – oh they're, they're talking about the LLC's
16 being separate property. Now if you're looking at these pieces, pieces of real estate and you're gonna
17 ask the question – are they excluded under the Post-Nupt. The answer's no. They're not listed
18 individually or jointly to Mr. Hankins and Sardia doesn't have an interest in the real estate. It's titled in
19 the name of the LLC. She has an interest in the LLC that has an interest in the real estate. That's a
20 completely different thing. I mean you can't, you can't have an LLC and pick and choose what parts of
21 having an LLC are gonna be binding on you. So even if you say that the, if, if you get to the point after a
22 hearing about whether it's a valid contract or not, this Court today can say specifically what that
23 contract says and what it excludes. So she doesn't waive her rights to the LLC's. So the LLC's are still
24 part of the game. Alright – both of 'em and by the way, the LLC's mainly own real estate, but they're
25 also in trucking and there are several dump trucks that are of significant value that are in the LLC's, but
26 that, that's beside the point. We gotta divide these LLC's, because by his Affidavit and by her, her
27 verified pleadings both of these LLC's were created during the marriage, marital and before the date of
28 separation. Okay. So I think this Court today can say if the Court finds this Agreement to be binding and

30 of 45

1 valid it only excludes specifically what it says and it does not exclude the LLC's. It does not exclude
2 anything else and you can specifically list both of those LLC's and not being excluded by this contract
3 'cause they're not. They're not listed. Okay.

4 THE COURT: And your contention is if it was valid then there's only two (2) other pieces of real
5 estate to be excluded.

6 MR. OLIVER: There's only two (2) that I'm, I know of, but I'm not, I haven't studied those deeds
7 before this hearing, Judge. I know that by of their EDM's they're not individual for the most part.
8 They're, they're corporate owned.

9 THE COURT: Okay.

10 MR. OLIVER: Okay. Umm just to back track a little and just to get the dates and everything.
11 These people were married on January 27 '01. They separated on June 24 of '14. The two (2)
12 businesses are Sardia Enterprises, LLC, which both of them were named members. It was created 3-8-
13 05, which is during the coverture period and the other one is Omar Construction and Trucking. I believe
14 Mr. Hankins is the sole member of that and that too was created during the course of marriage.
15 Umm I'm not gonna list all the rest of the personal property and everything that they have. I wanna go
16 now to is the, is the Post-Nuptial Agreement going to be valid and can you use it at this juncture for any
17 kind of summary judgement and can you, the legal question Judge is can you plead a contract as a bar to
18 something when the contract if the validity of the contract itself in is question. Don't you first have to
19 answer is it, is it valid before you try to use it in this Instance? I'm a little
20 confused as to what it could do anyway, because we did plead in the verified pleadings
21 unconscionability in both its creation and its form. You gotta, you gotta plead both and
22 by the way the statute of limitations on a sealed contract with I, unless the law's changed its ten (10)
23 years. It's always been ten (10) years as long as I've been practicing law and she's within that ten (10),
24 that ten (10) year time frame. Umm

25 THE COURT: Let, let me back track just a little bit.

26 MR. OLIVER: Yeah.

31 of 45

1 THE COURT: The umm, the corporate properties are the properties you claim are titled in the
2 LLC's

3 MR. OLIVER: Uhh-hmm.

4 THE COURT: names. Uhh are any of those jointly titled with the LLC and Mr. Hankins?

5 MR. OLIVER: Not that I'm aware of as I stand here and I, I, I see where you're going with that,
6 but is, it would be, I think that would be a question of valuation. I, if you, you can't exclude it
7 completely

8 THE COURT: Well

9 MR. OLIVER: if the LLC owns it, she still has an interest in the LLC.

10 THE COURT: Okay.

11 MR. OLIVER: We still gotta value that's part of the value of the LLC – would be my argument if
12 and I understand where you're going with it. Umm so the other question is gonna be whether or not if
13 we have a, a uhh, it's just, the, the consideration is how you recite consideration, we've shown what
14 the consideration is. The arguments about whether in, in fact if you look at the answers that were filed
15 – what the answer was in the original answer and the amended answer were that the foreclosure was
16 caused by Plaintiff, therefore he could not perform, but because that she was at fault for the non-
17 performance that there, that's a factual issue. So you'd have to get into the facts of why it is that the
18 piece of property that she was living in at the time of the entry of this Order, I mean of the Post-Nuptial
19 Agreement was foreclosed on as, as we've stated in the verified uhh, uhh pleading. So Judge if you, let
20 me go through, just briefly, I, I don't know that I need to go into too much detail. Where are my
21 exhibits? Here they are. If you will turn to the Exhibit 2. That's the original Complaint and I'll just direct
22 your attention to page 2 of that original Complaint and that's where I want to, you, you can look down
23 through paragraphs 8-15, which are the breach of contract allegations and then if you go to umm
24 Exhibit 3.

25 THE COURT: Okay. Let me ask you guys this

26 MR. OLIVER: Sure.

32 of 45

1 THE COURT: for that page. Unintelligible close of allegation there. So where's the one that
2 your, your client signed?

3 MR. OLIVER: She does not have it and that's a fact, again that would be a factual issue and
4 that's one of the things that I brought, because I've, I've looked at this copy of this Post-Nuptual
5 Agreement and if you look at it, and this goes back, that's Exhibit 6. The only reason I say that is
6 because the way it's notarized and the way everything, it just has a funny copy look to it. In my opinion,
7 the, the way I look at it, to my eye. I would love to see the original of it. I don't know that anybody has
8 the original of it. I've never seen it.

9 THE COURT: Right.

10 MR. OLIVER: Umm so, but this is the only one that anybody has. She, she alleges in that
11 paragraph that the pages were put in and taken out. That what's here was not what was actually
12 signed.

13 THE COURT: Well there, there should be an original with uhh Register of Deeds.

14 MR. OLIVER: I think the original would have been mailed back to Mr. Hankins. Just like anything
15 else. See at the bottom of page 1 of para, of, of the, it says umm mailing to Mr. Hankins. So I, I must
16 assume that it was, the original was mailed back to him. Just like a deed, the original deed would be
17 mailed back to the owner of the property, the new owner of the property on, on deeds. So, so we can
18 go then to Exhibit 3 and if I'll turn your attention to umm page 2 of that, Judge, of Exhibit 3. Paragraph
19 6, this is where the Defendant talks about the poor economic circumstances existing at the time of the
20 foreclosure that was due mostly to the fault of Plaintiff's actions and Defendant did not have the means
21 to pay the debt owed against the marital residence, therefore it was impossible to perform the terms of
22 the contract. Okay. There's where he's admitting in his own answer that he was able, unable to pay for
23 the mortgage for that, that, the, the umm original of the marital residence with blaming Sardia for his
24 inability to make those, those payments and if you go further into this answer again on page 4. The first
25 counter-claim, partial equitable distribution. "To the extent Plaintiff is seeking equitable distribution of
26 the real property that she has waived her interest in the Post-Nuptial Agreement. That portion of the
27 claim is deemed dismissed, barred, estopped pursuant to the operation of this Agreement." Paragraph
28 2 "that during the marriage." The, it says during the marriage that they, they acquired property and

## 33 of 45

1 then 3 the parties are entitled to an equitable distribution of the marital and divisible property and debt
2 outside the scope of the Post-Nuptual Agreement. You've got equitable distribution. There's no
3 summary judgement against equitable distribution. They've asked for it. The only question is what are
4 you gonna exclude from it if you find this Post-Nuptual Agreement to, to be enforceable. To go back
5 one second to the uhh, the question about this statute of limitations. Umm if you go to uhh, Exhibit 5.
6 It's in 4 also. When they're talking about the umm go to para, go to, go to Exhibit 5, Judge. Umm
7 Motion to Dismiss and what, what they talk about there, in, in there is that she

8 THE COURT: What is, which Exhibit is it in?

9 MR. OLIVER: It's, it's 5. You can look at 5 or 3. They have the same paragraphs in them. They
10 talk about, the complaint there paragraph 5 particularly. "Plaintiff has inexcusable delayed bringing the
11 action for nearly (8) years." Judge, I don't know what, well, in those years the Plaintiff was aware of the
12 Agreement and that it was uhh a legal document in effect, etcetera, etcetera. You go on to talk about
13 the unconscionable delay. They don't talk about a statute of limitations. I, I believe that Mrs. Smith
14 understood that there wasn't a statute of limitations issue.

15 THE COURT: Well sure, but it's, it's a Post-Nupt – you can still plead *unintelligible* and

16 MR. OLIVER: She can, I think that what she

17 THE COURT: And that unintelligible, isn't that

18 MR. OLIVER: Except laches has to be plead with specificity. I think in that case you have to call it
19 what it is. It's not like normally pleadings where you're not, you're not, you don't necessarily have to
20 call it what it is. If it walks like a duck, quacks like a duck, it's, it's a duck. I think what laches is plead is
21 very specific, but at any rate. I, I would ask the Court well when, when, when does it become important
22 in a contract like this to actually have the enforcement of it questioned or the well when it is questioned
23 is at the time it's trying to be enforced is when you would, is when you would do it, but at, at any rate
24 she filed, she filed it within the ten (10) year statute of limitation. Okay. Umm so I, again, I, I keep
25 circling back to kinda scratching my head a, about the Motion for Summary Judgement and as is
26 couched it was to, as the Motion is couched it is couched in terms of barring my, barring my client from
27 asking for equitable distribution, but looking at the pleadings that have been filed in this case the

## 34 of 45

1 Defendant himself has asked the Court for equitable distribution. Acknowledging that that Post-Nuptual
2 Agreement, no matter how you wanna read it, it's just a partial distribution of real estate titled in his
3 name individually or jointly or that she has an interest in. That's it. No more, no less – if it's a valid
4 contract. So what we would really ask the Court to do today is, well one umm dismiss the Motion for,
5 for Summary Judgement because you do have an equitable umm, you do have an equitable distribution
6 claim in front of you, filed by both parties. The question is gonna be at the outset is, is the Agreement, is
7 it enforceable. Okay. That's gonna be a que, we have to figure that out first. I'm gonna suggest we put
8 it in front of you in civil court so that you can hear, so we can get that question answered in the next
9 couple months and then once that's answered that is, it is valid – okay, I'll, I lost. I'm gonna assume right
10 now from my argument of what you can decide after this hearing is not summary judgement per say,
11 more like a declaratory action. Isn't that kinda what it is?

12 THE COURT: Well unintelligible the only question is, is this really a declaratory matter

13 MR. OLIVER: That's, that's the way I see it

14 THE COURT: *unintelligible.*

15 MR. OLIVER: procedurally. It's a declaratory judgement. That's what; to say to you Judge of this
16 is a valid contract what does it exclude and specifically say what, say what it does not exclude. It does
17 not exclude her interest in the LLC's, both of 'em. It does not exclude her interest in any personal
18 property.

19 THE COURT: Well if you take that to its most bland unintelligible how do you answer this alright
20 so the real estate is owned, and I already asked you that question. If there is property that's jointly
21 titled between the LLC and Mr. Hankins, which you have told the Court you don't believe there is any

22 MR. OLIVER: I don't.

23 THE COURT: umm real estate that is held by the LLC's and *unintelligible* by the LLC's. If, if there
24 were joint property between the LLC's and Mr. Hankins, then take the plain reading of the Post-Nupt
25 and assume that it's valid uhh, does that the value of that real estate get excluded from the value of the
26 LLC 'cause she has no right to that value that's jointly titled and

## 35 of 45

1 MR. OLIVER: I

2 THE COURT: I, I ask that question because I, you say there may or there may not be umm and I
3 suspect that if, if when y'all get back here at some point for equitable distribution some marital assets –
4 those have to be included in that and then that has to go into the valuation of the LLC's – doesn't it?

5 MR. OLIVER: I, we would argue that it does because the LLC has an, has an interest in it and I,
6 they're gonna argue that it's individually or jointly and the jointly with the LLC, therefore that piece of
7 property is excluded and you'd have to make a, make a decision on that. What I'm, what I'm most
8 interested in today because the, the real, the real nut here, the crack is she has not waived her interest in the
9 LLC's period and the LLC's own the vast majority of the real estate. The rest of it will just come out in
10 the wash, but clearly what, what I would like from the Court today is to determine that this Post-Nupt.,
11 if enforceable, says what it says and does not exclude the LLC's from consideration in the equitable
12 distribution.

13 THE COURT: So you want either a full declaratory judgement or a party declaratory judgement.

14 MR. OLIVER: In, in essence, Judge, or if you don't, if, if we, if you can't do, if you don't feel
15 comfortable doing that procedurally, then you deny the summary judgement, because I don't think that
16 they're carried their burden on summary judgement because there is equitable distribution. They've
17 asked for it and then we can take the, those, the, the declaratory judgement issue could become moot if
18 we can get in front of you on, on the fifth floor in civil court on the question of whether it's a valid
19 contract or not and I think at that point you could have a declaratory, if it's valid then you could do the
20 declaratory judgement saying this is a valid contract. You did not prove, Mr. Oliver, a breach of contract.
21 You did not prove rescission. Right and I'm declaring what this says.

22 THE COURT: Okay.

23 MR. OLIVER: But as far as where we are today I, think, I think it's clear that they have failed to
24 show that they're entitled to a summary judgement as a matter of, law. They, they've asked for
25 equitable distribution. It's just a matter of wh, what, what you're dividing, not, not if you're gonna
26 divide – what you're gonna divide.

27 THE COURT: Okay.

## 36 of 45

1 MR. OLIVER: Thank you, Judge.

2 THE COURT: Mr. Axford, I'll give you the last word.

3 MR. AXFORD: Umm, well Judge' umm saying that we've asked for equitable distribution I think is
4 a little bit of a mischaracterization. Mrs. Smith filed, I mean her first answer is, is "any distribution is
5 barred by this agreement" however if the Court finds that this agreement does not encompass all
6 marital assets, then we still think the distribution should be unequitable in our favor. I think is what is a
7 more plain reading. So it's, it's an alternative rather than we're asking for equitable distribution.

8 THE COURT: Well, see where which is, which paragraph is that in?

9 MR. AXFORD: Uhh let me uhh

10 THE COURT: And your affirmative defense is answer in the counterclaims.

11 MR. AXFORD: I, I think it's in

12 THE COURT: I mean your first, your first counterclaim, Mr. Hankins first counterclaim is
13 fashioned partial, partial equitable distribution.

14 MR. AXFORD: I was, uhh, I was actually referring to the Amended Motion to Dismiss from the
15 Defense's and Answers to Counterclaims.

16 THE COURT: Alright.

17 MR. AXFORD: Which would be Exhibit 5 on, on Mr. Oliver's handout.

18 THE COURT: *Unintelligible.*

19 MR. OLIVER: Exhibit 5, Judge.

20 THE COURT: Okay.

21 MR. AXFORD: So the first Motion to Dismiss under 12-B6 basically referring back to the Post-
22 Nuptual

23 THE COURT: I mean unintelligible exercise it again now. Umm

---

37 of 45

1    MR. AXFORD:  Paragraph 2.

2    THE COURT:  unintelligible for paragraph 17, Plaintiff's first claim unintelligible equitable

3    distribution in response to it and no response in paragraph 18.  "Allegations contained in paragraph 19

4    are admitted to the extent that she is entitled to an equitable distribution of marital property and

5    divisible property not addressed in the parties' Post-Nuptual Agreement executed on or about

6    September 1, 2007." That implies that, that she entitled to some equitable distribution, just not to the

7    stuff that's excluded from their Post-Nupt.

8    MR. AXFORD:  Correct.  So, right.

9    THE COURT:  So there's, the question becomes what's excluded in the Post-Nupt.

10    MR. AXFORD:  Exactly.

11    THE COURT:  Okay and what is it that you contend is excluded in the Post-Nupt if there's no

12    issue of material facts?

13    MR. AXFORD:  Umm again Judge I would, I think the document speaks as far as the last sentence

14    of that paragraph 3, that she because, because there is no separate property that she brought into the

15    marriage would be our contention is that all real estate, she's waiving her right to all real estate unless

16    there's a piece of real estate that's titled jointly in Mr. Hankins and Mrs. Hankins name.

17    THE COURT:  Okay.  If, if we posit that as true and we take the Post-Nuptual Agreement as

18    binding, paragraph 3 says he's entitled to sole ownership and rights to all real properties titled in his

19    name individually or jointly, except property titled jointly in the name of the parties, which means if they

20    have joint property then that's gonna be subject to equitable distribution.

21    MR. AXFORD:  Correct.

22    THE COURT:  Unintelligible.  Well that's, that's property period.  So that's bank accounts, that's

23    everything.  It doesn't uhh, real properties counts and you can guys can argue about what the comma

24    means there umm that says property and it doesn't denote property as real property.  It just says

25    property titled jointly in the name of parties and I think that would encompass real property umm as

26    well and any other type, manner and form of property.  It would seem to imply that and you may be

Heather H. Bath
AOC Approved Transcriptionist

---

38 of 45

1    able to tell me umm at a later date.  Anyway the properties titled in his name individually or jointly.  So

2    property titled, he's saying the property, how's the property titled solely under an LLC fall under his

3    name individually or jointly?

4    MR. AXFORD:  Well I think that would

5    THE COURT:  What's his contention with property solely with the LLC?

6    MR. AXFORD:  I think that would go back to the second paragraph where she waives her rights

7    to all real property and it doesn't, all real property that the wife may have an interest therein.

8    THE COURT:  In paragraph 2?

9    MR. AXFORD:  No, that's the, it's the last sentence on paragraph 3.

10    THE COURT:  Oh, okay.  Well sure, wife for herself waives and releases any and all rights that are

11    now in existence hereafter acquired properties before the State of North Carolina or any other

12    jurisdiction unintelligible of real.  Real property that the wife may have an interest therein.  Umm now

13    that's part of paragraph 3.  So doesn't that imply that it's bound to the same construction in your first

14    sentence up there which defines the type of property you're talking about?

15    MR. AXFORD:  I think what's con

16    THE COURT:  You have

17    MR. AXFORD:  I think what's contemplated is is the, the first paragraph or first part of that

18    paragraph is not as clearly written as it should be, however

19    THE COURT:  I agree with you.

20    MR. AXFORD:  I think the last paragraph is unmistakable as to what that means.  So if, as Your

21    Honor, has to do you're like alright well, I mean we can split that first part of that paragraph seventeen

22    (17) different ways, but when I get to this last sentence it is unmistakable as to what is meant and I think

23    it overrides the first step, first part of that paragraph.

24    THE COURT:  Well, okay and so I, I think it's been useful.  Here's what we're gonna do.  Umm as

25    to Summary Judgement, there's gonna be, there's, there's a, there's genuine issue of material fact umm

Heather H. Bath
AOC Approved Transcriptionist

---

39 of 45

1    as to whether or not there's gonna be a complete and full equitable distribution umm, then the issue is

2    what extent does the equitable distribution governed by the Post-Nupt Agreement.  Umm so I agree

3    with Mr. Oliver.  It would be a declaratory hearing on the Post-Nupt Agreement and specifically on

4    paragraph 3 on the issues that we've been chatting about that umm so I can get you a umm that notice

5    is gonna go this way I can get, I can't grant you a hearing next week since I'm gonna be unintelligible

6    next week.  Umm but we can do that.  Umm I think it's a pretty thin line and a steep hill I think that your

7    client with the last phrase and the reason I think that is is because it seems to me from a plain reading of

8    the Post-Nuptual Agreement that's included in paragraph 3 and that would be defined and/or modified

9    by the definitions that come from the paragraph.  If it's not and it's separate in part I think we run into a

10    unintelligible of public policy umm because that says any and all property that she's got interest in.  It

11    doesn't matter whether it's subject to the marriage or subject to the fine print or anything else.  She's

12    just waived to any real property and it may be perfectly fine, umm but I'd like you to focus on that so we

13    can get to talk in declaratory judgement and you can present the case law and articulate and argue on it.

14    It may be, it may be perfectly fine.  You can may read a few more times and figure out what all the

15    delimiters in there and sentence means.  Umm but I think that's, the issue that we need to fig, what y'all

16    need to figure out is to what extent does the Post-Nuptual Agreement apply to the party or to property

17    that Mrs. Uhh Hankins claims is subject to the equitable distribution claim umm and again it goes back

18    to the question that I asked Mr. Oliver umm if it's, if the real property clause is to graduate and say it's a

19    unintelligible how do you parse out that value from the LLC's.  I think that you would have the entire

20    value of the LLC's and include that value with other property that had to be parsed out in value of the

21    real, the real property umm and so we come in for a declaratory judgement I'd like to know what the

22    spread is and what it isn't that you're actually unintelligible about real terms assuming that the Agree,

23    assuming that the Agreement is valid or assume that it's not valid, but if it's valid umm how much are

24    you actually fighting about.

25    MR. OLIVER:  Okay.

26    THE COURT:  If it's invalid how much you're fighting about.  I wanna know what the net is.  Okay.

27    Umm the big issue here is the value of the LLC's and the assets.  The value of the LLC's unintelligible

28    applies to the real property and the assets held by the LLC's.  Is that correct?

29    MR. OLIVER:  Uhh-hmm.

Heather H. Bath
AOC Approved Transcriptionist

---

40 of 45

1    THE COURT:  And there's the other house that's been foreclosed on so there's no other real

2    property attached that's gonna be a subject of umm the equitable distribution claim.

3    MR. OLIVER:  Umm there

4    THE COURT:  If you get your unintelligible report on there.

5    MR. OLIVER:  I think it depends Judge on whether or not the spec home that I understand Mr.

6    Hankins has built with money from a property owned by Omar Construction was sold.  So there's equity.

7    Omar own, owned a piece of property.  I think they're five (5) lots and umm Mr. Hankins sold those lots

8    through the LLC.  So that money came into the LLC and that money, I understand, was used for a variety

9    of reasons, but I think it also flowed into the construction of a

10    THE COURT:  Didn't I enter an injunction against

11    MR. OLIVER:  You, you, you did, but umm I haven't gotten to, I haven't gotten to the bottom of

12    it.  I'm just, I'm just letting you know there may be a piece of property out there that I think it flows to.

13    THE COURT:  Okay.  Well that'll be, that'll be unintelligible when we get back to equitable

14    distribution.  We'll get to once all that stuff out, but uhh the first step is to determine whether you've

15    got a valid Post-Nuptual Agreement.  Umm uhh assume that this says what it means on both sides and

16    that will at least get everybody an idea of what we're talking about and how, how much it's worth and

17    talk about it.  You may find that the actual unintelligible is pretty narrow.  I don't know.  I just know

18    there's a bunch of LLC's and that there's some various assets that are held by 'em.  I don't know how

19    much the real estate is worth.  I don't recall right off the top of my head.  Umm I do know there's some

20    other durable assets as far as trucks and whatnot, but I'd like to be able to unintelligible.  Umm go up and

21    see uhh Unintelligible and

22    MR. OLIVER:  Uhh-hmm.

23    THE COURT:  see that the five (5) weeks from now I'll be back up in 5B.  I'll be in 5B next week,

24    but that calendar is set.  Umm but I will get it on my next five (5) week calendar.  I can at least give you a

25    flag or a placeholder on unintelligible trial date and we can talk about setting for declaratory judgement.

26    Any questions on what you need to cover on declaratory judgement?

Heather H. Bath
AOC Approved Transcriptionist

41 of 45

1     MR. OLIVER: Uhh, no I don't. I guess, are you making a Motion from the bench or do we have
2 to file a Motion for Declaratory – I mean we, I think we have to initiate the, I mean

3     THE COURT: You don't need to initiate. I'm telling you to do it.

4     MR. OLIVER: Okay and I understand that and then as far as the, the, the Summary Judgement is
5 denied then?

6     THE COURT: Summary Judgement is denied as to equitable distribution. I think there's a, a, an
7 issue of material fact as to how much is supposed to be included. I think the real issue is what it is.

8     MR. OLIVER: Okay.

9     THE COURT: Alright and not what's going to happen and that will be settled by figuring out what
10 you're proposing to offset.

11     MR. OLIVER: And finally as I go back to the very, very beginning I'm to draft and send to Mr.
12 Axford something that declares that I can, to the extent that Mr. Hankins files something individually or
13 contacts me, I'm permitted to, to respond to him. I think that's what I understood.

14     THE COURT: You are and I haven't seen anything as being served or being calendared and
15 whatnot. I don't know what the nature of all those motions are or anything else. I don't even know if
16 I'm the property court for those motions to be – I don't, so unintelligible.

17     MR. OLIVER: Well I can, I mean I, I think I need to; mainly I need to respond to the motions. I
18 will tell the Court I'm probably not, not going to respond to any phone calls or emails from Mr. Hankins.
19 I – I don't, I'll direct those to Mr. Axford since he is still the attorney of record so that the communication
20 would be between the two (2) of us and then I can file whatever appropriate motions I in response

21     THE COURT: And I

22     MR. OLIVER: to these

23     THE COURT: think that would prudent for so long as you are in the case, which is until I allow
24 you out umm in representing Mr. Hankins in all verbal communications to Mr. Hankins and Mrs. Hankins
25 needs to go through the attorneys. Umm if he wants to continue to file motions that's fine. Umm I can

---

42 of 45

1 tell you Mr. Hankins probably need to let your attorney know that or you're gonna be getting phone
2 calls every time you file a motion and umm it, it will be sufficient for you to file responses and serve
3 responses and motions on Mr. Hankins' counsel, okay.

4     MR. OLIVER: Correct. Not directly to Mr. Hankins.

5     THE COURT: Not directly to Mr. Hankins.

6     MR. OLIVER: I

7     THE COURT: You will send those to counsel.

8     MR. OLIVER: Okay.

9     THE COURT: Okay.

10     MR. OLIVER: Uhh-hmm.

11     MR. AXFORD: One other question, Judge.

12     THE COURT: Yes, sir.

13     MR. AXFORD: Umm back in, I don't know what the original deadline for discovery was, but uhh
14 Mr. Oliver filed a request for an extension on discovery and it was due last Friday at 5:00 and I don't
15 have anything.

16     THE COURT: Well y'all talk about that and if we're gonna have another Motion to Compel I'll do
17 it, but you should be coming to the short read. That discovery should be done here pretty soon if it's
18 not – the only discovery should be getting issued now is supplemental discovery that naturally flows
19 from responses that you didn't have cut off at the last time. So to the extent y'all do something

20     MR. AXFORD: Well Judge and I can tell you that, that Mr. Oliver and I have had many email
21 conversations there is nothing that I have found or that Mr. Oliver has since found since we were here, I
22 think in June, that Kathleen Murphy ever filed original discovery back in February when she said she did.
23 So I had to file an original discovery right after the hearing that we had in June.

---

43 of 45

1     THE COURT: Okay. Well that, that will be a proceeding. I, I, I'm not gonna get into a Motion to
2 Compel

3     MR. OLIVER: And I understand that, Judge.

4     THE COURT: as to whether discovery unintelligible. I'd appreciate it. I would, I would like to see
5 if you guys can work it out otherwise it's gonna be a mess 'cause I think you're, once again umm you are,
6 you coming on the tail end of the donkey and you're getting pretty close to the rear legs umm at this
7 point because you've painted into a pretty tight spot by what prior counsel has done. If they didn't do
8 it timely, not necessarily on you individually, but you're sort of stuck with the field the way you find it.
9 So umm I would hope that you could provide discovery. If y'all can't figure it out, file a Motion to
10 Compel and I'll see if I I can get it heard before the declaratory. See if you can

11     MR. OLIVER: Unintelligible.

12     THE COURT: file a Motion for Declaratory uhh for Declaratory Judgement regarding the umm
13 Post-Nupt. If there's any discovery issues at that time I wanna have, we can have a brief status
14 conference if you need to have a Motion to Compel, we'll have a Motion to Compel. Okay, but we're
15 getting to the short rows.

16     MR. OLIVER: That's fine, Judge. Judge, so that you don't have, unless you want that book, but I
17 know you guys don't usually like to keep stuff around here

18     THE COURT: Well I've got, I'm gonna keep the uhh, I

19     MR. OLIVER: Unintelligible.

20     THE COURT: Mr. Axford's copy and marked all over it. I'll keep that.

21     MR. OLIVER: Well you know what, if you keep it because again unintelligible a declaratory
22 judgement because it's all one, I know other court files sometimes look like that, at least some of it all
23 unintelligible.

24     THE COURT: Umm, thank you for being

25     MR. OLIVER: Thank you, Judge.

---

44 of 45

1     THE COURT: unintelligible. Did they hold everything open for you, Mr. Axford?

2     MR. AXFORD: Uhh, I actually handled all my morning stuff, Judge. So now I'm headed back over
3 there to see what I got.

4     THE COURT: Okay. Alright.

5     MR. OLIVER: Thank you, Judge.

45 of 45

1                              CERTIFICATION OF TRANSCRIPT

2           This is to certify that the foregoing transcript of proceedings of the Domestic Special Session

3      held on September 13, 2016 in Wake County is a true and accurate transcript of the proceedings

4      transcribed by me.  I further certify that I am not related to any party or attorney, nor do I have any

5      interest whatsoever in the outcome of this action.

6           This the 16th day of November, 2016.

7

8      _Heather H. Bath_

9      HEATHER H. BATH

10     AOC Approved Transcriptionist

11     804 Kimberly Ann Lane

12     Shallotte, NC 28470

13     910-470-8972

_____
                    Heather H. Bath
                 AOC Approved Transcriptionist

---

**1 of 83**

1  STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE

2  COUNTY OF WAKE                   DOMESTIC SPECIAL SESSION

3                                   15-CVD-7476

4  SARDIA MARIE PORTER HANKINS

5          PLAINTIFF

6  VERSUS

7  TIMOTHY OMAR HANKINS, SR.

8          DEFENDANT

9  ----------------------------------------

10  Transcript of proceedings in the General Court of Justice, Wake County, North Carolina, at the
11  November 16, 2016, Domestic Special Session, before the Honorable Michael Denning, Judge Presiding.

12  A P P E A R A N C E S

13  ON BEHALF OF THE PLAINTIFF

14    JOHN OLIVER, Attorney at Law

15    SARDIA MARIE PORTER HANKINS

16  ON BEHALF OF THE DEFENDANT

17    TIMOTHY OMAR HANKINS, SR.

**EXHIBIT 21** (tabbies)

Heather H. Bath
AOC Approved Transcriptionist

---

**2 of 83**

I N D E X

1
2
3  Opening Remarks by Court  -  .  .  .  .  .  .  .  3
4
5  Opening Argument by Mr. Oliver  -  .  .  .  .  .  4
6
7  Opening Argument by Mr. Hankins  -  .  .  .  .  8
8
9  Direct examination of Mr. Hankins by Mr. Oliver-  9
10
11  Direct examination of Ms. Hankins by Mr. Oliver-  43
12
13  Cross examination of Ms. Hankins by Mr. Hankins-  53
14
15  Re-direct examination of Ms. Hankins by Mr. Oliver -  58
16
17  Re-cross examination of Ms. Hankins by Mr. Hankins  60
18
19  Direct examination of Mr. Hankins  -  .  .  .  .  61
20
21  Judge's Comments  -  .  .  .  .  .  .  .  74
22
23  Closing Arguments by Mr. Hankins  -  .  .  .  .  75
24
25  Closing Arguments by Mr. Oliver  -  .  .  .  .  76
26
27  Judge's Comments  -  .  .  .  .  .  .  .  80

Heather H. Bath
AOC Approved Transcriptionist

---

**3 of 83**

1  THE COURT: Mr., Mr. Hankins, won't you come up sir. We are on the record on 15 CVD 7476
2  umm Sardia Porter Hankins versus Timothy Omar Hankins, Sr. This is on for uhh Mr. Hankins' Motion
3  uhh title is Motion for Summary Judgment Regarding umm Equitable Distribution right and I told you
4  you're on Declaratory Judgment.

5  MR. OLIVER: Your Honor, here, we already heard their Motion for Summary Judgment. You've
6  already denied that motion.

7  THE COURT: Okay.

8  MR. OLIVER: Okay.

9  THE COURT: So we're here for Declaratory Judgment.

10  MR. OLIVER: And a Motion for Interim Division.

11  THE COURT: Motion for Interim Division. Okay.

12  MR. HANKINS: Your, Your Honor would you, where I filed the motion to be considered today.
13  It'll only take me about twenty (20) minutes, 'cause I actually pulled out and did like a scaled down
14  version. I did an Affidavit and a Motion to be considered today.

15  THE COURT: When was the Motion, when was the Motion filed and noticed? Was it noticed?

16  MR. HANKINS: It was filed November 1st and I did an amendment on November 7th.

17  THE COURT: Okay. Did you file a Notice of Hearing?

18  MR. HANKINS: No, I didn't.

19  THE COURT: Okay. Well I'm quite certain that they're not gonna waive the notice. You have to
20  file a Notice of Hearing when you file a motion, Mr. Hankins. Umm, what was the motion?

21  MR. HANKINS: Well just in, in umm I guess to answer to his Declaratory Judgment he's uhh, so it
22  was just been a or well I can just simply make my argument when he makes his.

23  THE COURT: Well see, you're gonna get the opportunity to be heard on that
24  through declaratory judgment so that's fine. You're gonna be able to be heard on that

Heather H. Bath
AOC Approved Transcriptionist

---

**4 of 83**

1  MR. HANKINS: Yeah, that's right.

2  THE COURT: through the declaratory judgment.

3  MR. HANKINS: For me it won't take me but about twenty (20) minutes to, ten (10), fifteen (15),
4  twenty (20) minutes I'll say tops for me to say what I really need to say.

5  THE COURT: Okay. Well umm I'm gonna give you that opportunity to do it, but it's the
6  Plaintiff's motion and so they get to go first and

7  MR. HANKINS: Understood.

8  THE COURT: I wanna, I wanna hear what's set, with the ground rules are for today. Umm we've
9  got a uhh, your Motion for Declaratory Judgment and Interim Distribution.

10  MR. OLIVER: Correct, Your Honor.

11  THE COURT: Okay. So why don't you give me an idea as to what we're in for today.

12  MR. OLIVER: Thank you, Your Honor. Umm, Judge as you'll recall, and, and I know you've seen
13  these folks quite a few times. Umm about a month and a half ago there was a Motion for Summary
14  Judgment that you heard and in a nut shell the basis for the Summary Judgment was the fact that these
15  folks signed a Post-Nuptual Agreement and it became clear, you denied the Motion for Summary
16  Judgment, and it became clear that to move forward with the equitable distribution we needed to know
17  how to interpret the language of the Post-Nuptual Agreement and that's why the Motion for
18  Declaratory Judgment was filed is to get an interpretation of it. The Motion for Declaratory Judgment
19  also asks that you could declare it either enforceable or not enforceable, however I will add that you,
20  you can't side, sidestep that part and still give us the interpretation of it and say I don't know if it's
21  enforceable or not, but as you get ready for equitable distribution this is how this contract will be
22  interpreted as it relates to the property that y'all have.

23  THE COURT: Okay.

24  MR. OLIVER: The other part about this is gonna be the interim division and to understand both
25  the interim division and the Motion for Declaratory Judgment, what you'll need to remember, Judge, is

Heather H. Bath
AOC Approved Transcriptionist

## 5 of 83

1  this – that the parties got married in 2001 and they separated on June 24, 2014. There, there appears to

2  have been or may have been, quite frankly I don't know, some property that both these people had

3  before they got married, but the important thing to remember is they have two (2) corporations that

4  have been made a party to this action. One is Sardia Enterprises, LLC; that was created the evidence will

5  show in 2005 and Omar Construction & Trucking and the evidence will show that it was created during

6  the marriage. I don't have the date right in front of me, but I do have the Articles of Incorporation. So

7  the evidence is gonna show these are two (2) assets that were acquired during the marriage and what

8  the Court is gonna have to look at is the language of the Post-Nuptual Agreement and how it impacts

9  the parties, particularly the real property, because the real property is not titled in Mr. Hankins'

10  individual name nor Sardia Hankins' individual name. They're all in the name of one of these two (2)

11  corporations. Okay.

12  THE COURT: Okay. It's in – so the corporations have been joined okay and is there anybody

13  here to represent the corporations? Have they been noticed?

14  MR. OLIVER: They, directly noticed to them – Mr. Hankins is their represent, he's the sole

15  representative of it and they have never made an appearance through the attorneys, but again we're, I

16  don't think it's gonna matter once you get to it as to what

17  THE COURT: Okay. Well so that – well my next question is if you're asking for interim

18  distribution does it have to do with property that's held by the corporation?

19  MR. OLIVER: It can, it could and maybe you won't do that because I did not send Notice of

20  Hearing directly to the corporations through Mr. Hankins. So I see where you're going with that. They,

21  they don't have an attorney. They haven't had an attorney since this, this came up and I've been

22  sending notices for all of the hearings to Mr. Hankins as his attorneys before that since he's the sole

23  representative of and now sole shareholder of the corporations. Umm to the extent that the Prayer for,

24  and I did have some of relief being part of what you do with some of these pieces of property, umm if

25  you're not comfortable doing that without formal notice to the corporations themselves, individuals

26  THE COURT: I think the Court of Appeals said if I'm gonna do something

27  MR. OLIVER: Okay.

## 7 of 83

1  MR. OLIVER: I know that Judge. I, I wasn't gonna say the words,

2  THE COURT: I know.

3  MR. OLIVER: but I will.

4  THE COURT: So, but uhh the, the Court on its motion under Rule 28 umm will join the

5  corporations and if they decide and we'll notice them appropriately if they decide that they wanna

6  appear through attorney they can. If they don't, then they've been properly joined and noticed and we

7  can get along with that.

8  MR. OLIVER: Okay.

9  THE COURT: My issue is I, I don't have a problem, I'm, I'm sure that we can value everything and

10  the Court can, as, as we get on through equitable distribution we can get on with the value, but I can't

11  tell the corporations what to do with their assets.

12  MR. OLIVER: Okay. Judge, briefly just going back I, we, we believe the evidence will show that

13  the, the as far as the Declaratory Judgment part of this goes, it's very clear. We just want you to read

14  the Post-Nuptual Agreement. Read what the words say on the Post-Nuptual Agreement and it becomes

15  very clear to us what the interpretations are of it. We will present evidence as to how the contract was

16  entered into to show that there was umm procedural heavy-handedness in it and also that it, if you read

17  the terms if you would interpret it the way they would like to interpret it, it would be unconscionable.

18  So I know to satisfy the contract you have to show these two (2) things. It has to be procedural and

19  substantive in the unconscionability of it and Judge we will put on evidence that in fact Mr. Hankins also

20  breached the contract so that he should not be able to enforce it in the manner that he wants. Again

21  Judge, I'll go back to where I started. It is our opinion that when you hear the evidence you don't have

22  to determine whether the contract is enforceable or not. You could say I don't know if it's enforceable

23  or not, but if it is enforceable this is what this language means and that would take care of the issue of

24  trying to prepare for an equitable distribution of this case. Thank you, Judge.

25  THE COURT: Okay. Umm, one other housekeeping matter. I know Mr. Ashford has withdrawn.

26  Has there been an Order entered denying the summary judgment motion?

## 6 of 83

1  THE COURT: I, I can't tell the corporations what to do with any of their assets

2  MR. OLIVER: Correct.

3  THE COURT: and I can value

4  MR. OLIVER: I think we can sidestep it and we can correct that in as much as it is my

5  understanding that there are two (2) pieces of property that are being developed by the corporations

6  through Mr. Hankins right now, but they have not been sold so that there's already a Preliminary

7  Injunction in place that prohibits the corporations and all the Defendants from doing anything and then

8  we can re-calendar the hearing on what you do with that, with proper notice being given to the umm

9  corporations themselves.

10  THE COURT: Okay.

11  MR. OLIVER: So I think at the end of the day we can, we can sidestep the issue that you're

12  talking about so that we can get, we can get what we need done today, which the most important of

13  which is gonna be this Declaratory Judgment. We'd love to have an interim division, interim distribution

14  also, but if that causes the Court pause I think we can sidestep it and push it down the road and have

15  formal notice be had and I don't know that there'll be any more evidence that would be presented as to, at

16  at another hearing.

17  THE COURT: Okay.

18  MR. OLIVER: That's a long way of saying no, I did not give the corporations individual notice.

19  THE COURT: Okay, well and so because I'm, I'm unaware and I've seen these folks many times

20  and I'm unaware of the corporations being joined. Umm

21  MR. OLIVER: One was, one had two (2) members – that was Sardia Enterprises and one has one

22  (1) member and that's Mr. Hankins.

23  THE COURT: Okay, well I know that the corporations in and of themselves stand as a

24  MR. OLIVER: I understand.

25  THE COURT: as a third party and if the Court is gonna go look at the Campbell decision.

## 8 of 83

1  MR. OLIVER: There has, Judge.

2  THE COURT: Motion, there has.

3  MR. OLIVER: There has.

4  THE COURT: Okay. Alright. Okay. Umm, Mr. Hankins.

5  MR. HANKINS: Uhh, yes, Your Honor. Mr. Oliver over here wanna do so much sidestepping just

6  now I don't know whether we're dancing or litigating, but nevertheless Your Honor uhh he keeps talking

7  about corporations and the value of the corporations. If given the chance today I'm gonna simply show

8  you that just months prior to marrying Ms. Hankins I'm only gonna bring up three (3) pieces of property

9  which was my personal home, which I purchased in 2000 and two (2) other pieces of property that I sold

10  just months prior to her that total value of $800 and some thousand dollars right here. It will only take

11  me about ten (10), fifteen (15) minutes to go through it, which means according to John Oliver's own

12  inventory I don't own that much property now. In order for, I'm thinking that in order to do a split of

13  property in a marriage there should have been a gain somewhere and I'm at about a, at minimum

14  $200,000 loss just with the information in this, what John Oliver wrote up in the inventory. So

15  THE COURT: Well that sounds to me like a classification issue, because

16  MR. HANKINS: Okay.

17  THE COURT: is the property marital or is it separate.

18  MR. HANKINS: Alright.

19  THE COURT: That's not what we're here for, but you're

20  MR. HANKINS: The Declaratory Judgment.

21  THE COURT: gonna be heard on that. We're here on your Post-Nuptual Agreement

22  MR. HANKINS: Okay.

23  THE COURT: to figure out how your Post-Nuptual Agreement is going to apply to the rest of the

24  equitable distribution action,

---

9 of 83

1   MR. HANKINS: Understood.

2   THE COURT: Which means y'all entered into a Post-Nuptual Agreement. It says certain things
3   about how property is going to be classified and/or divided. You can contend that Judge, well it says this
4   is all the property is gonna be classified therefore it doesn't need to be divided because we already
5   decided in the Post-Nuptual Agreement.

6   MR. HANKINS: Understood.

7   THE COURT: I believe, my perception is that Mr. Oliver and Ms. Hankins is going to say well that
8   might, that's not exactly what it says and even if it does it was unconscionable. So we're gonna figure
9   out whether your Post-Nuptual Agreement applies. Once the Court determines if and how it applies
10  the'll determine how the Court classifies any property that falls within that definition, values any
11  property within that definition and then distributes any property within that definition, but that has to
12  be determined first.

13  MR. HANKINS: Understood.

14  THE COURT: So that's the first thing. So all the other stuff, you're still, you, you'll be, that all
15  goes to classification and value of property and that's fine and once we get there we can talk about it.
16  We wanna talk about the Post-Nuptual Agreement first. So I will turn it back over to you since it's your
17  Motion.

18  MR. OLIVER: Uhh, call Timothy Hankins, please Your Honor.

19  THE COURT: Okay, come on up Mr. Hankins.

20  MR. OLIVER: If I may approach, Your Honor.

21  THE COURT: Uhh-hmm.

22  CLERK: Before you sit down, if you will please raise your right hand if you wish, place your left
23  on the Bible or you will be affirmed.

24  MR. HANKINS: I'd rather be affirmed.

---

10 of 83

1   CLERK: That's fine. Do you solemnly affirm the testimony you shall provide to this Court shall
2   be the truth, the whole truth and nothing but the truth and this be your solemn affirmation?

3   MR. HANKINS: Yes, that is correct.

4   CLERK: Thank you, sir. Have a seat, please.

5   MR. OLIVER: Your Honor, may I approach?

6   THE COURT: You may.

7   MR. OLIVER: Please tell the Court your name.

8   MR. HANKINS: Timothy Omar Hankins, Sr.

9   MR. OLIVER: And where do you live?

10  MR. HANKINS: 4729 G Street, Garner 27529.

11  MR. OLIVER: Alright. If you would please would you turn to that, the Exhibits. I know I don't
12  have them tabbed and there's not very many of them to number 6 and tell me when you're on Plain,
13  what I've marked Plaintiff's Exhibit 6.

14  MR. HANKINS: I'm looking.

15  MR. OLIVER: Here, let me help you. You get it? Let me have that one back. I'll give you a
16  different one and I'll turn it for you. There you go. On Plaintiff's Exhibit 6 – do you recognize that?

17  MR. HANKINS: Excuse me?

18  MR. OLIVER: Do you recognize that document that I've marked as Plaintiff's Exhibit

19  MR. HANKINS: I do.

20  MR. OLIVER: 6? And what is that document marked as Plaintiff's Exhibit 6?

21  MR. HANKINS: It's an agreement between me and Sardia.

22  MR. OLIVER: Okay, this is the Post-Nuptual Agreement that, that is in controversy here today.

---

11 of 83

1   MR. HANKINS: That is correct.

2   MR. OLIVER: Okay, Judge. Move to admit Exhibit 6 into evidence please.

3   THE COURT: Okay. Any objection to your Post-Nuptual Agreement being entered, Mr. Hankins?

4   MR. HANKINS: Excuse me?

5   THE COURT: Any uhh, any objection to that?

6   MR. HANKINS: Uhh, no Your Honor. It look like the same one that's on record.

7   THE COURT: Okay. Court will receive Plaintiff's Exhibit 6.

8   MR. OLIVER: Your Honor, may I approach?

9   THE COURT: You may.

10  MR. OLIVER: In your, in your notebook of exhibits on the front is the, for the Clerk, that's the list
11  of exhibits for the Clerk.

12  THE COURT: Okay.

13  MR. OLIVER: Now it appears from this document then, Mr. Hankins, that you signed this in the
14  presence of a notary

15  MR. HANKINS: That is correct.

16  MR. OLIVER: and according to the notary seal you signed it on September 1, 2007. Correct?

17  MR. HANKINS: That sounds correct.

18  MR. OLIVER: Okay. Now in the exhibit notebook that you have and I'll do it this way because
19  it'll probably gone make it faster. Here's Exhibit 1. These are the same. I'm just doing it so I can turn to
20  the page and expedite this a little bit. Exhibit 1 – do you recognize this Exhibit?

21  MR. HANKINS: No.

22  MR. OLIVER: You do not? It consists of two (2) different pages – pages, looks to be page 23

---

12 of 83

1   MR. HANKINS: Now when you say recognize it, are we talking about the property that's listed
2   on here or do I recognize this particular document?

3   MR. OLIVER: Do you recognize these particular pages?

4   MR. HANKINS: No.

5   MR. OLIVER: Okay. I'm gonna hand you what I've marked as Exhibit 2 and ask you if you
6   recognize this.

7   MR. HANKINS: Let me, let's see what we got.

8   MR. OLIVER: Is that, is that your Equitable Distribution Affidavit that you filed in this case?

9   MR. HANKINS: John Oliver, you and them lawyers is in cahoots together and I'm not agreeing to
10  nothing Jennifer and them filed. Don't even go there with me. You know I've been complaining about
11  that the whole while. So no

12  THE COURT: Mr. Hankins,

13  MR. OLIVER: Yes.

14  THE COURT: you can answer the question. If you don't believe it is or you don't

15  MR. HANKINS: So alright. No, I'm not gonna say.

16  MR. OLIVER: You unintelligible it?

17  MR. HANKINS: No, John Oliver. I didn't. This, this looks like my signature on the first page, but
18  if it ain't got my signature on it I just

19  MR. OLIVER: Alright. We'll go through it.

20  MR. HANKINS: Alright.

21  MR. OLIVER: We can do it the easy way or the hard way. It's up to you.

22  MR. HANKINS: I mean, I, I need to understand. Go 'head.

## 13 of 83

1    MR. OLIVER: Let's go through the property. If, the key on here just to identify different pieces
2    of property. Are you on Exhibit 1?

3    MR. HANKINS: I am.

4    MR. OLIVER: Alright. The first property listed there is 4729 G Street in Garner, North Carolina.
5    Okay. Do you own that piece of property or does a company – let me start k this – is that an asset of
6    Omar Construction Company?

7    MR. HANKINS: It is.

8    MR. OLIVER: It is. And that piece of property was acquired by Omar Construction Company
9    approximately when?

10    MR. HANKINS: Approximately umm, 200, I'm 2005 or '06, something like that.

11    MR. OLIVER: And did you build a house on this after you bought it in 05, 06?

12    MR. HANKINS: Did I build it or did the company build it?

13    MR. OLIVER: You had it built it. The company built it.

14    MR. HANKINS: Well yeah, the company built it. Go 'head.

15    MR. OLIVER: Alright. Let's go to the next one. Number 2 – 1317 West Garner Road, Garner,
16    North Carolina and according to this it lists as an asset of Omar Construction & Trucking, LLC. Do you
17    still, does Omar Construction still have this piece of property?

18    MR. HANKINS: That is correct.

19    MR. OLIVER: Okay. Let's go to the next one, number 3. 610 East Martin Street, Garner, North
20    Carolina and it calls it an asset of Omar Construction Company. Does Omar Construction Company still
21    own 610 East Martin Street?

22    MR. HANKINS: I will agree. Yes.

Heather H. Bath
AOC Approved Transcriptionist

## 14 of 83

1    MR. OLIVER: Okay. Now we have numbers 4, 5, 6 and 7; 4, 5, 6, 7 and 8 and they umm are from
2    G Street and H Street. Let's go to 4 – 4409 H Court. It has no designation – do you know who currently
3    owns that property?

4    MR. HANKINS: 4, 5, 6, 7 and 8 is owned by Omar Construction and its' primarily, it's basically
5    two (2) lots, but they're kinda split up into five (5) different pieces.

6    MR. OLIVER: Does Omar still own these properties?

7    MR. HANKINS: That is correct, yes.

8    MR. OLIVER: Okay. The 60 Randolphville Road in Bolivia – it states here asset of Sardia
9    Enterprises. Today does Sardia Enterprises still own this piece of property?

10    MR. HANKINS: My Uncle has a lifetime right to it, but it's family property.

11    MR. OLIVER: I understand that, but if I looked at the deed am I gonna see Sardia Enterprises as
12    the deed owner?

13    MR. HANKINS: Sorry. Say that again.

14    MR. OLIVER: If I looked at the deed of 60 Randolphville Road in Bolivia, North Carolina, would it
15    list Sardia Enterprises as the owner of the property?

16    MR. HANKINS: Sardia Enterprises, not Sardia Enterprise – what you keep talking about. Two (2)
17    different companies and you know it.

18    MR. OLIVER: For, let's go to number 10. 411 Loop Road, five (5) parcels of land, Garner, North
19    Carolina, asset of Omar Construction Company. Does Omar still own those properties?

20    MR. HANKINS: No.

21    MR. OLIVER: Were those the properties that were sold in June of last year?

22    MR. HANKINS: That is correct.

23    MR. OLIVER: And that is where the approximately $230,000 that we'll talk about in a minute
24    came from.

Heather H. Bath
AOC Approved Transcriptionist

## 15 of 83

1    MR. HANKINS: That is correct.

2    MR. OLIVER: Proceeds. Okay. And then you list the two (2) companies themselves, Sardia
3    Enterprises, LLC and in the descript, acquisition date you say 2003.

4    MR. HANKINS: Wait a minute. What are you, tell me where you are, John Oliver.

5    MR. OLIVER: Number 11.

6    MR. HANKINS: You're at, okay. Go 'head, I'm sorry.

7    MR. OLIVER: Okay. Number 11 was created in approximately 2003.

8    MR. HANKINS: No.

9    MR. OLIVER: Okay. When was it created?

10    MR. HANKINS: 2015, 2016.

11    MR. OLIVER: You're, did you create a separate company after your date of separation?

12    MR. HANKINS: Yes.

13    MR. OLIVER: And what's the name of that company that you created?

14    MR. HANKINS: Sardia Enterprises.

15    MR. OLIVER: Okay. During the course of the marriage there was a Sardia Enterprise.

16    MR. HANKINS: There was a lot of Sardia Enterprise companies. She had a couple her own self.

17    MR. OLIVER: Okay. So the one that's listed here though, it, it, it says created in, it appears to
18    say created in '03. You're saying this is meant to be a company you created after the date of separation.

19    MR. HANKINS: That is correct.

20    MR. OLIVER: Alright and Omar Construction & Trucking, LLC was created in 2007, according to
21    this.

22    MR. HANKINS: 2007, yeah that sounds right. Yes.

Heather H. Bath
AOC Approved Transcriptionist

## 16 of 83

1    MR. OLIVER: Okay. Umm and does Omar Construction & Trucking still exist?

2    MR. HANKINS: That is correct. Yes.

3    MR. OLIVER: Alright. If you'll turn to the second page of Exhibit 1.

4    MR. HANKINS: Second page of Exhibit 1. Yeah, go 'head.

5    MR. OLIVER: There's, there's listed there number 42 – do you see that? A 2005 Sterling Dump
6    Truck?

7    MR. HANKINS: 2005 – Yes, go 'head.

8    MR. OLIVER: Number 42 – do you still have, who has, who owns that truck? Do you know?

9    MR. HANKINS: Omar Construction.

10    MR. OLIVER: Does it still have it?

11    MR. HANKINS: Well you gotta understand that Omar Construction started in 1997, which you've
12    kinda been – what did you call it? Sidestepping around it.

13    MR. OLIVER: No, that company was dissolved according to your own statements uhh in 2007
14    when you

15    MR. HANKINS: But the title is still

16    MR. OLIVER: 2007 when you created

17    MR. HANKINS: Well the title, the title, if I'm not mistaken John Oliver, it's titled in Omar
18    Construction name.

19    MR. OLIVER: Your, Your Honor. I, I would ask that I be called Mr. Oliver in this context. Umm, I
20    think I deserve that.

21    THE COURT: Okay.

22    MR. HANKINS: What, what did I call you?

Heather H. Bath
AOC Approved Transcriptionist

---

17 of 83

1   THE COURT: You just call him Mr. Oliver. You called him John Oliver. He'll call you Mr. Hankins
2   and you

3   MR. HANKINS: Oh, okay. I'm sorry, Mr. Oliver.

4   MR. OLIVER: Thank you. Do, does that 2005 Sterling dump truck still exist?

5   MR. HANKINS: It does.

6   MR. OLIVER: And it's still titled in Omar Construction.

7   MR. HANKINS: I think so, Mr. Oliver.

8   MR. OLIVER: And the 2004 Sterling dump truck – does it still exist?

9   MR. HANKINS: It does.

10  MR. OLIVER: And to who is it titled? Who's the title owner of that?

11  MR. HANKINS: I'm not sure.

12  MR. OLIVER: Alright. The 2006 Ford-350 – does it still exist?

13  MR. HANKINS: It does not.

14  MR. OLIVER: It does not. Was it uhh, uhh traded, totaled, what happened\?

15  MR. HANKINS: Sold at an auction.

16  MR. OLIVER: Okay.

17  MR. HANKINS: Wrecked and sold at an auction.

18  MR. OLIVER: Alright. Umm, turn if you would to, do you remember being required by the Court
19  to give an accounting to uhh Sardia about the properties that you had? We came to court on a Motion
20  to Compel and you, you did actually produce things for my office. Correct?

21  MR. HANKINS: I did.

22  MR. OLIVER: Okay, you did and if you can turn to Exhibit umm, uhh 3.

Heather H. Bath
AOC Approved Transcriptionist

---

18 of 83

1   MR. HANKINS: I'm at, I'm at 3.

2   MR. OLIVER: Okay and you see the first page – it says Wake County Real Estate Data right at the
3   top?

4   MR. HANKINS: Yeah, I mean, go 'head. What, what are you asking about?

5   MR. OLIVER: Okay, I just wanna make sure we're at the same place. This is Exhibit 3. Yeah. If
6   you look there's some handwriting on there. Is that your handwriting?

7   MR. HANKINS: Uhh, yeah it look like my writing.

8   MR. OLIVER: Okay. In fact did you not produce number 3 is, is, if you look through it is pages 1-
9   20, I, I numbered it on the bottom because I had to do 'em by hand because they weren't numbered
10  when I got 'em.

11  MR. HANKINS: Yeah. I'm with ya, I'm with 1-20.

12  MR. OLIVER: Okay. Now I have, I have the discovery documents that you produced to me, isn't
13  that a copy of the documents that you produced for my office pursuant to the Order to produce
14  documents?

15  MR. HANKINS: I done submitted a lot of stuff, but that looks like my writing and those are the
16  documents.

17  MR. OLIVER: Judge, I'm gonna move to admit Exhibit 3.

18  THE COURT: Do you have any objection to Plaintiff's Exhibit 3?

19  MR. HANKINS: Umm, no.

20  THE COURT: Okay, Court will receive into evidence Plaintiff's Exhibit 3.

21  MR. OLIVER: Thank you, Judge. Mr. Hankins, can you tell me umm whether or not as we sit
22  here today you own any real estate in your individual name?

23  MR. HANKINS: The heir property in Brunswick County.

Heather H. Bath
AOC Approved Transcriptionist

---

19 of 83

1   MR. OLIVER: The – I'm sorry.

2   MR. HANKINS: Heir, heir property, family property in Brunswick County.

3   MR. OLIVER: Okay. That's not the property we just talked about is it? Bolivia? Is that in
4   Brunswick?

5   MR. HANKINS: It's all part of it.

6   MR. OLIVER: Okay. That's family property. Do you own it with somebody else?

7   MR. HANKINS: All the property in Brunswick County has been in the family since I was born
8   rather, however it's titled so. Clarify your question.

9   MR. OLIVER: Okay. My question is as we are here today

10  MR. HANKINS: Okay.

11  MR. OLIVER: what real estate do you own in your individual name?

12  MR. HANKINS: I think there's a piece of property, 769 Galloway Road, that might be in Tim
13  Hankins name.

14  MR. OLIVER: Okay.

15  MR. HANKINS: So individually, just my name, not me and Sardia's together – right?

16  MR. OLIVER: Right, that's what I'm curious about.

17  MR. HANKINS: Okay.

18  MR. OLIVER: Any, any others?

19  MR. HANKINS: Currently? Not that I can think of.

20  MR. OLIVER: Alright. Turn there to the next Exhibit, which is Exhibit 4.

21  MR. HANKINS: Exhibit 4.

22  MR. OLIVER: Alright.

Heather H. Bath
AOC Approved Transcriptionist

---

20 of 83

1   MR. HANKINS: Alright, I'm right there.

2   MR. OLIVER: Do you, do you recognize, Exhibit 4 consists of 1, 2, 3 pages. I'm gonna ask if you
3   recognize that document.

4   MR. HANKINS: Uhh, would this, would this be the document I prepared for you?

5   MR. OLIVER: That's what I was gonna ask you if and if you wanna look at yours. You also had to
6   produce an accounting for pursuant to a court order you had to produce an accounting for what was
7   done with the sales proceeds of the five (5) Garner lots. Do you recall that?

8   MR. HANKINS: Yeah.

9   MR. OLIVER: Okay and do you remember producing for my offices an accounting and do you
10  recognize Exhibit 4 as part of that accounting?

11  MR. HANKINS: Yeah, unintelligible, but I know I got everything. I just produced so much stuff,
12  Mr. Oliver.

13  MR. OLIVER: Okay.

14  MR. HANKINS: I can't rem, I mean I know this is part of it. The numbers look right, but I done
15  been through so many, so much paperwork. You show me something and say do I remember it –
16  honestly, no.

17  MR. OLIVER: Okay. So you can't identify Plaintiff's Exhibit 4?

18  MR. HANKINS: No, not really. I, I mean I'm not denying, I'm not saying that it's not. I'm just
19  saying that I don't remember it,

20  MR. OLIVER: Alright.

21  MR. HANKINS: because I've had to produce so much stuff and that's, that's the honest truth.
22  I'm not saying – it does look right. It look, it look correct, but you ask me do I remember it – no. Now,
23  you know I don't.

Heather H. Bath
AOC Approved Transcriptionist

---

**21 of 83**

1    MR. OLIVER: Alright. Well let's go through it 'cause you did, you had to produce your bank
2    records also.

3    MR. HANKINS: That's correct. Yes, yea.

4    MR. OLIVER: Alright. So if I look in your bank records that you produced would I find a check to
5    Kathleen Murphy in the amount of $5,000 paid on 3-7-16, check #1092?

6    MR. HANKINS: You should.

7    MR. OLIVER: Alright. And if I ask that same question for every, every

8    MR. HANKINS: Everything listed on here

9    MR. OLIVER: legal

10    MR. HANKINS: you should, you should have it.

11    MR. OLIVER: So if I'm correct at the bottom of this it says legal fees $92,500. Mr. Hankins, did
12    you spend, from the $231 approximate thousand dollars you got from the sale of the five (5) lots in
13    Garner, did you spend $92,500 of that on legal fees?

14    MR. HANKINS: Probably more than that, but I guess if that's what you're getting at.

15    MR. OLIVER: And is it, would it also be true that the legal fees that we're talking about as I look
16    to the Doyle Law Group, Chad Axford and Kathleen Murphy were legal fees that you personally incurred
17    in this litigation regarding your marital estate and the custody of your children, those actions?

18    MR. HANKINS: Clarify that – one more time, Mr. Oliver.

19    MR. OLIVER: Okay. The, the $92,500 that you spent in legal fees.

20    MR. HANKINS: Okay.

21    MR. OLIVER: Those legal fees were for representation of you, Mr. Hankins, in this domestic
22    action?

---

**22 of 83**

1    MR. HANKINS: You, you're suing the corporation, which is owned by my mom, my uncles and
2    everybody else and they still, they own the money – so I don't, I, I mean you're suing the corporation –
3    where are we supposed to get the money from if we don't use the money that's in the corporation is
4    what I don't understand. So you, you're trying to narrow it down over to me, but yet you're suing the
5    corporation, me and everybody else. So I, I don't quite get what you're wanting me to say.

6    THE COURT: Well you, you can answer that question.  You can interrogate yourself or answer
7    '  that question when it's your turn, Mr. Hankins.

8    MR. HANKINS: Okay.

9    THE COURT: but you just, you need to answer his question and not argue with him.

10    MR. HANKINS: Alright. So, okay. So I'm gone say, alright I'd rather explain. I gonna say no,
11    answer the question, ask the question, Mr. Oliver. I, I wanna get it right. I wanna say no, but then
12    you're gone jump down my throat. So

13    MR. OLIVER: The question was according to Exhibit 4 and according to now your testimony

14    MR. HANKINS: Alright, go 'head.

15    MR. OLIVER: you spent $92,500 on legal fees.

16    MR. HANKINS: I did.

17    MR. OLIVER: My question is – those legal fees were for Timothy Hankins in this domestic action.
18    Wouldn't that be true?

19    MR. HANKINS: No.

20    MR. OLIVER: Okay and you're saying no because some of these fees would be related to the fact
21    that the corporations are part, are part we allege are part of the marital estate?

22    MR. HANKINS: No.

23    MR. OLIVER: Okay. If it's not for representing you in this domestic action what part of that,
24    what else in that $92,500?

---

**23 of 83**

1    MR. HANKINS: I don't quite understand that question. Honestly, I really. I mean, I, I don't
2    understand the question. If I try to explain

3    MR. OLIVER: Well neither one of these corporations hasn't retained an attorney in this case.
4    Right? So the corporations haven't in, incurred any uhh attorney's fees. Wouldn't that be, wouldn't
5    that be true?

6    MR. HANKINS: I would say that $92,000 is an expense or a fee. You're suing 'em. I mean you
7    can't get one without the other is the way I look at it.

8    MR. OLIVER: Let's turn to Exhibit 5 if we could for a minute. Same question first is do you
9    recognize this document?

10    MR. HANKINS: Hold on. Let me see. Let me see. Number 5, Wells Fargo, uhh look like some of
11    my information, something I may have prepared for you.

12    MR. OLIVER: Okay. When you closed on the umm property last June and received the
13    $231,555.51 didn't you immediately transfer, did you deposit that in Omar Construction's account first?

14    MR. HANKINS: Yes.

15    MR. OLIVER: And then didn't you transfer $100,000 out of it to Sardia Enterprise account?

16    MR. HANKINS: That sounds right.

17    MR. OLIVER: And then from that $100,000 that you moved, did you buy two (2) lots – one on
18    2608 Garner Street and a lot on Como Drive?

19    MR. HANKINS: That sounds correct.

20    MR. OLIVER: And did you pay

21    MR. HANKINS: It's Garner Road.

22    MR. OLIVER: Hmm?

23    MR. HANKINS: It's Garner Road. You said

---

**24 of 83**

1    MR. OLIVER: You're right.

2    MR. HANKINS: and Como Drive. Go 'head.

3    MR. OLIVER: Okay and you bought those two (2) lots for about $53,000.

4    MR. HANKINS: That sounds about right.

5    MR. OLIVER: Okay. And did you also go to an auto auction and purchase vehicles and
6    equipment in approximately the amount of $45,935?

7    MR. HANKINS: That sounds right.

8    MR. OLIVER: Okay. With regard to the lots – are you building, what are you doing with those
9    lots?

10    MR. HANKINS: Building house on them.

11    MR. OLIVER: How many houses are you building on 'em?

12    MR. HANKINS: Two (2).

13    MR. OLIVER: Where are you in the construction process with those two houses?

14    MR. HANKINS: One is eighty percent (80%) done and the other one is, haven't started yet.

15    MR. OLIVER: Okay. And if I go back to, I can go back to Exhibit 3 and go through them, but I, as I
16    looked at Wake County Real Estate Data that you produced the Como Drive is in the Omar Con, the
17    name of Omar Construction & Trucking, right?

18    MR. HANKINS: I think, I'm pretty sure yes.

19    MR. OLIVER: Yeah.

20    MR. HANKINS: I think all the real estate is in Omar Construction & Trucking.

21    MR. OLIVER: And then if I go to the umm 2608 Garner Road, that's the other one that you
22    purchased with, it's also in the name of Omar Construction & Trucking, LLC?

---

25 of 83

1    MR. HANKINS: I would, I would agree.

2    MR. OLIVER: Okay. So you're, you're planning on putting two (2) houses there.

3    MR. HANKINS: That's correct.

4    MR. OLIVER: And you're eighty percent (80%) complete on one

5    MR. HANKINS: Yes, uhh seventy-five (75), eighty (80), but yes.

6    MR. OLIVER: Which lot is the seventy-five or eighty percent (75-80%) finished one on?

7    MR. HANKINS: Garner Road.

8    MR. OLIVER: Okay. Alright and you haven't broken ground yet on the Como Drive.

9    MR. HANKINS: No.

10   MR. OLIVER: Okay. Alright. Can you tell me what umm equipment or vehicles were purchased
11   with the $45,000?

12   MR. HANKINS: A backhoe tractor, a backhoe.

13   MR. OLIVER: Okay, a backhoe.

14   MR. HANKINS: Replaced one and I had to sell.

15   MR. OLIVER: Anything else or just the backhoe?

16   MR. HANKINS: Umm, I can't, I bought, I bought a few cars too to uhh, to fix up and sell.

17   MR. OLIVER: Okay. Can you, can you list the cars that you bought to fix up and sell?

18   MR. HANKINS: Cadillac Escalade was one, a Mazda RX-7, RX-8 and a Ford Freestyle.

19   MR. OLIVER: Have you fixed them up and sold them?

20   MR. HANKINS: The Cadillac Escalade sold and somebody was stealing my mail so I didn't get the
21   titles in for the rest, but the Freestyle got sold yesterday at an auction; the same auction that I bought it
22   from. That was just a bad deal. It didn't

Heather H. Bath
AOC Approved Transcriptionist

---

27 of 83

1    MR. HANKINS: 12, somewhere around December of '15.

2    MR. OLIVER: Okay and I, I believe it's your testimony that you created a new Sardia
3    Enterprise after 2015.

4    MR. HANKINS: Yeah.

5    MR. OLIVER: Did you file with the Secretary of State Articles of Organization like the document
6    you are seeing.

7    MR. HANKINS: I did.

8    MR. OLIVER: You did and when did you do that?

9    MR. HANKINS: About the same time I, I dissolved this one and created another one.

10   MR. OLIVER: Okay. At the time you dissolved Sardia Enterprise, LLC, the one that's number 7 –
11   did that company own any real estate?

12   MR. HANKINS: I don't think so.

13   MR. OLIVER: Okay. Judge,

14   MR. HANKINS: No, I'm pretty sure because I haven't transferred anything.

15   MR. OLIVER: Okay. Judge, I'm gonna move to admit Exhibit 7.

16   THE COURT: Okay. Any objection to Plaintiff's Exhibit 7?

17   MR. HANKINS: No. No, sir.

18   THE COURT: Court will receive Plaintiff's Exhibit 7 into evidence.

19   MR. OLIVER: Okay. Turn if you will to the last document on there, Exhibit 8. Again, it appears
20   to come from the North Carolina uhh Department of Secretary of State and on the second page there's a
21   signature there that is Timothy Omar Hankins. Do you recog, is that, is that your signature on this
22   document?

23   MR. HANKINS: Uhh, hold on let me get to where you are.

Heather H. Bath
AOC Approved Transcriptionist

---

26 of 83

1    MR. OLIVER: You didn't make any money off that deal.

2    MR. HANKINS: I, it sold yesterday at the same auction I bought it from, so

3    MR. OLIVER: Alright. Look in there if you would to Exhibit 7.

4    MR. HANKINS: Man, I got 6.

5    MR. OLIVER: Here, I go, I can get you to 7.

6    MR. HANKINS: I gotcha, I gotcha, I got it.

7    MR. OLIVER: On the flip through 'em unintelligible. That's number 7.

8    MR. HANKINS: Alright.

9    MR. OLIVER: Unintelligible. That appears to be a document from the Secretary of State of North
10   Carolina.

11   MR. HANKINS: Yes.

12   MR. OLIVER: Okay and on, on the back of it, on the second page of it there appears to be umm
13   your sign, signature and Sardia's signature. Do you see that?

14   MR. HANKINS: Yes.

15   MR. OLIVER: Is that your signature on this document?

16   MR. HANKINS: Yes.

17   MR. OLIVER: Okay. If you look on the front then, this is for Sardia Enterprise, LLC.

18   MR. HANKINS: That's correct. That's correct.

19   MR. OLIVER: This, okay and if I look at this the, the filing date on the top right hand corner,
20   corner is April 8 of 2005. Does this company still exist?

21   MR. HANKINS: No.

22   MR. OLIVER: When was Sardia Enterprise, LLC dissolved?

Heather H. Bath
AOC Approved Transcriptionist

---

28 of 83

1    MR. OLIVER: Okay. It's

2    MR. HANKINS: You said, you said Exhibit 8?

3    MR. OLIVER: It's easier if I just turn to it and we'll keep switching unintelligible just goes faster.
4    Okay, now the second page of that it appears to be your signature. Is that your signature on that
5    document?

6    MR. HANKINS: Yes, it is.

7    MR. OLIVER: Okay and this would have been the Articles of Organization for Omar Construction
8    and Trucking, LLC.

9    MR. HANKINS: That is correct.

10   MR. OLIVER: Does this company still exist?

11   MR. HANKINS: It does.

12   MR. OLIVER: It does and if I'm reading it correctly this was filed on May 24, 2007.

13   MR. HANKINS: That sounds about right.

14   MR. OLIVER: Okay. Now you've made reference to a previous company named Omar
15   Construction & Trucking, LLC and have made the statements that it was created before y'all were
16   married. Is that correct?

17   MR. HANKINS: No.

18   MR. OLIVER: Okay. Did you have an Omar Construction and Trucking, LLC or strike that. Did
19   you have a company named Omar Construction & Trucking before you got married?

20   MR. HANKINS: It was called Omar Construction, Incorporated.

21   MR. OLIVER: Okay and isn't it true that that company was dissolved?

22   MR. HANKINS: By your client, behind my back. I would guess, I didn't dissolve it.

23   MR. OLIVER: It no longer exists does it?

Heather H. Bath
AOC Approved Transcriptionist

1     MR. HANKINS: No, it don't exist.

2     MR. OLIVER: Okay. So this is the only company that exists that we're talking about. So when

3 we look at all these, all these documents from the Register of Deeds and, and your statements this is the

4 company that owns all that real estate?

5     MR. HANKINS: Omar Construction & Trucking, that's right, John Oliver, Mr. Oliver.

6     MR. OLIVER: Thank you. Umm, one second, Judge. Remember in your discovery where you

7 had to produce umm and one of the questions to produce was tax returns? Does Omar Construction &

8 Trucking, LLC file state and federal tax returns?

9     MR. HANKINS: Yes.

10     MR. OLIVER: Okay.

11     MR. HANKINS: I would think, yes.

12     MR. OLIVER: Do you have an accountant that has them because I didn't see them in my, my

13 discovery request that we were, were given?

14     MR. HANKINS: I can go back and check, but I gave you everything I got.

15     MR. OLIVER: Okay.

16     MR. HANKINS: Everything that I had my hands on you got it.

17     MR. OLIVER: And with regard to Sardia, Sardia Enterprise – have you filed tax returns for Sardia

18 Enterprise?

19     MR. HANKINS: I, I don't know what all the tax lady did with the, the corporations stuff.

20     MR. OLIVER: Okay.

21     MR. HANKINS: You're asking me stuff I need to see paperwork on.

22     MR. OLIVER: Okay. I'm gonna hand you what I'm gonna mark as Exhibit 9 and ask, ask – give

23 you this one, shoot, sorry, ask if you recognize that document?

1     MR. OLIVER: Okay. It has a bank account.

2     MR. HANKINS: That's correct.

3     MR. OLIVER: And that's where? Yours is Wells, and yours is at Wells Fargo, Wells Fargo. Sardia

4 Enterprises has an account.

5     MR. HANKINS: An account at Wells Fargo, yes.

6     MR. OLIVER: Okay and Omar Construction has an account also doesn't it?

7     MR. HANKINS: That is correct.

8     MR. OLIVER: And where is that account?

9     MR. HANKINS: Four Oaks Bank.

10     MR. OLIVER: Okay. Other than those three (3) accounts, do you have umm signature authority

11 or any rights to any other bank account?

12     MR. HANKINS: Not to my knowledge.

13     MR. OLIVER: Okay. Are there money, is there any money in the, these accounts today as we

14 speak?

15     MR. HANKINS: No, there is not.

16     MR. OLIVER: Alright. And either of the $231,000 of the sales proceeds from the five (5) lots in

17 Garner, is there any money left out of that $231,000?

18     MR. HANKINS: There's no money left. No, there's no money left. I mean, no I don't have any

19 money now.

20     MR. OLIVER: Okay.

21     MR. HANKINS: But the corporation is doing things. The company is trying to get some things

22 generated and get some things going.

1     MR. HANKINS: Let's see. No.

2     MR. OLIVER: You don't. What does it appear to be?

3     MR. HANKINS: It appears to be my 2015 taxes.

4     MR. OLIVER: Can you turn to the last page of it then please and see if you recognize what

5 appears to be a Profit & Loss Statement?

6     MR. HANKINS: That's what it appears to be.

7     MR. OLIVER: Do you recognize that?

8     MR. HANKINS: No.

9     MR. OLIVER: Do you know whether or not that's the document you produced in discovery?

10     MR. HANKINS: Not for sure.

11     MR. OLIVER: Pursuant to the Court Order.

12     MR. HANKINS: Not for sure. I would have to get with my accountant.

13     MR. OLIVER: You uhh were able to produce, do you have a, a bank account in your individual

14 name, correct?

15     MR. HANKINS: That is correct.

16     MR. OLIVER: And what bank is that?

17     MR. HANKINS: Wells Fargo.

18     MR. OLIVER: And does Sardia Enterprise have a bank account?

19     MR. HANKINS: Enterprises.

20     MR. OLIVER: Enterprises, the new company.

21     MR. HANKINS: Yes, that's correct.

1     MR. OLIVER: Alright. Well I know the company is gonna do the lots. It's already developing one

2 lot that's got a house eighty percent (80%) done and the other lot. What other work is Omar

3 Construction & Trucking involved in right now?

4     MR. HANKINS: Umm, what other work? Building, just working for, the primar, primarily I'm

5 working for umm a guy name Chris Unintelligible and he builds houses for investors and I assist him.

6     MR. OLIVER: And do you do the, what are you doing when you're assisting him?

7     MR. HANKINS: Well I mean when it come to building houses basically there's nothing I can't do,

8 but my primary job is uhh he builds houses for investors. They buy lots and a lot of 'em are bad and

9 when they buy bad lots that kinda overrides the county in which umm that's where I come in. That's

10 what I specialize in is putting foundations with houses, putting foundations where other people can't,

11 putting foundations in. So I have to get with the engineers and we design and figure out how to make

12 the land suitable to build.

13     MR. OLIVER: And, and does, are you an employee of this fellow, this company or are you an

14 independent contractor?

15     MR. HANKINS: I'm not sure. Back when uhh Ms. Hankins sold that last house, that guy had a big

16 interest its it so most of the work I'm doing now is still paying off the money from when she sold that last

17 house ten (10) years ago.

18     MR. OLIVER: By the way, Judge, I don't know that I asked for uhh Exhibit 8 to be admitted and if

19 not I'm asking for it to be admitted now.

20     THE COURT: Okay. Any objection to uhh Plaintiff's Exhibit 8?

21     MR. HANKINS: What was number 8 again, Mr. Oliver?

22     MR. OLIVER: Omar Construction & Trucking Articles of Organization filed with the North

23 Carolina Secretary of State.

24     MR. HANKINS: No, I have no problem.

25     THE COURT: Okay. Court will receive Plaintiff's Exhibit 8 into evidence.

33 of 83

1    MR. OLIVER: With regard to the lot that you are developing in Garner or on Garner Road, I think
2    it is – now you bought the lot with, with cash from the sale of the five (5) lots.

3    MR. HANKINS: Correct.

4    MR. OLIVER: Did you have to borrow any money in addition to the cash you put down?

5    MR. HANKINS: To buy the lots?

6    MR. OLIVER: Uhh-huh.

7    MR. HANKINS: No.

8    MR. OLIVER: Okay. So when you bought the lot it's free and clear. You don't owe anybody any
9    money on it. You, the Omar Construction owned it free and clear.

10   MR. HANKINS: That's correct.

11   MR. OLIVER: Alright, but now you're doing construction work on it. You're building.

12   MR. HANKINS: That's, that's correct.

13   MR. OLIVER: Did you get a, a construction loan to build the building?

14   MR. HANKINS: No.

15   MR. OLIVER: Alright. If you don't, how are you, where is the money coming from to do the
16   actual construction of the home?

17   MR. HANKINS: Same people that built houses for me from 2, 200 and I mean 1995 to 2005
18   when you client took about a $1,000,000 dollars out of this company. Same people building.

19   MR. OLIVER: Alright. So the same people are building it and I assume that they get reimbursed

20   MR. HANKINS: At the sale.

21   MR. OLIVER: at the sale and you guys split that pie. You and Omar, I mean Omar

22   MR. HANKINS: Yes.

Heather H. Bath
AOC Approved Transcriptionist

---

34 of 83

1    MR. OLIVER: Construction and this other company

2    MR. HANKINS: I, yes. Ever since I've been in business it's always been a family business – me,
3    my uncles and it's always been a family business. So it's slowly coming back together.

4    MR. OLIVER: And I, I'm curious. The, the number keeps changing in your, in some of your filings
5    in this case where you've filed motions in this case you're, you've alleged that, that Sardia and the
6    lawyer had taken – sometimes it's $400, sometimes it's $600 and now it's a million.

7    MR. HANKINS: No, I've

8    MR. OLIVER: Is this same transaction?

9    MR. HANKINS: Mr. Oliver, I think I put it at a million and in one of the motions I said so you
10   won't argue, but I can clearly show you a million dollars in those documents over there.

11   MR. OLIVER: It's just, it's still the same transaction that you're alleging about?

12   MR. HANKINS: Same transaction – it went on for a period of about thirty (30), about thirty (30)
13   months when that money got missing.

14   MR. OLIVER: Okay.

15   MR. HANKINS: So it's not one transaction.

16   MR. OLIVER: Was it, just, just curious was it related to one particular house?

17   MR. HANKINS: As in reference to that money being missing?

18   MR. OLIVER: Uhh-huh.

19   MR. HANKINS: No. Omar Construction, Inc. period. Just so it happened over a period of thirty
20   (30) months and

21   MR. OLIVER: What year was that?

22   MR. HANKINS: That would be

23   MR. OLIVER: Approximately '06?

Heather H. Bath
AOC Approved Transcriptionist

---

35 of 83

1    MR. HANKINS: approximately 2005, October 2005 to June – no, no, I apologize. You say what
2    period was that? That would be from November 2003 to March 2006.

3    MR. OLIVER: Okay.

4    MR. HANKINS: That's about your thirty (30) months. November of 2003 to uhh March/April of
5    2006.

6    MR. OLIVER: And you found out about it and you reported the lawyer to the North Carolina
7    State Bar didn't you?

8    MR. HANKINS: I did.

9    MR. OLIVER: And he got disciplined for, for not properly paying some monies that he had been
10   entrusted to on your behalf – wouldn't that be true too?

11   MR. HANKINS: Yes, yes, John Oliver. Laughing. Laughing.

12   MR. OLIVER: He got disciplined and that's back in 19, 2006 and you know about this and your
13   wife's taken half a million, a million dollars and you stay married to her for another eight (8) years.

14   MR. HANKINS: That is correct.

15   MR. OLIVER: Okay. Go to Exhibit number 6, real briefly.

16   MR. HANKINS: 6, 6, 6, 6, 6.

17   MR. OLIVER: If you want me to we'll just keep doing it the same way 'cause I can get it to it a lot
18   faster. Your Honor, I apologize for not having this tabbed. Okay, now this is the Post-Nuptual
19   Agreement that you and Sardia entered into.

20   MR. HANKINS: That is correct.

21   MR. OLIVER: Alright – where is my copy in here? Umm, can you tell me how this document was
22   drafted – like who drafted it and how it worked logistically getting it from drafting to reading to signing?
23   You understand what I'm saying?

24   MR. HANKINS: Break the logistics down. I mean drafting

Heather H. Bath
AOC Approved Transcriptionist

---

36 of 83

1    MR. OLIVER: Let me ask you this. Did a lawyer draft this?

2    MR. HANKINS: Yes.

3    MR. OLIVER: What lawyer drafted this?

4    MR. HANKINS: Pauline Hankins.

5    MR. OLIVER: Okay and did you go to uhh Pauline Hankins

6    MR. HANKINS: Pauline.

7    MR. OLIVER: That's your sister.

8    MR. HANKINS: That is correct.

9    MR. OLIVER: She is a District Court Judge down on the coast?

10   MR. HANKINS: She is a Judge now.

11   MR. OLIVER: Okay. So at the time she wasn't a Judge was she?

12   MR. HANKINS: No, she was not.

13   MR. OLIVER: Okay. So she drafted this for you.

14   MR. HANKINS: Yes.

15   MR. OLIVER: Alright and did, how did Sardia first see this, this, this document?

16   MR. HANKINS: Umm, it was left at the house. She testified herself she had it for a while at the
17   house. She claimed it got misplaced, whatever, but she had it for a while.

18   MR. OLIVER: Did she initially refuse to sign it?

19   MR. HANKINS: Not that I know of.

20   MR. OLIVER: Alright. How long was it in the house before it was signed?

21   MR. HANKINS: I have no, I have, I don't know.

Heather H. Bath
AOC Approved Transcriptionist

## 37 of 83

1     MR. OLIVER: Okay. Where did you go to sign it? Where was it at, literally where were you
2 physically when you signed this document?

3     MR. HANKINS: We was at 1317 West Garner Road.

4     MR. OLIVER: Okay. That's your business office, right?

5     MR. HANKINS: Well, it was.

6     MR. OLIVER: Okay. That's where, that's where your business office was at that time. Alright,
7 the notary. Do you know this notary?

8     MR. HANKINS: She's somebody from the church.

9     MR. OLIVER: Someone from the church. Okay and she was there and in, and literally you and
10 Sardia put your, signed this document in her presence?

11     MR. HANKINS: Yes.

12     MR. OLIVER: Okay and then she notarized it?

13     MR. HANKINS: Yes, the best I can remember.

14     MR. OLIVER: How many, how many copies, how many originals were there of this document?

15     MR. HANKINS: I don't, I don't know. I remember when, when we got it done me and Sardia
16 brought it, took it downtown and recorded it.

17     MR. OLIVER: So the two (2) of you took it downtown to record it. That day or

18     MR. HANKINS: I would think, yeah I would think it would be that day, but I can't, that's
19 remember whether it was that day.

20     MR. OLIVER: Alright. Did you sign, do you know if you signed it in duplicates or did you just sign
21 one?

22     MR. HANKINS: I don't know.

23     MR. OLIVER: Do you know where the original of this document is?

Heather H. Bath
AOC Approved Transcriptionist

## 38 of 83

1     MR. HANKINS: No.

2     MR. OLIVER: In this document you promised to pay a mortgage of the house that was, that, that
3 y'all were living in at that time. Correct?

4     MR. HANKINS: I never said nothing, I hadn't seen anything about a mortgage in here. Where is
5 that at?

6     MR. OLIVER: If you look to page, page 2 it says uhh, number, paragraph 2 "the parties own real
7 property jointly as husband and wife located in the State of North Carolina husband agrees to allow wife
8 to continue to use the real property titled jointly in the parties name and to pay the indebtedness owed
9 on that real property."

10     MR. HANKINS: Well it didn't say nothing about no mortgage, number 1 and number 2 it don't
11 say nothing about no house. We owned one piece of property together today in our name.

12     MR. OLIVER: But, where was that piece of property located?

13     MR. HANKINS: Where was it or where is it? We still own it.

14     MR. OLIVER: Well where is it? You still own it.

15     MR. HANKINS: Yes.

16     MR. OLIVER: Okay. And, let me ask you this – at the time this document was signed where
17 y'all living? What was the address?

18     MR. HANKINS: That was in, that would have been, I don't know for sure. It might have been
19 Fieldgrass Place.

20     MR. OLIVER: Okay. Did you, did you move into 4729 G Street sometime in 2008?

21     MR. HANKINS: Between 2007 and 2008. I'm not for sure the moving date.

22     MR. OLIVER: And in fact the home you lived in immediately prior to G Street, 4729, was 1009
23 Fieldcrest Place.

24     MR. HANKINS: Fieldgrass.

Heather H. Bath
AOC Approved Transcriptionist

## 39 of 83

1     MR. OLIVER: Okay. Would that be a correct statement?

2     MR. HANKINS: That's, Fieldgrass Place, yes.

3     MR. OLIVER: Okay. And so then given the date of the document, number 6, of September 1 of
4 2007 the address you were living in at that time would have been 1009 Fieldgrass Place.

5     MR. HANKINS: I'm not for sure.

6     MR. OLIVER: Alright.

7     MR. HANKINS: I already told you

8     MR. OLIVER: Who owned that home?

9     MR. HANKINS: Who owned that Fieldgrass Place?

10     MR. OLIVER: Uhh-hmm.

11     MR. HANKINS: I did. Timothy Hankins.

12     MR. OLIVER: Okay. You didn't own it jointly?

13     MR. HANKINS: No, we did not. I bought it before we were married. Paid cash for it too – half a
14 million that got missing – nobody told you that, Mr. Oliver?

15     MR. OLIVER: Alright. Umm isn't it true Mr. Hankins that you threatened Sardia that you would
16 not pay the mortgage on the home she was living in if she didn't sign that document?

17     MR. HANKINS: No.

18     MR. OLIVER: Did you ever threaten her to be careful because bad things can happen to wives
19 that mess with their husband's money?

20     MR. HANKINS: No.

21     MR. OLIVER: Okay. Would it be true to say that you used some coercion to try to get her to sign
22 this document?

Heather H. Bath
AOC Approved Transcriptionist

## 40 of 83

1     MR. HANKINS: She still a million dollars from me. What kind of coercion do I need, John Oliver?
2 *Laughing.* Oh my God! I think I did pretty good. I didn't divorce her. I did not. I'm not the moving
3 party in here, John Oliver. She is.

4     MR. OLIVER: Your Honor, there's no question pending.

5     THE COURT: Okay. Umm, okay. Sustained and struck. It's a question and answer session.

6     MR. HANKINS: Yes, sir.

7     THE COURT: Not a discussion session, Mr. Hankins.

8     MR. HANKINS: Okay. Yes, sir.

9     THE COURT: Mr. Oliver, we've been, we've been going for just about an hour. We're gonna
10 take a brief restroom break.

11     MR. OLIVER: Okay. That's fine. Are we gonna stop for lunch or are we gonna go through,
12 'cause I'd be, I gotta, I gotta talk with my wife about an orthodontist appointment – who is gonna cover
13 it.

14     THE COURT: Okay. Well I wasn't, I wasn't planning on stopping. How long are y'all planning on
15 going?

16     MR. OLIVER: I'm almost done. I have *unintelligible* Sardia, but Sardia's testimony is gonna brief.

17     THE COURT: I'm not, I'm planning on going until we're done.

18     MR. OLIVER: Okay.

19     THE COURT: With just a couple of brief breaks. Okay. So step down for about five (5) minutes.

20     *Brief Recess.*

21     THE COURT: Okay, Mr. Hankins. You can come back up.

22     MR. OLIVER: If I may approach.

23     THE COURT: You may.

Heather H. Bath
AOC Approved Transcriptionist

41 of 83

1    MR. OLIVER: Mr. Hankins, I, I put in front of you what was, has been introduced as Exhibit 3 and
2    if you'll look at the very first page of this it appears to be 4729 G Street, Garner, North Carolina. Umm is
3    this and you testified that's the house that you moved to from 1009 Field, Fieldgrass Place?

4    MR. HANKINS: Yes.

5    MR. OLIVER: Okay. And isn't it also true that during the course of your marriage those two (2)
6    residences were the only two (2) residences that you used as marital residences?

7    MR. HANKINS: Uhh, yes.

8    MR. OLIVER: Okay. And if I'm looking at Exhibit 3, Page 1 – it appears the deed date for the
9    document, for the, the uhh 4729 G Street property was 6-27-07. Is that

10   MR. HANKINS: Where, where are you now?

11   MR. OLIVER: At the very, in the transfer information, the deed date of 6-27-07.

12   MR. HANKINS: On the, on the next page?

13   MR. OLIVER: No. If I may approach real quick?

14   THE COURT: You may.

15   MR. OLIVER: It does have the same, it has the same uhh, it appears if we go to Page 2 of that,
16   that on 11-22-05 Sardia Enterprises, Enterprise, LLC transferred that property to Omar Construction &
17   Trucking LLC on 6-27-07. Do you see that?

18   MR. HANKINS: Yes. I see it.

19   MR. OLIVER: Does that sound correct to you?

20   MR. HANKINS: Yeah, it does.

21   MR. OLIVER: Okay. Alright and so thereafter you signed the Post-Nuptial Agreement. Alright.

22   MR. HANKINS: Yes.

23   MR. OLIVER: September 1, I believe.

Heather H. Bath
AOC Approved Transcriptionist

---

42 of 83

1    MR. HANKINS: Thereafter – when you say thereafter what do you mean?

2    MR. OLIVER: At a subsequent date, which I believe is September 1. Let me go back and look.
3    Yes, if you look, September 1, 2007 is when you signed the Post-Nuptial Agreement. So just after Sardia
4    Enterprise, LLC transfers the property to Omar Construction & Trucking, LLC uhh you signed the Post-
5    Nupt. Now my question is – how soon after September 1, 2007 did you move from 1009 Fieldgrass
6    Place to 4729 G Street?

7    MR. HANKINS: Uhh, I, I don't know the exact date. I don't, I don't, I don't, I hadn't even thought
8    about it until you just asked me, but I don't know.

9    MR. OLIVER: Okay. And if we turn for just a second to Exhibit 6, which is your Post-Nupt and
10   again if we turn to the second page of that agreement when we were just talking about the fact that the
11   parties agree to, umm husband agrees to allow wife to continue to use the real property titled jointly in
12   the parties' name and pay all indebtedness owed on the real property – at the time this was signed what
13   property did you and Sardia own jointly?

14   MR. HANKINS: I wanna say the property in Holly Springs.

15   MR. OLIVER: What property was in Holly Springs?

16   MR. HANKINS: There was several houses, there were several houses in Holly Springs.

17   MR. OLIVER: Okay. And did you believe you owned those jointly?

18   MR. HANKINS: No, well it's a small, it's a property that's still in our names jointly today.

19   MR. OLIVER: Why has it not been listed in any of the listings that we have up to this date?

20   MR. HANKINS: Probably the same reason I don't get none of her bank statements, John Oliver.
21   You and these attorneys doing y'all thing.

22   MR. OLIVER: Judge, if we can request – if I can request that Mr. Hankins refrain from the asides.
23   I mean

24   MR. HANKINS: He just asked the question. He just asked the question. Why is that property
25   not been in this record right here and I gave you the answer.

Heather H. Bath
AOC Approved Transcriptionist

---

43 of 83

1    MR. OLIVER: Okay. Okay. So if you owned that property jointly at the time you signed this did
2    you give Sardia the umm, the use of those properties?

3    MR. HANKINS: I never restricted her from anything. So I, you saying did I give her the use – I
4    have never restricted Sardia from nothing. I don't, I don't know how to answer that.

5    MR. OLIVER: Alright. Irrespective of whether or not 1009 Fieldgrass Place was titled jointly –
6    was it the intent of this agreement to allow Sardia to continue to occupy 1009 Fieldgrass Place?

7    MR. HANKINS: No.

8    MR. OLIVER: It was not?

9    MR. HANKINS: No.

10   MR. OLIVER: Then where was she going to live?

11   MR. HANKINS: She had the money. I figured she had something worked out, but she had the
12   money. The house payment – do you want me to – well the house payment had went from zero to
13   $3,800 a month and I knew for a fact that I couldn't, I'm not paying no $3,800 a month for no thirty (30)
14   years.

15   MR. OLIVER: Okay. That's okay. Judge, that's all I have.

16   THE COURT: Okay. Umm, do you have, you're gonna call your client also.

17   MR. OLIVER: Uhh-hmm.

18   THE COURT: Okay. I'm gonna let him call his client and then you can umm cross-examine Ms.
19   Porter and then I'll hear from you again Mr. Hankins.

20   MR. OLIVER: Call Sardia Hankins, Your Honor.

21   THE COURT: Okay.

22   CLERK: Do you prefer to be sworn or affirmed?

23   MS. HANKINS: Sworn.

Heather H. Bath
AOC Approved Transcriptionist

---

44 of 83

1    CLERK: Sworn? If you'll please place your left hand on the Bible and raise your right. Do you
2    solemnly swear that the testimony you're about to give this Court shall be the truth, the whole truth and
3    nothing but the truth so help you God?

4    MS. HANKINS: Yes.

5    CLERK: Thank you. You may be seated.

6    MR. OLIVER: Please tell the Court your name.

7    MS. HANKINS: Sardia Porter Hankins.

8    MR. OLIVER: Okay. Where do you live Sardia?

9    MS. HANKINS: At this present moment I'm living at 109 River Knoll Drive.

10   MR. OLIVER: Alright. And at the end of Mr. Hankins' testimony he referred to some properties
11   that were owned in Holly Springs, North Carolina. Do you recall anything about properties owned in
12   Holly Springs, North Carolina?

13   MS. HANKINS: The property that was owned in Holly Springs we had umm, it was two (2)
14   property that we had bought and we had built and sold those properties.

15   MR. OLIVER: Do you know approximately when you sold those properties?

16   MS. HANKINS: Uhh, let's see. Those properties, I'm not so quite sure of the date, but they were
17   probably around in 2005. 2005 or something like that or 2004.

18   MR. OLIVER: Okay. Going back to the umm Exhibit 6, which is the Post-Nuptual Agreement and
19   if you turn to the second page, can you tell the Court where you were living at the September 1st date of
20   the signing of this Agreement?

21   MS. HANKINS: 1009 Fieldgrass Place.

22   MR. OLIVER: And that residence and the Garner Street, the G-Street residence, the 4729 G-
23   Street residences, during the course of the marriage did you ever occupy any other residences?

24   MS. HANKINS: No, those are the only two (2).

Heather H. Bath
AOC Approved Transcriptionist

1    MR. OLIVER: Alright. Do you know what happened to the 1005 Fieldgrass Place residence?

2    MS. HANKINS: It went into foreclosure.

3    MR. OLIVER: Okay. And do you know when it went into foreclosure?

4    MS. HANKINS: It went in foreclosure around back in umm 2008.

5    MR. OLIVER: Okay. And in what year did you move to the 4729 G-Street residence?

6    MS. HANKINS: That was back in 2008 we went to

7    MR. OLIVER: Okay.

8    MS. HANKINS: to umm, to G-Street.

9    MR. OLIVER: Alright. The, do you know whether or not the 1005 Fieldgrass Place property was
10  titled jointly or in Mr. Hankins name only?

11    MS. HANKINS: As a matter of fact it was filed first in his name and then after he had changed
12  the title and both of us names was on it. It was a couple of weeks ago I was looking at a title with both
13  of us soIntelligible in it.

14    MR. OLIVER: When you look at, in, in your mind when you read the paragraph in Exhibit 6 that
15  said 'husband agrees to allow wife to continue to use the real property titled jointly in the parties name
16  and pay all indebtedness owed on the real property' – to what property is that referring?

17    MR. OLIVER: Well based on this Agreement that I'm just reading, as you had just stated it
18  would be 1005 Fieldgrass Place. That's where we were living.

19    MR. OLIVER: Let's talk about the, the Agreement. Can you tell the Court umm when or how this
20  Agreement was first presented to you?

21    MS. HANKINS: Okay. I was umm home one day. Tim and I were going through some difficulties.
22  So what happened is he brought the papers home and say he want me to sign it.

23    MR. OLIVER: Did you sign them?

1    MS. HANKINS: No, I didn't.

2    MR. OLIVER: What did you do with them?

3    MS. HANKINS: I told him I was tired. He left the paper on, there was, where we sit and watch
4  TV in the living room, he left the papers there. I

5    MR. OLIVER: How long did they stay there?

6    MS. HANKINS: By the next morning when I woke up the paper was gone.

7    MR. OLIVER: Alright. And how long was it again before you were made aware that he had, that
8  he wanted you to sign uhh a Post-Nuptial Agreement?

9    MS. HANKINS: It's around two (2) months after he had umm, during that period of time he
10  came home one time and he say to me, he was watching Stop on TV where this lady and this couple
11  they have a problem with some tax returns stuff and the husband had killed the wife and he turned and
12  said to me

13    MR. OLIVER: He being?

14    MS. HANKINS: Mr. Hankins turned and said to me 'this is what Americans do with wife who
15  comes from overseas.' That's what he said.

16    MR. OLIVER: Okay.

17    MS. HANKINS: And then umm I was dropping my son off to school one day 'cause he was going
18  to school downtown. It was after that and I was, I can remember exactly where I was. I was making the
19  turn on Unintelligible Road when he called me and asked me if I'm not going to sign those papers and I
20  told him how can I sign a paper that I don't see and he asked me if I don't see that he hasn't made the
21  payment, the mortgage payment on the house. If I don't sign the papers, then he's not gonna make the
22  payment. That's what he stated.

23    MR. OLIVER: Did, did you thereafter or how long after that did you meet him at what, what was
24  then his office?

25    MS. HANKINS: It was shortly after one Saturday he had called me

1    MR. OLIVER: How many days?

2    MS. HANKINS: Umm to tell you truth Mr. Oliver, I cannot exactly precise the days.

3    MR. OLIVER: Do you remember though he testified you went to his office. Do you remember
4  doing that?

5    MS. HANKINS: Yes. He had called me one Saturday to meet his umm, at that time Ms. Debra
6  was working for him, doing his paperwork. So

7    MR. OLIVER: Ms. Debra being the notary?

8    MS. HANKINS: The notary.

9    MR. OLIVER: Okay.

10    MS. HANKINS: And

11    MR. OLIVER: And were the three (3) of you there?

12    MS. HANKINS: Well both of us were there first and he called me on the phone and stated that
13  since Ms. Debra is there if I'm not gonna sign the papers and we did sign the papers right there, but I
14  was only presented at the time of the signing with only two (2) papers, with here this paper right here
15  with this signatures signed. That's all I was presented.

16    MR. OLIVER: Are you testifying that you were unable to read the document before you signed
17  the notarization part?

18    MS. HANKINS: That's correct because he was hurrying us to hurry up and sign the papers he has
19  to go somewhere.

20    MR. OLIVER: When, when did you find out or how did you find out the content of the
21  documents itself?

22    MS. HANKINS: I was home one day

23    MR. OLIVER: How, how many days after the signing?

1    MS. HANKINS: It was a, it was years, a year after. Something like that.

2    MR. OLIVER: A year after.

3    MS. HANKINS: Yes, around a year after. Something like that. I think it's probably back in 2009 I
4  found out 'cause I was at G-Street when I found out and umm

5    MR. OLIVER: How did you find out?

6    MS. HANKINS: His brother called me.

7    MR. OLIVER: Mr. Hankins' brother called you.

8    MS. HANKINS: Yes.

9    MR. OLIVER: Alright.

10    MS. HANKINS: His brother called me, Wade Hankins, asking me if me and Tim divorced, no
11  separated. I told him no and he, I asked him why he say that and he stated that someone in the Register
12  of Deeds told him that Tim came down there and filed some papers showing that.

13    MR. OLIVER: Did you investigate what those papers were?

14    MS. HANKINS: I called Tim at the same time 'cause he wasn't home and I asked him about it and
15  what he told me was, this was his exact words – 'I signed those papers so that you won't not to take
16  away anything from you.' That's what he said. It's just to shut you down because when you get upset
17  you don't want to do anything.

18    MR. OLIVER: Have you ever seen the original of this document?

19    MS. HANKINS: I have never seen the paper. I've never seen a copy of it until when my lawyer
20  present me with a copy.

21    MR. OLIVER: Your lawyer that you had prior to me.

22    MS. HANKINS: Prior to you, yes.

---

49 of 83

1   MR. OLIVER: Alright. With regard, you, do you, you, is it your testimony that you do not believe
2   at the time of September 1, 2007 when you signed this document, you do not believe you still owned
3   Holly Springs property?

4   MS. HANKINS: No.

5   MR. OLIVER: Alright. Did you ever have the umm the use that, alright well, well let me ask you
6   this. At the time, September 1, 2007 were you using the Holly Springs property?

7   MS. HANKINS: No, because umm finish he build it was sold.

8   MR. OLIVER: Okay 'cause I'm reading the language and it says 'husband agrees to allow wife to
9   continue to use

10   MS. HANKINS: We have never lived in Holly

11   MR. OLIVER: the real property'.

12   MS. HANKINS: Springs before. Never.

13   MR. OLIVER: You've never used that house.

14   MS. HANKINS: I left Jamaica; I left Jamaica in October 29, 2002 and moved into 2209 Fieldgrass
15   Place.

16   MR. OLIVER: Okay. 1009.

17   MS. HANKINS: That's correct.

18   MR. OLIVER: Not 1209.

19   MS. HANKINS: No, 1009.

20   MR. OLIVER: Okay. Thanks. With regard to the two (2) business entities that we've been talking
21   about, alright.

22   MS. HANKINS: Yes, sir.

23   MR. OLIVER: Did you do work for either one of them during the marriage?

Heather H. Bath
AOC Approved Transcriptionist

---

51 of 83

1   MR. OLIVER: What is that document?

2   MS. HANKINS: That is the Affidavit that I filled out.

3   MR. OLIVER: Okay. If I may approach. That's your, that's your signature on it?

4   MS. HANKINS: Yes, it is.

5   MR. OLIVER: Notarized. I'm gonna turn to page umm 5 of 34 of this document and there you
6   list a lot of pieces of real estate okay.

7   MS. HANKINS: Yes, sir.

8   MR. OLIVER: Umm now those pieces of real estate were generally owned in the name of the
9   two (2) corporations. Would that be a fair statement?

10   MS. HANKINS: Umm that's correct except for I would wanna say for

11   MR. OLIVER: Let, let me stop you there for a second. Is that all the real estate at the date of
12   separation? You or the companies owned.

13   MS. HANKINS: Yes.

14   MR. OLIVER: Okay. And then when, we talked about the big dump trucks that the companies
15   also own. Correct?

16   MS. HANKINS: That's correct.

17   MR. OLIVER: Would it be a fair statement that the vast majority of the value of your marital
18   estate would be the properties, whether owned by individually or by the corporation and the dump
19   trucks?

20   MS. HANKINS: That's correct.

21   MR. OLIVER: Okay. Not, no retirement accounts?

22   MS. HANKINS: No.

23   MR. OLIVER: Not a lot of cash in the bank?

Heather H. Bath
AOC Approved Transcriptionist

---

50 of 83

1   MS. HANKINS: Well I did, well when I got here umm I didn't do much work for Omar
2   Construction. I didn't do, I don't think I did anything for Omar Construction.

3   MR. OLIVER: During the course of the marriage what work did you do for either one of these
4   companies?

5   MS. HANKINS: Sardia Enterprises mostly.

6   MR. OLIVER: What did you do for Sardia Enterprises?

7   MS. HANKINS: Sardia Enterprises is the one that consists of all the business was for that. I do
8   the paperwork for Sardia Enterprises and also for the trucking.

9   MR. OLIVER: And what did you, what did you do?

10   MS. HANKINS: Well this portion of the trucking I have to call all the clients and dispatch all the
11   trucking. Also too I also have to go pick up the checks for all the trucking. For the building I have to, for
12   the construction work part of it – for the building, yes when Omar was in, Tim was in New Orleans umm
13   he uninteligible build a house that was back in G-Street and it was sold. He collect the money on that
14   check and went back to New Orleans with it. Secondly umm what I did with umm the trucking also too
15   was I would supply him his workers with food and I would also sometimes go to Lowe's to buy materials
16   when he would send me to go to Lowe's. So I mostly, mostly I would do most of these stuff.

17   MR. OLIVER: Okay. Now the, hold on just one second. Talk about the marital estate itself.
18   Alright. On the date of separation you, you're contending that y'all own certain properties, certain
19   businesses that you've listed on your EO Affidavit and we've talked about. If I may approach, Judge.

20   THE COURT: You may.

21   MR. OLIVER: Judge, I'll put a stick – I, I believe I'm on 10. 9 was not admitted

22   THE COURT: You are on 10.

23   MR. OLIVER: Am I on 10? I'm gonna hand you what I'm going to mark as Exhibit 10 when I find
24   the sticker and ask if you can identify that please. Do you recognize that document?

25   MS. HANKINS: Yes, sir.

Heather H. Bath
AOC Approved Transcriptionist

---

52 of 83

1   MS. HANKINS: No.

2   MR. OLIVER: Your marital estate is the, the objects the real estate or the trucks that we are
3   talking about here today.

4   MS. HANKINS: That's correct.

5   MR. OLIVER: That's the extent of it. Judge, I'm gonna move to admit Exhibit 10.

6   THE COURT: Any objections to Plaintiff's Exhibit 10?

7   MR. HANKINS: I need to see it.

8   MR. OLIVER: Okay.

9   CLERK: Unintelligible.

10   MR. OLIVER: Yes, I did.

11   CLERK: Okay.

12   MR. HANKINS: Alright, I have no objections.

13   MR. OLIVER: Alright. Sardia coming out of the marriage after the date of separation, okay, can
14   you tell the Court how much of any of these pieces of properties or trucks, things of significant value,
15   that you, you have in your possession or were given possession of at the date of separation?

16   MS. HANKINS: I wasn't given anything.

17   MR. OLIVER: Alright. And of the marital estate, the total marital estate, what, what type of
18   property out of the marital estate have you received so far?

19   MS. HANKINS: I have not received any.

20   MR. OLIVER: Well what about and the furniture was left at the marital house?

21   MS. HANKINS: Yes.

22   MR. OLIVER: And no cash in the bank, anything

Heather H. Bath
AOC Approved Transcriptionist

---

1   MS. HANKINS: No.

2   MR. OLIVER: unintelligible from the marital estate?

3   MS. HANKINS: Nothing at all.

4   MR. OLIVER: And what control, if any, do you have over either of the two (2) corporations?

5   MS. HANKINS: I don't at this moment.

6   MR. OLIVER: Judge, that's all I have.

7   THE COURT: Alright. Okay. Umm, Mr. Hankins do you have any questions for Ms. Hankins?

8   MR. HANKINS: I do.

9   THE COURT: Okay.

10   MR. HANKINS: Umm, earlier you said something about 1009 Fieldgrass Place was titled in your

11   name or your both names?

12   MS. HANKINS: Yes, it was and I can exactly remind you when it was done. You had purchased a

13   piece of land from your mom back home, back in umm Bolivia and that's when you had umm changed

14   the title on the property because you went, when we had Fieldgrass Place your mom drive from Bolivia,

15   came to the house to sign the title. We went to the corner store to the notary down there to do the,

16   sign it.

17   MR. HANKINS: Well, did your lawyer or either one of you guys bring anything in reference to

18   that?

19   MS. HANKINS: I can't, I saw it there the day and I can present it. I didn't know it was gonna be

20   an issue today.

21   MR. HANKINS: So if I went on the Wake County website I would see something in reference

22   MS. HANKINS: I don't know what you have done with it, Mr. Hankins; you have done with it, Mr.

23   Hankins, Tim, but it was signed because you were in control of everything.

Heather H. Bath
AOC Approved Transcriptionist

---

1   MR. HANKINS: Okay. So umm let me see. You stated that uhh, do you recall telling the Court

2   that while I was in New Orleans that you had no money? Do you recall telling the Court that in August?

3   MS. HANKINS: I don't quite remember if I did, but yes, when you unintelligible calling, we were

4   having yes, difficulties. Yes, we were.

5   MR. HANKINS: So is it your testimony that while I was in New Orleans you had no money?

6   MS. HANKINS: We had money I could buy food, a little food now and then, but you were

7   the one responsible for paying all the bills and all those subs those. I didn't have any control over any of

8   this stuff, Tim.

9   MR. HANKINS: Okay. Umm, let's see. So, so you're saying when I was in New Orleans, you're

10   saying you was buying materials, you were running the truck and all those things. Is that, that was that

11   not your testimony?

12   MS. HANKINS: Yes, I was running the truck and which you know we were working with Lane

13   Construction at the time, but I was under the advice of everything that you told me to do.

14   MR. HANKINS: Well how were you doing that without money? Could you explain that to the

15   Court please?

16   MS. HANKINS: But Tim, it would be advice by you telling me what to spend and where to spend

17   it.

18   MR. HANKINS: But no, that's not what you had the Court to believe. You had, you just said you

19   had enough money to buy food and stuff. That's different than putting fuel in dump trucks and

20   everything else. That's a whole different ball game. You, you just sit there a few minutes ago and

21   testified

22   THE COURT: Mr. Hankins. You, you gotta ask her a question

23   MR. HANKINS: Okay, I'm sorry. Alright.

24   THE COURT: and not argue with her. Okay.

Heather H. Bath
AOC Approved Transcriptionist

---

1   MR. HANKINS: Alright. But isn't it true Ms. Hankins that you had plenty of money while I was in

2   New Orleans?

3   MS. HANKINS: Mr. Hankins, Tim, I cannot say I did have plenty of money. It's not my record,

4   but what I have access to is what you can tell me what to do. Such as the purchasing the materials for

5   building the house – yes. You tell me what to do and where to get that money. Any money that has

6   been spent you have to advise what is that. That's what has always been in the marriage.

7   MR. HANKINS: Do you recall while I was in New Orleans, since you speak about that, do you

8   recall sending me any money?

9   MS. HANKINS: Yes, you told me to send you some money and it was on the sale of a

10   property.

11   MR. HANKINS: So it's your testimony that when G-Street sold I came up and went back with

12   that money.

13   MS. HANKINS: When G-Street was sold, because I was new to, to the area I cannot exactly tell

14   exactly where it was, where we did the closing, but when G-Street was sold it was me and my cousin,

15   Sherry, we went to the closing. You met us there as

16   MS. HANKINS: Well – excuse me.

17   MS. HANKINS: soon as the closing was finished.

18   MR. HANKINS: I object, Your Honor, I simply asked you a question.

19   MS. HANKINS: Repeat your question, please.

20   MR. HANKINS: You stated that when G-Street sold that I came to Raleigh and left with the

21   money.

22   MS. HANKINS: Yes, sir.

23   MR. HANKINS: Okay. And uhh so again just to make sure I'm clear it's your testimony

24   that other than food money you had no money.

Heather H. Bath
AOC Approved Transcriptionist

---

1   MS. HANKINS: Tim, you know and I know the truth here. Based on what has been in the house

2   is what you been told to spend on food that was it and what else was spent in the business to do

3   particular what you want me to do.

4   MR. HANKINS: Okay. May I approach her, Your Honor?

5   THE COURT: Yeah, sure.

6   MR. OLIVER: Can I see real quick what you have? Oh I see, 11-30.

7   MR. HANKINS: Okay. That is a wire transfer from, would you tell the Court who that wire

8   transfer is from?

9   MS. HANKINS: That was from me.

10   MR. HANKINS: And who did you send that money to?

11   MS. HANKINS: It was sent to you.

12   MR. HANKINS: And tell the Court what the amount was.

13   MS. HANKINS: It was $60,000.

14   MR. HANKINS: And what was the date of that transfer?

15   MS. HANKINS: That was 11-30-05.

16   MR. HANKINS: OS. Your Honor, I'd like to enter that in as evidence.

17   MR. OLIVER: No objection to it.

18   THE COURT: Okay. Uhh Court receives Defendant's Exhibit 1. Can you bring that over here Mr.

19   Hankins? Okay. Thanks.

20   MR. HANKINS: That also is a wire transfer.

21   MR. OLIVER: Judge, at this point I'm gonna ask that he that identified by the witness as to what

22   it is and does she recognize it before she starts testifying from it.

Heather H. Bath
AOC Approved Transcriptionist

---

57 of 83

1    THE COURT: Umm, sustained. You have to lay a foundation for it first. Sir, you can't testify as
2    to the

3    MR. HANKINS: Okay. Would you tell the Court what that is?

4    MR. OLIVER: Again, she'd be just saying what the paper says that it is. The question would
5    properly be Judge, does she recognize that as, that document. Can she identify what it is.

6    MR. HANKINS: Your Honor, I already know she uhh never seen it. It's just a wire transfer.

7    MR. OLIVER: If she's never seen it then she can't

8    THE COURT: Well

9    MR. OLIVER: identify it and that

10   THE COURT: If she's never seen it,

11   MR. OLIVER: won't come in that way.

12   THE COURT: then she, you can't enter the evidence if she's never seen it and doesn't have any
13   idea what it might be. You're gonna have to figure out another way to get the evidence entered.

14   MR. HANKINS: Ms. Hankins.

15   MS. HANKINS: Yes.

16   MR. HANKINS: Ms. Hankins, so you, you explain to, where I, where I'm getting your, where
17   you're going is that is basically I controlled ever, all the money. Is that what you're trying to get the
18   Court to understand?

19   MS. HANKINS: Tim, as I can say, yes.

20   MR. HANKINS: Uhh Ms. Hankins, over the period of the marriage did you ever start any other
21   corporations?

22   MS. HANKINS: Well Sardia Enterprise was started in 2003. It was a corporation at first because
23   you were trying to do away with Omar Construction and umm that's where Sardia Enterprise came in

Heather H. Bath
AOC Approved Transcriptionist

---

58 of 83

1    and then you changed Sardia Enterprise to an LLC where both of us become liable, a liability because it
2    was a sole proprietor at the time, but it was just Sardia back in 2003. It was a corporation at first because
3    what year it was, there we Sardia Enterprize started in with a "z" under your instruction and the reason
4    for that is because of some fraudulent that transaction that you had done with Sardia Enterprise, LLC
5    with Sun Trust and they close the bank and you told me to open one at Four Oaks Bank, with Sardia
6    Enterprize, with a "z". Those are the only two (2) companies.

7    MR. HANKINS: So during this time do you, did you take out any big loans or anything like that
8    where you had your own personal money?

9    MS. HANKINS: No, I've never taken out any big loans.

10   MR. HANKINS: Okay. May I approach, Your Honor?

11   THE COURT: You may.

12   MR. HANKINS: Ms. Hankins, would you examine that document please? Would you tell the
13   Court what that is?

14   MR. OLIVER: Again Judge, it'd be does she recognize it first and if her signature is on it whether
15   that's her signature or not.

16   THE COURT: Sustained.

17   MR. HANKINS: Do you recognize that Ms. Hankins?

18   MS. HANKINS: No, I can't recall this document.

19   MR. HANKINS: Okay. Your Honor, at this time I have no other questions for her.

20   THE COURT: Okay. Any re-direct?

21   MR. OLIVER: Couple of, couple of follow-ups, Judge. Umm, you were asked whether or not
22   you'd ever taken out any big loans on cross and you said no and throughout the testimony by Mr.
23   Hankins and in multiple filings with the Court he's alleged that you and an attorney stole various
24   amounts of money. Do you recall that?

Heather H. Bath
AOC Approved Transcriptionist

---

59 of 83

1    MS. HANKINS: I heard it.

2    MR. OLIVER: And sometimes it's some $400 and some thousand and sometimes it's half a
3    million and sometimes it's a million dollars. Have, have you ever, do, do you even know what he's
4    talking about?

5    MS. HANKINS: No.

6    MR. OLIVER: Alright. Did you ever steal or take or inappropriately get any kind of money from
7    Mr. Hankins?

8    MS. HANKINS: No.

9    MR. OLIVER: Do you recall the attorney that alleges that you were conspiring with? Do you
10   remember?

11   MS. HANKINS: The attorney is David Shearron, which is Mr. Hankins' umm lawyer as uhh before
12   I get, before we were married was his real estate lawyer.

13   MR. OLIVER: And at some point after you were married to Mr. Hankins did Mr. Hankins
14   complain to the North Carolina State Bar about a transaction that that lawyer conducted?

15   MS. HANKINS: Yes, he did.

16   MR. OLIVER: Do you know what happened to that lawyer, about what he conducted?

17   MS. HANKINS: He was umm, it's, unintelligible, sorry about that, its life it was – yes.

18   MR. OLIVER: Do you remember what he failed to do that the State Bar disciplined him for?

19   MS. HANKINS: Well as to Mr. Hankins because he was the one that filed the papers 'cause he
20   told me he was filing it on behalf of us because he was trying to stole our property on 411 Loop Road.
21   That's what he advised me it was for. I think it was over some $50,000 that he had paid the lawyer to
22   close on the land.

23   MR. OLIVER: Mr. Hankins had paid the lawyer to close on the land.

Heather H. Bath
AOC Approved Transcriptionist

---

60 of 83

1    MS. HANKINS: Give the, yes. Gave it to David Shearron to finish paying off the property, off the
2    land and then the lawyer did not give the money to the, to the seller or something like that.

3    MR. OLIVER: Okay. That's all I have, Judge.

4    THE COURT: Do you have any umm re-cross, just off that of that re-direct?

5    MS. HANKINS: Yes. I just have one or two (2) questions about 411 Loop Road. Umm you do
6    admit that the property was in your sole name alone. Is that correct?

7    MS. HANKINS: That's correct.

8    MR. HANKINS: And umm, umm at this point Your Honor, you uhh, did you do any other
9    transactions with Mr. Shearron? Did you and Mr. Shearron do any other transactions?

10   MS. HANKINS: I would never go to Mr. Shearron office unless you send me to either drop paper
11   or something like that. Not that I recall of.

12   MR. HANKINS: I think I have no further questions, Your Honor.

13   THE COURT: Mr. Oliver?

14   MR. OLIVER: No, Judge.

15   THE COURT: You can step down.

16   Recess

17   THE COURT: Umm, do you have any evidence you'd like the Court to consider regarding the uhh
18   Post-Nuptual Agreement?

19   MR. HANKINS: I do, Your Honor, but may I, take a, run to the restroom for like two (2) minutes
20   please? I'm taking those high blood pressure medicine and when it acts up, it acts up.

21   THE COURT: Okay. We'll give you two (2) minutes. Court is in recess.

22   Recess

23   THE COURT: You ready to proceed?

Heather H. Bath
AOC Approved Transcriptionist

---

**61 of 83**

1     MR. HANKINS: I am, Your Honor. Your Honor, do I have to come up here or can I do mine from

2   here?

3     THE COURT: You can go, you can sit down there and when it comes to cross examine you we'll

4   have you uhh come up here.

5     MR. HANKINS: Okay.

6     THE COURT: Umm, tell you, I just wanna be clear Mr. Hankins we're on your, on the Post-

7   Nuptual Agreement. So I want to hear evidence about the validity of the Post-Nuptual Agreement. I

8   understand that you've got significant issue with what you agree, would, you contend Ms. Hankins has

9   made off with a lot of money over a period of time umm, but I'm worried about marital property and

10   the hearing of your Post-Nuptual Agreement on the distribution of that marital property.

11     MR. HANKINS: I think I, I think I understand you, Judge.

12     THE COURT: Yeah, not whether I'm worried about

13     MR. HANKINS: Alright.

14     THE COURT: Page 2 of your Post-Nuptual Agreement. All the other stuff is relevant and we're

15   gonna get to it eventually when we have a hearing, but today we're talking about the Post-Nuptual

16   Agreement, which will then let us know how much stuff we're talking about if and when we get to your

17   ED trial. Okay. I don't want the whole ED trial today is what I'm saying.

18     MR. HANKINS: Okay.

19     THE COURT: Okay. Alright. Go ahead.

20     MR. HANKINS: Alright and I'm sure if I start drifting off Mr. Oliver will reel me back, Mr. Oliver

21   will reel me back in, but Your Honor I want to uhh submit this loan in, if nothing else but illustrative

22   purposes where Ms., Ms. Hankins is claiming it, if I can that she had no money so I would like to submit

23   that In as first as evidence, if possible. If, if that's not in line I understand. I mean, I heard what you said.

24     THE COURT: Okay. Well what would that, what, what hearing would that have on the Post-

25   Nuptual Agreement?

---

**63 of 83**

1     THE COURT: So I wanna hear about if you've got anything to shed on the execution of the

2   Agreement, which is the signing of the Agreement and whatnot. I'm happy to hear that. If you've got

3   anything that addresses some of the uhh points that Mr. Oliver made; I'm happy to hear that also.

4     MR. HANKINS: Alright. I'll tell you what. He spoke about the house, 1009 Fieldgrass Place. We

5   all talked about it. Can I present my evidence on it?

6     THE COURT: Sure.

7     MR. HANKINS: On uhh 1009 Fieldgrass Place. Alright. Well I think it's clear, Your Honor, I would

8   like to take – now she mentioned this guy's name and I would like to submit this in as, 'cause she talked

9   about him, I didn't – my brother, my twin brother. We have a difference of about fourteen [14] months

10   and the reason it's so important is, the reason I feel it's important in this whole matter when we talk

11   about the house, which he talked about, it's my brother who convinced her to take the money out the

12   house. He's the one that's been leading the way on her. So I just have just a picture and I'm ready to

13   show

14     THE COURT: I can tell you. The only thing I'm worried about the house looking at y'all's

15   Agreement is whether or not the house was a marital asset. You

16     MR. HANKINS: Okay.

17     THE COURT: contend that it was titled

18     MR. HANKINS: Understood, Your Honor.

19     THE COURT: In your name and it wasn't a marital asset

20     MR. HANKINS: Alright. Gotcha.

21     THE COURT: and she has said there's

22     MR. HANKINS: Alright.

23     THE COURT: Just let me narrow it down for you and I understand that it's, we keep slicing this

24   case. So

---

**62 of 83**

1     MR. HANKINS: Well the Post-Nuptual Agreement was signed by the sheer, all the money that

2   got missing, which would include this document because she secured a $35,000 loan with cash in her

3   savings.

4     MR. OLIVER: I'm gonna object if he's gonna start testifying from a document that's not been

5   entered into evidence.

6     THE COURT: Well I'm gonna, I'm not gonna take it as it's from the document. I, I think he's

7   telling me why he thinks the Post-Nuptual Agreement can even being we took a little bit of that

8   testimony from your client so I'll take it as background information. I'm not gonna take it as

9   unintelligible.

10     MR. OLIVER: Okay. I, I

11     THE COURT: Go 'head.

12     MR. HANKINS: Okay. So do I get to submit it in if nothing else but for illustrative purposes when

13   we're talking about the purpose of the Agreement and why it came to be. It was just a vast amount of

14   money that got missing prior to the Agreement.

15     THE COURT: Okay. Well and I understand that that's your contention as to why we got the

16   Post-Nuptual Agreement.

17     MR. HANKINS: Okay.

18     THE COURT: I'm not necessarily

19     MR. HANKINS: Okay.

20     THE COURT: I'm not necessarily concerned as to why there is a Post-Nuptual Agreement. I'm

21   concerned as to whether or not the Agreement is valid. Okay.

22     MR. HANKINS: Whether it's valid. Okay.

23     THE COURT: Okay.

24     MR. HANKINS: Alright.

---

**64 of 83**

1     MR. HANKINS: I know. I know, Your Honor.

2     THE COURT: Paragraph 2 says the "parties own real property jointly as husband and wife

3   located in the State of North Carolina and the husband agrees to allow the wife to continue to use the

4   real property titled jointly in the parties name and to pay all indebtedness owed on the real property."

5   I'm interested to know what real property that speaks of.

6     MR. HANKINS: Okay and the validity of the Agreement.

7     THE COURT: Well

8     MR. HANKINS: In paragraph 1, may I speak about paragraph 1 or do

9     THE COURT: Well

10     MR. HANKINS: I have to what John Oliver talked about?

11     THE COURT: I wanna know what property y'all owned jointly at the time of the execution of this

12   Agreement.

13     MR. HANKINS: Would be

14     THE COURT: What's the property in paragraph 2 in your Agreement is talking about.

15     MR. HANKINS: Okay. The property uhh in paragraph 2 would be a lot down in Holly Springs.

16   Uhh it's a small lot, but it's a lot down in Holly Springs. That was the only thing that was in our name if,

17   if, if 1009 Fieldgrass Place was at anyway, like Ms. Hankins already testified, that it was deeded in both

18   our names – that's not true. That's just simply not true.

19     THE COURT: Well so if there's a bunch of Deeds of Trust that are umm filed with, with the

20   Register of Deeds and both of you are listed on the Deeds of Trust encumbering it what, what would

21   that mean?

22     MR. HANKINS: Oh, okay. Well then

23     THE COURT: That she was paying for it, but it wasn't hers?

24     MR. HANKINS: Say it again?



65 of 83

1    THE COURT: Would that mean that she was on the loan, but it wasn't hers? She had agreed to
2    pay for it, but it's not her house?

3    MR. HANKINS: Well she wasn't working. I was working. I borrowed the money on the house to
4    build a garage and that so may be, and that too may be irrelevant, but I borrowed money. The house
5    was paid for and I, I see where it's going. I borrowed the money on the house

6    THE COURT: I understand. I'm, I'm

7    MR. HANKINS: Go 'head.

8    THE COURT: I, I don't know where anything's going right now, Mr. Hankins. I'm just trying

9    MR. HANKINS: I understand.

10    THE COURT: I'm just trying to figure out uhh let's, so you're saying you had a lot in Holly Springs
11    that you jointly owned at the time and

12    MR. HANKINS: And I would like to enter this into evidence. This is the only property that we
13    have in our name. The rest of the property that was in our name, Ms. Hankins sold and took the money.

14    THE COURT: Okay. Well so you have a lot in Holly Springs. Paragraph 2 says umm that you
15    agree to allow to continue to use the real property that's titled jointly in your – how was she using the
16    lot at that time?

17    MR. HANKINS: Well we had a house on the property and, and in all the mix-up between the
18    attorney and, and all the money got missing, the house got sold and the money disappeared. That's the
19    best I can put it.

20    THE COURT: Well

21    MR. HANKINS: and it left this piece of land beside it.

22    THE COURT: Okay.

23    MR. HANKINS: But that

Heather H. Bath
AOC Approved Transcriptionist

---

66 of 83

1    THE COURT: Your, your Pre-Nupt says you agree to allow her to continue to use the real
2    property – how was using the real property that this paragraph refers to?

3    MR. HANKINS: At the time, at the time, I, alright if we move to 4723 G Street, let's just say that
4    was

5    THE COURT: No, I don't want a hypothetical. Y'all are, here's, let me

6    MR. HANKINS: I understand.

7    THE COURT: Y'all went in, y'all went into your, from the way I understand it, y'all went into your
8    business office and there was a notary there and that y'all signed this Post-Nuptial Agreement. Right?

9    MR. HANKINS: That's correct.

10    THE COURT: Is that correct?

11    MR. HANKINS: Yes.

12    THE COURT: And so at the time and that was on September 1st. Right – 2007?

13    MR. HANKINS: That, that sounds right.

14    THE COURT: Is that correct?

15    MR. HANKINS: Uhh-hmm.

16    THE COURT: So the 1st day of September, 2007. So on September 1, 2007 which real property
17    was Ms. Hankins using that was jointly titled in your and hers name?

18    MR. HANKINS: Well I guess she wasn't using, she was not using the property that was jointly in
19    both of our names. Umm, Ms. Hankins always, once she got the money, she got the money, she was
20    always talking about leaving. John Oliver made reference

21    THE COURT: Okay and I, I, I understand that.

22    MR. HANKINS: Alright, alright.

23    THE COURT: You just, you say that she took a bunch of money

Heather H. Bath
AOC Approved Transcriptionist

---

67 of 83

1    MR. HANKINS: So

2    THE COURT: and that she transferred a bunch of money

3    MR. HANKINS: Alright.

4    THE COURT: and she was using it.

5    MR. HANKINS: So

6    THE COURT: I'm just, I'm, I'm gonna take baby steps

7    MR. HANKINS: I know I

8    THE COURT: Mr. Hankins. I'm a very, very, very, I'm a very simple guy and I just wanna move
9    through

10    MR. HANKINS: Alright.

11    THE COURT: this one piece at a time. The, on the date that you executed this Agreement you
12    agreed to allow her to continue use real property. That implies that she was using some real property
13    that was jointly titled. I just wanna know which real property that is.

14    MR. HANKINS: Well the only property that was jointly titled would be this, this piece of property
15    down here. This one piece, lot in Holly Springs.

16    THE COURT: Okay and so, if it's the lot in Holly Springs

17    MR. HANKINS: Let me

18    THE COURT: Let me finish my line of questioning

19    MR. HANKINS: Go 'head.

20    THE COURT: before you knock me off my train,

21    MR. HANKINS: Alright.

Heather H. Bath
AOC Approved Transcriptionist

---

68 of 83

1    THE COURT: my train of thought. Okay. Umm, so you got a lot in Holly Springs. Was, was there
2    any indebtedness on that lot in Holly Springs?

3    MR. HANKINS: The only thing that was owed on it was uhh taxes, just taxes owed on it.

4    THE COURT: Okay. And it was an empty lot?

5    MR. HANKINS: It is.

6    THE COURT: Okay.

7    MR. HANKINS: But—may I?

8    THE COURT: Now you may.

9    MR. HANKINS: Alright. If 4723, Your Honor, I guess when I think about, I never, John Oliver,
10    made reference to all this money got missing and you stayed together for eight (8) years – I dealt with it
11    to, to uhh, to preserve the stability of the children. I didn't wanna, I don't care, to me regardless of what
12    money got missing, it still didn't mean enough to me to even wanna press charges against her or push
13    her out the house or anything of that nature. The, the, I just didn't wanna go there and if, if, if uhh the
14    house at 4723 G Street, I don't have, I didn't have a problem taking care of her a place to stay. Again to
15    preserve the stability of the children I lost Ms. Hankins to leave that house. I never forced her,
16    never bothered with her, I never asked her to leave that house. The reason Ms. Hankins left that house,
17    she had, just like when she took the money – we all clear about that, but it's not today – the reason Ms.
18    Hankins left the house, the reason she abandoned the marriage and abandoned the house was for the
19    same reason everything else is happening. If I can, I would like to present my, the primary reason 'cause
20    I wasn't even living in the house with her when she left. I was leaving in the crawl space. We weren't
21    sleeping together. I dug out, cut the rooms, put a bedroom down there and like a kitchen space and a
22    little living room under the house is where I was staying at when she left. So I go from living in a 6,000
23    square foot house to living under her house to preserve the stability of my children. What caused Ms.
24    Hankins to leave that house, what caused her to leave that house – this right here. She knows exactly
25    what that is. She can play all the games that she want.

Heather H. Bath
AOC Approved Transcriptionist

## 69 of 83

1  THE COURT: What, what, well and that's, and that may bear on any other factors that the Court
2  considers once it gets time to distribute your property, Mr. Hankins.

3  MR. HANKINS: But

4  THE COURT: But I'm here

5  MR. HANKINS: Just

6  THE COURT: about the Pre-Nuptial Agreement.

7  MR. HANKINS: But John Oliver's trying, I'm trying to make the argument that I didn't, even if we
8  put, if we talked about 4729 I never pushed her out of the house. I never bothered her to get out the
9  house. That's the house we were living in if everybody wanna talk about a house. She up and left on
10  her own. She induced a lot of problems. She induced a lot problem.

11  THE COURT: But now, 4729 wasn't jointly titled to either of you — was it?

12  MR. HANKINS: It wasn't jointly titled.

13  THE COURT: Okay. And was there a, a mortgage on 4729?

14  MR. HANKINS: No, sir. It wasn't.

15  THE COURT: Okay.

16  MR. HANKINS: My mom and them — once I got back from Louisiana and all that money was
17  gone, my mom and them gave me quite a bit of money because I come back and all the money was
18  gone. Couldn't stay at Fieldgrass Place 'cause the payment was $3,800 — from zero to $3,800. So I had
19  some things I had to work out to try to hold the family together — period.

20  THE COURT: Well how did the payment for Fieldgrass Place go from zero dollars to $3,800?

21  MR. HANKINS: Oh when I first bought the place I paid for it in full. I borrowed $326,000 like
22  three (3) years after I bought it, which would be 2003. I took that money and this is where 411 loop
23  Road came in and the houses in Holly Springs, which all that money saying it disap, went missing, when
24  Ms. Hankins and Mr. Shearon wound up with 411 Loop Road up until I got the money back in 2015. So I

Heather H. Bath
AOC Approved Transcriptionist

## 70 of 83

1  borrowed the money on the house uhh built a couple of houses in Holly Springs and the intent was to
2  build a garage and before I knew it all that money and I was left with a $3,800 house payment. Every
3  dime of it was gone.

4  THE COURT: Were you only one on the Deed of Trust at that point?

5  MR. HANKINS: The Deed

6  THE COURT: How did

7  MR. HANKINS: The mortgage paper — she was on the mortgage papers.

8  THE COURT: Okay.

9  MR. HANKINS: Ain't no question about that. She was on the mortgage papers.

10  THE COURT: Okay. Well so she's on for the hook for a $3,800 payment too. Right?

11  MR. HANKINS: Say again?

12  THE COURT: Well

13  MR. HANKINS: Yeah.

14  THE COURT: She's beholden to pay $3,800 payment also.

15  MR. HANKINS: Yes, sir.

16  THE COURT: Because she's on the mortgage. Right?

17  MR. HANKINS: Yeah.

18  THE COURT: Okay.

19  MR. HANKINS: I guess my point is I own it free and clear and she's trying to say she don't have
20  any money or didn't have any money — she got every dime of that money.

21  THE COURT: And I

22  MR. HANKINS: Yeah, so we're back to the Agreement.

Heather H. Bath
AOC Approved Transcriptionist

## 71 of 83

1  THE COURT: I understand. What you gotta, what you gotta do, you gotta

2  MR. HANKINS: Keep 'em separated.

3  THE COURT: How much money — you gotta keep it separated from the Pre-Nuptial Agreement.
4  The two (2) are gonna come together eventually, but we're only dealing with one part at a time right
5  now.

6  MR. HANKINS: Understood.

7  THE COURT: Okay. So you bought the place outright in 2003.

8  MR. HANKINS: Bought it in 2000.

9  THE COURT: In 2000.

10  MR. HANKINS: So I lived it in from 2000 to 2003 without a payment.

11  THE COURT: Okay.

12  MR. HANKINS: And since we keep talking about, can I enter, can I bring the picture, I guess an
13  exhibit up of my house?

14  THE COURT: Sure.

15  MR. OLIVER: In 2001 he built the house on that lot.

16  THE COURT: Hmm.

17  MR. OLIVER: Alright so you bought it unintelligible. You bought cash for it and then he put a
18  house on it.

19  MR. HANKINS: Do you need to see this?

20  MR. OLIVER: Uhh-hmm. It's just photos of the house? That the interior? This is 1009 — all of
21  this?

22  MR. HANKINS: Yes.

Heather H. Bath
AOC Approved Transcriptionist

## 72 of 83

1  MR. OLIVER: Okay. Which one is this going to? Unintelligible. Is this the mortgage, are you
2  saying this is the mortgage on that now? Okay. Need to kind of do them separately. Those are photos
3  and this is a document.

4  MR. HANKINS: I'd like to enter in unintelligible he's looked at all of 'em, photos of the house.
5  This would be in Wake County the day I bought it and the day I lost it and then that will show the date
6  that I borrowed the money on the house. This would be the actual value of

7  THE COURT: Did you see all this stuff, Mr. Oliver?

8  MR. OLIVER: I did and the only one I, I — if I can approach real quick — the last one being the
9  value of the house if I can look at that. I may have an objection to that.

10  THE COURT: The photos would be marked as Defendant's Exhibit 2.

11  MR. OLIVER: I don't have an objection to the photographs and I, I don't have an objection to the
12  statement of what the Deed of Trust is that he says was on it that was the mortgage obligation whatever
13  number that one is

14  THE COURT: Okay. That will be Defendant's Exhibit 3 — would be Deed of Trust for 1009
15  Fieldgrass Place.

16  MR. OLIVER: And I'm gonna, I'm gonna object to the last piece of this inasmuch as it purports to
17  state values at different times and I don't even know it's the back page of some, looks like a loan
18  application or something, but I'm gonna object to that part of it.

19  THE COURT: Okay. Well I'll, I'll sustain the objection and I wouldn't accept the values anyway
20  'cause I think we're getting a bit

21  MR. OLIVER: Far field.

22  THE COURT: Far field here.

23  MR. OLIVER: Yeah.

Heather H. Bath
AOC Approved Transcriptionist

73 of 83

1    THE COURT: Umm, so to speak, but I'm gonna take Defendant's Exhibit 2 is the photograph.
2    Defendant's Exhibit 3 is the uhh Deed of Trust and Defendant's Exhibit 4 is a copy of the Wake County
3    Real Estate Data and ownership history for 1009 Fieldgrass Place. Okay.

4    MR. HANKINS: Alright.

5    THE COURT: Okay, go 'head, Mr. Hankins.

6    MR. HANKINS: Alright. Umm alright, Your Honor. Umm I'm trying to stay in line with what
7    we've got going on. Again I'm about to wrap it up when I, I tell you I never in no kind of way,
8    whatsoever, asked Ms. Hankins. She, she abandoned the home and then gets her lawyer to take the
9    home. I remind the Court what I testified earlier that I wasn't even living up there with her. Things were
10   that bad that I was living under the house. You know it, as a contractor I was able, you know, to get it a
11   couple of little rooms dug out in the bottom where I could stay down there just to kinda give her some
12   space. I'd like to enter in the picture, just a photo of where I was actually staying at. That would be the
13   entrance to where I was staying at when she left the house. My front door changed a little bit, Your
14   Honor, from the beginning to the end.

15   THE COURT: Any objection to Defendant's Exhibit 5?

16   MR. OLIVER: Well it's not relevant, Judge, but at this point it, it doesn't make any difference
17   either way.

18   THE COURT: Okay.

19   MR. OLIVER: It's not relevant.

20   MR. HANKINS: I think it is relevant, Mr., Mr. Oliver.

21   THE COURT: Well I, I'll, I'll take it on your argument, but I got a good sense where both of
22   you are and I got a good idea of what's gonna go on with your Pre-Nupt Agreement. This may be
23   relevant in your overall equitable distribution case and that's fine when we take that I can take that as a
24   statutory consideration. I don't know if you've alleged, I can't recall if you've alleged marital misconduct
25   or not. I don't know. I know you umm

---

74 of 83

1    MR. OLIVER: I don't know off the top of my head, Judge.

2    THE COURT: In any event, it may be relevant and I'll certainly hear about it.

3    MR. HANKINS: Understood, Judge.

4    THE COURT: Okay. Here's my umm concern and/or issue with the Pre-Nupt or the Post-Nupt
5    uhh umm, if it's valid I'm not sure Paragraph 2, based on what you show me has any, any sort of uhh
6    purchase or life umm because it specifically says uhh "real property titled jointly in the parties names"
7    and your contention is there's no real property titled in y'all's name, which means there's nothing for
8    her to continue to use umm or own. As I look down at Paragraph 3 umm it still talks about real property
9    and uhh part of my recollection from your, from our previous hearing and certainly from today's hearing
10   is, is that all the real property was held by two (2) corporations right now. So the titling of that real
11   property to me is a moot point. Umm its value that it adds to the corporations, which and them in and
12   of themselves are not real property. So it may be a valid Post-Nuptial Agreement. There's nothing for
13   it to apply to off of those two (2) paragraphs and when we get to trial I would expect, since we've talking
14   about real property for the last two (2) hearings that we've had, somebody would show me all the real
15   property and how it's titled and we got through some of that today and we got through quite a bit of it
16   and umm the Court's left with the impression that the real property is titled with uhh Sardia Enterprises
17   or Enterprise, which iteration that particular company is in right now and Omar uhh Trucking Company,
18   LLC. So the classification of those two (2) particular entities is of a great deal of interest to the Court
19   umm because if they're marital then that value has to be established umm and it has to be distributed if
20   we can, if and when we go forward on equitable distribution. Umm, which brings me to a further point.
21   They need to be joined and they need to be noticed if you're gonna ask me to do anything on an interim

22   MR. OLIVER: I understand, Your Honor.

23   THE COURT: distribution basis umm

24   MR. OLIVER: I'll, I'll if, when I'm in my closing I'll address, address that if you want me to.

25   THE COURT: Okay.

26   MR. OLIVER: If you want to heard at, during closing. I hope you do.

---

75 of 83

1    THE COURT: Umm, yeah I'm gonna, I'm gonna let both of you close, but I go through that
2    particular exercise that I did umm just to let you know where I am based on what you've given me and it
3    doesn't mean that I'm not interested in everything else you have. I think that all bears on equitable
4    distribution and what's equal and what's fair once the Court values umm any property that the Court
5    determines is marital, but based on the narrow issue that we were looking at today umm your Post-
6    Nuptial Agreement speaks specifically in terms of real property and I have yet to see any real property
7    that meets the definition that is set forth in your Post-Nuptial Agreement. So that means there's
8    nothing for the Court to apply that to. That doesn't mean that if you go on and you've been doing
9    discovery for close to two (2) durn years on this case I would think any real property would have come to
10   surface that's jointly titled in both of y'all's names. Umm if some pops up, then uhh I'll, I'll apply the
11   Post-Nuptial Agreement then. I, I think uhh, uhh procedural and unconscionability is extremely steep
12   hill in North Carolina.

13   MR. OLIVER: I understand that.

14   THE COURT: to, to climb. She went and she signed it umm it's, it's, I've got that. I'm, I'm gonna
15   leave it at that and I'm, I'm gonna hear some closings from y'all. Umm do you wanna waive your
16   opening?

17   MR. OLIVER: I do.

18   THE COURT: Okay. Mr. uhh Hankins, I'll let you argue first then.

19   MR. HANKINS: Your Honor, to be honest with you I don't know what to argue, but I'm gonna
20   give it a good shot. Umm,

21   THE COURT: Well let me

22   MR. HANKINS: I'm doing the same

23   THE COURT: I'm gonna help you out a little bit.

24   MR. HANKINS: I'm doing the same business that I've been doing since 1995. I don't, I'm not
25   going anywhere. I haven't disrupted any property. I've had to sell a lot to try to get the construction
26   company back up running so I don't see any reason why anything, any order needs to be entered until

---

76 of 83

1    uhh we make the ED, of any kind. Umm I just, I don't see it. Uhh, I mean, I'm doing the same business
2    that I've always done. I, I plan on always doing it. So uhh you know and I did testify and I don't know
3    what weight it may have, but I never asked her to leave, never pushed her out of the house. I done
4    everything I could to uhh you know to try to – my thing is the children. If I had to go back and do it all
5    over again I would for those three (3) kids. Take everything I've ever dealt with over those three (3)
6    kids. They are of the chain – worth every dime of it. So even during the time when the Agreement was
7    signed and this was going and that was going me and kids did three (3) things hand – played, are and
8    worked. They same hardworking kids. So I'm not going anywhere. I mean, I don't, I know he got some
9    kind of General Statute uhh going on there's a provision, I was thinking that we might and I know we
10   didn't get into the property that I owned prior to marriage, but that's not an issue today the fact that I
11   own more property today before I got married than I do now, we'll get into that later, but I don't think
12   there's no, no order and again, I'm hero byrmyself, but uhh I, and I'm confident that the Court know
13   what's going on and will make the best decision. That's it for me.

14   THE COURT: Thank you. Mr. Oliver.

15   MR. OLIVER: Thank you, Your Honor. Umm I and in some ways I'm probably gonna parrot what
16   you just said and also what Judge Worley said when she entered the Preliminary Injunction, which is if
17   you read, if you read the Post-Nupt and then if all I'm talking about paragraph 3 umm it does deal
18   only with real property titled in his name individually or jointly and the evidence is what that is and you
19   don't have to determine – we're not here to divide the property. All we're asking for is a Declaration
20   from the Court that what this means is it's limited to affecting property that he owned at the time of the
21   signing individually or jointly. It had to have his name on it and to the extent a piece of property is not
22   owned either individually or him individually with someone else is not impacted by this Agreement and
23   the reason I have to make the argument I, because it seems to me very, very clear. The, the real estate
24   obviously most of it is owned by the corporations and the corporations themselves you'll have to
25   determine whether they're, they're marital or not and then you'll have to divide those, the value of
26   those. She doesn't waive any of the rights to go after what part she might have in those two (2)
27   corporations and that's what's gonna be the crux of the equitable distribution trial. Frankly it's going to
28   be how much of what those corporations own is marital property and how do you divide it. That's what
29   the crux is gonna be, because the corporations themselves, if you look at Exhibits 7 and 8, the

1  corporations themselves are marital property. They were created during the marriage. Now that may
2  not take away the arguments of yes, but they were funded with – right, or property was transferred to
3  them that I can trace back to separate property, that's a totally different issue. Totally different
4  issue. So because this Post-Nupt does not say and Sardia Hankins wants her right to any corporate
5  entity that may exist as of the date of this Agreement it, this Post-Nupt has no impact on the
6  corporations themselves. The reason I'm making this argument and filed that Declaratory Judgment is I
7  got the sense from the, the uhh, Mr. Axford's arguments at the Motion for Summary Judgment that
8  somehow he wanted to bootstrap the fact that the corporations owned the real estate into the
9  argument that she's waived her rights to the corporations and nothing could be further from the truth
10  and so Judge, I listened to you and I believe you, you would agree that that's what I hope you agree that
11  that is what, that is what the Post-Nupt impacts and if you look at Exhibit 3 Judge, remember I did the
12  Exhibit 3 and that was introduced and it shows when all the property was now. These aren't the deeds
13  and you're right we'll have to bring the deeds in, but it appears there may actually be one piece of real
14  estate that's gonna fit the definition under that Post-Nupt if you find the Post-Nupt to be valid – maybe,
15  but that doesn't change what we asking for the Court to declare is that that Post-Nupt has no impact on
16  the corporations themselves. She didn't waive any rights to them. Okay. That's issue number one.
17  Number 2 – I realize that unconscionability in procedure of signing a contract and unconscionability in
18  what it does is a really, really steep hill and frankly you heard her testimony as to how this all came
19  about and you may find that that may not have been even hands doing it, but she went in and she
20  signed it. I will say this umm I think the threats to her were real because she's the party of significantly
21  less power in this relationship inasmuch as she's come here from Jamaica, he calls the shots and does it
22  so that, that further impacts any statements he may make to her about whether he'll pay mortgages,
23  what happens to people that interfere with the property and how much she felt coerced by that.
24  Unconscionability – if you, if she, if you interpreted this Post-Nupt the way he wants to interpret it she
25  gets nothing. Zero. There's nothing to have. Period and that would make it unconscionable. Judge, I
26  don't think you have to make that decision today though. I think you can determine the, you can give us
27  what we need with a Declaratory Judgment without saying whether it's valid or it's valid. You can say I
28  don't know, but if it is valid this is what it means and that's really what I'm after is what does it mean. I
29  want for once and forever exclude the fact that this could possibly be interpreted having her waive her
30  rights to parts of these corporations because she didn't and it doesn't do that.

1  THE COURT: Well I can tell you – I don't think that it does that, but I don't think that gets you
2  out of the woods because I can foresee the argument that's going to be made and it's something that
3  both of you need to consider, which is I think corporation is not real property. If the Court classifies that
4  you – don't worry Mr. Hankins, you can sit down. If the Court classifies the corporations as marital, then
5  it has to value and distribute them. Umm if the Post-Nupt is valid umm I would expect umm Mr.
6  Hankins to ask the Court to read the Post-Nupt as umm bifurcating the value of the real property from
7  the corporations.

8  MR. OLIVER: I'm not sure how that's done – if the corporation owns the property

9  THE COURT: Well

10  MR. OLIVER: It owns the property and it becomes part of the value of the corporation. I'm not
11  sure, I'm not sure how that, that fits, that fits but

12  THE COURT: Umm, okay.

13  MR. OLIVER: The only other, the other argument I have on this and this is where we got about
14  the breach is that the paragraph regarding umm "husband agrees to allow wife to continue to use the
15  real property titled jointly in the parties name and to pay all indebtedness owed on the real property."
16  Well I know what property we're talking about and we know the indebtedness wasn't paid and we know
17  that that property was foreclosed on. The question is, is it jointly titled and what I would say to the
18  Court as, as it relates to a breach it's irrelevant because it's what they intended and what they intended
19  by that paragraph was for Sardia to be able to continue to occupy a residence, continue to use it and the
20  indebtedness would be paid on it and she wouldn't have to worry about that. So the fact that they said
21  jointly titled irrespective of whether that's true or not and it doesn't appear that it is true. It appears
22  that it was titled solely in Mr. Hankins' name. The Deed of Trust and everything would have been in
23  joint because there's not a mortgage company in North Carolina that's gonna give you a loan on a
24  property that a husband, that a husband owns, but is married. There's gonna have to be the wife
25  coming in signing and I think they may have been confused about the exact titling of it because they
26  both were on the Deed of Trust, but what I'm telling you for the Court to determine whether or not Mr.
27  Hankins breached this Post-Nuptial Agreement and therefore the Post, he can't enforce an Agreement
28  that he in material breach of and so irrespective of whether it's jointly titled or not the intent of that

1  paragraph was for her to occupy 1009 and for Mr. Hankins to pay the indebtedness on it. He did not do
2  that. The house was foreclosed on. He did not carry his part of the bargain. So he can't complain. He
3  can't enforce a contract which is in material breach of. So umm I, I, I think for equitable distribution
4  purposes it would matter in how you would look at it, even though the property doesn't exist anymore.
5  It's the circumstances surrounding that whole property, but what for what our argument was about
6  whether or not it's a breach of the contract to not fulfil your half of the bargain yet require the other
7  person to fulfil their half of the bargain, which you can't do. As far as the Interim Division goes I, we
8  talked about this, I think the way to handle that is that I can renew my Motion for an Interim Division
9  because clearly I was, he does, there are no assets that are in Mr. Hankins individual names. They're all
10  in, all in corporate names, for all intents and purposes. I don't know of any that are singularly in, in his
11  name that he can transfer uhh in here. So I can give proper notice to the corporations and renew my
12  Motion for Interim Division and then, then you'll have to decide whether it's appropriate to have one of
13  the corporations transfer some property or money to uhh Ms. Hankins.

14  THE COURT: Well I can't do that. I can't tell the corporation to transfer its' assets. I can, if you
15  can say Judge the corporation has at least $500,000 worth of value and we think that umm you can
16  distribute part of that value to uhh Ms. Hankins and require Mr. Hankins

17  MR. OLIVER: No, that's what, that's what I meant. I misspoke. You'd be ordering Mr. Hankins
18  to, to, to do something.

19  THE COURT: Okay.

20  MR. OLIVER: Okay. I understand that.

21  THE COURT: Right. You'd be, you'd be asking me say, Judge I, I want you or you want the Court
22  to distribute part of her value that

23  MR. OLIVER: Correct.

24  THE COURT: she might reasonably received

25  MR. OLIVER: Correct, but I understand the Court feels it can't do that at this juncture because
26  the corps did not get notice of hearing. They didn't get notice.

1  THE COURT: Right.

2  MR. OLIVER: So I, I understand that, but I think that's where and I would also remind the Court
3  there is a Preliminary Injunction in place that does require Mr. Hankins to do certain things before any of
4  the corporate property or any of his personal property is, is sold and I'll remind Mr. Hankins of that. I
5  think we can, if you will allow us to get back, give notice to the corps and get back in court I would like to
6  try to do that in fairly short order so that we can lock down, if the Court believes our position we can
7  lock down the sale of the properties and I think it's coming up on the Garner Street property that's
8  eighty percent (80%) complete, but the main thing out of today, Judge, is the uhh, the uhh, we believe
9  that the post, we've shown that the, the Post-Nupt is, is either unconscionable or that he's breached the
10  contact and it's not enforceable. I don't think you have to determine that today, but that I, but that we
11  absolutely have to have something that states that umm Sardia, this Post-Nupt does not impact Sardia's
12  interest, whatever that may be, in the two (2) corporations. Thank you, Judge.

13  THE COURT: You don't get any rebuttal, sir. You got to go first.

14  MR. HANKINS: Thank you, Your Honor.

15  THE COURT: All I'm talking about is your Post-Nupt. I'm, I'm gonna chew on that a little bit. I'll
16  let y'all know what Order is, is gonna happen. I will tell you that I don't think the Post-Nuptial
17  Agreement affects the value of the two (2), the two (2) corporations and what they hold and how the
18  Court has to value. Now how those get distributed and how those get classified is another, is a whole
19  nother kettle of fish that you're gonna have to fight about umm when you get to uhh, when you get to
20  equitable distribution. Okay.

21  MR. OLIVER: Uhh-hmm.

22  THE COURT: As to your other two (2) uhh points as to umm material breach and what not, I'll
23  chew on that, but I think y'all are gonna have to navigate around the Post-Nupt for right now. Umm but
24  I can tell you, you need to proceed forward on valuing the corporations. The corporations

25  MR. OLIVER: Uhh-hmm.

81 of 83

1   THE COURT: need to be joined and you need to reset your, your Motion for Interim Distribution.
2   Yes, Mr. Hankins.

3       MR. HANKINS: Being that I don't have a lawyer now and I can't get one to help me out in this
4   case, Your Honor. You know we may have equitable distribution come up. Is it too late for me to do
5   discovery myself? I have to do it myself.

6       THE COURT: All discovery in this case should be done, sir. Y'all been going on for two (2) years
7   and you've had a number of attorneys. I'm not pushing it out any further. Umm you know the local
8   rules say that it's a hundred and twenty (120) days. You get a hundred and twenty (120) days from the
9   last responsive pleading uhh to complete all your discovery. Umm that's stretched a bit sometimes in
10  family court umm due to either the complexity of the case or the agreement of the parties, but umm
11  we're not going through another round of discovery in here. Umm, when you go to value both of those
12  corporations if there needs to be some supplemental discovery issued the Court will give you a brief
13  schedule to issue supplementary discovery and do depositions if you need to. Umm I don't think, my
14  sense and my feeling is, is that y'all don't need to do that because the assets are held by both the
15  corporations. They're pretty straight forward umm and any liquid value or actual value of the
16  corporations is beyond goodwill and the property that they hold shouldn't be, it shouldn't be too
17  difficult to value these. Umm, which to me says there shouldn't be a lot more discovery that you need
18  to do to value the corporations. Now if there's any other arguments, rabbits you wanna chase down
19  holes that you think fit within the gamut of your Post-Nupt, you can do that, but I'm not giving you a
20  bunch of extra time to do it. Umm I, I don't think that particular valuation is, is very complication. Uhh I
21  haven't looked at your full EDIA's but I suspect that they're in line with a lot of other stuff when we get
22  to equitable distribution. Umm the Court has to classify the property. Was it separate? Was it marital?
23  Was it divisible? I've gotta value it for that particular point and then I have to distribute it. Umm so
24  anything that's, that goes to those particular three (3) things should already have been done in
25  discovery. The only outliers gonna be, since you've been here so long it's gonna be divisible property.
26  Umm we'll deal with that when we get to it, but there's not a whole lot more discovery that needs to be
27  done.

28      MR. HANKINS: I understand.

Heather H. Bath
AOC Approved Transcriptionist

---

82 of 83

1   THE COURT: Okay.

Heather H. Bath
AOC Approved Transcriptionist

---

83 of 83

1                    CERTIFICATION OF TRANSCRIPT

2       This is to certify that the foregoing transcript is of the Domestic Special Session held on
3   November 15, 2016 in Wake County and that it is a true and accurate transcript of the proceedings
4   transcribed by me.

5       I further certify that I am not related to any party or attorney, nor do I have any interest
6   whatsoever in the outcome of this action.

7       This the 30th day of October, 2017.

8

9   Heather Bath

10  HEATHER H. BATH

11  AOC Approved Transcriptionist

12  804 Kimberly Ann Lane

13  Shallotte, NC 28470

14  910-470-8972

15

16

Heather H. Bath
AOC Approved Transcriptionist

**ATTACHMENT to the EXHIBIT LIST/ Jennifer Smith Echols**

REF: JENNIFER SMITH ECHOLS, the color stickers if they appear in color , represent the same forged signature, if not Debtor intend on writing the color under the sticker to identify the color

The one with the sicker on the top, is the ones presented in Mr Brown's report.    E X 22

Concerning the **Consent Motion to Withdraw** and the **Consent Orders to withdraw** br Mrs Smith Echols are as follows:

1. I never signed one of Mrs Smith's consent Motions or the Consent Order to withdraw, I fired her because her words match her actions herein , basically i knew she was lying to me and setting me up .
2. The other Lawyers withdrew without my consent after being paid , I don't under why Jennifer Smith thought she needed it.
3. Mrs Smith forged name on
   (a) a consent motion to withdraw dated Dec 3rd, 2015 file # 14-CVD-8806
   (b) a consent motion to withdraw dated Dec 3rd, 2015 file # 15-CVD-7478
   (C) a consent Order to withdraw dated Dec 14th, 2015 file # 14- CVD-8806 gre
   ( d) a consent Order to withdraw dated Dec 18th, 2015 file # 14- CVD-8806 gre
   (e) a consent ORDER to withdraw dated Dec14th, 2015 file # 15-CVD-7478 blue
   (f) a consent ORDER to withdraw dated Dec 14th, 2015 file # 15-CVD-7476 blue intended same document as "e" but it's not a copy of "e" . It appear that she copied the same signature on the another  document , presenting two or more of the same forged document for Judges signature
   .(g) a consent ORDER to withdraw dated Dec 14th , 2015 file # 15-CVD-7476 blu

   ( h) motion to withdraw        dated March 30 , 2016        file # 14-CVD-8806
   (I) Order allowing consent Motion to withdraw   April 11, 2016 file # 14-CVD-8806

4. Pamela Reese's ( Judge Assistant , court case  coordinator ) , her email shows that she did not send me the Order that was signed ( Scheduling of the ED set for Sept 13th, 2016 ). Not only did Mrs Reese not send me the Orders , I did not receive any notice of the hearing held Dec 2, 2015. Additional Mrs Reese as I did bring to the attention of Chief Judge Rader, Mrs Reese refuse to schedule my motion. A Lic Gen Contractor for 20+ years and their excuse as outlined in the Gatekeeper Order would imply that I can not fill out a notice of hearing and a calendar request. ( title 18 USC 241-242 the Color of Law and the Color of Office .

Timothy Omar Hankins Sr _Timothy O. Hankins Sr._ , this the 29th day of January , 2019

---

EX 22

SARDIA HANKINS,                      )
        Plaintiff,                   )
                                     )
v.                                   )   CONSENT MOTION TO WITHDRAW
                                     )   AS COUNSEL
TIMOTHY HANKINS, SR.,                )
        Defendant.                   )

**NOW COMES,** Jennifer R. Smith and The Doyle Law Group, P.A. and respectfully moves the court pursuant to Rule 1.16 of the North Carolina Revised Rules of Professional Conduct that she and the law firm of The Doyle Law Group, P.A. be allowed to withdraw as counsel for Defendant Timothy Hankins, Sr. in this action, whereas Defendant consents as evidenced by his signature below, and whereas the Wake County Local Rules provide that withdrawal of counsel within two weeks before a scheduled hearing shall not be the sole grounds of a continuance.

This the _3ed_ day of December, 2015.

[EXHIBIT 22 sticker]

THE DOYLE LAW GROUP, P.A.

Jennifer R. Smith
9051 Strickland Road, Suite 121
Raleigh, NC 27615
Telephone: (919) 301-8843
Attorney for Defendant

CONSENTED TO:

_Timothy Hankins Sr._
TIMOTHY HANKINS, SR.
Defendant

---

SARDIA MARIE PORTER-HANKINS,    )
        Plaintiff,              )
                               )
v.                             )   CONSENT MOTION TO
                               )   WITHDRAW AS COUNSEL
TIMOTHY OMAR HANKINS, SR.      )
        Defendant.             )

**NOW COMES,** JENNIFER R. SMITH, and respectfully moves the court pursuant to Rule 1.16 of the North Carolina Revised Rules of Professional Conduct that she and the law firm of The Doyle Law Group, P.A. be allowed to withdraw as counsel for Defendant Timothy Omar Hankins, Sr., in this action in regard to any prospective litigation beyond entry of the outstanding Order resulting from the hearing held in August of 2015, whereas Defendant consents as evidenced by his signature below, and whereas the law firm of The Doyle Law Group, P.A. wish to withdrawal of counsel within two weeks before a scheduled hearing shall not be the sole grounds of a continuance. Jennifer R. Smith and the law firm of The Doyle Law Group, P.A. wish to remain attorneys of record for Defendant Timothy Omar Hankins, Sr., for the limited purpose of entering the outstanding Order resulting from the August 2015 hearing, but wish to be allowed to withdraw as counsel for any prospective litigation in this action.

This _3ed_ day of _December_ , 2015.     THE DOYLE LAW GROUP, P.A.

Jennifer R. Smith
NC Bar No. 31425
9051 Strickland Road, Suite 121
Raleigh, NC 27615
Telephone: (919) 301-8843

CONSENTED TO:

_Timothy Omar Hankins Sr_
TIMOTHY OMAR HANKINS, SR.
Defendant

---

SARDIA MARIE PORTER-HANKINS,    )
        Plaintiff,              )
                               )
v.                             )   ORDER ALLOWING
                               )   CONSENT MOTION TO
TIMOTHY OMAR HANKINS, SR.,     )   WITHDRAW AS COUNSEL
        Defendant.             )

**THIS CAUSE** coming on to be heard before the undersigned Judge Presiding at Wake County District Court upon the Motion of Jennifer R. Smith that she and the law firm of The Doyle Law Group, P.A. be allowed by the Court to withdraw as counsel of record for Defendant Timothy Omar Hankins, Sr., and it appearing to the Court that said Motion is made with good cause shown and should be allowed;

**IT IS, THEREFORE, ORDERED** that Jennifer R. Smith and the law firm of The Doyle Law Group, P.A. are allowed to withdraw as counsel of record for Defendant Timothy Omar Hankins, Sr., in this action, and are relieved of all further duties herein with the exception of any duties related to entering the outstanding Order resulting from the hearing held in August 2015.

This _14th_ day of _Dec_ , 20 _15_ .

District Judge Presiding

I CONSENT:

_Timothy Omar Hankins_
TIMOTHY OMAR HANKINS, SR.
Defendant

Green

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
FILE NO. 14 CVD 8806

SARDIA MARIE PORTER-HANKINS,
    Plaintiff,

v.

TIMOTHY OMAR HANKINS, SR.,
    Defendant.

ORDER ALLOWING
CONSENT MOTION TO
WITHDRAW AS COUNSEL

THIS CAUSE coming on to be heard before the undersigned Judge Presiding at Wake County District Court upon the Motion of Jennifer R. Smith that she and the law firm of The Doyle Law Group, P.A. be allowed by the Court to withdraw as counsel of record for Defendant Timothy Omar Hankins, Sr., and it appearing to the Court that said Motion is made with good cause shown and should be allowed;

IT IS, THEREFORE, ORDERED that Jennifer R. Smith and the law firm of The Doyle Law Group, P.A. are allowed to withdraw as counsel of record for Defendant Timothy Omar Hankins, Sr., in this action, and are relieved of all further duties herein with the exception of any duties related to entering the outstanding Order resulting from the hearing held in August 2015.

This 18th day of DEC, 2015.

District Judge Presiding

I CONSENT:

TIMOTHY OMAR HANKINS, SR.
Defendant

*SAme As other Green Different Doc.*

---

NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
FILE NO. 15 CVD 7476

SARDIA HANKINS,
    Plaintiff,

v.

TIMOTHY HANKINS, SR.,
    Defendant.

CONSENT ORDER ALLOWING
MOTION TO WITHDRAW AS COUNSEL

THIS CAUSE coming on to be heard before the undersigned Judge Presiding at Wake County District Court upon the Motion of Jennifer R. Smith that she and the law firm of The Doyle Law Group, P.A. be allowed by the Court to withdraw as counsel of record for Defendant, and it appearing to the Court that Defendant consents, as evidenced by his signature below, good cause for this motion is shown and it should be allowed;

IT IS, THEREFORE, ORDERED that Jennifer R. Smith and the law firm of The Doyle Law Group, P.A. are allowed to withdraw as counsel of record for Defendant in this action, and are relieved of all further duties herein.

THIS the 14th day of DKC, 20 K.

District Judge Presiding

I CONSENT:

TIMOTHY HANKINS, SR.
Defendant

*SAme As other Blue Different Doc.*

---

NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
FILE NO. 15 CVD 7476

SARDIA HANKINS,
    Plaintiff,

v.

TIMOTHY HANKINS, SR.,
    Defendant.

CONSENT ORDER ALLOWING
MOTION TO WITHDRAW AS COUNSEL

THIS CAUSE coming on to be heard before the undersigned Judge Presiding at Wake County District Court upon the Motion of Jennifer R. Smith that she and the law firm of The Doyle Law Group, P.A. be allowed by the Court to withdraw as counsel of record for Defendant, and it appearing to the Court that Defendant consents, as evidenced by his signature below, good cause for this motion is shown and it should be allowed;

IT IS, THEREFORE, ORDERED that Jennifer R. Smith and the law firm of The Doyle Law Group, P.A. are allowed to withdraw as counsel of record for Defendant in this action, and are relieved of all further duties herein.

THIS the 14th day of DKC, 20 K.

District Judge Presiding

I CONSENT:

TIMOTHY HANKINS, SR.
Defendant



*Blue*

---

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
FILE NO. 14 CVD 8806

SARDIA MARIE PORTER-HANKINS,
    Plaintiff,

v.

TIMOTHY OMAR HANKINS, SR.,
    Defendant.

MOTION TO
WITHDRAW AS COUNSEL

NOW COMES, JENNIFER R. SMITH, and respectfully moves the court pursuant to Rule 1.16(b)(7) of the North Carolina Revised Rules of Professional Conduct that she and the law firm of The Doyle Law Group, P.A. be allowed to withdraw as counsel for Defendant Timothy Omar Hankins, Sr., in this action as professional considerations require termination of the representation. It is noted that the Wake County Local Rules provide that withdrawal of counsel within two weeks before a scheduled hearing shall not be the sole grounds of a continuance.

This 30th day of March, 2016.    THE DOYLE LAW GROUP, P.A.

Jennifer R. Smith
NC Bar No. 31623
9051 Strickland Road, Suite 121
Raleigh, NC 27615
Telephone: (919) 301-8843

STATE OF NORTH CAROLINA ~~FILED~~

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
FILE NO. 14 CVD 8806

WAKE COUNTY          2016 APR 11   A 9 25

SARDIA MARIE PORTER-HANKINS, C.S.C.,
        Plaintiff,

        v.

TIMOTHY OMAR HANKINS, SR.,
        Defendant.

ORDER ALLOWING
CONSENT MOTION TO
WITHDRAW AS COUNSEL

THIS CAUSE coming on to be heard before the undersigned Judge Presiding at Wake
County District Court upon the Motion of Jennifer R. Smith that she and the law firm of The
Doyle Law Group, P.A. be allowed by the Court to withdraw as counsel of record for Defendant
Timothy Omar Hankins, Sr., and it appearing to the Court that said Motion is made with good
cause shown and should be allowed;

IT IS, THEREFORE, ORDERED that Jennifer R. Smith and the law firm of The Doyle
Law Group, P.A. are allowed to withdraw as counsel of record for Defendant Timothy Omar
Hankins, Sr., in this action, and are relieved of all further duties herein.

This _11_ day of _APR_ , 20_16_.

_____
District Judge Presiding

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County
BY: _____
Assistant County Clerk Superior Court
Lee  4/11/16

---

NORTH CAROLINA   FILED

IN THE GENERAL COURT OF JUSTICE

COUNTY OF WAKE          2016 AUG 26  P 1: 25
                    WAKE COUNTY, C.S.C.

DISTRICT COURT DIVISION

FILE NO. 14CVD8806

SARDIA MARIE PORTER-HANKINS
        BY _____
        Plaintiff

NOTICE of UNAUTHORIZED SIGNATURE

        v.

TIMOTHY OMAR HANKINS SR
        Defendant

Mailed to: The Doyle Law Group, Jennifer Smith Echols
        9051 STRICKLAND RD, STE. 121
        RALEIGH NC 27615

NOW COMES the undersign, Timothy Omar Hankins Sr give notice that Jennifer R Smith without my
authorization did use my signature to the CONSENT MOTION TO WITHDRAW AS COUNSEL dated
December 3, 2015 and the ORDER ALLOWING CONSENT MOTION TO WITHDREW AS COUNSEL dated
December 18, 2016. Jennifer Smith may have gathered my signature before December1, 2015 and used
it other than the purpose intended. I have not seen Jennifer since she was fired her in November 2016

This _26_ DAY OF AUGUST 2016

By: Timothy Omar Hankins Sr.  _Timothy O Hankins Sr_

CERTIFICATE OF SERVICE

The undersigned hereby certified that a copy of this the NOTICE OF UNAUTHORIZED SIGNATURE herein
was served by first class mail on the _26_ of AUGUST, 2016

---

I will get that to you ASAP!!

Pam

Pamela Reese

FCCC for Hon. Judge Michael Denning

316 Fayetteville St.

Raleigh, NC 27601

Office 919-792-4885

From: Timothy Hankins [mrhrtimothyhankins1000@yahoo.com]
Sent: Saturday, April 16, 2016 7:06 PM
To: Reese, Pamela D. <Pamela.D.Reese@nccourts.org>
Subject: RE: Resend it please

Hi Pamela

Please let me know what and if anything else is scheduled . I know about September 29th , the DMPO. I
have dismissed Kathleen Murphy and Chad Axford and someone out the Benson office is going to finish this
out for me. I um so so sorry for all the confusion

Sent from Yahoo Mail on Android

On Tue, Mar 22, 2016 at 1:46 PM, Reese, Pamela D.

<Pamela.D.Reese@nccourts.org> wrote:

    I didn't send you a copy of the order. I will have to get it from the clerk's office. I will try to get it to by
    end of day if not first thing in the morning.

    pam